**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE HOLDINGS, | ) | Case No. 07-11047 (CSS) |
| INC., a Delaware corporation, *et al.*, | ) | |
| | ) | |
| Debtors, | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| DB STRUCTURED PRODUCTS, INC., | ) | C.A. No. 07-00773 (JJF) |
| | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HOME MORTGAGE HOLDINGS, | ) | |
| INC., a Delaware Corporation, *et al.*, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

## OPENING BRIEF OF APPELLANT DB STRUCTURED PRODUCTS, INC.

| | |
|---|---|
| **BINGHAM McCUTCHEN LLP** | **ASHBY & GEDDES, P.A.** |
| Steven Wilamowsky | William P. Bowden (#2553) |
| 399 Park Avenue | Amanda M. Winfree (#4615) |
| New York, NY 10022 | 500 Delaware Avenue, 8th Floor |
| (212) 705-7000 | P.O. Box 1150 |
| | Wilmington, DE 19899 |
| Andrew J. Gallo | (302) 654-1888 |
| 150 Federal Street | |
| Boston, MA 02110 | |
| (617) 951-8117 | |

*Attorneys for Appellant DB Structured Products, Inc.*

Dated: May 7, 2008

## TABLE OF CONTENTS

TABLE OF CITATIONS..........................................................................................ii

INTRODUCTION.................................................................................................1

NATURE AND STAGE OF PROCEEDINGS...................................................1

SUMMARY OF ARGUMENT............................................................................3

STATEMENT OF FACTS...................................................................................4

    A.    The MLPSA............................................................................4

    B.    The Sale Motion....................................................................6

    C.    The Ruling.............................................................................7

    D.    The DPSP Appeal.................................................................8

ARGUMENT.......................................................................................................9

    A.    Standard of Review..............................................................9

    B.    The Bankruptcy Court Incorrectly Concluded that the
        Servicing Obligations Are Severable from the MLPSA.......................................10

    C.    The Bankruptcy Court Incorrectly Concluded that the
        Servicing Obligations Are Severable from the MLPSA.......................................16

    D.    The Court's Ruling Is Contrary to the Third Circuit's
        Recent Decision in *Fleming*...............................................21

CONCLUSION....................................................................................................22

## TABLE OF CITATIONS

<u>Cases</u>

<u>A & J Enterprise Solutions, Inc. v. Business Applications Outsourcing Technologies, Inc.</u>,
    812 N.Y.S.2d 226 (N.Y.Dist.Ct., 2nd Dist. 2005)......................................17, 20

<u>Am. Flint Glass Workers Union v. Anchor Resolution Corp.</u>,
    197 F.3d 76 (3d Cir. 1999)......................................................................9

<u>Bailey v. Fish & Neave</u>,
    8 N.Y.3d 523 (2007)............................................................................16

<u>Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.</u>,
    502 F.3d 91 (2d Cir. 2007)....................................................................12

<u>Folger Adam Sec. Inc. v. DeMatteis/MacGregor, JV</u>,
    209 F.3d 252 (3d Cir. 2000)...........................................................11, 13, 15

<u>Greenfield v. Philles Records, Inc.</u>,
    98 N.Y.2d 562 (2002)...........................................................................16

<u>Grochocinski v. Crossman (In re Crossman)</u>,
    259 B.R. 301 (Bankr. N.D. Ill. 2001).......................................................12

<u>In re Convenience USA, Inc.</u>,
    2002 WL 230772 (Bankr. M.D. N.C. Feb. 12, 2002).....................................15

<u>In re Fleming Companies, Inc.</u>,
    499 F.3d 300 (3d Cir. 2007)...............................................................21, 22

<u>In re Foamex Intern., Inc.</u>,
    382 B.R. 867 (D. Del. 2008)....................................................................9

<u>In re Gardinier, Inc.</u>,
    831 F.2d 974 (11th Cir. 1987)..........................................................16, 18, 19

<u>In re Kopel</u>,
    232 B.R. 57 (Bankr. E.D.N.Y. 1999).......................................................20

<u>In re Joshua Slocum Ltd.</u>,
    922 F.2d 1081 (3d Cir. 1990)...................................................................21

<u>In re Paul</u>,
    355 B.R. 64 (Bankr. N.D. Ill. 2001).........................................................12

In re Telegroup,
    281 F.3d 133 (3d Cir. 2002)..................................................................................9

In re Wheeling-Pittsburgh Steel Corp.,
    54 B.R. 772 (Bankr. W.D. Pa. 1985)..................................................................15

Integrated Solutions, Inc. v. Service Support Specialties, Inc.,
    124 F.3d 487 (3d Cir. 1997)..........................................................................3, 12, 14

Kopel v. Campanile (In re Kopel),
    232 B.R. 57 (Bankr. E.D.N.Y. 1999)..................................................................15

Matter of the Estate of Wilson,
    50 N.Y.2d 59 (N.Y. App. Div. 1980)..................................................................17

Mellon Bank, N.A. v. Metro Communications, Inc.,
    945 F.2d 635 (3d Cir. 1991)..................................................................................9

Schmidt v. Magnetic Head Corp.,
    97 A.D.2d 151 (N.Y. App. Div. 1983)..................................................................16

The Shaw Group, Inc. v. Bechtel Jacobs Company, LLC,
    350 B.R. 166 (Bankr. D. Del. 2006)........................................8, 11, 13, 15, 17

United Air Lines, Inc. v. U.S. Bank Trust, National Association (In re UAL Corp.),
    346 B.R. 456 (Bankr. N.D. Ill. 2006)..................................................14, 15

Universal Minerals, Inc. v. C.A. Hughes & Co.,
    669 F.2d 98 (3d Cir. 1981)..................................................................................9

U.S. v. U.S. Gypsum Co.,
    333 U.S. 364 (1948)..........................................................................................9

**Statutes**

11 U.S.C. § 363..............................................................7, 10, 11, 13, 15, 17

11 U.S.C. § 363(b)(1)..........................................................................................12

11 U.S.C. § 363(l)..............................................................................................14

11 U.S.C. § 365..............................................................7, 10, 13, 15, 17

11 U.S.C. § 365(b)(2)..........................................................................................14

11 U.S.C. § 365(f).................................................................................................11, 21

11 U.S.C. § 365(f)(3).........................................................................................4, 13, 14

## INTRODUCTION

This appeal arises out of the motion (the "Sale Motion")[1] of the debtors in possession in the above-captioned cases (the "Debtors") to sell their mortgage loan servicing business to an affiliate of WL Ross & Co. (the "Buyer"). (See A82 (D.I. 12)). Pursuant to its agreement with the Debtors, the Buyer agreed to purchase, among other things, servicing rights associated with loans owned by Appellant DB Structured Products, Inc. ("DBSP"), without assuming material obligations related to those same servicing rights, to the detriment of DBSP.

## NATURE AND STAGE OF PROCEEDINGS

On August 6, 2007 (the "Petition Date"), American Home Mortgage Corp. (the "Seller"), American Home Mortgage Servicing, Inc. (the "Servicer" and, collectively with the Seller, the "Contracting Debtors"), and the other Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), thereby commencing the above-captioned cases (the "Cases").

Both of the Contracting Debtors are parties to a Master Loan Purchase and Servicing Agreement (the "MLPSA"), dated as of May 1, 2006, under which DBSP purchased mortgage loans from the Contracting Debtors. (See A296-422.) The MLPSA is for "servicing retained" sales, pursuant to which the Seller agreed to sell mortgage loans to DBSP and the Servicer agreed to subsequently service those same mortgage loans for DBSP's benefit in

---

[1] "A" followed by a number refers to a specific page of the Appendix, which is filed herewith. "D.I." refers to docket items in this case from the United States Bankruptcy Court for the District of Delaware.

1

exchange for the right to a "servicing fee."[2]  In addition to ongoing obligations to service the mortgage loans sold, the Contracting Debtors provided DBSP with various representations and warranties regarding the loans sold (including the obligation to repurchase bad loans) that survive the sale.  The MLPSA provides that both the Servicer and the Seller are responsible for these ongoing representations and warranties.

On August 6, 2007, the Debtors filed the Sale Motion, requesting approval of the sale of substantially all of the Debtors' assets relating to its loan servicing business, including only those portions of the MLPSA that allow the Debtors to service the mortgage loans sold to DBSP (the "Sale"), thereby leaving behind the ongoing representations and warranties contained in the contract.  The Sale Motion was later supplemented and amended to reflect that the Debtors had agreed to a stalking horse asset purchase agreement (the "APA") with the Buyer.  (D.I. 865, 937).  After an unsuccessful attempt at an auction, the Debtors sought approval of the Sale to the Buyer pursuant to the APA.  DBSP objected to the Sale (the "DBSP Objection") (See A83-295 (D.I. 675, 1108, and 1533)).

The Bankruptcy Court held a hearing on the Sale Motion (the "Sale Hearing") that spanned five days during which it heard the testimony of seven witnesses and extensive oral argument.  DBSP actively participated in the Sale Hearing.  Following the conclusion of the Sale Hearing, the Bankruptcy Court issued an oral ruling at an October 23, 2007 hearing.  (See A2117-2152 (D.I. 1664)).  Further to the Bankruptcy Court's ruling, an order approving the Sale (the "Sale Order") was entered by the Bankruptcy Court on October 30, 2007.  (See A2153-2693 (D.I. 1711)).  On the same day, DBSP filed an emergency motion for a stay pending appeal of

---

[2] Loan servicing refers to the tasks that must be performed in order to protect a mortgage investment, including, among other things, collecting and properly applying monthly payments from borrowers, and dealing with delinquencies.

2

the Sale Order (the "Motion for Stay").  (A2694-2719 (D.I. 1713)).  Rather than challenge the

Motion for Stay, the Debtors modified the APA so that the servicing portions of the MLPSA

would not be transferred to the Buyer pending DBSP's appeal of the Sale Order.  (See A2720-

2727 (D.I. 1986)).  In light of this modification, DBSP withdrew the Motion for Stay as moot.

(See A2728 (D.I.1830)).

        Also on November 6, 2007, DPSP filed its Notice of Appeal with respect to the

Sale Order.  (See A2729-3271 (D.I. 1799)).  Pursuant to a standing order of this Court, the matter

was referred to mediation.  A mediation session between the parties commenced on February 27,

2008, but was unsuccessful.  On April 17, 2007, the mediator filed a Notice of Completion of

Mediation with this Court.  On April 23, 2007, this Court entered an order (the "Scheduling

Order") establishing a briefing schedule for the instant matter.  This brief is filed with the Court

in accordance with the Scheduling Order and in support of DBSP's appeal.

## SUMMARY OF ARGUMENT

        The Bankruptcy Court's ruling was incorrect as a matter of law.  First, the

Bankruptcy Court permitted the servicing portion of the contract to be assigned to the Buyer

even though the contract contains an unambiguous anti-assignment provision.  This was an error

of law, because the Bankruptcy Court also found that the MLPSA is not executory, a conclusion

that the Debtors strenuously advocated and a position that DBSP never challenged.  While

section 365(f)(3) of the Bankruptcy Code invalidates anti-assignment provisions in *executory*

contracts, there is no similar provision in section 363 with respect to *non-executory* contracts.  In

fact, the Third Circuit Court of Appeals has expressly rejected the notion that anti-assignment

rights can be invalidated in relation to transfers of property pursuant to section 363.  See

Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487, 493 (3d Cir. 1997).

3

Second, in ruling that the servicing provisions of the MLPSA can be severed from the rest of the contract sold by the Debtors, the Court invalidated certain provisions that inexorably link the sales and servicing portions of the contract by finding that these provisions were "unenforceable cross-default provisions." (A2143 (D.I. 1664)). But there is nothing in the Bankruptcy Code that renders cross-default provisions unenforceable *per se*. The rule invalidating cross-default provisions in *executory* contracts is derivative of section 365(f)(3) and is only applied because cross-default provisions are considered to be *de facto* anti-assignment provisions. As noted above, the Bankruptcy Court ruled that the MLPSA is not an executory contract; accordingly, there is no basis to invalidate any anti-assignment provisions of the MLPSA, *de facto* or otherwise.

Finally, the Bankruptcy Court's finding that the MLPSA is severable is inconsistent with the unambiguous terms of the MLPSA, including the "cross-default" provisions that the Bankruptcy Court improperly refused to consider. Accordingly, the Bankruptcy Court's ruling should be reversed and the Sale Order, at least with respect to DBSP, should be vacated.

## STATEMENT OF THE FACTS

### A.     The MLPSA

Both of the Contracting Debtors are parties to the MLPSA with DBSP, dated as of May 1, 2006, pursuant to which DBSP purchased mortgage loans from the Contracting Debtors. (A296-422). The MLPSA is for "servicing retained" sales, pursuant to which the Seller agreed to sell mortgage loans to DBSP and the Servicer agreed to subsequently service those same mortgage loans for DBSP's benefit in exchange for the right to a "Servicing Fee."[3] The MLPSA

---

[3] This, as opposed to a "servicing released" sale, pursuant to which the seller transfers the loans and does not continue as servicer.

4

provides that DBSP can terminate the Servicer as servicer of its mortgage loans if the Servicer defaults on any obligations of *either of* the Contracting Debtors under the MLPSA. (A355-356 (MLPSA § 14.01)).

The MLPSA further provides that the Contracting Debtors are obligated to repurchase mortgage loans, or to otherwise pay amounts to DBSP, if certain representations and warranties made by the Seller with respect to the mortgage loans sold to DBSP are breached. Specifically, these obligations include the following: (a) pursuant to Section 7.06 of the MLPSA, if any borrower fails to make the first, second or third scheduled monthly payment on a loan sold to DBSP, DBSP has the right to request that the Contracting Debtors repurchase the loan (claims pursuant to this section of the MLPSA are known as early payment default or "EPD" claims) (see A336-337); and (b) pursuant to Section 7.05 of the MLPSA, if any borrower prepays his or her mortgage loan in full within a specified time period, the Contracting Debtors are obligated to pay an amount to DBSP (calculated pursuant to the formula contained in section 7.05 of the MLPSA) as compensation for the loss of interest caused by the early payment (claims pursuant to this section of the MLPSA are known as "Premium Recapture" claims) (see A336). DBSP is owed approximately $19 million for EPD and Premium Recapture claims pursuant to the MLPSA.

The MLPSA restricts the Contracting Debtors' right to transfer servicing rights to a third party. Consistent therewith, the MLPSA contains the so-called "anti-assignment" provisions providing that it is an event of default that entitles DBSP to terminate the Servicer under the MLPSA if servicing is transferred without DBSP's consent. (See A354-356 (MLPSA §§ 13.04, 13.05 and 14.01(vii)). Additionally, it is an event of default that entitles DBSP to terminate the Servicer if the Servicer "ceases to meet the qualifications of *either* a FNMA

[Fannie Mae] *or* a FHLMC [Freddie Mac] servicer." (A356 (MLPSA § 14.01(vi))) (emphasis added).

Three other provisions of the MLPSA are of primary importance when considering the Bankruptcy Court's ruling that the MLPSA is severable into two separate and distinct contracts:

> ***The Indemnity Provision*** - Section 13.01 of the MLPSA (the "Indemnity Provision") provides, in pertinent part, that the Servicer is to indemnify and hold DBSP harmless for "any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the ***Seller*** to perform its obligations under this Agreement . . . ." (A353) (emphasis added).

> ***The Payment Default Provision*** - Section 14.01(i) of the MLPSA (the "Payment Default Provision") provides that it shall be an event of default by the Servicer that, if not cured, would entitle DBSP to terminate the Servicer if the Servicer should fail "to remit to the Purchaser ***any payment*** required to be made under the terms of this Agreement . . . ." (A355) (emphasis added).

> ***The Waterfall Provisions*** - Sections 11.09(ii) & (vi) of the MLPSA's Exhibit 8 "Servicing Addendum" (the "Waterfall Provisions") provide that the Servicer cannot be reimbursed for certain advances the Servicer is required to make on the mortgage loans until certain repurchase obligations relating to sale representations and warranties are satisfied. (A389-390).

**B.    The Sale Motion**

On August 6, 2007, the Debtors filed the Sale Motion requesting approval of the sale of substantially all of the Debtors' assets relating to its loan servicing business, including only those portions of the MLPSA that relate to the servicing of the mortgage loans sold to DBSP. The Sale Motion was later supplemented and amended to reflect that the Debtors had agreed to the terms of the APA with the Buyer.

Pursuant to the APA, the Buyer agreed to purchase only a portion of the MLPSA – the Debtors' rights and obligations relating to the specific task of servicing mortgage loans – and left behind with the Debtors' bankruptcy estates any ongoing representations and warranties

6

that the Debtors termed as relating to the sale of mortgage loans, including any EPD or Premium Recapture claims. Additionally, the Debtors sought a ruling that EPD or Premium Recapture claims did not have to be cured prior to the sale of servicing rights under the MLPSA. Accordingly, as part of the Sale Motion, the Debtors requested a finding that to the extent any rights and obligations relating to the servicing of mortgage loans were contained in a contract with ongoing representations and warranties that related back to the sale of those loans, the servicing portion of the agreement was a separate and distinct contract that could be severed and sold on its own.

C.    **The Ruling**

DBSP actively participated in the Sale Hearing, following which, on October 23, 2007, the Bankruptcy Court issued an oral ruling (the "Ruling"). (A2117-2152 (D.I. 1664)). For purposes of DBSP's Appeal, the following are the key aspects of the Ruling:

- The MLPSA is not executory and, therefore, Bankruptcy Code section 363, and not 365, is applicable to the Debtors' sale of the servicing provisions of the MLPSA. (A2125-2126 (Oct. 23, 2007 Hrg. Transcript at 9-10).

- The Debtors must transfer all of their rights and obligations under the servicing provisions of the MLPSA pursuant to section 363. Section 363 does not allow the Debtor to transfer "less than the entire bundle of rights and obligations under the servicing contracts." (A2126-2127 (Oct. 23, 2007 Hrg. Transcript at 10-11)).

- The Indemnity Provision and the Waterfall Provisions in the MLPSA are clear and unambiguous and provide: (a) that the Servicer is liable for all amounts owed by the Seller under the MLPSA; and (b) that the Servicer cannot be reimbursed for certain advances absent the payment of certain repurchase obligations under the MLPSA. (A2138-2139 (Oct. 23, 2007 Hrg. Transcript at 22-23)).

- Notwithstanding the Indemnity Provision and the Waterfall Provisions, the MLPSA is severable into two distinct contracts – a contract for the sale of mortgage loans and a contract for the servicing of mortgage loans. (A2139-2140 (Oct. 23, 2007 Hrg. Transcript at 23-24)).

- The Indemnity Provision and the Waterfall Provisions are not sufficient on their own to make the sale and servicing agreements contained within the MLPSA interrelated because, pursuant to the <u>Shaw Group</u> decision (discussed below), these are cross-default provisions that are unenforceable pursuant to Section 365(f)(3) of the Bankruptcy Code. (A2140-2143 (Oct. 23, 2007 Hrg. Transcript at 24-27)).

- Because the servicing portion of the MLPSA is severable from the sale portion of the agreement, the Debtors can sell the servicing portion of the MLPSA to the Buyer without curing any outstanding EPD or Premium Recapture claims under the MLPSA. (A2133-2134, A2145 (Oct. 23, 2007 Hrg. Transcript at 17-18, 29)).

On October 30, 2007, the Bankruptcy Court entered the Sale Order, which approved the Sale in furtherance of the Ruling. (A2153-2693 (D.I. 1711)). The APA contemplated that there would be two "closings" relating to the Sale. First, after the Sale Order was entered, there was an "economic close" pursuant to which the Buyer paid the Debtors the compensation due under the APA and assumed both the risks and benefits of the servicing business going forward. Second, the APA contemplated a "legal close" that would occur no later than September 30, 2008, at which time the Debtors would actually transfer the servicing rights purchased to the Buyer. Two closings were necessary because the Buyer was not a licensed servicer of mortgage loans and needed the time between the closings to gain the regulatory approvals and licenses necessary to assume the Debtors' servicing obligations.[4]

D.    **The DBSP Appeal**

DBSP appealed the Sale Order. On October 30, 2007, DBSP filed the emergency Motion for Stay. In order to moot the Motion for Stay, the Debtors filed and the Bankruptcy Court approved an amendment to the APA (the "<u>Second Amendment</u>"), placing the MLPSA on Schedule 1.1(l) of the APA as a Disputed Servicing Agreement which would not be assumed and

---

[4] Upon information and belief, the "legal closing" occurred on April 11, 2008.

8

assigned pending the outcome of DBSP's appeal. (A2720-2727 (D.I. 1986)). Accordingly, while the Debtors continue to service DBSP's loans pursuant to the MLPSA, the MLPSA is currently in limbo pending this appeal – the Debtors cannot yet transfer its servicing rights to the Buyer, but the Debtors have not committed to returning those servicing rights to DBSP.

## ARGUMENT

### A.    Standard of Review

In undertaking a review of the issues on appeal, a federal district court applies a clearly erroneous standard to the bankruptcy court's findings of fact. Conclusions of law are subject to *de novo* review. See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." U.S. v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercises 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)). "The appellate responsibilities of the Court are further understood by the jurisdiction exercised by the Third Circuit, which focuses and reviews the Bankruptcy Court decision on a de novo basis in the first instance." In re Foamex Intern., Inc., 382 B.R. 867, 869 (D. Del. 2008) (citing In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002)).

9

**B.    The Servicing Portions of the MLPSA Cannot Be Transferred Pursuant to Section 363 in Light of the Anti-Assignment Provisions and Other Restrictions Contained in the MLPSA.**

Assuming, *arguendo*, that the Bankruptcy Court correctly concluded that the MLPSA is severable and that the servicing portion thereof is a separate and distinct non-executory contract (the "Servicing Contract"), it was an error for the Bankruptcy Court to conclude that the Servicing Contract could be transferred by the Debtors pursuant to section 363 of the Bankruptcy Code notwithstanding Section 13.05 of the MLPSA, which requires the consent of DBSP prior to a transfer of servicing rights. Additionally, there is no authority to support the Bankruptcy Court's decision to invalidate, as impermissible "cross-default provisions," the Indemnity Provision, Waterfall Provisions, and the requirement of Section 14.01(vi) of the MLPSA that the new servicer be Freddie Mac qualified, where the Servicing Contract is being transferred pursuant to section 363, and not assumed and assigned pursuant to section 365.

The Debtors contended at trial, and the Bankruptcy Court agreed in its decision, that the MLPSA is not an executory contract within the meaning of section 365 of the Bankruptcy Code. As the Bankruptcy Court ruled, "the testimony of Mr. Love and Mr. Aronoff [two of Debtors' witnesses] established that the servicing portion of those [loan sale and servicing] contracts contain no material obligations on behalf of the owner of the mortgage, that if breached would be sufficient to excuse the performance of the servicer. Specifically, the servicer's right of payment of its servicing fees and other fees is not an obligation of the mortgagee.... Thus, the contracts are *not executory.*" (A2126 (Oct. 23, 2007 Hrg. Transcript at 10:14-15)) (emphasis added). Because the MLPSA is not executory, the Bankruptcy Court found that section 365 of the Bankruptcy Code does not apply, and that the Debtors' rights under the MLPSA had to be transferred to the Buyer pursuant to section 363.

10

As the Bankruptcy Court itself stated in its decision, pursuant to section 363 the Debtors must transfer "all of their rights and obligations under the servicing contracts to the buyer." (A2128 (Oct. 23, 2007 Hrg. Transcript at 10)). This portion of the Ruling is consistent with the Third Circuit's decision in Folger Adam, in which the Third Circuit held that the assignment of a debtor's rights under a non-executory contract is subject to all of the defenses that the counterparty to the contract has in relation to those rights. See Folger Adam Sec. Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 264 -65 (3d Cir. 2000). Accordingly, unless there is a specific provision in the Bankruptcy Code that preempts state law and allows the Bankruptcy Court to excise specific rights that DBSP has under the Servicing Contract, those rights are enforceable by DBSP in relation to any effort by the Debtors to transfer the Servicing Contract to a third party pursuant to section 363.

Where a contract is executory, and is being assumed and assigned pursuant to section 365 of the Bankruptcy Code, section 365(f) invalidates any anti-assignment provisions that would prevent such assumption and assignment by the debtor. Thus, section 365(f) expressly preempts state law contract rights and permits a debtor to assign the executory contract without the counterparty's consent. Courts have interpreted section 365(f) to invalidate not only anti-assignment clauses, but also de facto anti-assignment clauses, such as cross-default provisions in unrelated executory contracts. See The Shaw Group, Inc. v. Bechtel Jacobs Company, LLC, 350 B.R. 166, 180-81 (Bankr. D. Del. 2006). However, there is no equivalent to section 365(f) in section 363, which governs the sale of non-executory contracts. Accordingly, where a contract is not executory, as the Bankruptcy Court expressly found with respect to the Servicing Contract, there is no basis to invalidate anti-assignment, or de facto anti-assignment

11

provisions (*i.e.,* cross-default provisions) with respect to a transfer of that contract pursuant to section 363.

Indeed, the Third Circuit Court of Appeals already has held in <u>Integrated</u> that an *actual* (much less a *de facto*) assignment restriction remains enforceable in bankruptcy. In <u>Integrated</u>, a chapter 11 trustee attempted to sell certain tort claims to a third party that were not assignable under applicable non-bankruptcy law. <u>Integrated</u>, 124 F.3d at 490. In support of this effort, the buyer argued that section 363 should be interpreted to override transfer restrictions, because, it argued, "'the overriding purpose of the Bankruptcy Code is the expeditious and equitable distribution of the assets of the debtor's estate.'" <u>Id.</u> at 493. The Third Circuit rejected the buyer's argument, noting the absence of any suggestion in the statute or legislative history of 363 that "would even raise an inference that Congress intended to give the trustee such authority under such provisions." <u>Id.</u> The Third Circuit went on to say:

> The clear lack of Congressional intent to preempt state law restrictions on transferring property of the estate is even more telling given the explicit language that Congress uses when it intends to displace state non-bankruptcy law in other provisions of the Bankruptcy Code.

<u>Id.</u> See also <u>Grochocinski v. Crossman (In re Crossman)</u>, 259 B.R. 301, 306-08 (Bankr. N.D. Ill. 2001) (adopting <u>Integrated</u> reasoning and denying transfer of assets subject to statutory and contractual restrictions on assignment); <u>In re Paul</u>, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001) ("[S]ection 363(b)(1) merely allows a trustee to sell property if the debtor would have had the same right under state law."); <u>see</u> <u>also</u> <u>Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.</u>, 502 F.3d 91, 100 (2d Cir. 2007) ("[P]roperty in the bankrupt's estate is alienable *insofar as it would have been alienable outside the bankruptcy context*.") (citing <u>Integrated</u>) (emphasis added).

12

This reasoning was followed by Chief Bankruptcy Judge Walrath in <u>Shaw Group</u>, the decision that the Bankruptcy Court relied upon almost exclusively in overruling DBSP's objection to the Sale. In <u>Shaw Group</u>, Chief Judge Walrath considered whether certain provisions of various contracts assumed and assigned by the Debtor were enforceable against the assignee. Chief Judge Walrath analyzed the issue under both sections 363 and 365. While Chief Judge Walrath invalidated the provisions pursuant to section 365(f)(3) as impermissible cross-defaults and, therefore, *de facto* anti-assignment provisions (see <u>Shaw Group</u>, 350 B.R. at 179), she did not apply the same reasoning when considering the provisions under section 363. Because section 363 contains no analog to section 365(f)(3), anti-assignment provisions, and certainly *de facto* anti-assignment provisions, contained in contracts that are transferred pursuant to section 363 are enforceable to the extent that such provisions are enforceable under state law. As Chief Judge Walrath wrote, the sale of a contract pursuant to section 363 "could not eliminate" the parties' existing rights and defenses under the contract. <u>Id.</u> at 172-73 (citing <u>Folger Adam</u>, 209 F.3d at 264). Accordingly, when analyzing the contractual provisions before the court in <u>Shaw Group</u> under section 363, Chief Judge Walrath considered whether the provisions were enforceable under state law, but would not invalidate the provisions as *de facto* anti-assignment clauses. <u>See id.</u>

Thus, the MLPSA, which has been found to be non-executory, can only be transferred subject to and conditioned upon compliance with any "anti-assignment" provisions contained therein, whether *de facto* or *de jure.* Accordingly, it was clear error for the Bankruptcy Court to find that the Servicing Contract could be sold by the Debtors to the Buyer notwithstanding the fact that DBSP did not consent to the Sale pursuant to section 13.05 of the MLPSA (a *de jure* anti-assignment provision).

While the Bankruptcy Court's decision included no explanation as to why section 13.05 is unenforceable, the Bankruptcy Court apparently relied on section 363(l) of the Bankruptcy Code in support of its finding that DBSP's consent was not required. (See A2123-2144 (Oct. 23, 2007 Hrg. Transcript at 16, 28)). However, because section 363(l) deals solely with the invalidation of *ipso facto* clauses, it has no relevance where anti-assignment clauses are at issue. Indeed, the Third Circuit in Integrated, in support of its ruling *enforcing* the relevant assignment restriction in that case, cited section 363(l) as an example of a *different* type of contractual restriction that is *un*enforceable in bankruptcy due to specific Congressional preemption. Thus, not only did the Third Circuit expressly hold that the Bankruptcy Code does not authorize transfers of assets in contravention of applicable non-bankruptcy law, it also specifically, if implicitly, rejected any argument that section 363(l) somehow provides a basis for doing so. See Integrated, 124 F.3d at 493.[5]

Similarly, it was clear error for the Bankruptcy Court to rely upon the Shaw Group decision to find that the Indemnity and Waterfall Provisions are unenforceable cross-defaults. The court in Shaw Group based its finding that cross-default provisions are unenforceable on the theory that they are *de facto* anti-assignment provisions that are invalidated by section 365(f)(3). See Shaw Group, 350 B.R. at 179 ("[T]he Court concludes that the Offset Provision is a classic cross-default clause which is not enforceable under section 365(f)(3).") (citing United Air Lines, Inc. v. U.S. Bank Trust, National Association (In re UAL Corp.), 346

---

[5] The Integrated court's conclusion was necessarily correct: if a provision in the Bankruptcy Code rendering *ipso facto* clauses unenforceable could be read so broadly as to cover anti-assignment provisions as well, then section 365(f)(3) of the Bankruptcy Code, which overrides anti-assignment provisions in the context of *executory* contracts, would be rendered entirely redundant, given that section 365 contains its own *ipso facto* provision that corresponds to section 363(l). See 11 U.S.C. § 365(b)(2).

14

B.R. 456, 470 (Bankr. N.D. Ill. 2006)).[6] The portion of the Bankruptcy Court's ruling in this case that invalidates the Indemnity and Waterfall provisions acknowledges, by quoting the relevant provisions from Shaw Group, that section 365(f)(3) is the provision used to invalidate cross-default clauses. (A2142-2143 (Oct. 23, 2007 Hrg. Transcript at 26-27)). However, what the Ruling ignores is that 365(f)(3) is not applicable where, as here, the Servicing Contract is being sold pursuant to section 363. As noted above, Shaw Group supports DBSP's position because the Bankruptcy Court in that case stated that contracts transferred pursuant to section 363 remain subject to applicable defenses and obligations. Id. at 173 (citing Folger Adam, 209 F.3d at 263). Therefore, even if the Servicing Contract was severable from the rest of the MLPSA, it was an error for the Bankruptcy Court to approve the sale of the Servicing Contract to the Buyer without the Indemnity and Waterfall Provisions intact. Those obligations of the Servicer are part of the Servicing Contract and, accordingly, would have to be transferred as part of the Servicing Contract under section 363.

Finally, an integral part of the Servicing Contract (even assuming it is severable from the rest of the MLPSA) are the provisions that require the Servicer to meet the qualifications of both a Fannie Mae and a Freddie Mac servicer. (See A320, A356 (MLPSA §§ 7.02(v) & 14.01(vi)). While evidence was admitted at the Sale Hearing that the Buyer was engaging in efforts to become Fannie Mae qualified (and presumably, by now, it has done so),

---

[6] Other cases applying the so-called "cross-default" rule have done so only with respect to section 365. See, e.g., In re Convenience USA, Inc., 2002 WL 230772 (Bankr. M.D. N.C. Feb. 12, 2002) (cross default provisions do not integrate executory contracts); United Airlines, 346 B.R. at 468 (assumption of an executory contract "under § 365 is subject to a 'well-established' cross-default rule"); Kopel v. Campanile (In re Kopel), 232 B.R. 57, 64-65 (Bankr. E.D.N.Y. 1999) (enforcing cross-default provision in executory contract sought to be assumed under section 365); In re Wheeling-Pittsburgh Steel Corp., 54 B.R. 772, 778-79 (Bankr. W.D. Pa. 1985) (construing cross-default provisions in separate insurance policies; noting that not all cross-default provisions are unenforceable and distinguishing cross-default provisions in *non-executory* contracts).

the evidence also showed that no effort was made to become Freddie Mac qualified.  There was

no basis for the Bankruptcy Court to invalidate the Freddie Mac qualification requirements,

particularly for purposes of a sale of the Servicing Contract pursuant to section 363.

Accordingly, it was error for the Bankruptcy Court to approve the sale of the Servicing Contract

to the Buyer who, upon information and belief, is not Freddie Mac qualified, over DBSP's

objection.

> **C.    The Bankruptcy Court Incorrectly Concluded that the**
> **<u>Servicing Obligations Are Severable from the MLPSA.</u>**

The Bankruptcy Court specifically found that the Indemnity Provision and the

Waterfall Provisions in the MLPSA are clear and unambiguous and provide: (a) that the Servicer

is liable for all amounts owed by the Seller under the MLPSA; and (b) that the Servicer cannot

be reimbursed for certain servicing related advances absent the payment of certain repurchase

obligations.  (<u>See</u> A2139-2140 (Oct. 23, 2007 Hrg. Transcript at 23-24).  Nevertheless, the

Bankruptcy Court incorrectly used the "cross-default rule" – which presupposes the existence of

two separate agreements – to invalidate those provisions creating interrelated obligations and

linked consideration among the parties to the MLPSA.  Having invalidated those provisions, the

Bankruptcy Court then concluded that the MLPSA was severable into two separate agreements

because the obligations of the parties were not interrelated.  This reasoning is entirely circular

and contrary to applicable law.

Severability of contracts is determined by the intent of the parties.  <u>In re</u>

<u>Gardinier, Inc.</u>, 831 F.2d 974, 976 (11th Cir. 1987).  Where, as the Bankruptcy Court found with

respect to the MLPSA, an agreement is unambiguous, intent is determined as a matter of law by

reviewing the terms within the four corners of the agreement.  <u>Bailey v. Fish & Neave</u>, 8 N.Y.3d

523, 528 (2007) ("extrinsic evidence may not be considered unless the document itself is

ambiguous"); <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); <u>Schmidt v. Magnetic Head Corp.</u>, 97 A.D.2d 151, 157 (N.Y. App. Div. 1983) ("[W]here the intention of the parties is clearly and unambiguously set forth in the agreement itself effect must be given to the intent as indicated by the language used . . . . The express 'provisions establish the rights of the parties . . . .'") (citations omitted).[7]

   As an initial matter, the Bankruptcy Court incorrectly applied the so-called "cross-default rule" to invalidate the Indemnity and Waterfall provisions of the Agreement. As discussed more fully above, this rule is only applicable when considering assumption and assignment of an agreement under section 365. Where, as here, a contract is non-executory and is therefore being assigned pursuant to section 363, there is no basis to invalidate these provisions. Additionally, unlike the facts here, the "cross-default rule" was applied by the court in <u>Shaw Group</u> to determine whether two contracts that were *already separate* were sufficiently linked for purposes of assumption or assignment under section 365. In this case, the Bankruptcy Court used the "cross-default rule" to invalidate unambiguous provisions of a single writing for the purpose of severing it into two agreements. No precedent supports the application of the "cross-default rule" in this manner. To the contrary, the law is clear that in determining the intent of the parties for purposes of severability, the Bankruptcy Court should have considered the intent of the parties as expressed by all terms of the MLPSA. <u>Matter of the Estate of Wilson</u>, 50 N.Y.2d 59, 65 (N.Y. App. Div. 1980) ("whether the provisions of a contract are severable depends largely upon the intent of the parties as reflected in the language they employ and the particular circumstantial milieu in which the agreement came into being."); <u>A & J Enterprise</u>

---

[7] By its terms, the MLPSA is governed by New York law. (<u>See</u> A360 (MLPSA § 22)).

<u>Solutions, Inc. v. Business Applications Outsourcing Technologies, Inc.</u>, 812 N.Y.S.2d 226, 229-30 (N.Y.Dist.Ct., 2nd Dist. 2005) ("As to whether the claims grew out of an entire contract or a divisible contract is an issue of fact to be determined by the intention of the parties which is to be gathered from the agreement itself and the circumstances surrounding its execution.").

The three factors applied in <u>Gardinier</u>, and by the Bankruptcy Court in this case, to determine whether a contract is severable are whether the terms of the agreement reflect the following: (1) that the nature and purpose of the obligations sought to be severed are different; (2) that the consideration for each obligation is different; and (3) whether the obligations of the parties are interrelated. <u>See Gardinier</u>, 831 F.2d at 976; (A2139 (Oct. 23, 2007 Hrg. Transcript at 23)). When considered as unambiguous terms within the four corners of the MLPSA and in light of the <u>Gardinier</u> factors, the Waterfall, Indemnity and Payment Default Provisions necessitate a finding that the MLPSA is not severable into two different agreements.

Pursuant to the Indemnity Provision, the Servicer is to indemnify and hold DBSP harmless for "any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the *Seller* to perform its obligations under this Agreement . . . ." (A353 (MLPSA § 13.01)) (emphasis added). As the Bankruptcy Court found, the Indemnity Provision is unambiguous and obligates the Servicer to make any and all payments under the MLPSA that relate to the mortgage loan sales, including EPD and Premium Recapture claims. Therefore, the Servicer has <u>the</u> <u>same</u> obligations as the Seller under the MLPSA. Accordingly, in light of the Indemnity Provision, the final <u>Gardinier</u> factor, whether the obligations of each party to the MLPSA are interrelated, must be resolved in DBSP's favor.

18

The Waterfall Provisions are the single most important provisions in the MLPSA concerning servicing compensation because they govern how the Servicer is to make withdrawals of its Servicing Fees from the custodial accounts that it controls. The fact that the Waterfall Provisions make reimbursement for advances by the Servicer subordinate to the payment of certain repurchase obligations for defaults relating to the sale of the mortgage loans proves, incontrovertibly, that the parties to the MLPSA viewed the consideration for the sale and servicing of the loans as interrelated (the second factor in the Gardinier test).

The Payment Default Provision further supports a finding that the servicing and sale portions of the MLPSA were interrelated. DBSP can terminate the Servicer if the Servicer fails to make "any payment" required by the terms of the MLPSA. This provision is not limited solely to payments relating to the servicing of the loans. Accordingly, the MLPSA is clear that if the Servicer fails to make any payments due, including payments on EPD or Premium Recapture claims, servicing can be terminated. In fact, when DBSP issued a default notice based upon the Contracting Debtors' failure to satisfy EPD claims, the notice was sent to both the Seller and the Servicer. (See A423 (Sale Hearing Exhibit "DBSP-4")).

Finally, with respect to the first Gardinier factor, the nature and purpose of the sale and servicing portions of the agreement are not different. The MLPSA relates to a "servicing retained" sale - one transaction in which loans are sold and servicing is retained by the seller. As the Debtors' witness, Robert Johnson, testified at the Sale Hearing, in considering whether to sell loans servicing retained as opposed to servicing released, the Debtors considered the economic impact of the entire transaction including: (1) the price to be received for the loans without the servicing (A1552-1553 (Oct. 17, 2007 Transcript at 37-38)); (2) the anticipated servicing revenue to the Debtors associated with the retained servicing (A1553-1554 (Oct. 17,

2007 Transcript at 38-39)); (3) the anticipated cost to the Debtors of potential EPD and Premium

Recapture claims (A1553-1554 (Oct. 17, 2007 Transcript at 38-39)); (4) the advantage to the

Debtors of retaining information relating to the performance of the loans (A1557-1558 (Oct. 17,

2007 Transcript at 42-43)); (5) the competitive advantage to the Debtors associated with

retaining the servicing, and thereby retaining regular monthly contact with the borrower (A1557-

1558 (Oct. 17, 2007 Transcript at 42-43)); and (6) the efficiencies that inure to the Debtors with

respect to identifying valid EPD and Premium Recapture claims when the Debtors control the

servicing of the underlying loans (A1556-1557 (Oct. 17, 2007 Transcript at 41-42)).  When

negotiating a loan sale agreement and deciding whether to retain or release servicing, the Debtors

would consider all the benefits of retaining servicing and would weigh those benefits against the

increased consideration that a buyer would be willing to pay if the Debtors released the servicing

as part of the transaction.  (A1552-1555 (Oct. 17, 2007 Transcript at 37-40)).  Accordingly, when

entering into a contract like the MLPSA, the Debtors viewed the transaction as one interrelated

economic transaction by the Debtors, not two separate, unrelated agreements.  The economic

benefits of retaining the servicing were weighed against the consideration to be received for the

sale of the loans, and, as Mr. Johnson testified, the Debtor might be willing to make concessions

in the agreement, relating to either the sale or servicing of the loans, in order to retain the

servicing rights.  (A1560-1562 (Oct. 17, 2007 Transcript at 45-47)).  Thus, the sale and servicing

provisions of the MLPSA were "contemporaneously executed as necessary elements of the same

transaction, such that there would have been no transaction without each."  See In re Kopel, 232

B.R. 57, 67 (Bankr. E.D.N.Y. 1999).

     A finding that the MLPSA is one integrated contract is also consistent with the

"circumstances surrounding the execution" of the agreement.  A & J Enterprise, 812 N.Y.S.2d at

229-30. DBSP's witness, Peter Principato, was the only witness to offer testimony about the negotiation of the MLPSA. He testified that DBSP typically entered agreements where one entity acted as both servicer and seller and that, when counterparties insisted on using two entities, as with the MLPSA, DBSP's goal was to make both the seller and servicer responsible for all obligations under the agreement, just like the one-entity agreements. (A1818-1822 (Oct. 18, 2007 Hrg. Transcript at 197-201)). Mr. Principato testified that, where a seller insisted on having two entities act as seller and servicer, it was important to DBSP to make certain that both parties were obligated on all representations and warranties relating to both the sale and the servicing of the loans to ensure that (1) the loans were serviced properly, and (2) DBSP would have the right to terminate servicing at the first sign of the financial distress of either the seller or the servicer (which were typically related entities). (A1821-1822 (Oct. 18, 2007 Hrg. Transcript at 200-201)). Mr. Principato testified with respect to the negotiation of the MLPSA that DBSP specifically insisted that the servicer be added to the Indemnity Provision so that it would be responsible for all of the obligations under the agreement. (A1825-1826 (Oct. 18, 2007 Hrg. Transcript at 204-205). When viewed in this context, the terms of the MLPSA clearly reflect the parties' intent to have one integrated agreement, not two.

###  D.     The Bankruptcy Court's Ruling Is Contrary to the Third Circuit's Recent Decision in *Fleming*.

Even assuming, *arguendo,* that section 365(f) somehow applies here, the Bankruptcy Court nonetheless applied it incorrectly and in a manner that does not comport with recent Third Circuit authority. In In re Fleming Companies, Inc., 499 F.3d 300 (3d Cir. 2007), the Third Circuit Court of Appeals reiterated that bankruptcy courts "'must be sensitive to the rights of the non-debtor contracting party . . . and the policy requiring that the non-debtor receive the full benefit of his or her bargain.'" Id. at 305 (quoting In re Joshua Slocum Ltd., 922 F.2d 1081,

1091 (3d Cir. 1990)).  The unambiguous terms of the MLPSA reflect that DBSP bargained for an agreement pursuant to which both the Servicer and the Seller would be liable for all obligations. The terms of the MLPSA establish why this was important, and why DBSP would bargain for a provision that allows it to terminate servicing if sale-related claims go unpaid.  Pursuant to the MLPSA, the Servicer retains and controls custodial accounts in trust for DBSP that contain all of the principal and interest payments collected on the mortgage loans owned by DBSP.  (See A388-389 (MLPSA Servicing Addendum at Exhibit 8, § 11.08)).  Failure of the Seller or Servicer to make EPD or Premium Recapture payments under the MLPSA would be an indicator that the Debtors' business enterprise was in financial distress.  Given that, under the MLPSA, the Debtors acted as a collection agent and custodian of DBSP's money, it makes sense that DBSP would want the ability to terminate servicing, and thereby move its money out of the Debtors' control, at the first sign of financial distress.  Accordingly, DBSP bargained for a contract that inexorably linked the Debtors' right to service the mortgage loans with their obligations to satisfy DBSP's claims relating to the representations and warranties contained in the MLPSA.

By severing the MLPSA, and allowing the servicing rights under the contract to be transferred prior to the satisfaction of EPD and Premium Recapture claims, the Bankruptcy Court eviscerated DBSP's bargain.  The Sale Order essentially allows the Debtors to do in bankruptcy what they did not successfully bargain for outside of bankruptcy – to capitalize and realize value from the servicing portion of the MLPSA without fulfilling their obligations under the remainder of the contract.  That result is in direct conflict with the policy, and the law, as expressed by the Third Circuit in Fleming.

## CONCLUSION

For all of the foregoing reasons, DBSP respectfully requests that this Court reverse the Bankruptcy Court's Ruling and vacate that portion of the Sale Order that would permit the Contracting Debtors to assign the Servicing Rights to the Buyer.

Dated:  May 7, 2008

**BINGHAM McCUTCHEN LLP**
Steven Wilamowsky
399 Park Avenue
New York, NY 10022
(212) 705-7000

**BINGHAM McCUTCHEN LLP**
Andrew J. Gallo
150 Federal Street
Boston, MA  02110
(617) 951-8117

- and -

**ASHBY & GEDDES, P.A.**

William P. Bowden (I.D. #2553)
Amanda M. Winfree (I.D. #4615)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Appellant DB Structured Products, Inc.*

**UNREPORTED CASE**

Westlaw.

Not Reported in B.R.                                                                                          Page 1
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.), 48 Collier Bankr.Cas.2d 1224
**(Cite as: Not Reported in B.R., 2002 WL 230772)**

**H**
In re Convenience USA, Inc.
Bkrtcy.M.D.N.C.,2002.

United States Bankruptcy Court, M.D. North Carolina.
In re: CONVENIENCE USA INC., et al., Debtors.
**No. 01-81478, 01-81480, 01-81483, 01-81489,
01-81481, 01-81479, 01-81482.**

Feb. 12, 2002.

MEMORANDUM OPINION

STOCKS, Bankruptcy J.
*1 These cases came before the court on February 7,
2002, for hearing upon the Motion of Debtors to Reject
Certain Unexpired Non-Residential Real Estate Prop-
erty Leases ("the Motion"). John A. Northen and
Richard M. Hutson, II appeared on behalf of the Debt-
ors. Alan D. McInnes appeared on behalf of U.S. Res-
taurant Properties, Inc. and six related limited liability
companies who are landlords under the lease referred to
in the Motion (hereinafter referred to collectively as
"USRP"). John H. Small appeared on behalf of LaSalle
Bank National Association and Diane P. Furr appeared
on behalf of the Committee of Unsecured Creditors.
Having considered the Motion, the objection filed on
behalf of USRP and the evidence offered by the parties,
the findings of the court pursuant to Bankruptcy Rules
9014 and 7052 are hereinafter set forth.

MATTER BEFORE THE COURT

The Motion was filed pursuant to § 365 of the Bank-
ruptcy Code under which a trustee or Chapter 11 debtor,
subject to the court's approval, may assume or reject an
unexpired lease of the debtor. Under the lease referred
to in the Motion, Debtors leased from the six landlords
named in the lease 27 convenience stores for an initial
lease term of 20 years. The Debtors seek to reject the
lease only as to six of the leased properties. USRP ob-
jects to the motion, arguing that the Debtors must as-
sume or reject the lease as a whole. The issue presented

is whether the Debtors may reject the lease as to only
six of the leased properties or whether the Debtors must
assume or reject the lease as a whole.

FACTS

Debtor Convenience USA, Inc. ("Convenience USA")
is a consolidator of convenience stores in the southeast-
ern region of the United States and currently operates
over 200 such stores. The stores generally sell gasoline,
lottery tickets, money orders, food items and other con-
venience merchandise. The stores are owned and oper-
ated through entities which are subsidiaries or affiliates
of Convenience USA. These subsidiaries and affiliates
are the other debtors in this case. The subsidiaries and
affiliates of Convenience USA were formed in connec-
tion with acquisitions of existing chains of convenience
stores from various third parties over a period of ap-
proximately two years, from March 5, 1998 through
January of 2000.

In the process of acquiring chains of convenience stores
from various third parties, Convenience USA became
aware that Gant Oil Company ("Gant Oil") operated a
chain of 28 convenience stores located in North Caro-
lina and was interested in selling its business. Gant Oil
owned some of the 28 locations, leased some store loca-
tions from unrelated third parties and leased the remain-
ing properties from related third parties ("the Gant En-
tities").

In March of 1999 Convenience USA formed Gant Ac-
quisition, LLC ("Gant Acquisition") for the purpose of
acquiring various assets involved in the Gant Oil busi-
ness and engaged in negotiations with the Gant Entities
for the acquisition of the Gant Oil business. The Gant
Entities were interested in minimizing the income taxes
related to the sale of the Gant Oil business, including
the real property owned or leased by them. In order to
reduce the tax obligations of the Gant Entities, Conveni-
ence USA, Gant Acquisition and the Gant Entities
agreed to a structure for the acquisition of the Gant Oil
business assets by Gant Acquisition under which Gant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                      Page 2
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.), 48 Collier Bankr.Cas.2d 1224
**(Cite as: Not Reported in B.R., 2002 WL 230772)**

Acquisition agreed to buy the inventory, certain equipment and certain other business assets from the Gant Entities for $2,164,000.00 plus the cost of the inventory. In addition, the Gant Entities agreed to transfer 27 parcels of real estate with improvement and equipment to U.S. Properties Operating L.P. ("USRP Operating") or its assigns for the purchase price of $13,075,000.00 and USRP Operating, in turn, was to lease the 27 properties to Gant Acquisition with an annual base rent that was the product of 11.375% multiplied by the sum of the purchase price of the 27 properties plus the expenses incurred by USRP in purchasing the 27 properties.[FN1] Asset purchase agreements were entered into in May of 1999 and the deal was closed in July of 1999, at which time Gant Acquisition acquired the inventory, equipment and other business assets from the Gant Entities. Gant Entities closed the sale of the 27 convenience stores to USRP Operating and, pursuant to a lease document known as the Energy Lease, the 27 convenience stores were leased to Gant Acquisition by six different lessors who were the assigns of USRP Operating.

> FN1. The 28th store was to be leased by Gant Acquisition directly from the existing landlord.

*2 When these cases were filed on May 21, 2001, the Debtors were still leasing the 27 stores and have continued to do so. However, the six stores identified in the Motion have continued to operate at a loss since these cases were filed. The Debtors' efforts to improve the profitability of the six stores have not been successful and the six stores in question do not generate sufficient income to cover the rent or other expenses related to the operation of the six stores. As a result, the Debtors are sustaining substantial losses at the six stores. The Debtors have concluded that these losses cannot be stemmed and Debtors therefore wish to reject the lease of the six stores and close the six stores in order to avoid further losses to the estate.

### DISCUSSION

The general rule is that in order for a contract to be assumed or rejected under § 365 of the Bankruptcy Code,

the contract must be assumed or rejected in its entirety. *See Stewart Title v. Old Republic Nat. Title*, 83 F.3d 735, 741 (5th Cir.1996). However, where a contract, though contained in a single document, is divisible into several different agreements, some of the divisible agreements may be assumed or rejected under § 365 without assuming or rejecting the entire contract. *See id.; In re Gardinier, Inc.*, 831 F.2d 974 (11th Cir.1987); *In re Holly's, Inc.*, 140 B.R. 643, 681 (Bankr.W.D.Mich.1992); *In re Cutter's, Inc.*, 104 B.R. 886, 889 (Bankr.M.D.Tenn.1989).

The parties in the present case are in sharp disagreement regarding the status of the Energy Lease. USRP contends that the Energy Lease is a single, indivisible agreement which must be assumed or rejected in its entirety. The Debtors argue that the Energy Lease is a divisible contract and that the lease of each of the 27 leased properties is an executory agreement, divisible from the Energy Lease as a whole, that may be rejected by the Debtors without rejecting the leases of the other properties described in the Energy Lease.

The conflicting contentions of the parties involve their rights under the Energy Lease. Determination of contract or property rights by the bankruptcy courts ordinarily is controlled by state law. *See Butner v. United States*, 440 U.S. 48, 54, 99 S.Ct. 914, 917-18, 59 L.Ed.2d 136 (1979). Usually, the law of the forum state is controlling. However, in the present case, paragraph 18.15 of the Energy Lease provides that the lease shall be governed by the laws of the State of Texas. In the Fourth Circuit, a bankruptcy court must apply the conflicts of law rules of the forum state in determining which state's law to apply in making determinations of property rights in the assets of a bankruptcy estate. *See In re Merritt Dredging Co., Inc.*, 839 F.2d 203 (4th Cir.1988). This rule requires resort to North Carolina conflicts of law rules to determine which body of state law is controlling in determining the issues regarding the interpretation of the Energy Lease.

The general rule in North Carolina is that a choice of law or forum selection clause in a contract is enforceable unless it is shown that the clause was the product of fraud or unequal bargaining power or that enforce-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                 Page 3
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.), 48 Collier Bankr.Cas.2d 1224
**(Cite as: Not Reported in B.R., 2002 WL 230772)**

ment of the clause would be unfair or unreasonable. *See Bell Atlantic Tricon Leasing Corp. v. Johnnie's Garbage Serv., Inc.,* 113 N.C.App. 476, 439 S.E.2d 221 (1994). In the present case, involving a contract negotiated by experienced business people, no such showing has been made. The court therefore will apply Texas law in accordance with the choice of law provision in the Energy Lease.

**A. Application of Texas Law.**

**\*3** The concept of divisible contracts is recognized under Texas law. *See In re Payless Cashways, Inc.,* 230 B.R. 120, 135 (8th Cir. BAP 1999) (discussing Texas law), aff'd. 203 F.3d 1081 (8th Cir.1999). Under Texas law, there is no one test or criterion that is determinative as to whether a contract is entire or divisible. *See Johnson v. Walker,* 824 S.W.2d 184, 187 (Tex.App.-Ft. Worth 1991); *St. John v. Barker,* 638 S.W.2d 239, 243 (Tex.App.1982); *Chapman v. Tyler Bank & Trust Co.,* 396 S.W.2d 143, 146 (Tex.Civ.App.-Tyler 1965). The determination of whether a contract is divisible depends primarily upon the intent of the parties, the subject matter of the agreement and the conduct of the parties. *See Walker,* 824 S.W.2d at 187; *St. John,* 638 S.W.2d at 243; *Chapman,* 396 S.W.2d at 146-47. "The intention of the parties as determined by the language used in a contract is controlling in determining whether the contract is severable or is entire and indivisible." *Blackstock v. Gribble,* 312 S.W.2d 289, 292-293 (Tex.Civ.App.-Eastland 1958). A frequently used test under Texas law to determine the divisibility of a contract is whether the consideration for the agreement is apportionable, and it generally is held that a contract is divisible where the part to be performed by one party consists of several distinct and separate items and the price to be paid by the other party is apportioned to each item. *See Walker,* 824 S.W.2d at 187; *Click v. Seale,* 519 S.W.2d 913, 918 (Tex.Civ.App.-Austin 1975); *Chapman,* 396 S.W.2d at 146-147. Single assent to a whole transaction involving several parts indicates that a contract is entire. However, the mere fact that agreements are embraced in one instrument will not make the writing entire and indivisible. *See Click,* 519 S.W.2d at 918. "In the end, the intent of the parties, as demonstrated by

the language used, is controlling." *In re Payless Cashways, Inc.,* 230 B.R. at 135.

**1. Intent of the Parties**

In the present case, the Energy Lease, of course, is a single instrument in which there apparently was single assent by the multiple parties to the lease. However, as the foregoing authorities make clear, this circumstance, standing alone, does not end the inquiry and make the agreement entire and indivisible. *See Click,* 519 S.W.2d at 918. The other circumstances of the case must be considered and under Texas law, the factor that weighs most heavily in deciding whether the Energy Lease is an entire contract or is divisible, is the intent of the parties as reflected in the provisions of the Energy Lease.

From an examination of the lease provisions, the court is satisfied that the intent of the parties in this case was to have a contract in which the lease of the various leased properties would be divisible. Such intent is reflected in several provisions of the Energy Lease, particularly those provisions dealing with the transfer of leased properties during the term of the lease and provisions dealing with allocation of the rent.

**\*4** Paragraph 18.2 of the Energy Lease, dealing with transfer of a leased property by the landlord, and paragraph 18.24, entitled "Separate Lease Agreements," strongly reflect an intent that the lease be divisible with respect to the various leased properties. Under these provisions, the landlord has the unfettered right to sell or otherwise transfer any number of the leased properties at any time during the lease term. In such event, the Energy Lease requires the tenant to enter into a new lease with the transferee or new owner of the property being sold or transferred, and the Energy Lease continues in effect as to the remaining leased properties, except that the rent payable under the Energy Lease is reduced by the amount of the rent allocated under the lease to the property being sold or transferred. The effect of these provisions is that the property that is transferred is severed from the Energy Lease and becomes subject to a new lease with a new landlord, while the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.), 48 Collier Bankr.Cas.2d 1224
(Cite as: Not Reported in B.R., 2002 WL 230772)

Energy Lease remains in effect as to the other leased properties, which reflects that the Energy Lease is a divisible contract. In fact, the lease has to be divisible in order for the landlord to be able to sell leased properties and still have the lease continue into effect as to the remaining properties. While paragraph 18.25 of the Energy Lease gives the tenant an option to purchase any leased property proposed for sale, such an option is entirely consistent with the Energy Lease being divisible because if the tenant exercises the option, one of the leased properties is severed from the Energy Lease and transferred to the tenant without affecting the lease of the remaining leased properties.

Paragraph 1.8 of the lease is the "Rent Reduction Amount" provision and also is strongly indicative of an intent to have a divisible contract. This provision, together with Exhibit G of the lease, provides for the apportionment of the rent and the assignment of specific amounts of rent to each of the 27 leased properties. This provision provides the mechanism for determining the amount of the rent reduction that is to occur when there is a division of the Energy Lease as a result of the sale or destruction of one or more leased properties. The amount of the reduction is the product of (i) total Base Rent (described in Exhibit D) prior to any reduction multiplied by (ii) the ratio of (A) the purchase price allocated pursuant to Exhibit G to the Building with respect to which the Rent Reduction Amount is calculated, divided by (B) the aggregate purchase price allocations for each of the buildings. USRP's argument that the lease does not provide for an apportionment of the base rent under the lease ignores the foregoing terms of the Energy Lease, as well as the conduct of the parties following the execution of the lease. In actuality, the inclusion in the Energy Lease of provisions permitting the landlords to sell leased properties during the lease term and providing for the termination of the lease as to destroyed properties necessitated that the parties adopt a mechanism for adjusting the rent. Such a mechanism is contained in paragraph 1.8 which specifically sets forth a formula for allocating the base rent among the 27 properties. Moreover, following the execution of the Energy Lease, the parties agreed upon a schedule (page 2 of Debtors' Exhibit No. B) which specifically and on a

property-by-property basis detailed the amount of the annual and monthly rent allocated to each of the 27 properties. Under Texas law, a circumstance that weighs very heavily in finding that a contract is divisible is if the part of the contract to be performed by one party consists of several separate items and the price to be paid by the other party is apportioned to each item. *See Walker,* 824 S.W.2d at 187;*Click,* 591 S.W.2d at 918;*Chapman,* 396 S.W.2d at 146-47. This is precisely what occurred in the present case-the landlords agreed to lease to the Debtors 27 separate and distinct properties and the parties allocated the rent among the various properties on both an annual and monthly basis.

**\*5** There are other provisions that reflect an intent to have a divisible contract. Under paragraph 14.0 of the lease, if one of the leased properties is condemned, the entire lease is not terminated. Instead, the lease provides for the lease of the condemned property to be severed from the Energy Lease and for the lease to continue in effect as to the other leased properties. A similar division occurs in the event of the destruction of a building on a leased property. Under paragraph 13.0 of the lease, if one of the stores is damaged beyond repair, the lease terminates as to that leased property. This occurs without affecting the lease of the other leased properties except that under paragraph 1.8 the rent payable under the Energy Lease is apportioned and reduced by the amount of rent that was being paid for the leased property that was destroyed.

In arguing that these provisions do not reflect an intent that the Energy Lease be divisible, USRP contends that in adopting such provisions the parties were merely recognizing possible contingencies and dealing with them. While this may be true, it does not follow that these provisions do not reflect an intent that the lease be divisible. With respect to each of the contingencies, the parties had two choices. The parties could have elected to provide in the lease that if one of the leased properties were sold, condemned or destroyed, the entire lease would terminate. Presumably, the parties would have made this election if the economic realities had dictated such a resolution upon the loss of one or more of the leased properties. The parties did not elect such a provi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                Page 5
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.), 48 Collier Bankr.Cas.2d 1224
**(Cite as: Not Reported in B.R., 2002 WL 230772)**

sion. Instead, the parties elected to have a contract under which the lease of some of the properties may be terminated without affecting the continuing lease of the remaining properties. Choosing such terms reflects an intent to have a divisible contract.

Another provision of the Energy Lease reflecting the intent of the parties that the Energy Lease be divisible is paragraph 18.23 dealing with "Landlord Obligation." This provision recites that each of the six separate landlords named in the lease "is leasing its respective premises, as identified on *Exhibit A*, to tenant on a several, and not joint and several basis."Under this provision, none of the six landlords named in the lease is responsible for a default on the part of any other landlord and, in the event of a default by one landlord, the intent and effect of the provision is that the leases of the defaulting landlord would be severed from the Energy Lease and the Energy Lease would continue in effect as to the leased properties owned by the other landlords.

In concluding that the parties intended that the Energy Lease be divisible, the court also has considered Paragraph 17 of the Energy Lease, which deals with default. In the event of a default, paragraph 17.2(b) permits the landlord to terminate the tenant's right to possession "of one or more (including all)" of the leased properties. This provision also permits a division of the lease by permitting the landlord to terminate any number of the leased properties, while leaving the lease in effect as to the remaining properties. This provision was characterized during the evidence as a "cross default" clause. As such, it is argued that the provision is inconsistent with an intent that the contract be divisible. To the extent that the default provisions are inconsistent with an intent that the lease be divisible, such provisions are insufficient to outweigh the other provisions of the lease which weigh more heavily in favor of a finding of an intent that the lease be divisible. Accordingly, the court concludes that it was the intent of the parties that the Energy Lease be divisible.

2. Subject Matter of the Agreement

**\*6** The second prong to be considered under Texas law

in deciding whether a contract is divisible is the subject matter of the agreement. A finding that the subject matter of the contract is such that the contract can be divided into two or more separate agreements that can be performed independent of each other weighs in favor of a finding that the contract is divisible.

The type of agreement involved in the present case, of course, is a lease. The subject matter of a lease is the property that is dealt with in the lease. In the present case, that subject matter consists of 27 separate and distinct convenience stores located in 18 different cities and scattered over a wide area of North Carolina. The Energy Lease deals with the various properties in the same way, imposing the same lease terms upon each location, except for the amount of rent allocated to the various locations. There is nothing in the evidence or in the Energy Lease that suggests that the various stores cannot be operated separately and independently of each other in accordance with the provisions of the lease. It thus appears from the nature of the properties and the terms of the Energy Lease that the Energy Lease can be divided into separate and independent leases for one or more of the properties. The subject matter aspect of the test for determining whether a contract is divisible therefore weighs in favor of a finding that the Energy Lease is a divisible contract.

3. Conduct of the Parties

The third point of focus under Texas law in determining whether a contract is divisible is the conduct of the parties. USRP points out that following the execution of the Energy Lease, the Debtors paid the rent under the lease by means of a single payment that was wire transferred into a sweep account that USRP was required to maintain for its lender. USRP argues that this method of payment reflects that there was no allocation of the rent among the various leased properties. However, the evidence also showed that following the execution of the lease the parties followed through with the provisions of the Energy Lease calling for an allocation of the rent and generated a schedule that incorporated both components of the "base rent" (i.e., the $13,075,000.00 cost of the properties and the amount of the expenses in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.), 48 Collier Bankr.Cas.2d 1224
**(Cite as: Not Reported in B.R., 2002 WL 230772)**

curred by USRP in purchasing the properties) and which specifically set forth an allocation of the annual and monthly rent for each of the 27 properties. With such an allocation in place, making a single payment into the sweep account had little significance since such payments could be allocated at any time using an allocation that was in place for just such purpose. The court therefore concludes that the conduct of the parties also favors a finding that the Energy Lease is divisible.

In summary, having considered the intent of the parties, the subject matter of the Energy Lease and the conduct of the parties the court finds and concludes that the Energy Lease is a divisible contract such that each of the 27 leased properties may be regarded as the subject of a separate executory contract that stands on its own and may be dealt with separate and apart from the other leased properties.

B. Application of Bankruptcy Law

*7 While state law is controlling on the issue of whether the Energy Lease is divisible, the rejection or assumption of executory contracts or unexpired leases pursuant to § 365 of the Bankruptcy Code is governed solely by federal law. *See Otto Preminger Films, Ltd. v. Qintex Entm't, Inc.,* 950 F.2d 1492, 1495 (9th Cir.1991); *In re Wheeling-Pittsburgh Steel Corp.,* 54 B.R. 772, 779 (Bankr.W.D.Pa.1985).Section 365 was intended to permit a DIP to pick and choose among the debtor's executory contracts and unexpired leases and to assume those which are beneficial to the estate and to reject those that are not beneficial. It having been determined in the present case that the Energy Lease is divisible into separate leases, the issue of whether the Debtors may reject six of those unexpired leases at this time is a matter of federal law involving the application of § 365.

1. Effect of Default Provisions

As noted above, paragraph 17.2(b), in effect, is a cross-default clause, since it purports to permit the landlords to terminate all of the leases based upon a default with respect to only one of the leased properties. USRP argues that the default provisions have the effect of inex-

tricably intertwining the leases in such a fashion that the Debtors cannot reject less than the entire Energy Lease. In the bankruptcy context, it is well established that cross-default provisions do not integrate executory contracts or unexpired leases that otherwise are separate or severable. *See In re Plitt Amusement Co. of Washington, Inc.,* 233 B.R. 837, 847 (Bankr.C.D.Cal.1999). Moreover, cross-default provisions are unenforceable in bankruptcy where they would restrict the debtor's ability to fully utilize the provisions of § 365 with respect to an executory contract or unexpired lease. *See In re Sanshoe Worldwide Corp.,* 139 B.R. 585, 597 (S.D.N.Y.1992); *In re Braniff, Inc.,* 118 B.R. 819, 845 (Bankr.M.D.Fla.1989). The permissible limitations on the ability of a DIP to assume and assign executory contracts or unexpired leases under § 365 are found in § 365(c). Any contractual restriction on assignment under § 365 other than those specified in § 365(c) is invalidated by § 365(f). Thus, where a debtor is a party to a number of unexpired leases, cross-default clauses that would serve to prevent the debtor from assuming some of the leases without assuming the others at the same time are unenforceable under § 365(f).*See In re Sambo's Rests., Inc.,* 24 B.R. 755, 757-58 (Bankr.C.D.Cal.1982).

In the present case, because the Energy Lease is divisible, the Debtor in effect is a party to 27 separate unexpired leases. If given effect, the cross-default provisions in this case would prevent the Debtors from utilizing the provisions of § 365 to reject some of those leases, while reserving the decision whether to reject or to assume and assign the remaining leases to a later time. If the cross-default provisions were permitted to operate in such a fashion they would have the effect of foreclosing the ability of the Debtors possibly to assume and assign the other 21 leases pursuant to § 365. Such a result is contrary to § 365(f) and is not permissible under bankruptcy law. It follows that the default provisions in the present case do not limit the ability of the Debtors to reject six of the leases at this time, while leaving to another day the decision whether to reject the remaining leases or whether to assume and assign them in accordance with the provisions of § 365.

2. Standard Applicable to Motion to Reject

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                        Page 7
Not Reported in B.R., 2002 WL 230772 (Bkrtcy.M.D.N.C.). 48 Collier Bankr.Cas.2d 1224
**(Cite as: Not Reported in B.R., 2002 WL 230772)**

**\*8** The standard to be applied in this case in determining whether the Debtors' decision to reject should be approved is the business judgment standard or test. *See Lubrizol Enters, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1047 (4th Cir.1985). Where the debtor's decision to reject an executory contract represents an exercise of sound business judgment, the decision should be approved by the court. The Debtors have sustained continuing losses from the operation of the stores located on the properties referred to in the Motion despite efforts to improve operations at the stores. There is no market for the stores at the current rental rates for the properties and unless the stores are closed the Debtors will continue to sustain significant losses at each location. Under these circumstances, Debtors' decision to close the stores in order to avoid further losses to the estate represents an exercise of sound business judgment. Accordingly, the Motion should be granted and the rejection sought by Debtors should be approved. A separate order so providing will be entered contemporaneously with the filing of this memorandum opinion.

In accordance with the memorandum opinion filed contemporaneously herewith, it is ORDERED, ADJUDGED AND DECREED as follows:

(1) The Motion of Debtors to Reject Certain Unexpired Non-Residential Real Estate Leases is granted and the rejection by Debtors of the unexpired leases of the properties listed on attached Exhibit A is approved;

(2) Such rejection shall be effective as of January 31, 2002, provided that the Debtors vacate the premises listed on Exhibit A by February 14, 2002; and

(3) The lessors listed on Exhibit A shall have 60 days from the date of this order within which to file any claims for damages based upon Debtors' rejection pursuant to this order.

EXHIBIT A

ORDER

| Store No. | Address | Lessor |
|---|---|---|
| 810 | 648 Waughtown Street<br>Winston-Salem, NC | USRP (Gant 2), LLC |
| 812 | 1078 Cedar Point Blvd.'<br>Swansboro, NC | USRP (Gant 2), LLC |
| 815 | 4862 Arendell Street<br>Morehead City, NC | USRP (Gant 3), LLC |
| 818 | 150 Highway 70W<br>Havelock, NC | USRP (Gant 3), LLC |
| 830 | 1310 Live Oak Street<br>Beaufort, NC | USRP (Gant 5), LLC |
| 832 | 1915 West Webb Avenue<br>Burlington, NC | USRP (Gant 5), LLC |

Bkrtcy.M.D.N.C.,2002.
In re Convenience USA, Inc.
Not Reported in B.R., 2002 WL 230772
(Bkrtcy.M.D.N.C.). 48 Collier Bankr.Cas.2d 1224

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.