# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:                                                  :     Chapter 11
                                                        :
AMERICAN HOME MORTGAGE                                   :     Bankruptcy Case No. 07-11047-CSS
HOLDINGS, INC., a Delaware                               :
Corporation, et al.,                                    :     Jointly Administered
                                                        :
            Debtors.                                    :
-------------------------------------------------------- x
DB STRUCTURED PRODUCTS, INC.,                            :
                                                        :
            Appellant,                                  :
                                                        :
    v.                                                  :     Civil Action No. 07-0773-JJF
                                                        :
AMERICAN HOME MORTGAGE                                   :
HOLDINGS, INC., a Delaware                               :
Corporation, et al.,                                    :
                                                        :
            Appellees.                                  :
-------------------------------------------------------- x

### ANSWERING BRIEF OF APPELLEES
### AMERICAN HOME MORTGAGE HOLDINGS, INC., ET AL.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
James L. Patton, Jr. (No. 2202)
Pauline K. Morgan (No. 3650)
Sean T. Greecher (No. 4484)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
    Telephone: (302) 571-6600
    Facsimile: (302) 571-1253

*Counsel for Appellees American Home Mortgage Holdings, Inc., et al.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES..................................................................................I

NATURE AND STAGE OF PROCEEDINGS .................................................1

ISSUES ON APPEAL AND STANDARD OF REVIEW ................................5

SUMMARY OF ARGUMENT .........................................................................6

ARGUMENT......................................................................................................8

I. THE APPEAL IS FUTILE BECAUSE DBSP HAS CHALLENGED ONLY ONE OF TWO ALTERNATIVE RULINGS SUPPORTING THE RESULT BELOW ...............................8

    A. At All Times Relevant to this Appeal, DBSP Asserted that the MLPSA was an Executory Contract Governed by Section 365 of the Bankruptcy Code ....................10

    B. The Bankruptcy Court Ruled in the Alternative and Approved the Servicing Sale under both § 363 and § 365 of the Bankruptcy Code, without Deciding Whether the MLPSA was Executory.......................................................................12

    C. DBSP's Appeal is Premised Entirely Upon § 363 of the Bankruptcy Code; the Only Non-§ 363 Issue was Not Properly Preserved for Appeal .................................16

II. THE BANKRUPTCY COURT'S RULING THAT THE MLPSA IS SEVERABLE INTO A LOAN SALE AGREEMENT AND A LOAN SERVICING AGREEMENT IS WELL-REASONED, IS SUPPORTED BY RECORD EVIDENCE, AND ACCORDS DUE WEIGHT TO THE INDEMNITY, DEFAULT, AND WATERFALL PROVISIONS ........................17

    A. The Bankruptcy Court Correctly Applied the Gardinier Factors in Determining the MLPSA was Severable ....................................................................18

        1. *The Nature and Purpose of the Loan Sale and Loan Servicing Provisions of the MLPSA are Different* ............................................................................. 20

        2. *The Loan Sale and Loan Servicing Provisions of the MLPSA are Supported by Separate and Distinct Consideration*............................................................. 21

        3. *The Indemnification and Waterfall Provisions do not, without More, Render the Obligations AHM Corp. and the Servicer "Interelated"*........................... 23

    B. The Bankruptcy Court Correctly Applied the Cross-Default Rule in Determining the Indemnity, Default, and Waterfall Provisions of the MLPSA Did Not Integrate the Loan Sale and Servicing Agreements.......................................24

        1. *The Cross-Default Rule is Not Tied to § 365; it is a Necessary Corollary of the* Cum Onere *Principle, which Underlies Both § 363 and § 365* ................ 24

        2. *To the Extent Necessary, § 363(l) of the Bankruptcy Code Provides a Statutory Basis for the Invalidating the Cross-Default Provisions at Issue in this Case* ........................................................................................................ 25

3.  *Ample Precedent Supports Application of the Cross-Default Rule to Multiple Agreements Contained in a Single Document* ................................................ 27

4.  *The Bankruptcy Court Correctly Concluded that the Indemnity, Default, and Waterfall Provisions Do Not Render the Loan Servicing and Loan Sale Portions of the MLPSA Economically Interdependent* .................................... 28

C.  The Bankruptcy Court's Severability Ruling is Perfectly Consistent with Fleming ...................................................................................................... 30

III.  THE BANKRUPTCY COURT PROPERLY CONCLUDED THAT DBSP'S CONSENT TO THE SALE OF THE SERVICING RIGHTS UNDER THE MLPSA WAS UNNECESSARY ......... 35

IV.  THE BANKRUPTCY COURT PROPERLY CONCLUDED THAT THE SERVICING AGREEMENT COULD BE SOLD TO THE BUYER NOTWITHSTANDING ITS LACK OF FREDDIE MAC QUALIFICATION, WHICH IS IMMATERIAL UNDER THE CIRCUMSTANCES ........................................................................................... 39

RESERVATION OF RIGHTS ............................................................................ 40

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

### Reported Cases

Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l),
    85 F.3d 68 (2d Cir. 1996)..................................................... 19

Brook Village N. Assocs. v. Gen. Elec. Co., 686 F.2d 66 (1st Cir. 1982)....................... 9, 16

Burger King Corp. v. Mason, 710 F.2d 1480 (11th Cir. 1983)..................................... 39

Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.),
    379 B.R. 503 (Bankr. D. Del.), reconsideration denied,
    383 B.R. 585 (Bankr. D. Del. 2008)............................................... 19, 21, 34

In re Convenience USA, Inc., Case No. 01-81478
    2002 Bankr. LEXIS 348 (Bankr. M.D.N.C. Feb. 12, 2002)............................. 27, 28

In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007)............................................ 11, 30, 31, 40

Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV,
    209 F.3d 252 (3d Cir. 2000)....................................................... 4, 24, 35, 38

In re Gardinier, Inc., 831 F.2d 974 (11th Cir. 1987)................................................ 17, 18

Glassman Constr. Co. v. United States, 421 F.2d 212 (4th Cir. 1970)................................. 9

Grochocinski v. Crossman (In re Crossman), 259 B.R. 301 (Bankr. N.D. Ill. 2001)............... 37

Integrated Solutions v. Serv. Support Specialties, 124 F.3d 487 (3d Cir. 1997)......... 11, 35, 36

In re Joshua Slocum, Ltd., 922 F.2d 1081 (3d Cir. 1990)...................................... 14, 31

Kopel v. Campanile (In re Kopel), 232 B.R. 57 (Bankr. E.D.N.Y. 1999)...................... 28, 29

Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),
    304 F.3d 410 (5th Cir. 2002)............................................................... 29

Mellon Bank, N.A. v. Metro Communs., Inc., 945 F.2d 635 (3d Cir. 1991)........................ 6

Nagle v. Alspach, 8 F.3d 141 (3d Cir. 1993)...................................................... 9, 17

Newark Morning Ledger Co. v. United States, 539 F.2d 929 (3d Cir. 1976)...................... 11

Orenstein v. United States, 191 F.2d 184 (1st Cir. 1951).......................................... 9

i

In re Paul, 355 B.R. 64 (Bankr. N.D. Ill. 2001).............................................................37

In re Rickel Home Ctrs., 240 B.R. 826 (D. Del. 1998)
    appeal dismissed, 209 F.3d 291 (3d Cir. 2000)..........................................26

Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.),
    350 B.R. 166 (Bankr. D. Del. 2006)..............................................24, 25

Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank,
    611 F.2d 465 (3d Cir. 1979)...........................................................11

In re Trans World Airlines, Inc., 145 F.3d 124 (3d Cir. 1998)....................................16

United Air Lines, Inc. v. U.S. Bankr. Trust Nat'l Ass'n (In re UAL Corp.),
    346 B.R. 456 (Bankr. N.D. Ill. 2006)..........................................24, 29

Univ. Mews Assocs. v. Jeanmarie, 471 N.Y.S.2d 457 (N.Y. Sup. Ct. 1983)...................37, 38

Zimmermann v. Jenkins (In re GGM, P.C.), 165 F.3d 1026 (5th Cir. 1999)........................16

### UNREPORTED CASES

Opinion, In re Fleming Cos., Case No. 03-10945 (MFW),
    D.I. 6916 (Bankr. D. Del. Feb. 27, 2004).................................................. 31

Order, In re Fleming Cos., Civ. No. 04-371-SLR,
    D.I. 20 (D. Del. Mar. 30, 2005)............................................................ 31

### STATUTES

11 U.S.C. § 363................................................................................ *passim*

11 U.S.C. § 363(f)(5)....................................................................................7

11 U.S.C. § 363(l)............................................................................. *passim*

11 U.S.C. § 365................................................................................ *passim*

11 U.S.C. § 365(f)..............................................................................14, 16, 26

11 U.S.C. § 365(f)(3)..........................................................................16, 24, 25

## RULES AND SECONDARY AUTHORITIES

Restatement 2d of Contracts § 229................................................................40

Fed. R. Bankr. P. 8013.............................................................................6

Fed. R. Bankr. P. 8020........................................................................... 40

## NATURE AND STAGE OF PROCEEDINGS[1]

Following the cessation of the Debtors' mortgage loan origination operations immediately prior to the Petition Date, the Debtors commenced the Cases to preserve the going concern value of their loan servicing operations while effecting an orderly liquidation of their business for the benefit of their stakeholders. Toward this end, the Debtors filed the Sale Motion on the Petition Date, which sought authority to sell the Servicer's business as a going concern (the "Servicing Sale").

On August 17, 2007, DBSP filed a motion [D.I. 229 (RR-1)[2]] (the "Stay Relief Motion") seeking relief from the automatic stay imposed by § 362 of the Bankruptcy Code for "cause" under § 362(d)(1), so as to permit termination of the Servicer's rights under the MLPSA. As "cause" for relief from the stay, DBSP asserted, *inter alia*, that incurable defaults under the MLPSA precluded assumption and assignment of the MLPSA under § 365 of the Bankruptcy Code in connection with the Servicing Sale. (RR-1 at ¶¶ 2, 25-27.)

On August 27, 2007, the Debtors filed a notice [D.I. 403 (RR-5)] of potential executory contracts to be assumed and assigned in connection with the Servicing Sale, and the proposed cure amounts (the "Initial Cure Notice"). On September 10, 2007, the Debtors filed a modified notice [D.I. 674 (R-6)] (the "Modified Cure Notice"), which clarified that the designation of any agreement as a "potential executory contract" did not constitute a determination or admission that such agreement was in fact "executory" within the meaning of § 365 of the Bankruptcy Code, "all rights . . . thereto being expressly reserved." (R-6 at 5.)

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Opening Brief of Appellant DB Structured Products, Inc. (the "Opening Brief").

[2]    Citations to the record on appeal will be in the form of ([R or RR]-[Tab #] at [pinpoint]), with "R" referring to DBSP's designation of the record on appeal and "RR" referring to the Debtors' counter-designation of items to be included in the record on appeal.

On September 10, 2007, DBSP filed an objection to the Sale Motion [D.I. 675 (R-7)] (the "Original Objection") based upon the Debtors' alleged inability to satisfy the requirements for assumption and assignment of the MLPSA under § 365 of the Bankruptcy Code. (R-7 at ¶¶ 3-4.) Specifically, DBSP argued that (i) material, incurable defaults of the Servicer precluded assumption and assignment of the MLPSA, (ii) the Debtors' proposed cure amount of $0 would be insufficient to cure existing EPD and Premium Recapture claims against American Home Mortgage Corp. ("AHM Corp."), and (iii) the Debtors must provide DBSP with adequate assurance that the Buyer would be able to meet future EPD and Premium Recapture obligations. (Id. at ¶¶ 21-28.)

On September 11, 2007, the Debtors filed an objection to the Stay Relief Motion [D.I. 702 (RR-3)] (the "Stay Relief Objection"), arguing that any Servicer defaults under the MLPSA had been cured and that, "to the extent the [MLPSA] is executory," the Debtors could meet all requirements for assumption and assignment under § 365. (RR-3 at ¶¶ 20-21.)

The Bankruptcy Court held an evidentiary hearing on the Stay Relief Motion on September 17, 2007 (the "Stay Relief Hearing"), at which it concluded any default under the MLPSA had been cured and denied the Stay Relief Motion. (RR-5 at 7:4-105:8; RR-4.)

On September 25, 2007, the Debtors filed the executed APA with the Buyer [D.I. 931 (R-11)], which provided that the Buyer would acquire the *servicing* rights and assume *servicing*-related liabilities under the contracts to be assigned, but would not assume any *non*-servicing related liabilities such as EPD or Premium Recapture Claims. On September 26, 2007, the Debtors filed a supplemental notice [D.I. 962]of potential executory contracts to be assumed and assigned in connection with the Servicing Sale, and the proposed cure amounts (the "Supplemental Cure Notice"), which clarified that the Debtors were seeking to sell only the loan

servicing rights under the listed contracts and again reserved all rights as to whether such contracts were in fact executory.  (Appx. A at 2.)[3]

On October 2, 2007, DBSP filed a supplemental objection [D.I. 1108 (R-15)] (the "Supplemental Objection" and, together with the Original Objection, the "DBSP Sale Objections"), incorporating its prior objection and asserting further that assumption and assignment of only the servicing portion of the MLPSA would violate the *cum onere* principle (i.e., that a debtor must take the burdens along with the benefits of an executory contract).

On October 10, 2007, the Debtors filed an omnibus reply [D.I. 1443 (R-16)] (the "Reply Brief") to more than 33 objections to the Servicing Sale.  As intimated in the Stay Relief Objection, the Debtors argued that the MLPSA was not an "executory" contract and that, accordingly, the servicing rights thereunder could be sold pursuant to § 363 of the Bankruptcy Code without regard for the cure and adequate assurance requirements of § 365.  Alternatively, the Debtors argued that, even if the MLPSA were an executory contract, assumption of the servicing portion without assuming or curing defaults under the loan sale portion would be permissible because the MLPSA is severable into two distinct contracts under both federal bankruptcy law and New York state law.

On October 14, 2007, with leave of the Bankruptcy Court, DBSP filed a sur-reply [D.I. 1533 (R-17)] to the Debtors' Reply Brief (the "Sur-Reply Brief"), in which it questioned the Debtors' assertion that the MLPSA was non-executory and argued that, at any rate: (i) DBSP's right to terminate servicing rights for cause cannot be reduced to a money judgment so as to fall within § 363(f)(5) of the Bankruptcy Code; (ii) the servicing rights cannot be sold

---

[3]    The Supplemental Cure Notice was omitted, apparently unintentionally, from DBSP's designation of the record on appeal (which included, *inter alia*, the Initial Cure Notice and the Modified Cure Notice).  A copy of the Supplemental Cure Notice appears as Appendix A hereto.

free and clear of claims arising under the MLPSA per the Third Circuit's decision in <u>Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV</u>, 209 F.3d 252 (3d Cir. 2000) (holding that contract rights could not be sold free and clear of non-debtor party's recoupment defense); (iii) even if the servicing rights could be sold to the Buyer free and clear of claims under the MLPSA, DBSP would be entitled to have its claims attach to the sale proceeds as adequate protection under § 363(e) of the Bankruptcy Code; and (iv) it was aware of no precedent permitting non-executory contracts to be severed.  DBSP argued further that severing the MLPSA into servicing and non-servicing components would rewrite the contract and deprive DBSP of the benefit of its bargain in violation of the Third Circuit's holding in <u>In re Fleming Cos.</u>, 499 F.3d 300 (3d Cir. 2007).

The Bankruptcy Court held a five-day evidentiary hearing on the Sale Motion from October 15-19, 2007 (the "<u>Sale Hearing</u>"), at which it heard testimony from four fact witnesses and one expert witness for the Debtors, and one fact witness from DBSP, in addition to extensive oral argument by counsel for the Debtors and DBSP (R-47 to R-51).  On October 23, 2007, the Bankruptcy Court issued its ruling approving the Servicing Sale and ordered counsel for the Debtors to confer with counsel for the objecting parties and present a consensual form of order.  (R-52.)

On October 25, 2007, the Court held a hearing on the proposed Sale Order (the "<u>Sale Order Hearing</u>").  Counsel for DBSP appeared at this hearing and was heard on a number of objections, certain of which prompted the Bankruptcy Court to clarify and further explain its prior ruling.  (R-53 at 74:23-1111:8.)  The Court entered the Sale Order on October 30, 2007 [D.I. 1711 (R-24)].

DBSP immediately filed an emergency motion for stay of the Sale Order pending appeal [D.I. 1713 (R-25)] (the "DBSP Stay Motion"), which was subsequently joined by UBS Real Estate Securities Inc. ("UBS") [D.I. 1778 (R-29)] (the "UBS Stay Motion"). As noted in the Opening Brief, the Debtors and the Buyer amended the APA to maintain the status quo pending resolution of DBSP's appeal, and, in light of such modification, DBSP withdrew the DBSP Stay Motion as moot and filed its notice of appeal. However, the Debtors filed an objection to the UBS Stay Motion [D.I. 1914] (the "Objection to UBS Stay Motion"), which squarely addressed the merits of the DBSP Stay Motion.[4] (See Appx. B at ¶¶ 10-17.) The Bankruptcy Court held a hearing on the UBS Stay Motion on November 9, 2007, at which it commented on the likelihood of success on appeal and, ultimately, denied the UBS Stay Motion. (R-54 at 29:4-30:10.)

DBSP filed its designation of the record and statement of issues on appeal on November 28, 2007. Pursuant to this Court's scheduling order, DBSP filed its Opening Brief on May 7, 2008.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Distilled to its essence, the Appeal presents essentially three legal issues, in descending order of analytical priority:

1.  Whether the MLPSA is severable into two agreements, one for the sale of mortgage loans (subject to continuing warranties and representations) and another for the servicing of mortgage loans, notwithstanding the Indemnity, Default, and Waterfall Provisions linking the obligations of AHM Corp. and the Servicer.

---

[4]  DBSP suggests in its Opening Brief that the Debtors modified the APA in order to avoid having to answer the DBSP Stay Motion on the merits. (See Op. Br. at 3 ("Rather than challenge the Motion for Stay, the Debtors modified the APA . . . .").) The Objection to UBS Stay Motion was omitted, apparently unintentionally, from DBSP's designation of the record on appeal (which included, *inter alia*, both the UBS Stay Motion and the transcript of the hearing thereon). A copy of the Objection to UBS Motion for Stay appears as Appendix B hereto.

    2.      Assuming the MLPSA is severable, whether the servicing agreement may be sold under § 363 notwithstanding a provision in the MLPSA requiring DBSP's consent to assignment.

    3.      Assuming the MLPSA is severable, whether the servicing agreement may be sold to a under § 363 to an entity that is not *both* a Fannie Mae- *and* a Freddie Mac- qualified servicer as required by the MLPSA.

Each of these issues is a mixed question of law and fact. Accordingly, this Court must accept the Bankruptcy Court's findings of fact unless clearly erroneous, while exercising plenary review of the Bankruptcy Court's choice and interpretation of legal precepts, as well as the application of those legal precepts to the facts. Mellon Bank, N.A. v. Metro Communs., Inc., 945 F.2d 635, 642 (3d Cir. 1991). In evaluating the Bankruptcy Court's findings of fact, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr. P. 8013.

## SUMMARY OF ARGUMENT

    1.      **The Appeal is futile, because DBSP has appealed only one of two alternative rulings supporting the result below.** The Bankruptcy Court approved the Servicing Sale alternatively under § 363 and § 365 of the Bankruptcy Code, without making a finding as to whether the MLPSA is executory (and therefore subject to § 365) or non-executory (and therefore subject to § 363). DBSP had at all times below asserted the former. Yet now, on appeal, it embraces the theory that the MLPSA is non-executory, a position it never advocated below. But in light of the Bankruptcy Court's alternative rulings under § 365 of the Bankruptcy Code, legal error in the § 363 rulings would not constitute grounds for vacating the Sale Order, and remanding for further proceedings would be inappropriate given that DBSP would be taking a contrary position on remand than it had taken at all times previous.

2.     **The Bankruptcy Court's ruling that the MLPSA is severable is legally sound, supported by record evidence, and accords due weight to the Indemnity, Default, and Waterfall Provisions.**  The Bankruptcy Court properly found that, but for these provisions, the MLPSA would clearly be severable under New York state law.  In light of such finding, the Bankruptcy Court subjected these provisions to testing under the well-established "cross-default rule," and ultimately concluded that they were insufficient, without more, to render the loan sale and loan servicing provisions of the MLPSA economically interdependent so as to require transfer of the MLPSA in toto.  DBSP does not meaningfully challenge the factual underpinnings of this ruling, and its legal arguments, though perhaps superficially plausible, do not stand up to closer scrutiny.

3.     **DBSP's consent to assignment of the servicing rights under the MLPSA was not required.**  The DBSP anti-assignment provision does not preclude the power to assign—it merely conditions the right to assign.  Under New York law, DBSP can be compelled to accept a money satisfaction in exchange for a breach of the contractual anti-assignment provision.  Accordingly, the Debtors can sell the MLPSA free and clear of DBSP's "anti-assignment rights" under § 363(f)(5) of the Bankruptcy Code.  Moreover, the MLPSA requires that consent to assignment not unreasonably be withheld, and the circumstances support a finding that DBSP's refusal to consent to the Servicing Sale was unreasonable.

4.     **The Bankruptcy Court did not err in approving the sale of servicing rights under the MLPSA to the Buyer notwithstanding the Freddie Mac-qualification requirement in the MLPSA.**  The Bankruptcy Court specifically found that this requirement was immaterial and DBSP provides no record evidence or legal argument to establish otherwise.  It is axiomatic under basic contract principles that a court may excuse literal compliance with an

immaterial contractual condition in order to prevent a forfeiture, irrespective of any additional powers the Bankruptcy Code may provide.

## ARGUMENT

### I.    THE APPEAL IS FUTILE BECAUSE DBSP HAS CHALLENGED ONLY ONE OF TWO ALTERNATIVE RULINGS SUPPORTING THE RESULT BELOW

DBSP asserts throughout its Opening Brief that the Bankruptcy Court "found" and "ruled" that the MLPSA is not executory and, accordingly, that Bankruptcy Code section 363, and not 365, governed the sale of the servicing rights under the MLPSA. (See Op. Br. at 3, 4, 7, 10, 13.) DBSP also asserts it "never challenged" this proposition. (Op. Br. at 3.) As discussed more fully below, neither assertion is supported by the record on appeal.

The Bankruptcy Court approved the Servicing Sale under both § 363 and § 365 of the Bankruptcy Code, without making a specific finding as to the executory or non-executory nature of the MLPSA. This ruling was practical, insofar as it was responsive to the legal positions of both the Debtors (who had asserted that the MLPSA was non-executory may be sold under § 363 of the Bankruptcy Code) and DBSP (which had asserted that the MLPSA was executory and must be assumed and assigned under § 365 of the Bankruptcy Code). The ruling was also jurisprudentially sound, insofar as it avoided rendering an advisory ruling on an issue (i.e., whether the MLPSA was executory) that would be of no legal consequence in light of the Bankruptcy Court's conclusion that the Servicing Sale could be approved under either § 363 or § 365.

Although DBSP asked the Bankruptcy Court for rulings under § 365 and got them (albeit, not the ones DBSP had desired), DBSP has not appealed the § 365 rulings. Rather, DBSP has embraced the Debtors' theory that the MLPSA is not executory and focused its Appeal solely on the Bankruptcy Court's § 363 rulings. In light of the Bankruptcy Court's

alternative rulings under § 365, however, legal error in the § 363 rulings, without more, would not be grounds to vacate the Sale Order as DBSP requests in its Opening Brief. Legal error in the § 363 rulings would constitute reversible error *only* if it were coupled with a finding (either by this Court or by the Bankruptcy Court on remand) that the MLPSA was in fact non-executory and § 365 therefore did not apply. However, DBSP is estopped from taking this position on appeal (or on subsequent remand), because it had asserted a directly contrary position below. Having invited the Bankruptcy Court to rule under § 365, DBSP cannot now be heard to complain that § 363 rather than § 365 should govern this dispute. See Brook Village N. Assocs. v. Gen. Elec. Co., 686 F.2d 66, 76 (1st Cir. 1982) (where appellants argued to the lower court that Pennsylvania law governed, they could not argue on appeal that New Hampshire law governed, irrespective of the merits of the argument: "Having taken one position below, they cannot change their stance on appeal."); Glassman Constr. Co. v. United States, 421 F.2d 212, 215 (4th Cir. 1970) (appellant precluded from complaining of errors invited by it on a prior appeal: "[Appellant] strongly urged our duty to decide the issues of estoppel and payment on the prior appeal. It should not be heard now to complain that we did what it asked of us."); Orenstein v. United States, 191 F.2d 184, 193 (1st Cir. 1951) ("An appellant ordinarily will not be permitted to complain of an error which he himself invited or which at his instance the court committed."). Accordingly, even if the Bankruptcy Court's § 363 rulings were in error, its decision must stand because DBSP has not challenged the § 365 rulings. See Nagle v. Alspach, 8 F.3d 141, 143 (3d Cir. 1993) (affirmance required where appellant challenged only two of four independent bases for ruling below).

**A.     At All Times Relevant to this Appeal, DBSP Asserted that the MLPSA was an Executory Contract Governed by Section 365 of the Bankruptcy Code**

DBSP's Stay Relief Motion and Original Objection, which raised issues of cure of prior defaults and adequate assurance of future performance, both presupposed that the MLPSA was an executory contract that must be assumed and assigned in accordance with § 365 of the Bankruptcy Code.  (RR-1; RR-7.)

In their Modified Cure Notice, the Debtors inserted a prominent reservation of rights as to whether the "potential executory contracts" listed thereon (including the MLPSA) were in fact executory.  (R-6.)  In their Stay Relief Objection, the Debtors again reserved their rights as to whether the MLPSA was executory, citing an unreported bankruptcy court ruling that held loan servicing agreements were non-executory and could be sold under § 363 without complying with the requirements for assumption and assignment under § 365.  (RR-3 at 9 n.6.)

At the Stay Relief Hearing, DBSP continued to press its incurable default argument, which presupposed the MLPSA was an executory contract subject to § 365.  (See RR-5 at 10:15-11:17 and 85:16-25.)  In its Supplemental Objection, DBSP again relied on § 365 in attacking the sale of only the loan servicing portion of the MLPSA.  (R-15.)

In their Reply Brief, the Debtors argued (i) that the MLPSA was not executory and that the servicing rights thereunder could be sold under § 363 of the Bankruptcy Code without meeting the requirements for assumption and assignment under § 365 and (ii) alternatively, that all requirements for assumption and assignment under § 365 would be met.  (R-16.)

DBSP began its Sur-Reply Brief by "question[ing] whether the [MLPSA] can reasonably be considered non-executory" and citing a provision of the agreement that arguably imposes an affirmative obligation upon DBSP to pay a servicing fee to the Servicer.  (R-17 at

¶ 1.) DBSP went on to state that it "need not challenge" the Debtors' characterization of the

agreement, however, because sale of the MLPSA could not be approved under § 363. (Id. at

¶¶ 2-5.)[5]  Nevertheless, DBSP spent the next nine pages of its Sur-Reply Brief responding to

arguments raised in the § 365 section of the Debtors' Reply Brief. (Id. at ¶¶ 6-12.)  Of course, if

DBSP had intended to concede that the MLPSA was non-executory, then none of this would

have been necessary.

At the Sale Hearing, the Bankruptcy Court questioned the Debtors' non-executory

theory, asking whether confidentiality provisions in the various servicing agreements at issue

might create material performance obligations on the part of the non-debtor parties. (See R-51 at

76:2-20.)  Two other objecting parties (Morgan Stanley and UBS) expressly opposed the

Debtors' contention that their MLPSAs were non-executory. (R-51 at 139:4-11.)  For its part,

DBSP continued to press its § 365 objections while at the same time addressing the Debtors'

§ 363 theory in the alternative.[6]  For example, DBSP's counsel stated:

- "[I]f you were to find, as my clients assert, that these contracts—that my contract—
  I'm talking about my contract, that [the MLPSA] is an integrated agreement that is
  one document that includes the reps and warranties related to the sale, including the
  [EPDs] and includes all of the servicing rights and obligations, I think it's clear under
  [Fleming, 499 F.3d 300] that you would not be able to—*under 365 you would not be
  able to do what the debtors want you to do*." (R.51 at 103:19-104:2 (emphasis
  added).)

---

[5]    Notably absent from the Sur-Reply Brief was any mention of Section 13.05 of the
MLPSA (requiring DBSP's consent to assignment of the servicing rights) or Integrated Solutions
v. Serv. Support Specialties, 124 F.3d 487 (3d Cir. 1997), both of which feature prominently into
DBSP's newly-embraced § 363 theory of the case.

[6]    In determining the propriety of DBSP's raising § 363 issues offensively on appeal, it is
appropriate to consider the defensive posture in which DBSP made its § 363-based arguments
below. See Toyota Industrial Trucks U.S.A., Inc. v. Citizens Nat'l Bank, 611 F.2d 465, 470 (3d
Cir. 1979) (appellant barred from asserting argument on appeal for one purpose where it raised
argument for a different purpose in the proceedings below); Newark Morning Ledger Co. v.
United States, 539 F.2d 929, 932 (3d Cir. 1976) (same).

- "[S]everability is the issue the debtors have to prove in order to do whatever they want to do under 363 *and under 365*. Now, backing up a second, even if they can prove severability, I think they've also got some issues under 363. This argument is also addressed in our reply brief. So, again, I'm talking now *if you find severability, you find the contracts are nonexecutory*." (Id. at 104:24-105:5 (emphasis added).)

- "Now, we've heard about these servicing rights as a property right throughout this case. *There's the arguments on the executory contract point*." (Id. at 112:21-23 (emphasis added).)

Nowhere on the record of the Sale Hearing does DBSP abandon its § 365 objections or concede that § 363 applies. Thus, at the conclusion of the Sale Hearing when the Bankruptcy Court began deliberating on its decision, it no doubt believed that the executory nature of the MLPSA (as well as the Morgan Stanley and UBS MLPSAs) was still a contested issue.

**B.      The Bankruptcy Court Ruled in the Alternative and Approved the Servicing Sale under both § 363 and § 365 of the Bankruptcy Code, without Deciding Whether the MLPSA was Executory**

The Bankruptcy Court's ruling approving the Servicing Sale, which took twenty-five minutes to read into the record, covered several contracts other than the MLPSA and addressed seven objections other than DBSP's. In support of its contention that the Bankruptcy Court "found" the MLPSA was non-executory, DBSP cites generally to pages 9-10 of the transcript ruling (Op. Br. at 7), and provides a select quotation therefrom (Op. Br. at 10). What follows is a more complete quotation from the portion of the ruling DBSP believes supports its position, with the language quoted by DBSP italicized and the essential missing language in bold:

> **[S]ubject fully to the upcoming discussion regarding the pending objections** and as limited by my more immediate comments, the debtors have satisfied their burden under § 363 of the Bankruptcy Code to transfer their contract rights relating to the servicing of mortgages. . . . While I agree that the contracts are non-executory and that the contract rights may be transferred under § 363, I

disagree somewhat with how the debtors have characterized what it is they are transferring. . . .  Under the common law of contracts, there is a distinction between the assignment of rights under a contract, the delegation of duties under a contract, and the transfers of rights and obligations under a contract.  Under the Bankruptcy Code, if a contract is executory . . . the debtor must comply with § 365 . . . in order to transfer the rights and obligations under such contract.  In the event a contract is not executory, the debtor may assign, delegate, or transfer rights and/or obligations under § 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied.  The debtors argue that the contracts relating to the servicing of mortgages are not executory.  Debtors have satisfied their burden of proof in establishing that **those contracts, not subject to pending objections**, are not executory.  Specifically, as discussed previously, the Court finds that the testimony of Mr. Love, Mr. Johnson, and Mr. [Aronoff] established that the debtors' *prima facie* case that those contracts for which no objection is currently pending are severable into two contracts.  Moreover, *the testimony of Mr. Love and Mr. [Aronoff] established that the servicing portion of those contracts contain[s] no material obligations on behalf of the owner of the mortgage that if breached would be sufficient to excuse the performance of the servicer.  Specifically, the servicer's right of payment of its servicing fees and other fees is not an obligation of the mortgagee,* but rather is solely payable from the stream of payments of the mortgagor or the proceeds of the collateral in the event of nonpayment by the mortgagor.  *Thus, the contracts are not executory.*

(R-52 at 8:12-10:15 (emphasis added).).  In full context, it is clear that "the contracts" to which the Bankruptcy Court was referring in the passage quoted by DBSP were "those contracts not subject to a pending objection," which specifically *excludes* the MLPSA.  The only other finding regarding the executory nature of a contract related to the Connecticut Housing Finance Authority ("Connecticut").  (Id. at 15:17-19.)  The Bankruptcy Court made no finding as to the executory nature of the MLPSA.

The Bankruptcy Court addressed the objections of DBSP, Morgan Stanley, and UBS at the end of its ruling.  As noted above, these parties had contested the Debtors' assertion that their respective MLPSAs were non-executory.  They had also asserted objections premised upon (i) the *cum onere* principle (i.e., that the Debtors had to transfer or assume and assign the MLPSAs in toto and could not sever the loan servicing portions from the loan sale portions), (ii) cure of prior defaults, and (iii) adequate assurance of future performance.  After a lengthy

discussion, the Bankruptcy Court overruled the *cum onere* objections "based upon §§ 363(l) *and* 365(f)" of the Bankruptcy Code. (R-52 at 28:21 (emphasis added).)

The Bankruptcy Court went on to overrule the cure and adequate assurance objections "for the reasons previously given" in connection with overruling other similar objections. (Id. at 29:8-10.) Reasons previously given had included: (i) that, applying the test from In re Joshua Slocum, Ltd., 922 F.2d 1081 (3d Cir. 1990), there were no "material and economically significant" defaults that required cure (R-52 at 15:19-23); (iii) that there was no basis to require cure of defaults under contracts that were not being assumed and assigned (id. at 17:22-18:1 and 20:10-14); (iii) that the Debtors had in fact provided adequate assurance of future performance (id. at 14:8-11, 16:1-3, and 20:14-17); and (iv) with respect to the Connecticut Housing Finance Authority contract, that the cure and adequate assurance requirements of § 365 did not apply because the contract was not executory (id. at 15:17-19).

While the Bankruptcy Court's rulings on the cure and adequate assurance objections were admittedly ambiguous as to whether § 363 or § 365 (or both) provided the rule of decision, given the lack of a specific finding as to the executory nature of the MLPSA (in stark contrast to the Bankruptcy Court's disposition of the Connecticut objection) and the alternative ruling under § 363 and § 365 in connection with DBSP's severability objection, it is not reasonable to infer from the Bankruptcy Court's ruling a specific finding that the MLPSA was non-executory.

Moreover, to the extent there was any confusion on this point, the Bankruptcy Court's comments at the Sale Order Hearing should have cleared it up. At that hearing, counsel for DBSP raised what is now the central argument on appeal, i.e., that the anti-assignment provision in the MLPSA was enforceable because § 363 provided no basis for invalidating it.

The Bankruptcy Court responded: "Your objection's noted for the record.  And I would note also that the Debtors sought and I ruled that they could find—*they could assume and assign your contract under 363 or 365 so it's a distinction without a difference in my mind*, but if I'm wrong, I'm wrong."  (R-53 at 99:5-9 (emphasis added).)

Notwithstanding the Bankruptcy Court's clarification that it had ruled in the alternative under *both* § 363 *and* § 365, the DBSP Stay Motion, which was incorporated by reference into the UBS Stay Motion, again asserted that the Bankruptcy Court had authorized the Servicing Sale under § 363 and not § 365.  (R-25.)  In passing on the likelihood of success on the merits of the appeal at the hearing on the UBS Stay Motion, the Bankruptcy Court *again* pointed out that its ruling had been in the alternative:

> I think it was important that [my ruling] dealt with the issues in many cases for a number of different reasons, and often in alternative reasons.  There was a finding that the contract[s] were non-executory and subject to sale under 363, and the non-assignability clauses are unenforceable ipso facto clauses under 363(l).  There was an alternative finding that if they were executory, that they were severable and they could be assumed and assigned under the bankruptcy code and 365—oh, boy, (m), maybe.  I can't remember, frankly, again made those ant[i]-assignment provisions non-enforceable.  *I think that's important because the [DBSP Stay Motion] and the UBS [Stay Motion], sort of cherry picked one little piece of it.  I don't think that's fair to the overall reading, and I don't think it's fair to the sale order that was approved.*

(R-54 at 29:19-30:7 (emphasis added).)

In light of the Bankruptcy Court's subsequent clarification of its ruling, there is simply no basis for DBSP to assert that the Bankruptcy Court "found" or "ruled" that § 365 of the Bankruptcy Code did not apply.

**C.    DBSP's Appeal is Premised Entirely Upon § 363 of the Bankruptcy Code; the Only Non-§ 363 Issue was Not Properly Preserved for Appeal**

Of the seven issues on appeal initially identified by DBSP, five specifically reference § 363 of the Bankruptcy Code, to the exclusion of § 365. The remaining two issues (i.e., whether the MLPSA is severable into two agreements, and whether the Indemnity and Waterfall Provisions constitute unenforceable cross-default clauses) could potentially touch upon both § 363 and § 365. However, as is clear from DBSP's Opening Brief, the *reason* DBSP believes the severability and cross-default rulings are wrong is that they were premised upon § 365(f)(3) (so the argument goes), but there is no corollary provision of § 363 (Op. Br. at 4, 11, and 17).

The only argument in DBSP's Opening Brief that is not specific to § 363 is its final argument, premised upon § 365(f) and <u>Fleming</u>. While the Debtors responded to the <u>Fleming</u> argument in their Reply Brief (R-16 at 30-35) and will respond to it again herein, this argument was not identified in DBSP's statement of the issues on appeal and, to the extent it turns upon "conceptually distinct issues implicating very different factual and legal analyses," <u>In re Trans World Airlines, Inc.</u>, 145 F.3d 124, 132 (3d Cir. 1998), from the severability and cross-default issues, it is not fairly encompassed by the designation of those issues on appeal and, accordingly, was waived. <u>See id.</u> (designation of issue as to the general amount of claim was not broad enough to encompass a specific issue as to whether interest was awardable on that claim); <u>see also Zimmermann v. Jenkins (In re GGM, P.C.)</u>, 165 F.3d 1026, 1032 (5th Cir. 1999) ("[E]ven if an issue is argued in the bankruptcy court and ruled on by that court, it is not preserved for appeal under Bankruptcy Rule 8006 unless the appellant includes the issue in its statement of issues on appeal.").

As noted above, in light of the Bankruptcy Court's alternative rulings under § 363 and § 365, legal error in the § 363 rulings would constitute reversible error *only if* it were coupled with a finding that the MLPSA is in fact non-executory. However, as discussed above, DBSP is estopped from taking this position on appeal because it had previously argued that the MLPSA was executory and subject to § 365 of the Bankruptcy Code. See Brook Village, 686 F.2d at 76. Because DBSP has not challenged (and now, *cannot* challenge) the Bankruptcy Court's § 365 rulings, which provide an independent basis for affirmance, the Appeal is futile and should be dismissed. See Nagle, 8 F.3d at 143.

**II.  The Bankruptcy Court's Ruling that the MLPSA is Severable into a Loan Sale Agreement and a Loan Servicing Agreement is Well-Reasoned, is Supported by Record Evidence, and Accords Due Weight to the Indemnity, Default, and Waterfall Provisions**

DBSP's presentation of the arguments in its Opening Brief, which leads off strongly with the anti-assignment objection, obfuscates the central issue on appeal, which is the Bankruptcy Court's severability ruling. As discussed below, if the MLPSA is severable into two agreements then it was entirely appropriate for the Bankruptcy Court to approve the transfer of the servicing agreement without DBSP's consent, where the sole basis for withholding such consent was the non-payment of EPD and Premium Recapture Claims under the separate loan sale agreement. And if the MLPSA is not severable, then the servicing rights will not be transferred to the Buyer (which has not agreed to assume EPD and Premium Recapture obligations), and the remaining issues on appeal will be moot.

DBSP's attacks on the severability ruling are superficial and unfairly portray the Bankruptcy Court as having "ignore[d]" applicable law (Op. Br. 15) and having "refused to consider" the Indemnity and Waterfall Provisions (Op. Br. at 4). DBSP's various arguments are

17

addressed below in the order in which they present themselves in the Bankruptcy Court's

analytical progression.

**A.     The Bankruptcy Court Correctly Applied the <u>Gardinier</u>
Factors in Determining the MLPSA was Severable**

DBSP agrees that the analysis set forth in <u>In re Gardinier, Inc.</u>, 831 F.2d 974 (11th

Cir. 1987), viewed against the backdrop of New York state contract law, is appropriate in

determining whether the MLPSA is severable.[7]  DBSP disagrees, however, with the Bankruptcy

Court's application of the <u>Gardinier</u> factors to MLPSA.

<u>Gardinier</u> involved a three-party contract whereby a seller promised to sell real

property to a buyer and to pay a broker a commission for his services.  The contract stated that if

the buyer failed to perform, the seller and the broker would divide the deposit, and if the seller

failed to perform, he was responsible for the full commission to the broker.  The seller filed for

bankruptcy and sought to assume the contract.  The bankruptcy court approved the seller's

assumption of the contract and sale of the real property to the buyer, but blocked the

commission, holding that the seller's agreement with the broker was a separate, fully executed

agreement.  Affirming the bankruptcy court, the Eleventh Circuit identified the following factors

that supported the bankruptcy court's holding:

> First, *the nature and purpose of the agreements are different*. One
> agreement addresses the sale of property and the other contemplates an
> employment contract related to the sale of the property. Second, *the
> consideration for each agreement is separate and distinct*. [The buyer]
> agreed to pay [the seller] in excess of $ 5 million in consideration for the
> [property]. [The seller] separately agreed to pay [the broker] a commission

---

[7]     The Debtors argued below that federal law governed the severability analysis and
supplied the "economic interdependence" criterion for determining whether a cross-default
provision integrated otherwise severable contracts. (R-16 at 37-41.)  DBSP asserted, and the
Bankruptcy Court agreed, that "economic interdependence" was a requirement under both New
York state law and federal law. (R-51 at 113:16-115:1' R-52 at 18:16-18 and 19:3-6.)
Accordingly, the Debtors do not here quarrel with the applicability of New York state law.

> as consideration for services rendered in making the sale of the property.
> There was no consideration flowing between [the broker] and [the buyer].
> Finally, *the obligations of each party to the instrument are not
> interrelated.*

Gardinier, 831 F.2d at 976 (emphasis added, citations omitted).

Following the commencement of this Appeal, the Bankruptcy Court issued an

opinion in an unrelated adversary proceeding arising in these Cases, in which it considered

whether servicing rights were severable from a master mortgage loan repurchase agreement

under New York state contract law. See Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re

Am. Home Mortg., Inc.), 379 B.R. 503 (Bankr. D. Del.) (Sontchi, J.), reconsideration denied,

383 B.R. 585 (Bankr. D. Del. 2008) (Sontchi, J.). Calyon involved a "repo agreement"

providing for the sale of mortgage loans on a servicing-retained basis, subject to an obligation to

repurchase the loans after a fixed period of time. Following commencement of these Cases,

Calyon sued to compel turnover of loan servicing files, contending that the "safe harbor"

provisions of §§ 559 and 555 of the Bankruptcy Code rendered the automatic stay of § 362

inapplicable and permitted termination of the repo agreements on account of the Debtors'

bankruptcy filings. The Debtors defended in part on the basis that the loan servicing component

of the repo agreement was severable from its loan sale and repurchase component, and only the

latter constituted a "repo agreement" or "securities contract" under §§ 559 or 555, respectively.

The Bankruptcy Court determined that, under New York contract law, a contract

is severable "when by its terms, nature and purpose, it is susceptible of division and

apportionment." Calyon, 379 B.R. at 521 (quoting Atlantic Mut. Ins. Co. v. Balfour MacLaine

Int'l (In re Balfour MacLaine Int'l), 85 F.3d 68, 81 (2d Cir. 1996)). "Applying the controlling

law to the unambiguous terms of the [repo agreement]," the Bankruptcy Court concluded it was

"clear that the servicing of the mortgage loans is severable from the sale and repurchase of mortgage loans." Id.

The Bankruptcy Court's severability ruling in connection with the Servicing Sale is properly understood in light of its subsequent Calyon opinion, which involved an analogous agreement and similar factual circumstances, and reflects a more thorough and considered analysis of the issues presented than the Bankruptcy Court was able to present in its bench ruling on the Servicing Sale. Moreover, given that DBSP's central theme on appeal is that § 363 does not permit modification of the MLPSA from its natural state under New York law, Calyon is particularly instructive because it was decided (in pertinent part) purely as a matter of New York law, without the overlay of § 363 or § 365.

1.    *The Nature and Purpose of the Loan Sale and Loan Servicing Provisions of the MLPSA are Different*

On the first Gardinier factor, the Bankruptcy Court found that the nature and purpose of the servicing portions and the loan sale provisions of the MLPSA were different. (R-52 at 23:24-24:2.) DBSP contests this finding, citing parol testimony of Robert Johnson and Peter Principato for the proposition that the Debtors and DBSP viewed the MLPSA as comprising a single deal in which loans are sold and servicing is retained. (Op. Br. at 19-21.) This argument is unavailing, because it would swallow the Gardinier rule—if a "single deal" were enough, then the real estate purchase contract in Gardinier would have come out the other way. And at any rate, the Bankruptcy Court specifically ruled that the language of the MLPSA was clear and unambiguous and, accordingly, that the testimony of Mr. Principato was inadmissible to establish DBSP's subjective intent concerning the agreement. (See R-52 at 23:6-10.) Testimony of Mr. Johnson proffered by DBSP for the same purpose falls within the spirit of

this ruling, which DBSP has not appealed. Thus, the Bankruptcy Court's finding as to the nature

and purpose of the DBSP must stand if it is supported by record evidence.

In <u>Calyon</u>, the Bankruptcy Court found that the nature and purpose of the loan

sale/repurchase provisions and the servicing provisions of the repo agreement were different

because

> [t]he sale and repurchase of mortgage loans concerns the Debtors obtaining
> financing through the repo market for the origination of mortgage loans and the
> Purchasers providing that financing in a manner that preserves the liquidity of
> their investment. Servicing a mortgage loan, on the other hand, encompasses
> collecting mortgage payments, administering tax and insurance escrows,
> responding to borrower inquiries, and maintaining control over the collection and
> default mitigation processes. Importantly, regardless of whether a mortgage loan
> is owned by the loan originator, a party to a repurchase agreement, a
> securitization trust or a private investor, the loan requires servicing.

<u>Calyon</u>, 379 B.R. at 521. The Bankruptcy Court also found it significant that the repo agreement

itself distinguished the ownership of the mortgage loans from the right to designate the servicer

of the mortgage loans: "This is, in and of itself, strong evidence of the parties' intent to sever the

servicing or the right to designate the servicer from the sale and repurchase of the mortgage

loans." <u>Id.</u> The <u>Calyon</u> reasoning applies with equal force to the MLPSA here, numerous

provisions of which support the Bankruptcy Court's conclusion as to the first <u>Gardinier</u> factor.

### 2. *The Loan Sale and Loan Servicing Provisions of the MLPSA are Supported by Separate and Distinct Consideration*

On the second <u>Gardinier</u> factor, the Bankruptcy Court found that the loan

sale/purchase and loan servicing provisions of the MLPSA are supported by separate and distinct

consideration. (R-52 at 24:3.) DBSP contests this finding, asserting that the Waterfall

Provisions "are the single most important provisions" in the MLPSA and that subordination of

the Servicer's right to reimbursement for advances to the payment of certain repurchase

obligations "incontrovertibly" proves that the consideration for the sale and the servicing of the

loans is interrelated. (Op. Br. at 19.) Additionally, DBSP asserts that DBSP's ability to terminate the Servicer for failure to make "any payment" due under the MLPSA (including EPD and Premium Recapture Claims), "supports a finding" of interrelated consideration. (Id.)

The consideration supporting the servicing of mortgage loans is obviously the *servicing fee* (from which the servicer derives its operating profit), as opposed to the right to be reimbursed for advances. See Calyon, 379 B.R. at 521. (R-45 at Exh. 8 § 11.25 ("Servicing Compensation").) And the consideration supporting the purchase and sale of mortgage loans is obviously the purchase price paid for the loans, together with any continuing representations and warranties. See id. (finding that consideration underlying loan sale/repurchase provisions was the differential between the sale price and the repurchase price). (R-45 at § 1 (definition of "Purchase Price"), § 7.01(xiv) (referencing "consideration received by the seller"). Thus, while repurchase obligations certainly constitute a *portion* of the consideration underlying the sale and purchase of mortgage loans, it is a stretch to suggest that a contractual provision tying the right to be reimbursed for servicing advances to the payment of repurchase obligations "incontrovertibly" establishes interrelatedness of the consideration under the agreement. If anything, the fact that the Waterfall Provisions prioritize certain payment entitlements under the MLPSA over others suggests that there are various, distinct forms of consideration flowing under the contract.

With respect to the Default Provision, the Bankruptcy Court below seriously questioned whether the language referencing a "failure by the Servicer to make any payment due under the terms of this Agreement" (R-45 at § 14.01(i)) reasonably encompassed the payment of EPD and Premium Recapture Claims where the obligation to pay such claims rests with AHM Corp. and not the Servicer. (R-51 at 113:17-114:7.) As noted above, for purposes of its

severability ruling, the Bankruptcy Court read the Default Provision in the light most favorable

to DBSP. Because DBSP was entitled to no such indulgence, the interpretation of the Default

Provision is an open issue in this Appeal. At any rate, that the Default Provision might "support

a finding" that the consideration underlying the loan sale and loan servicing provisions of the

MLPSA is not separate and distinct, does not render the Bankruptcy Court's contrary finding

clearly erroneous, especially in light of other, more prominent provisions of the MLPSA that

establish the inherent separateness of the consideration flowing between the parties. (R-45 at

§§ 1, 4, 9(xiv) (seller's consideration); §§ 1, 14.01(vii), 15, and Exh. 8 §§ 11.09 (iii) and 11.25

(servicer's consideration).) The Bankruptcy Court's ruling on the second Gardinier factor must

be affirmed.

### 3. The Indemnification and Waterfall Provisions do not, without More, Render the Obligations AHM Corp. and the Servicer "Interelated"

The Bankruptcy Court found that "the obligations of each party [to the MLPSA]

relating to the purchase and sale of mortgages and the sale of mortgages are not interrelated

except, perhaps, for the indemnity and waterfall provisions." (R-52 at 24:4-7.) The Bankruptcy

Court went on to conclude that, under the cross-default rule, the Indemnity and Waterfall

Provisions standing alone did not render the obligations of AHM Corp. and the Servicer

"interrelated" for purposes of the third Gardinier factor. (Id. at 24:7-9.) DBSP contests this

finding on the basis that the Indemnity Provision, by requiring the Servicer to indemnify DBSP

from the failures of AHM Corp., establishes that the obligations of the Servicer and AHM Corp.

are one in the same. (Op. Br. at 18.) This argument is properly directed at the Bankruptcy

Court's cross-default rule analysis, which is addressed below. Because the loan sale and loan

servicing portions of the MLPSA are not "economically interdependent" the Indemnity Provision

23

constitutes an unenforceable cross-default provision that is not sufficient to render AHM Corp.'s and the Servicer's obligations "interrelated" for purposes of the final <u>Gardinier</u> factor. Accordingly, the Bankruptcy Court's finding on the third <u>Gardinier</u> factor must be affirmed.

**B.      The Bankruptcy Court Correctly Applied the Cross-Default Rule in Determining the Indemnity, Default, and Waterfall Provisions of the MLPSA Did Not Integrate the Loan Sale and Servicing Agreements**

**1.      *The Cross-Default Rule is Not Tied to § 365; it is a Necessary Corollary of the* Cum Onere *Principle, which Underlies Both § 363 and § 365***

DBSP argues that the cross-default rule is premised entirely upon § 365(f)(3) of the Bankruptcy Code and the *de facto* anti-assignment doctrine and, accordingly, is inapplicable to the transfer of contractual rights under § 363. (Op. Br. at 15.) This is not true. While the <u>Shaw Group</u> court did cite § 365(f)(3) as the basis for its application of the cross-default rule, <u>Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.)</u>, 350 B.R. 166, 179 (Bankr. D. Del. 2006), and the Bankruptcy Court quoted extensively from the <u>Shaw Group</u> opinion (R-52 at 26:1-27:1), the Bankruptcy Court specifically held that the rule is "equally applicable to the transfer under § 363 of the Bankruptcy Code of rights and obligations under non-executory contracts" (<u>id.</u> at 18:9-11). This is consistent with <u>United Air Lines, Inc. v. U.S. Bankr. Trust Nat'l Ass'n (In re UAL Corp.)</u>, 346 B.R. 456 (Bankr. N.D. Ill. 2006), which explained the rule as follows:

> [T]he best understanding of the cross-default rule is that it, like the *cum onere* rule, defines the scope of the 'executory contract or unexpired lease' subject to assumption or rejection under § 365(a). Just as the *cum onere* rule prevents the estate from avoiding obligations that are an integral part of an assumed agreement, so the cross-default rule prevents the nondebtor party from imposing on the estate the costs of substantially unrelated agreements.

<u>Id.</u> at 468 n.11.

24

The *cum onere* principle applies equally to the sale of property rights pursuant to § 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to § 365. See Folger Adam, 209 F.3d at 252. (Accord R-52 at 10:23-24 (finding that, in order to sell servicing agreements pursuant to § 363 the Debtors had to transfer "all the rights and obligations under the servicing contracts"); Op. Br. at 11 (agreeing with this proposition).) Thus, in the § 363 context, the cross-default rule is properly viewed as defining the scope of the property interest (here, the contract rights) that is to be sold *cum onere*. This is consistent with the Bankruptcy Court's conclusions that (i) the Debtors "have every right" to transfer a servicing agreement under § 363 separately from other agreements "provided, however, that those agreements are in fact separate," (R-52 at 18:11-14) and (ii) that "[t]he rights and obligations under the various . . . contracts must be economically interdependent in order to implicate the *cum onere* principle." (R-52 at 19:3-6.)

### 2. To the Extent Necessary, § 363(l) of the Bankruptcy Code Provides a Statutory Basis for the Invalidating the Cross-Default Provisions at Issue in this Case

As discussed above, the Bankruptcy Court premised its cross-default ruling alternatively on § 363(l) and § 365(f)(3) of the Bankruptcy Code. (R-52 at 28:20-25.) Section 363(l) provides, in pertinent part, that

> the [debtor in possession] may use, sell, or lease property . . . notwithstanding any provision in a contract . . . that is *conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking of possession by a trustee* in a case under this title or a custodian, *and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.*

11 U.S.C. § 363(l). The "property interest" at issue in this dispute is, of course, the Servicer's rights under the MLPSA. And there can be no doubt that the Indemnity, Default, and Waterfall Provisions, if enforceable, provide DBSP "an option to effect[] a forfeiture, modification, or

termination" of the Servicer's rights under the MLPSA.  Cf. Shaw Group, 350 B.R. at 179

(provision was a "cross-default" provision where it triggered the loss of substantial rights under

one agreement upon breach of another).  Thus, to the extent the Indemnity, Default, and

Waterfall Provisions are "conditioned on the insolvency or financial condition of the debtor" or

"on the commencement of a [bankruptcy] case" (so-called "*ipso facto*" conditions) and interfere

with the Servicer's "use" or "sale" of its rights under the MLPSA, they are expressly invalidated

by § 363(l).

    Against this backdrop, DBSP's candid explanation in its Opening Brief of the

"benefit of its bargain" vis-à-vis the Indemnity, Default, and Waterfall Provisions (which tracks

the testimony of DBSP's witness at the Sale Hearing) is all but dispositive:

> Pursuant to the MLPSA, the Servicer retains and controls custodial accounts in
> trust for DBSP that contain all of the [P&I] payments collected on the mortgage
> loans owned by DBSP. *Failure of [AHM Corp.] or the Servicer to make EPD or
> Premium Recapture payments under the MLPSA would be an indicator that the
> Debtors' business enterprise was in financial distress.* Given that, under the
> MLPSA, the Debtors acted as a collection agent and custodian of DBSP's money,
> *it makes sense that DBSP would want the ability to terminate servicing, and
> thereby move its money out of the Debtors' control, at the first sign of financial
> distress. Accordingly, DBSP bargained for a contract that inexorably linked the
> Debtors' right to service the mortgage loans with their obligations to satisfy
> DBSP's claims* relating to the representations and warranties contained in the
> MLPSA.

(Op. Br. at 22 (emphasis added); see R-50 at 220:3-221:20 (Principato testimony); R-52 at

27:22-28:6 (finding Principato testimony supported finding of severability).  Of course, if any of

the foregoing were memorialized in the MLPSA itself, § 363(l) would obviously apply.  DBSP

appears to believe that the lack of an *express* reference to any *ipso facto* condition in the

Indemnity, Default, and Waterfall Provisions insulates those provisions from scrutiny under

§ 363(l).  Courts have rejected this in the analogous § 365(f) context, however, and have

interpreted the statute's reference to contractual provisions "condition[ing] the assignment of [a]

contract" broadly to include *de facto* as well as express conditions on assignment. See, e.g., In re Rickel Home Ctrs., 240 B.R. 826, 831-832 (D. Del. 1998) (Farnan, J.), appeal dismissed, 209 F.3d 291 (3d Cir. 2000). Given that the admitted purpose of the Indemnity, Default, and Waterfall Provisions was to serve as an early warning of the Debtors' financial condition and to permit DBSP to seize valuable servicing rights at the first sign of trouble, it would elevate form over substance not to include these provisions within the fold of *ipso facto* provisions invalidated by § 363(l).

### 3. *Ample Precedent Supports Application of the Cross-Default Rule to Multiple Agreements Contained in a Single Document*

DBSP asserts that the Bankruptcy Court's reasoning is circular because the conclusion that the Indemnity and Waterfall Provisions constitute "cross-default provisions" presupposes that the MLPSA is severable into two agreements. According to DBSP, "[n]o precedent supports the application of the 'cross-default rule' in this manner." (Op. Br. at 17.)

In point of fact, one of the seminal "cross-default rule" decisions cited in DBSP's Opening Brief (at 15 n.6) involved a single, master lease agreement covering multiple commercial properties. In re Convenience USA, Inc., Case No. 01-81478, 2002 Bankr. LEXIS 348 (Bankr. M.D.N.C. Feb. 12, 2002). Like the Bankruptcy Court below, the Convenience USA court analyzed the lease agreement at issue under applicable state law and concluded that the only factor weighing against a finding of severability was a provision permitting the termination of the entire lease upon default of the lessee's obligations as to any one of the leasehold properties. Id. at*16-17. Construing this termination provision in light of what would otherwise constitute an aggregation of individual lease agreements, the court concluded the provision was, in effect, a cross-default clause. Applying the "cross-default rule" line of cases, the court found

that the cross-default provision was insufficient on its own to compel a finding that the master lease was unitary and indivisible.  Id. at *22-23.

Properly understood, the cross-default rule is not an exercise in question-begging that presupposes the outcome of the severability analysis; rather, it is *part and parcel of the severability analysis*.  Just as multiple, separately documented agreements may constitute a single, integrated transaction, e.g., Kopel v. Campanile (In re Kopel), 232 B.R. 57 (Bankr. E.D.N.Y. 1999), so too may a single transaction document contain multiple, divisible agreements, e.g., Convenience USA, 2002 Bankr. LEXIS 348.

> **4.    *The Bankruptcy Court Correctly Concluded that the Indemnity, Default, and Waterfall Provisions Do Not Render the Loan Servicing and Loan Sale Portions of the MLPSA Economically Interdependent***

The Bankruptcy Court found that, even reading the MLPSA in the light most favorable to DBSP, "the *only possible basis* to find the purchase[/]sale and servicing agreements economically interdependent are the indemnity and waterfall provisions." (R-52 at 27:19-22 (emphasis added).)  Absent any other basis for finding economic interdependence, the Bankruptcy Court concluded the Indemnity and Waterfall Provisions were "unenforceable cross-default provisions that serve as *de facto* anti-assignment provisions" and did not serve to integrate the MLPSA for purposes of the *cum onere* rule.  (See id. at 27:15-16.)

It is noteworthy that DBSP, having once embraced the economic interdependence criterion and argued for its application below, does not now challenge the Bankruptcy Court's "economic interdependence" finding, which is the crux of the entire severability ruling.  Instead, DBSP asserts simply that the Bankruptcy Court "refused to consider" the Indemnity and Waterfall Provisions, which is a remarkable statement given that the Bankruptcy Court devoted six pages of its 25-page ruling to a discussion of these provisions (R-52 at 22:6-28:25) and, even

though it was under no compulsion to do so, read them in the light most favorable to DBSP (Id. at 23:11-13). DBSP does, however, complain that the Bankruptcy Court "eviscerated" its bargain by depriving DBSP of its ability to terminate the Servicer on account of unpaid EPD and Premium Recapture Claims and permitting the transfer of the servicing rights without satisfaction of such claims. (Op. Br. at 22.) To the extent this was intended as a challenge to the Bankruptcy Court's economic interdependence finding, it is unavailing.

"Economic interdependence" is not established whenever the payment obligations under one contract are tied to the receipt of economic benefits under the other contract—if it were, then *every* cross-default clause, by its very definition, would render the cross-defaulted contracts economically interdependent. Rather, contracts are economically interdependent when the consideration underlying each contract supports *the other* contract, such that non-performance under one contract would constitute a failure of the consideration underlying *the remaining* contract. United Air Lines, 346 B.R. 456, 469 (Bankr. N.D. Ill. 2006) (discussing Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.), 304 F.3d 410, 444-45 (5th Cir. 2002); Kopel, 232 B.R. 57). Thus, to establish the economic interdependence of the loan sale and loan servicing portions of the MLPSA, DBSP needed to establish that AHM Corp.'s failure to live up to its *seller* obligations deprives DBSP of the essential benefit of the Servicer's *servicing* obligations. See id. DBSP did not do this. At best, DBSP established a tautology, i.e., that AHM Corp.'s failure to live up to its seller obligations has deprived DBSP of the essential benefit of AHM Corp.'s seller obligations. But the fact that DBSP currently owns some loans it wishes it could sell back to AHM Corp. has nothing to do with the quality or value of the Servicer's servicing of the loans DBSP does own.

The Bankruptcy Court found that "the evidence [adduced at the Sale Hearing] was *overwhelming* that there's been no real impairment of the servicing" functions as a result of these Cases or the Servicing Sale (R-53 at 86:1-3 (emphasis added).) Moreover, DBSP's own witness acknowledged that if it were permitted to terminate the Servicer and transfer servicing to another entity, the successor servicer would *not* undertake AHM Corp.'s EPD and Premium Recapture obligations. (R-50 at 241:4-12). As such, and in the absence of any explanation from DBSP why non-payment of EPD and Premium Recapture Claims deprives DBSP of the essential benefit of the servicing obligations performed by the Servicer, the Bankruptcy Court's economic interdependence finding is not clearly erroneous.

### C.    The Bankruptcy Court's Severability Ruling is Perfectly Consistent with Fleming

DBSP asserts generally that the Bankruptcy Court's severability ruling is contrary to Fleming, 499 F.3d 300. If anything, however, Fleming *confirms* the Bankruptcy Court's equitable discretion to modify the MLPSA as necessary to permit sale thereof.

The debtor in Fleming, a wholesale supplier of supermarkets, sought to assume and assign a long-term supply agreement with a national supermarket chain ("Albertson's") to a cooperative of grocery wholesalers ("AWG"). The agreement was executed in connection with the debtor's acquisition of Albertson's Tulsa, Oklahoma warehouse (the "Tulsa Facility") as a going concern. By its terms, the agreement required the debtor to supply Albertson's Oklahoma stores "from the Tulsa Facility," which, in addition to being staffed largely with former Albertson's employees, utilized the electronic ordering system and ordering codes Albertson's had developed to gather data from which marketing and pricing decisions would be made. When the debtor was unable to perform under the agreement, Albertson's switched its source of supply for its Oklahoma stores to its own warehouse in Fort Worth, Texas. The debtor subsequently

filed for chapter 11 relief and, at the direction of AWG, rejected the lease for the Tulsa Facility. AWG, which maintained its own warehouse facilities in the Midwest and operated retail stores that directly competed with Albertson's in Oklahoma, planned to supply Albertson's from its own warehouses at the prices and on the terms required by the supply agreement.

Albertson's objected to assumption and assignment of the supply agreement, arguing that the debtor and AWG could not establish adequate assurance of future performance unless Albertson's would be supplied from the Tulsa Facility. In response, the debtor and AWG argued that the contractual provision requiring shipment from the Tulsa Facility was not material and, even if it were, amounted to a *de facto* anti-assignment provision because compliance was no longer commercially practicable. The bankruptcy court sided with Albertson's, holding that "assumption and assignment *cannot* modify an agreement's express terms," Opinion at 6, In re Fleming Cos., Case No. 03-10945 (MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004) (emphasis added),[8] and concluding that AWG's undisputed inability to ship from the Tulsa Facility prevented it from providing adequate assurance of future performance. The district court affirmed. Order, In re Fleming Cos., Civ. No. 04-371-SLR, D.I. 20 (D. Del. Mar. 30, 2005).[9]

Although the Third Circuit ultimately affirmed the bankruptcy and district courts, it disagreed with their legal analysis. For instance, in stark contrast to the bankruptcy court's narrow and absolutist view of its power under § 365 of the Bankruptcy Code, the Third Circuit began its analysis by *confirming* that "the bankruptcy court has *discretion* to excise or waive a bargained-for element of a contract" and "*can refuse enforcement* of terms of a contract in order to permit assignment" so long as doing so does not deprive the non-debtor party of the "full benefit of its bargain." Fleming, 499 F.3d at 305 (emphasis added). The threshold question in

---

[8]    This opinion appears at R-16 Exh. H-3.

[9]    The order appears at R-16 Exh. H-4.

determining whether the exercise of such discretion is appropriate in a given case, the court concluded, is whether the contractual term at issue is "material and economically significant." Id. (citing Joshua Slocum, 922 F.2d 1081).

The "material and economically significant" standard "was derived from a review of case law interpreting § 365 of the Bankruptcy Code which focused on balancing twin concerns: preventing substantial economic detriment to the nondebtor contracting party and permitting the bankruptcy estate's realization of the intrinsic value of its assets." Id. at 305-06. Accordingly, application of the standard requires a *two-part inquiry*. First, the court must focus on "the importance of the term to the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance)." Id. at 306. Then, the court must balance the countervailing rights of the debtor, the proposed assignee, and the debtor's creditors "to get the benefit of the bargain [the debtor] struck with [the non-debtor party]." Id. at 307.

Applying this standard, the Third Circuit concluded that requiring delivery from the Tulsa Facility was an integral part of the supply agreement and that noncompliance with this condition would burden Albertson's in an "economically significant" way because Albertson's had "bargained for the benefits of expedience, of a trained staff, a consistent supply of products, and a proven electronic system of record-keeping which furthered Albertson's marketing a pricing plans, all of which were only available from 'the Tulsa Facility.'" Id. The court then considered the rights of the debtor, AWG, and creditors to realize the benefits of the supply agreement, but concluded that, on balance, "the scale tip[ped] in favor of Albertson's." Id. In reaching this conclusion, the court found it significant that AWG had brought about its own

inability to fulfill the terms of the supply agreement by ordering the debtor to reject the lease for the Tulsa Facility. Id. at 307 ("AWG, by its own actions, cannot give adequate assurance of performance."), 308 ("AWG rejected the Tulsa Facility lease, and now complains that it is impossible to comply with an integral term of the contract. This term could have been performed by some party. It is not now an anti-assignment provision simply because AWG made the decision not to take on a necessary burden.").

The Debtors assume that the "economic interdependence" and "material and economically significant" standards are closely related, such that a finding that the loan sale and servicing provisions of the MLPSA were (or were not) economically interdependent would compel the conclusion that the Indemnity, Default, and Waterfall Provisions were (or were not) "material and economically significant" terms of the contract, and vice-versa. As such, if the Bankruptcy Court was correct that the loan sale and servicing provisions of the MLPSA are not economically interdependent, then DBSP's Fleming argument adds little. Notably, however, *even if* the Indemnity, Default, and Waterfall Provisions of the MLPSA constituted "material and economically significant" terms of the contract, the Fleming analysis would permit the Bankruptcy Court to balance DBSP's right to insist on strict performance of its contract against the Debtors' and their creditors' right to realize the intrinsic value of the servicing rights by selling them to the Buyer. See Fleming, 499 F.3d at 307.[10] In this connection, there are at least two key differences between the Fleming case and this case.

---

[10]    DBSP appears to read Fleming as prohibiting the modification of material terms of a contract. This reading is flawed, however, because if there were a *per se* rule against modification of material terms of a contract, the Third Circuit's analysis would have ended upon finding that shipment from the Tulsa Facility was "material and economically significant" to Albertson's. The analysis did *not* end, however, and the court proceeded to balance the equities.

First, in Fleming, permitting assignment of the Supply Contract to AWG would have required Albertson's to re-transition its supply source from its own warehouse facilities, which utilized its custom electronic ordering system, to AWG's facilities, which did not. In addition, the Tulsa Facility was staffed with Albertson's former employees, who were familiar with Albertson's business, while AWG's warehouse facilities were staffed with its own employees, who were not. Here, the transition of servicing from the Servicer to the Buyer requires nothing from DBSP and will in no way impact the continued remittance of payments from borrowers. In addition, the Buyer is staffed by the Servicer's former employees. Accordingly, DBSP quite literally will receive the benefit it bargained for, i.e., the uninterrupted servicing of the mortgage loans by the Servicer's employees.

Second, in Fleming, AWG inflicted its own wound by directing Fleming to reject the Tulsa Facility lease. Here, the Buyer has done nothing to impair its ability to perform the servicing duties under the MLPSA. DBSP however, insists on the performance of obligations essentially unrelated to the servicing of mortgage loans. Unlike Albertson's objection in Fleming, which was based on its commercially reasonable expectations of the bargain it struck with Fleming for the supply of its Oklahoma stores, DBSP's objection to the Servicing Sale appears to be an attempt to improve the bargain it struck with the Servicer for the servicing of mortgage loans, by obtaining servicing rights for which it did not pay a servicing-released premium[11] and imposing requirements on the Buyer (i.e., payment of EPD and Premium Recapture Claims) that would not be imposed upon a replacement servicer chosen by DBSP.

---

[11]    See Calyon, 379 B.R. at 522 (noting that Calyon was still free to sell its mortgage loans on a servicing-retained basis and that, "as [it] did not pay a higher price in purchasing the mortgage loans under the [repo agreement] in the first instance (as would have been the case if they had bought the loans on a servicing released basis), the Court is not particularly troubled by their receipt of a lower price" in a servicing-retained sale; "Indeed, if the Court were to allow

In light of the foregoing, even if the Indemnity, Default, and Waterfall Provisions are material and economically significant to the MLPSA, the Bankruptcy Court did not abuse its equitable discretion in excising them from the contract to permit transfer of the servicing rights to the Buyer.

### III.    The Bankruptcy Court Properly Concluded that DBSP's Consent to the Sale of the Servicing Rights under the MLPSA Was Unnecessary

DBSP argues that the Bankruptcy Court erred in authorizing transfer of the servicing rights under the MLPSA to the Buyer without DBSP's consent notwithstanding a provision of the MLPSA requiring DBSP's consent to any such assignment. The Bankruptcy Court ruled that consent-based contractual restrictions on assignment were unenforceable pursuant to § 363(l) of the Bankruptcy Code, which was discussed above. (R-52 at 16:3-6; R-53 at 97:22-98:6.)

Citing Folger Adam, 209 F.3d at 264-65, DBSP argues that the transfer of the Servicer's rights under the MLPSA under § 363 of the Bankruptcy Code is subject to all of DBSP's "defenses" in relation to those rights. (Op. Br. at 11.) Based on this preservation of "defenses," DBSP extrapolates that all of its rights under the MLPSA are enforceable unless specifically preempted by the Bankruptcy Code. (DBSP fails to explain, however, how its right to oppose assignment or terminate upon assignment can be fairly construed as a "defense" to performance where DBSP does not have any material performance obligations under the MLPSA.) Citing Integrated Solutions, Inc. v. Service Support Specialities, Inc., 124 F.3d 487, 493 (3d Cir. 1997), DBSP argues that the Bankruptcy Court's invalidation of the anti-assignment provision under § 363(l) is reversible error because the Third Circuit "expressly rejected that

---

otherwise, [Calyon] would receive a windfall—the right to designate the servicer without paying the concomitant premium.").

anti-assignment rights can be invalidated in relation to transfers of property pursuant to section 363." (Op. Br. at 3.)

DBSP overstates the holding of Integrated Solutions, which did not involve contractual "anti-assignment rights" and was not decided under § 363(l). In that case, a purchaser obtained prejudgment tort claims through a § 363 sale from a chapter 7 bankruptcy trustee and then sued on the claims. The defendants moved to dismiss for lack of standing, arguing that applicable state law prohibited the assignment of prejudgment tort claims and, accordingly, that the trustee was the only party with standing to bring the claims. The purchaser argued that 11 U.S.C. §§ 704(1) (requiring trustee to expeditiously collect and reduce to money property of the estate) and 363(b)(1) (permitting trustee to sell property outside the ordinary course of business) pre-empted state-law restrictions on the transfer of the tort claims, which constituted property of the bankruptcy estate. The bankruptcy court disagreed with the purchaser and granted the defendants' motion to dismiss. On appeal, the Third Circuit considered the following, narrow question: "Did Congress intend to preempt state law restrictions on the assignability of tort claims under federal bankruptcy law?" Integrated Solutions, 124 F.3d at 490. The court found nothing in §§ 704(1) or 363(b)(1) expressly authorizing the trustee to sell property free of state-law restrictions and nothing in the legislative history indicating Congress intended such a result. This was underscored by the fact that other provisions of the Bankruptcy Code, including § 363(l), expressly displaced otherwise applicable law. Accordingly, the court concluded that "neither § 363(b)(1) nor § 704(1) indicates a specific congressional intent to preempt state laws limiting the assignability of tort claims belonging to the estate." Integrated Solutions, 124 F.3d at 494. It is evident from this narrow holding that the court might reach a different result under different circumstances—e.g., if state law restricted assignment of

prejudgment tort claims *by a bankruptcy trustee* specifically, which would implicate § 363(l) of the Bankruptcy Code.

DBSP cites two other cases adopting the <u>Integrated Solutions</u> reasoning with respect to interests in structured settlement/annuity contracts, which, like the prejudgment tort claims at issue in <u>Integrated Solutions</u>, are inherently non-assignable under applicable state law. <u>See</u> <u>Grochocinski v. Crossman (In re Crossman)</u>, 259 B.R. 301, 306-08 (Bankr. N.D. Ill. 2001); <u>In re Paul</u>, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001).  At issue in this case, however, are garden-variety contract rights—which, unlike prejudgment tort claims or interests in structured settlement/annuity contracts, are inherently alienable under New York state law, which governs the MLPSA.

In New York, contractual provisions restraining alienability are narrowly construed.  Accordingly,

> [f]or a contractual clause forbidding or restricting an assignment of rights thereunder to reveal the intent necessary to *preclude* the power to assign, or cause an assignment violative of contractual provisions to be wholly *void*, such clause *must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way.*  Such must specifically eliminate the *power* as well as the *right* to assign the contract in violation of its bar or restrictions, *otherwise the original obligor is given only the right to damages for its breach, but does not [sic] render the assignment ineffective.*

<u>Univ. Mews Assocs. v. Jeanmarie</u>, 471 N.Y.S.2d 457, 461 (N.Y. Sup. Ct. 1983) (emphasis added, citations omitted).

The "anti-assignment" provision in the MLPSA (titled "No Transfer of Servicing") provides, in pertinent part, as follows:

> The Servicer acknowledges that the Purchaser has acted in reliance upon the Servicer's adequacy of its servicing facilities, plan, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof.  Without in any way limiting the generality of this Section, the Servicer *shall not* either assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion thereof, or sell or otherwise dispose of

all or substantially all of its property or assets, *without* the *prior written approval* of the Purchaser, *which consent shall not unreasonably be withheld.*

(R-45 at § 13.05 (emphasis added).) Attempted assignment in violation of this provision constitutes an event of default. (Id. at § 14.01(vii).) Under New York law, these provisions are insufficient to preclude the Servicer's *power* to assign the servicing rights under the MLPSA; they speak only to the *right* to assign. Univ. Mews Assocs., 471 N.Y.S.2d at 461. Because DBSP could be compelled to accept a money judgment in satisfaction of any breach of these contractual anti-assignment provisions, section 363(f)(5) of the Bankruptcy Code permits sale of the servicing rights "free and clear" of any such claim. See 11 U.S.C. § 363(f)(5); Folger Adam, 209 F.3d at 259-60.

Even if the anti-assignment provisions precluded the *power* to assign the servicing rights under the MLPSA, the Bankruptcy Court had the power to authorize the Servicing Sale (i) as discussed above, under § 363(l) to the extent DBSP's enforcement of the anti-assignment provisions would effect a forfeiture based on the Debtors' financial condition, (ii) in the exercise of its equitable discretion under Fleming, to the extent a balancing of the harms and equities between DBSP and the Debtors and their creditors would support such a result, and (iii) under basic contract principles, to the extent it concluded that DBSP's consent to the transfer was unreasonably withheld. Each of these alternative holdings would be supported by the same record evidence below, namely: (i) that the Buyer, having purchased the Servicer's entire mortgage servicing platform, would succeed to the "servicing facilities, plan, personnel, records and procedures" of the Servicer, and to some extent to its "integrity" and "reputation," all of are recited as considerations underlying the anti-assignment provision and (ii) that the Servicer is insolvent and liquidating in bankruptcy while the Buyer is a fully capitalized entity backstopped by approximately $4 billion in private equity capital (R-48 at 18:23-19:18).

IV.    **The Bankruptcy Court Properly Concluded that the Servicing Agreement Could Be Sold to the Buyer Notwithstanding its Lack of Freddie Mac Qualification, Which is Immaterial under the Circumstances**

DBSP argues that the Freddie Mac qualification requirement was an "integral part" of the MLPSA and that nothing in § 363 provides a basis for invalidating this requirement vis-à-vis the Buyer.  (Op. Br. at 15-16.)  DBSP provides no record support or legal argument for its assertion that Freddie Mac qualification is "integral," and as the following colloquy between counsel for DBSP and the Bankruptcy Court at the Sale Order Hearing makes clear, the Bankruptcy Court specifically found the Freddie Mac qualification requirement was immaterial:

> [Mr. Wilamowsky]: They've not even alleged that they have Freddie Mac approval, and so how are they expecting you to enter an order today which contains a finding that there are no defaults?  . . .   And it's a servicing related default so it's not one that's unenforceable.
>
> [The Court]: No, there are no material defaults.  The evidence was overwhelming that there's been no real impairment of the servicing.  And to the extent that Freddie Mac was in there—again, I think it's—it was not material.  So my finding is that there are no material defaults. . . .  [J]ust to be clear, I think the evidence of Mr. Love was more than clear that there'd been no material change in the actual performance of servicing and I think that based on the evidence of Mr. Johnson, and Mr. Weil . . . and Mr. [Aronoff] . . . that the Freddie Mac default was not material.

(R-53 at 85:20-86:23.)  The Bankruptcy Court's conclusion on this point is bolstered by the evidence previously adduced the Stay Relief Hearing, which established that substantially all the loans in the DBSP portfolio are international taxpayer identification number ("ITIN") loans (i.e., loans to undocumented aliens) that are not eligible for purchase or securitization by Freddie Mac. (RR-5 at 45:14-22.)

The real question presented by the foregoing is not whether § 363 of the Bankruptcy Code permits the Bankruptcy Court to invalidate the Freddie Mac requirement, but whether applicable nonbankruptcy law permits a party to create a forfeiture by insisting on literal compliance with immaterial terms of a contract.  It does not.  See, e.g., Burger King Corp. v.

Mason, 710 F.2d 1480, 1490 (11th Cir. 1983) ("[I]t is elementary that the mere breach of an agreement which causes no loss will not sustain a suit for damages, much less rescission." (quotations omitted)); Restatement 2d of Contracts § 229 (Excuse of a Condition to Avoid Forfeiture: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."); Accord Fleming, 499 F.3d at 305 ("[T]he bankruptcy court has discretion to excise or waive a bargained-for element of a contract.") Accordingly, the Bankruptcy Court did not err in authorizing the sale of the servicing rights to the Buyer.

## RESERVATION OF RIGHTS

The Debtors hereby reserve the right to request just damages and single or double costs pursuant to Fed. R. Bankr. P. 8020 (governing frivolous appeals), including, but not limited to, any consequential damages resulting from the delay imposed by this Appeal.

## CONCLUSION

For the reasons set forth above, the Debtors respectfully request that this Court affirm the Sale Order and grant the Debtors such other and further relief as is just and proper.

Dated:    Wilmington, Delaware        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          May 27, 2008

                                      _____
                                      James L. Patton, Jr. (No. 2202)
                                      Pauline K. Morgan (No. 3650)
                                      Sean T. Greecher (No. 4484)
                                      Patrick A. Jackson (No. 4976)
                                      The Brandywine Building
                                      1000 West Street, 17th Floor
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 571-6600
                                      Facsimile: (302) 571-1253

                                      Counsel for Appellees American Home Mortgage
                                      Holdings, Inc., et al.

40

## CERTIFICATE OF SERVICE

I, Patrick A. Jackson, Esquire, hereby certify that on this 27th day of May, 2008, I caused

a true and correct copy of the foregoing **ANSWERING BRIEF OF APPELLEES**

**AMERICAN HOME MORTGAGE HOLDINGS, INC., ET AL.,** to be filed with the Clerk of

the Court using CM/ECF, which will send notification that such filing is available for viewing

and downloading to the following counsel of record:

William P. Bowden: wbowden@ashby-geddes.com
Sean T. Greecher: sgreecher@ycst.com, bank@ycst.com
Amanda Marie Winfree: awinfree@ashby-geddes.com

I further certify that I have served the parties listed on the service list below in the

manner indicated.

/s/ Patrick A. Jackson
Patrick A. Jackson

William P. Bowden, Esq.
Amanda M. Winfree, Esq.
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(UBS Securities LLC; Morgan Stanley; CIFG)
(DB Structured)
**Hand Delivery**

Andrew J. Gallo, Esq.
Bingham McCutchen
150 Federal Street
Boston, MA 02110
**Federal Express**

Steven Wilamowsky, Esq.
Bingham McCutchen
399 Park Avenue
New York, NY 10022-4689
(DB Structured)
**Federal Express**