## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, | ) | |
| INC., a Delaware corporation, *et al.*, | ) | Case No. 07-11047 (CSS) |
| | ) | |
| Debtors, | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| DB STRUCTURED PRODUCTS, INC., | ) | C.A. No. 07-00773 (JJF) |
| | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HOME MORTGAGE HOLDINGS, | ) | |
| INC., a Delaware Corporation, *et al.*, | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

### APPENDIX IN SUPPORT OF
### <u>REPLY BRIEF OF APPELLANT DB STRUCTURED PRODUCTS, INC.</u>

| | |
|---|---|
| **BINGHAM McCUTCHEN LLP**<br>Steven Wilamowsky<br>399 Park Avenue<br>New York, NY 10022<br>(212) 705-7000<br><br>Andrew J. Gallo<br>150 Federal Street<br>Boston, MA 02110<br>(617) 951-8117 | **ASHBY & GEDDES, P.A.**<br>William P. Bowden (#2553)<br>Amanda M. Winfree (#4615)<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, DE 19899<br>(302) 654-1888 |

*Attorneys for Appellant DB Structured Products, Inc.*

# APPENDIX – TABLE OF CONTENTS

**Tab**          **Description**

A.          *Debtors' Omnibus Response to Certain Objections to the Sale of Certain Assets and the Assumption and Assignment of Executory Contracts Relating to the Debtors' Loan Servicing Business* [D.I. 1443]

B.          Unreported Cases

          Dawson Home Fashions, Inc. v. SRCO Inc.,
              1995 WL 679253 (S.D.N.Y. Nov. 15, 1995)

          In re Buffets Holdings, Inc.,
              2008 WL 2080555 (Bankr.D.Del. May 16, 2008)

          In re Burr Wolff, LP,
              2007 WL 2964835 (S.D.Tex. Oct. 10, 2007)

# **APPENDIX A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                                                    :    Chapter 11

AMERICAN HOME MORTGAGE HOLDINGS, INC.,      :    Case No. 07-11047 (CSS)
a Delaware corporation, et al.,[*]                        :
                                                          :    Jointly Administered
         Debtors.                                         :
                                                          :    **Ref. Dkt. Nos. 11, 113, 403, 614, 615,
                                                          :    660, 674, 675, 718, 720, 723, 724, 730,
                                                          :    740, 800, 813, 815, 823, 824, 825, 826,
                                                          :    829, 830, 831, 832, 836, 838, 840, 841,
                                                          :    845, 850, 851, 855, 857, 859, 911, 995,
                                                          :    1029, 1034, 1036, 1041, 1043, 1046,
                                                          :    1047, 1048, 1051, 1053, 1054, 1056,
                                                          :    1057, 1058, 1061, 1065, 1067, 1071,
                                                          :    1108, 1113, 1117, 1118, 1121, and 1123
                                                          :    Hrg. Date: Oct. 15, 2007 at 12:00 p.m.**

---------------------------------------------------------------- x

# DEBTORS' OMNIBUS RESPONSE TO CERTAIN OBJECTIONS TO THE SALE OF CERTAIN ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS RELATING TO THE DEBTORS' LOAN SERVICING BUSINESS

---

[*] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. I

INTRODUCTION ............................................................................................... 1

PRELIMINARY STATEMENT ......................................................................... 2

BACKGROUND ................................................................................................ 4

I.  THE LOAN ORIGINATION/SALE BUSINESS AND THE LOAN SERVICING
    BUSINESS ................................................................................................ 4

    A.    *MLPSAs* .......................................................................................... 5

        1.    Embedded Servicing Agreements .................................................. 6

        2.    Third-Party Securitizations and AARs ......................................... 7

    B.    *Stand-Alone Servicing Agreements* ............................................. 8

        1.    AHM Securitizations ..................................................................... 8

        2.    Non-Securitized Mortgage Loans ............................................... 10

II. PROCEDURAL HISTORY ....................................................................... 10

III.    THE APA AND THE BUYER ................................................................. 12

IV.    THE OBJECTIONS ................................................................................. 14

    A.    *Objections Based on the Cum Onere Principle* ......................... 15

    B.    *Objections Relating to Allegedly Incurable Defaults* ............... 15

    C.    *Objections to the Proposed Cure Amount* ................................ 15

    D.    *Objections Asserting Prohibitions Against Assignment* ........... 16

    E.    *Objections Regarding Adequate Assurance of Future Performance* ........ 16

    F.    *Objections Based on Alleged Termination of the Servicing Agreements* . 16

ARGUMENT ................................................................................................... 17

I.  THE SERVICING AGREEMENTS ARE NOT EXECUTORY CONTRACTS; THE
    DEBTORS CAN SELL THE SERVICING RIGHTS UNDER § 363 OF THE
    BANKRUPTCY CODE IRRESPECTIVE OF THE REQUIREMENTS OF § 365 .......... 17

    A.    *The Servicing Rights are property of the Debtors' estates, which can be
    sold free and clear of various claims under § 363 of the Bankruptcy Code* ........ 17

        1.    The Debtors may sell their Servicing Rights free and clear of
    "claims" arising under the Servicing Agreements ....................... 18

        2.    The Debtors may sell their Servicing Rights notwithstanding any
    *ipso facto* defaults under the Servicing Agreements .................... 19

    B.    *The Servicing Agreements are not executory contracts* ............ 21

i

      1.     The Servicing Agreements impose obligations on AHM Servicing to perform all necessary tasks but impose no substantive obligations on the non-debtor parties............................................. 22

      2.     The limited obligations of non-debtor parties under the Servicing Agreements are not material, and therefore do not render the Servicing Agreements executory ................................................. 26

          a.   *Ministerial obligations under the Servicing Agreements are not material*................................................................................. 26

          b.   *Ancillary obligations under the Servicing Agreements are not material*................................................................................. 27

II. TO THE EXTENT THE SERVICING AGREEMENTS ARE EXECUTORY CONTRACTS, THEIR ASSUMPTION AND ASSIGNMENT ON THE TERMS PROPOSED IN THE SALE MOTION AND THE APA IS CONSISTENT WITH THE REQUIREMENTS OF § 365 OF THE BANKRUPTCY CODE....................................... 29

    A.    *The Court has the discretion to refuse enforcement of contractual terms that, if enforced, would prevent the Debtors from realizing the intrinsic value of the Servicing Agreements via assumption and assignment*.................................... 30

    B.    *The Servicing Agreements are severable from the Other Agreements and may be assumed and assigned independently consistent with the cum onere principle*............................................................................................................ 35

      1.     The Servicing Agreements and Other Agreements are not economically interdependent and are therefore severable under federal bankruptcy law............................................................... 37

      2.     Applicable state law supports the conclusion that the Servicing Agreements are severable from the Other Agreements ................ 41

    C.    *The Debtors will cure any "material and economically significant" defaults under the Servicing Agreements; other alleged defaults are irrelevant*. 44

      1.     The Debtors are in fact Fannie Mae-qualified; any default relating to the alleged loss of such qualification has been cured .............. 45

      2.     Section 365(b)(1)(A) does not require the Debtors to undo historical facts; any and all material and economically significant defaults under the Servicing Agreements are curable.................... 46

      3.     Section 365(b)(2) of the Bankruptcy Code excuses the cure of any *ipso facto* defaults ........................................................................ 49

      4.     The Debtors need not cure defaults under the Other Agreements 50

    D.    *The only condition for assignment of the Servicing Agreements is compliance with § 365(f)(2) of the Bankruptcy Code*........................................... 51

      1.     Servicing Agreements are not "financial accommodations" contracts and may be assumed and assigned without the Objecting Parties' consent .......................................................................... 51

      2.      Express and *de facto* anti-assignment provisions are unenforceable under § 365(f)(1) of the Bankruptcy Code ................................... 53

      3.      The Form APA did not require the Debtors to obtain the Objecting Parties' consent as a prerequisite to assignment of the Servicing Agreements ............................................................................... 53

   E.    *The Adequate Assurance Objections are without merit; the Buyer need only comply with material and economically significant terms of the Servicing Agreements* ................................................................................................ 55

III.   THE COURT NEED NOT DETERMINE AT THE SALE HEARING WHETHER ANY SERVICING AGREEMENTS WERE VALIDLY TERMINATED PREPETITION ............................................................................ 58

IV.   THE PURPORTED POSTPETITION TERMINATION OF THE EMC EMBEDDED SERVICING AGREEMENT VIOLATED THE AUTOMATIC STAY AND WAS INVALID AS A MATTER OF LAW BECAUSE IT WAS PREMISED UPON AN UNENFORCEABLE *IPSO FACTO* DEFAULT PROVISION ........................................... 58

**CONCLUSION** ........................................................................................... **63**

**RESERVATION OF RIGHTS** ............................................................... **64**

iii

## <u>TABLE OF AUTHORITIES</u>

Page

**Cases**

*Unites States Supreme Court*

Butner v. United States,
   440 U.S. 48 (1979)..................................................................................................... 39

*United States Circuit Courts of Appeals*

In re Fleming Cos., No. 05-2365,
   2007 App. LEXIS 19927 (3d Cir. Aug. 22, 2007).............................................. passim

In re Gen'l Datacomm Indus., Inc.,
   407 F.3d 616 (3d Cir. 2005) ..................................................................................... 21

United Airlines, Inc. v. HSBC Bank U.S.A., N.A.,
   416 F.3d 609 (7th Cir. 2005) ..................................................................................... 40

Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),
   304 F.3d 410 (5th Cir. 2002) ..................................................................................... 34

Cinicola v. Scharffenberger,
   248 F.3d 110 (3d Cir. 2001) ................................................................................ 34, 53

In re Rickel Home Ctrs., Inc.,
   209 F.3d 291 (3d Cir. 2000) ......................................................... 17, 34, 47, 50

Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,
   141 F.3d 490 (3d Cir. 1998) ..................................................................................... 17

Integrated Solutions v. Serv. Support Specialties,
   124 F.3d 487 (3d Cir. 1997) ..................................................................................... 19

Worthington v. General Motors Corporation (In re Claremont Acquisition Corp.),
   113 F.3d 1029 (9th Cir. 1997) ................................................................................... 45

Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l),
   85 F.3d 68 (2d Cir. 1996) .......................................................................................... 40

Stewart Title v. Old Republic Nat. Title,
   83 F.3d 735 (5th Cir. 1996) ....................................................................................... 36

In re Columbia Gas Sys., Inc.,
    50 F.3d 233 (3d Cir. 1995) ................................................................ 21, 25, 26

Maritime Elec. Co. v. United Jersey Bank,
    959 F.2d 1194 (3d Cir. 1991) ................................................................ 56

In re Wolverine Radio Co.,
    930 F.2d 1132 (6th Cir. 1991) ................................................................ 18

In re Joshua Slocum, Ltd.,
    922 F.2d 1081 (3d Cir. 1990) ................................................................ 31, 47

Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n.
    (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.),
    878 F.2d 742 (3d Cir. 1989) ................................................................ 57

In re Munple, Ltd.,
    868 F.2d 1129 (9th Cir. 1989) ................................................................ 20

In re Moreggia & Sons, Inc.,
    852 F.2d 1179 (9th Cir. 1988) ................................................................ 40

In re Stringer,
    847 F.2d 549 (9th Cir. 1988) ................................................................ 58

Fed'l Dep. Ins. Co. v. Air Florida, Inc.,
    822 F.2d 833 (9th Cir. 1987) ................................................................ 21

In re Gardinier, Inc.,
    831 F.2d 974 (11th Cir. 1987) ................................................................ 35, 36

In re PCH Assocs.,
    804 F.2d 193 (2d Cir. 1986) ................................................................ 40

Pristas v. Landaus of Plymouth, Inc.,
    742 F.2d 797 (3d Cir. 1984) ................................................................ 59

Lipsky v. Commonwealth United Corp.,
    551 F.2d 887 (2d Cir. 1976) ................................................................ 21

In re Italian Cook Oil Corp.,
    190 F.2d 994 (3d Cir. 1951) ................................................................ 33

### *United States District Courts*

In re USA Commercial Mortgage Co., Case No. 2:07-CV-00072-RCJ-GWF,
    2007 U.S. Dist. LEXIS 65264 (D. Nev. Aug. 29, 2007) ........................... 18, 23, 24, 26

Aceituno v. KBI Norcal, Inc., Case No. 2:06-cv-2273-GEB-DAD,
    2007 U.S. Dist. LEXIS 43890 (E.D. Cal. June 4, 2007) .......................................................... 21

In re Fleming Cos.,
    Civ. No. 371-SLR, D.I. 20 (D. Del. Mar. 30, 2005) ............................................................... 30

Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.
    (In re The Babcock & Wilcox Co.), Case No. 01-912 c/w 01-1187,
    2002 U.S. Dist. LEXIS 874 (E.D. La. Jan. 4, 2002) ............................................................... 27

In re Bradlees Stores, Inc., Case No. 01-CV-3934 (SAS),
    2001 U.S. Dist. LEXIS 14755 (S.D.N.Y. Sept. 20, 2001) ....................................................... 21

In re Golden Books Family Entm't, Inc.,
    269 B.R. 311 (D. Del. 2001) .................................................................................................... 21

Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of Midcom Communs., Inc.,
    246 B.R. 296 (E.D. Mich. 2000) .............................................................................................. 49

Kopel v. Campanile (In re Kopel),
    232 B.R. 57 (E.D.N.Y. 1999) ............................................................................................ 34, 35

In re James Cable Partners, L.P.,
    154 B.R. 813 (M.D. Ga. 1993) ................................................................................................ 19

In re Indian River Homes, Inc.,
    108 B.R. 46 (D. Del. 1989) ...................................................................................................... 20

### *United States Bankruptcy Courts*

In re Integrated Health Serv., Inc., Case No. 00-389(MFW),
    2000 Bankr. LEXIS 1310 (Bankr. D. Del. July 7, 2007) ................................................... 36, 37

In re USA Commercial Mortgage Co.,
    Case No. 06-10725 (LBR), D.I. 2377 (Bankr. D. Nev. Jan. 8, 2007) ...................................... 23

Shaw Group, Inc., v. Bechtel Jacobs Co., LLC (In re The IT Group, Inc.),
    350 B.R. 166 (Bankr. D. Del. 2006) .................................................................................. passim

In re L.G. Philips Displays USA Inc., Case No. 06-10245 (BLS),
    2006 Bankr. LEXIS 1092 (Bankr. D. Del. June 21, 2006) ................................................ 26, 27

EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.),
    356 B.R. 631 (Bankr. D. Del. 2006) ........................................................................................ 19

United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.),
    346 B.R. 456 (Bankr. N.D. Ill. 2006) ...................................................................................... 34

Kipperman v. Circle Trust (In re Grafton Partners, L.P.),
    321 B.R. 527 (B.A.P. 9th Cir. 2005) ................................................................. 57

Ready Prods., Inc. v. Jarvis (In re Jarvis), Case No. 04-10806-JMD,
    2005 Bankr. LEXIS 536 (Bankr. D.N.H. Mar. 28, 2005)....................................... 26

In re Fleming Cos.,
    Case No. 03-10945 (MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004) ................... 30

In re Enron Corp., Case No. 01 B 16034 (AJG),
    2003 Bankr. LEXIS 2263 (Bankr. S.D.N.Y. Dec. 1, 2003)...................................... 54

In re ANC Rental Corp.,
    277 B.R. 226 (Bankr. D. Del. 2002) ................................................................. 50

Bank of America, N.A. v. Garcia (In re Garcia),
    276 B.R. 627 (Bankr. D. Ariz. 2002)........................................................ 11, 45, 46

In re UAL Corp.,
    293 B.R. 183 (Bankr. N.D. Ill. 2003) ............................................................. 34, 49

In re Valley Media, Inc.,
    279 B.R. 105 (Bankr. D. Del. 2002) ................................................................. 56

In re Waste Systems Int'l, Inc.,
    280 B.R. 824 (Bankr. D. Del. 2002) ................................................................. 17

In re Neuhoff Farms, Inc.,
    258 B.R. 343 (Bankr. E.D.N.C. 2000)............................................................... 50

In re Vitanza, Case No. 98-19611,
    1998 Bankr. LEXIS 1497 (Bankr. E.D. Pa. Nov. 13, 1998)......................... 44, 45, 46

Anchor Resolution Corp. v. State St. Bank & Trust Co. of Am.
    (In re Anchor Resolution Corp.),
    221 B.R. 330 (Bankr. D. Del. 1998) ................................................................. 26

Bridgeport Jai Alai v. Autotote Sys. (In re Bridgeport Jai Alai),
    215 B.R. 651 (Bankr. D. Conn. 1997) ............................................................. 37, 39

In re C.A.F. Bindery,
    199 B.R. 828 (Bankr. S.D.N.Y. 1996)............................................................... 19

In re Spectrum Info. Techs.,
    190 B.R. 741 (Bankr. E.D.N.Y. 1996)............................................................... 26

In re Lee West Enters.,
    179 B.R. 204 (Bankr. C.D. Cal. 1995)............................................................... 45

Central City South Assocs. v. Spirit Holding Company, Inc.
   (In re Spirit Holding Company, Inc.),
      166 B.R. 371 (Bankr. E.D. Mo. 1994) ............................................................. 46

In re Dundee Equity Corp., Case No. 89-B-10233,
      1992 Bankr. LEXIS 436 (Bankr. S.D.N.Y. Mar. 6, 1992) ........................... 18

DiCello v. United States (In re Railway Reorganization Estate, Inc.),
      133 B.R. 578 (Bankr. D. Del. 1991) ............................................................... 19

In re Brendlinger,
      116 B.R. 42 (Bankr. W.D. Pa. 1990) ............................................................. 59

In re Hutchins,
      99 B.R. 56 (Bankr. D. Colo. 1989) ................................................................ 19

In re Joshua Slocum, Ltd.,
      99 B.R. 250 (Bankr. E.D. Pa. 1989) ........................................................ 31, 32

In re Residential Resources Mortgage Inv. Corp.,
      98 B.R. 2 (Bankr. D. Ariz. 1989) ................................................................... 57

In re Precision Carwash Corp.,
      90 B.R. 34 (Bankr. E.D.N.Y. 1988) ............................................................... 17

Madisonview Towers v. Yardley (In re Yardley),
      77 B.R. 643 (Bankr. M.D. Tenn. 1987) .................................................... 44, 46

In re Bygaph, Inc.,
      56 B.R. 596 (Bankr. S.D.N.Y. 1986) ............................................................. 18

In re Compass Van & Storage Corp.,
      65 B.R. 1007 (Bankr. E.D.N.Y. 1986) ........................................................... 20

Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.),
      67 B.R. 198 (Bankr. D. Nev. 1986) ..................................................... 22, 23, 26

In re Haute Cuisine, Inc.,
      58 B.R. 390 (Bankr. M.D. Fla. 1986) ............................................................ 46

In re Bon Ton Restaurant and Pastry Shop, Inc.,
      53 B.R. 789 (Bankr. N.D. Ill. 1985) .............................................................. 46

In re Waldron,
      36 B.R. 633 (Bankr. S.D. Fla. 1984) ............................................................. 39

In re Adolphsen,
      38 B.R. 776 (Bankr. D. Minn. 1983) ............................................................. 25

Harper v. Victor Motors (In re Victor Motors), Adv. No. 83P-0325,
    1983 Bankr. LEXIS 6131 (Bankr. D. Utah May 27, 1983)......................... 49

Chera v. 991 Boulevard Realty Corp. (In re National Shoes, Inc.),
    20 B.R. 55 (Bankr. S.D.N.Y. 1982)..................................................... 20

In re J.M. Fields, Inc.,
    22 B.R. 861 (Bankr. S.D.N.Y. 1982).................................................. 17

In re U.L. Radio Corp.,
    19 B.R. 537 (Bankr. S.D.N.Y. 1982)............................................. 53, 54

In re Sapolin Paints, Inc.,
    5 B.R. 412 (Bankr. E.D.N.Y. 1980)..................................................... 53


*California*

Lowy v. United Pac. Ins. Co.,
    429 P.2d 577 (Cal. 1967).............................................................. 41

Simmons v. California Institute of Tech.,
    34 209 P.2d 581 (Cal. 1949).......................................................... 41

Los Angeles Gas & Elec. Co. v. Amalgamated Oil Co.,
    156 Cal. 776 (Cal. 1909).............................................................. 41

Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.,
    116 Cal. App. 4th 1375 (Cal. Ct. App. 2004).................................... 41


*Minnesota*

Skogberg v. Huisman, Case No. C7-02-2059,
    2003 Minn. App. LEXIS 1043 (Minn. Ct. App. Aug. 19, 2003)............... 21

Cloverdale Foods v. Pioneer Snacks,
    580 N.W.2d 46 (Minn. Ct. App. 1998)............................................. 21


*New York*

In re Estate of Wilson,
    405 N.E.2d 220 (N.Y. 1980)......................................................... 40

Christian v. Christian,
    365 N.E.2d 849 (N.Y. 1977)......................................................... 40

vi

First Savings & Loan Ass'n of Jersey City, N.J. v. Am. Home Assurance Co.,
    29 N.Y.2d 297 N.Y.S.2d 609 (1971) .......................................................................... 41

Ming v. Corbin,
    37 N.E. 105 (N.Y. 1894) ............................................................................................. 41

**Statutes**

11 U.S.C. § 101(5) ....................................................................................................... 18

11 U.S.C. § 105(a) ....................................................................................................... 18

11 U.S.C. § 362(a)(3) .................................................................................................. 56

11 U.S.C. § 363 ............................................................................................... 3, 13, 16, 17

11 U.S.C. § 363(b) .................................................................................................. 20, 47

11 U.S.C. § 363(f) ....................................................................................................... 18

11 U.S.C. § 363(l) ................................................................................................ 19, 20, 56

11 U.S.C. § 365 .................................................................................................... passim

11 U.S.C. § 365(b)(1) .................................................................................................. 29

11 U.S.C. § 365(b)(1)(A) ........................................................................................ 15, 33

11 U.S.C. § 365(b)(1)(B) ........................................................................................ 15, 45

11 U.S.C. § 365(b)(1)(C) .............................................................................................. 16

11 U.S.C. § 365(b)(2) .................................................................................................. 47

11 U.S.C. § 365(b)(2)(A) .............................................................................................. 47

11 U.S.C. § 365(c) ....................................................................................................... 48

11 U.S.C. § 365(c)(2) .................................................................................... 15, 48, 49, 56

11 U.S.C. § 365(e)(1) .................................................................................................. 56

11 U.S.C. § 365(e)(2)(B) ........................................................................................ 48, 56

11 U.S.C. § 365(f)(2) ................................................................................ 29, 48, 50, 53

11 U.S.C. § 365(f)(2)(A) .............................................................................................. 15

11 U.S.C. § 365(f)(2)(B) ........................................................................................ 16, 30

11 U.S.C. § 541(a)(1)..........................................................................................16

11 U.S.C. § 541(c) .............................................................................................19

11 U.S.C. § 555................................................................................3, 56, 58, 59

11 U.S.C. § 559.................................................................................................57

11 U.S.C. § 741(7)(A)(viii)...........................................................................57, 58

U.C.C. § 2-609 cmt. 3 (1972) ...........................................................................53

U.C.C. § 2-609 cmt. 4 .......................................................................................53

**Other Authorities**

3 Collier on Bankruptcy ¶ 365.05[4] ................................................................47

Fannie Mae Guide for Mortgage Selling and Servicing Contracts..........................45, 57

Freddie Mac Single-Family Seller/Servicer Guide................................................54

H. R. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977) .............................................19

S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978) ..................................................19

# INTRODUCTION

AHM Holdings and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors in possession in the above cases (collectively, "AHM" or the "Debtors"), hereby respond (the "Omnibus Response") to certain objections (each an "Objection" and collectively, the "Objections") filed by various non-debtor parties (each an "Objecting Party" and collectively, the "Objecting Parties")[1] to:

    (i)    the Emergency Motion of the Debtors for Orders: (A)(I) Approving Sale Procedures; (II) Scheduling a Hearing to Consider Sale of Certain Assets Used in the Debtors' Loan Servicing Business; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of Such Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreement [Related] Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief, D.I. 11, filed August 6, 2007 (the "Sale Motion");

    (ii)    the Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, D.I. 403, filed August 27, 2007 (the "Initial Cure Notice");

    (iii)    the *Modified* Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure

---

[1]    The Objections identified on Exhibits A-F of this Omnibus Response (concerning the sale of servicing rights) are as follows, listed by Objecting Party and docket number(s) only: Countrywide Bank, FSB and/or Countrywide Home Loans, Inc., D.I. 614 & 1056; DB Structured Products, Inc., D.I. 675 & 1108; Financial Guaranty Insurance Co., D.I. 718 & 1036; Citibank, N.A., D.I. 723, 724 & 1047; CitiMortgage, Inc., D.I. 740, 855 & 1058; Deutsche Bank National Trust Co., D.I. 800 & 832; Connecticut Housing Finance Authority, D.I. 813; Wells Fargo Bank, N.A., D.I. 824 & 1053; The Bank of New York, D.I. 826; Duke University Federal Credit Union, D.I. 831; U.S. Bank, N.A., D.I. 836, 1067 & 1117; CIFG Assurance North America, Inc., D.I. 838 & 1053; HSI Asset Securitization Corp. and HSBC Bank USA, N.A., D.I. 840 & 1113; Credit Suisse First Boston Mortgage Capital LLC, D.I. 1034; Goldman Sachs Mortgage Co. and GS Mortgage Securities Corp., D.I. 845 & 1118; EMC Mortgage Corp., D.I. 850 & 1057; JPMorgan Chase Bank, N.A. and certain affiliates, D.I. 730 & 1048; Morgan Stanley Mortgage Capital Holdings LLC; Wells Fargo Funding, Inc., D.I. 851 & 1053; GMAC Mortgage LLC, D.I. 857 & 1071; Residential Funding Co. LLC, D.I. 859 & 1061; UBS Real Estate Securities, Inc., D.I. 1029 & 1123; Morgan Stanley Mortgage Loans, D.I. 1054; and Assured Guaranty Corp., D.I. 1065.

    The Objections identified on Exhibit G of this Omnibus Response (unrelated to the sale of servicing rights) are as follows, listed by Objecting Party and docket number(s) only: Tuscaloosa County, Alabama, D.I. 615; De Lage Landen Financial Services, Inc., D.I. 660, 841 & 1041; FNC, Inc., D.I. 720; Iron Mountain Information Management, Inc., D.I. 815; Security Connections, Inc., D.I. 823 & 1046; Experian Information Solutions, Inc., D.I. 825; Qwest Communications Corp., D.I. 829; ZC Real Estate Tax Solutions, D.I. 830; Travis County, Texas, D.I. 911; Banc of America Leasing & Capital, LLC, D.I. 995 & 1051; DRI Management Systems, Inc. (informal); and SoftLanding Systems, Inc. (informal).

Obligations, if Any, D.I. 674, filed September 10, 2007 (the "<u>Modified Cure Notice</u>"); and/or

(iv)    the Supplemental Notice of (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, D.I. 962, filed September 26, 2007 (the "<u>Supplemental Cure Notice</u>").

On information and belief, all timely filed Objections that are not addressed by this Omnibus Response[2] were resolved by the Notice of Contracts Excluded from (I) Possible Assumption and Assignment of Certain Leases, License Agreements, and Executory Contracts; and (II) Proposed Cure Obligations, if Any, D.I. 979, filed September 27, 2007 (the "<u>Exclusion Notice</u>"), which withdrew the Sale Motion as to certain Potential Executory Contracts (as defined in the Exclusion Notice) that were previously identified in the Initial Cure Notice and/or Modified Cure Notice.

In support of this Omnibus Response, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

Before the Court is a proposed sale of the Debtors' servicing business as a going concern which, if approved, could bring between $400-500 million into the Debtors' bankruptcy estates and provide for the continued employment of the Debtors' remaining work force.  Most vocally opposed to such sale are a host of institutional investors and lenders which, despite voluntarily purchasing mortgage loans from the Debtors *without* the accompanying Servicing Rights (as hereinafter defined)—and paying accordingly—now seek to *improve* their original

---

[2]    Such Objections are as follows (listed by Objecting Party and docket number(s) only): EMC Mortgage Corp., D.I. 728 & 846; Liquid Funding, Ltd., D.I. 729 & 847; Bear Stearns Mortgage Capital Corp. and EMC Mortgage Corp., D.I. 732; Bear Stearns Mortgage Capital Corp., D.I. 848; Societe Generale, D.I. 733; Credit Suisse First Boston Mortgage Capital LLC, D.I. 844; ABN AMRO Bank N.V., D.I. 852; Nexis Real Estate Capital Inc., D.I. 853; Merill Lynch Mortgage Lending, Inc., D.I. 858; Federal Home Loan Mortgage Corp., D.I. 893; and Calyon New York Branch, D.I. 1031.

bargain by wresting control of such servicing rights from the Debtors' estates for no additional consideration.

These Objecting Parties advance various legal theories to undermine the proposed sale, almost all of which proceed from the following, fundamentally flawed premises: first, that the contracts giving rise to the Debtors' Servicing Rights (the Servicing Agreements, as hereinafter defined) are inextricably intertwined with contracts relating to the sale and/or securitization of the underlying mortgage loans (the Other Agreements, as hereinafter defined); and second, that such Servicing Agreements are executory contracts governed by § 365 of the Bankruptcy Code. To preclude assumption and assignment of the Servicing Agreements, some Objecting Parties invoke allegedly incurable defaults or the Debtors' alleged inability to provide adequate assurance of future performance under the Servicing Agreements. Other Objecting Parties characterize the Servicing Agreements as "financial accommodations" contracts that may not be assumed or assigned, and/or as "securities contracts" that may be terminated on account of an *ipso facto* default and without relief from the automatic stay by virtue of the safe harbor provision of § 555 of the Bankruptcy Code. Finally, almost all of the Objecting Parties assert that a necessary condition to assumption and assignment of any of the Servicing Agreements is the payment of claims arising under the Other Agreements.

The mountain of paper created by the Objecting Parties is daunting, but deceptively so. The vast majority of the Objections will be resolved if the Court determines (as it should) that the Debtors are seeking not the assumption and assignment of executory Servicing Agreements pursuant to § 365 of the Bankruptcy Code, but rather, the sale of vested contractual rights pursuant to § 363. And even if the Servicing Agreements are executory contracts, most of the Objections will still be resolved if the Court determines (again, as it should) that the

3

Servicing Agreements are severable from the Other Agreements.  In so ruling, the Court would merely be confirming what is obvious within the mortgage industry, namely that (i) mortgage loans and servicing rights constitute separate and distinct *property* interests and (ii) the origination and sale of mortgage loans and the servicing of mortgage loans are completely different functions that are capable of being (and indeed, routinely are) performed by different entities.

*To be absolutely clear*, in approving the sale, the Court would *not* be ruling that the underlying mortgage loans, servicing files, and/or unremitted P&I or T&I escrows (as hereinafter defined) constitute property of the estate—they are not, and the Debtors have never contended otherwise.[3]  Nor would the Court be ruling that the MLPSAs or Securitization-Related Agreements (as hereinafter defined) do not qualify as "financial accommodations" contracts or "securities contracts" under the Bankruptcy Code—they may or may not, but the Court need not reach the issue because *the Servicing Agreements* clearly do not qualify as either.  Finally, the Court need not pass upon the validity of any alleged termination of a Servicing Agreement prepetition—those issues will be litigated, if at all, at a later time.

## BACKGROUND

### I.  THE LOAN ORIGINATION/SALE BUSINESS AND THE LOAN SERVICING BUSINESS

Prior to the closing of the Debtors' loan origination business, AHM Corp. and AHM Acceptance originated mortgage loans that they then either securitized or sold outright to the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage

---

[3]    Where the Debtors have refused to turn over servicing-related files and/or P&I or T&I escrows belonging to the Objecting Parties (or, in the case of T&I escrows, belonging to the mortgagor-borrowers), the Debtors have had a colorable claim to lawful *possession* of such property due to a dispute over the validity of the non-debtor party's purported termination of the Servicing Agreement at issue. *The Debtors have never asserted more than a possessory interest in this property.*

Corp. ("Freddie Mac"), large national banks, thrifts and smaller banks, securities dealers, real estate investment trusts or other institutional loan buyers.  Mortgage loans were typically sold with limited recourse, subject to continuing representations and warranties requiring AHM Corp./Acceptance, e.g., (i) to repurchase loans for which there was a payment default within a specified period of time after the initial sale (an "Early Payment Default" or "EPD") or which did not comply with the underwriting standards of the ultimate investor, or (ii) to pay a yield maintenance premium (a "Premium Recapture Payment" or "PRP") with respect to loans that were paid off prior to maturity.

The Debtors' loan servicing business has continued to operate during these chapter 11 cases and is conducted through AHM Servicing.  Loans are serviced primarily for the trusts of AHM Securitizations (as hereinafter defined) and for Fannie Mae, the Government National Mortgage Association ("Ginnie Mae") and other third-party purchasers of mortgage loans.  Historically, the Debtors' loan servicing business provided the Debtors with a countercyclical source of revenue and a stable cash flow, as net income from servicing activities generally tends to increase during periods of rising interest rates when revenue from originations generally tends to diminish.  As of December 31, 2006, AHM Servicing serviced approximately 197,000 loans having an aggregate unpaid principal balance ("UPB") of approximately $46.3 billion.

A.    **MLPSAs**

AHM Corp./Acceptance, as Seller, and AHM Servicing, as Servicer, are parties to a number of Mortgage Loan Purchase and Servicing Agreements ("MLPSAs") with institutional investors and lenders, as Purchasers (the "Third-Party Purchasers"), whereby AHM Corp./Acceptance sold mortgage loans on either a "servicing-retained" or "servicing-released"

5

basis.[4] The MLPSAs operated as an ongoing sale program under which the Third-Party Purchasers stood ready to purchase mortgage loans so long as the loans offered for sale satisfied certain underwriting standards.

### 1.    Embedded Servicing Agreements

With respect to mortgage loans sold on a servicing-retained basis, AHM Servicing retained the right to service such mortgages (the "<u>Servicing Rights</u>") on the terms and consistent with the obligations set forth in relevant subsection(s) and other provisions of the MLPSAs (such subsection(s) and provisions of each MLPSA, an "<u>Embedded Servicing Agreement</u>"). With respect to mortgage loans sold on a servicing-released basis, the Third-Party Purchaser acquired all rights, including the Servicing Rights.

Under MLPSAs where Servicing Rights were retained, AHM Servicing is entitled to receive fees for the servicing duties performed. Mortgagors generally make payments to AHM Servicing, in its capacity as Servicer, and AHM Servicing, in turn, processes the payments received. Typically, the payments received will consist of two components: (i) principal and interest ("<u>P&I</u>"), and (ii) tax and insurance escrows ("<u>T&I</u>"). AHM Servicing, as Servicer, retains a portion of the P&I component as compensation for servicing, and the balance of the P&I is paid to the owner of the mortgage loan (i.e., the Third-Party Purchaser). The T&I component is set aside in separate escrows until payment of the applicable real estate taxes or homeowner's insurance and private mortgage insurance premiums are payable. This arrangement is much the same under MLPSAs where Servicing Rights are not retained, except

---

[4]    AHM Corp./Acceptance is also a party to certain MLPSAs to which AHM Servicing is not a direct party. Often such MLPSAs directly reference AHM Servicing (e.g., by defining it as the "Servicer"). And in all instances, AHM Servicing does the actual servicing on AHM Corp./Acceptance's behalf.

that the Third-Party Purchaser has the option of transferring servicing of the mortgage loans to another servicer.

As discussed in detail below, embedding Servicing Rights in MLPSAs was a simple matter of drafting convenience for the parties. Practically and economically speaking, the duties, conditions, and obligations associated with the Embedded Servicing Agreements, and the consideration underlying them, are no different from those associated with Stand-Alone Servicing Agreements (as hereinafter defined) and, at any rate, are readily severable from the MLPSAs. Indeed, some of the Objecting Parties utilize both Embedded and Stand-Alone Servicing Agreements and, from a business standpoint, would be hard-pressed to make any distinction between them.

### 2. Third-Party Securitizations and AARs

In certain instances (the "Third-Party Securitizations"), MLPSAs were structured as master agreements whereby the Third-Party Purchaser would purchase, pool, and resell mortgage loans to successive securitization trusts. Along with each pool of loans resold to a securitization trust, the Third-Party Purchaser, and the trustee of the securitization trust would enter into an Assignment, Assumption and Recognition Agreement (an "AAR") with AHM Servicing, Inc. The execution of the AAR, in effect, assigned to the trustee of the securitization trust the Third-Party Purchaser's right to AHM Servicing's performance of its mortgage loan servicing functions. Put another way, the AAR made the trustee of the securitization trust an obligee of AHM Servicing's obligations under the Embedded Servicing Agreement. Thus, where mortgage loans were sold to the Third-Party Purchaser on a servicing-retained basis and later securitized, AHM Servicing would continue to own the Servicing Rights with respect to

such loans after execution of the AAR and transfer of the subject mortgage loans to the securitization trust.

**B.    Stand-Alone Servicing Agreements**

The Debtors (usually, AHM Servicing) are also parties to several servicing agreements that are independently documented (the "Stand-Alone Servicing Agreements").

**1.    AHM Securitizations**

A number of the Stand-Alone Servicing Agreements relate to securitization transactions (the "AHM Securitizations") involving residential mortgage loans and/or home equity lines of credit ("HELOCs") originated by commercial lenders (the "Lenders") and purchased by an AHM entity.  HELOCs differ from residential mortgage loans primarily in that the Lenders, in addition to loaning some amount of money at the outset of the transactions, commit to honor future draws requested by the borrowers.

A typical AHM Securitization began with a Lender originating a critical mass of residential mortgage loans and/or HELOCs and entering into a Mortgage Loan Purchase Agreement ("MLPA") or similar agreement, as Seller, with an AHM entity as Purchaser (the "AHM Purchaser").  Under the MLPA, the AHM Purchaser purchased a pool of residential mortgage loans and/or the current balances of a given pool of HELOCs and, with respect to the HELOCs, agreed to purchase any additional balances created upon the funding by the Lender-Seller of subsequent draws requested by the borrower.  The obligation to fund draws under the HELOCs remained with the Lender-Seller.

Contemporaneously with the execution of the MLPA, the AHM Purchaser created a securitization trust[5] and conveyed to it (i) a nominal sum of money to fund the trust corpus, and (ii) the residential mortgage loans and HELOCs acquired via the MLPA, along with associated rights under the MLPA (e.g., the continuing representations and warranties of Lender-Seller with respect to the mortgage loans and HELOCs sold to the AHM Purchaser). Because the AHM Purchaser was not obligated under the MLPA to fund future draws under the HELOCs, no such obligation was assumed by the securitization trust.

The securitization trust, as Issuer, entered into an Indenture with an Indenture Trustee and Securities Administrator, whereby it issued notes or trust certificates to investors and pledged the residential mortgage loans and/or HELOCs it received from the AHM entity as collateral. The Indenture Trustee holds the mortgages and HELOCs to secure the rights of those investing in the Issuer's notes/certificates.

To provide for the servicing of securitized residential mortgage loans and HELOCs, the Issuer and Indenture Trustee enter into a Backup or Master Servicing Agreement with a non-AHM servicer (typically, Wells Fargo for residential mortgage loans and GMAC for HELOCs) (the "Backup/Master Servicer").[6] The Issuer, Indenture Trustee, Backup/Master Servicer, and Lender-Seller also enter into separate agreements with AHM Servicing (or other AHM entity that is *not* the AHM Purchaser) for the servicing of residential mortgage loans (a "Residential Mortgage-Backed Securities ('RMBS') Servicing Agreement") and HELOCs (a "HELOC Servicing Agreement"). Under these agreements, AHM Servicing collects payments

---

[5]    Such trusts are either American Home Mortgage Asset Trusts ("AHMATs") or American Home Mortgage Investment Trust ("AHMITs").

[6]    AHM Acceptance is the Back-Up/Master Servicer with respect to at least one AHMIT. Typically, however, the Back-Up/Master Servicer is a non-AHM party.

from the borrowers and remits such payments (net of servicing fees) to the Securities Administrator for distribution to investors pursuant to the Indenture.

The RMBS and HELOC Servicing Agreements are typically cross-defaulted with the MLPAs, the Trust Agreements, the Indentures, the Backup/Master Servicing Agreements, and/or other agreements executed in connection with the AHM Securitizations (collectively, the "Securitization-Related Agreements"). Other events of default under the RMBS and HELOC Servicing Agreements include charge-offs or payment defaults in excess of certain thresholds and failure of AHM Investment to meet certain net worth requirements.

As discussed below, the Objecting Parties cannot satisfy their burden of proving that these separate and distinct RMBS and HELOC Servicing Agreements with AHM Servicing are somehow integrated with and indivisible from Securitization-Related Agreements to which AHM Servicing is not a party.

## 2.    Non-Securitized Mortgage Loans

The Debtors are parties to several Stand-Alone Servicing Agreements concerning non-securitized mortgage loans, usually with credit unions and other investors having discrete mortgage portfolios. Few Objections were filed with respect to these agreements.

## II.    PROCEDURAL HISTORY

A detailed description of the background of these cases and the Sale of the Servicing Business is set forth in the Sale Motion.[7] On August 6, 2007 (the "Petition Date"), following the cessation of the Debtors' loan origination operations, the Debtors filed these chapter 11 cases to, *inter alia*, preserve the going concern value of their loan servicing operations

---

[7]     Capitalized terms not otherwise defined in this section shall have the meaning ascribed to them in the Sale Motion.

10

while effecting an orderly liquidation of their business for the benefit of their stakeholders.  On the Petition Date, the Debtors filed the Sale Motion, seeking authority, *inter alia*, to sell substantially all assets relating to the Debtors' mortgage loan servicing business on substantially the same terms as set forth in a form asset purchase agreement (the "Form APA") attached to the Sale Motion.

By Order dated August 9, 2007, D.I. 113 (the "Original Procedures Order"), the Court granted the Sale Motion to the extent it requested the establishment of sale procedures (the "Sale Procedures") relating to the sale of the Servicing Business and set certain deadlines for the sale process.  The Original Procedures Order also authorized the Debtors to extend the deadlines set forth in the Sale Motion and the Sale Procedures, after consultation with Bank of America, N.A., in its capacity as the administrative agent under the Second Amended and Restated Credit Agreement, dated August 10, 2006 (the "Administrative Agent") and the Official Committee of Unsecured Creditors (the "Committee"), without further order of the Court.  In the Sale Motion, the Debtors reserved the right to modify the Sale Procedures if they determined that a modification would be in the best interests of their estates.

The Original Procedures Order provided that an auction for the sale of the servicing business (the "Auction") was to be held on September 10, 2007, with a hearing on the Sale Motion (the "Sale Hearing") to be held on September 17, 2007.  Through the Initial Cure Notice, the Modified Cure Notice and the Supplemental Cure Notice (collectively, the "Cure Notices"), the Debtors notified non-debtor parties to the various agreements that might be transferred to a buyer through the sale process of the potential transfer of the Debtors' rights under those agreements, as well as the proposed cure amounts (the "Proposed Cure Amounts") to

11

be paid if such agreements were to be assumed and assigned under § 365 of the Bankruptcy
Code.

## III.    THE APA AND THE BUYER

After the entry of the Original Procedures Order, the Debtors concluded, in the
exercise of their business judgment, that having a stalking horse bidder for the sale of the
Servicing Business would be in the best interests of their estates.  The Debtors commenced good-
faith, arm's-length negotiations with AH Mortgage Acquisition Co., Inc. (the "Buyer") with
respect to a transaction whereby the Buyer would agree to purchase the Servicing Business and
become the stalking horse bidder for the sale process.  To afford time to conduct those
negotiations, on August 31, 2007, the Debtors filed a notice, D.I. 540, advising all interested
parties that the bid deadline had been extended to September 18, 2007, the Auction had been
rescheduled to September 24, 2007, and the Sale Hearing had been rescheduled to October 1,
2007.  To allow further time to finalize those negotiations, on September 14, 2007, the Debtors
filed another notice, D.I. 746, advising all interested parties that the bid deadline had been further
extended to October 2, 2007, the Auction had been rescheduled for October 5, 2007, and the Sale
Hearing had been rescheduled for October 9, 2007.[8]

The Debtors and the Buyer ultimately reached an agreement, as embodied in that
certain Asset Purchase Agreement (together with all exhibits and schedules thereto, the "APA").[9]
Pursuant to the APA, the Buyer agreed to acquire the Purchased Assets.  The Buyer has also
agreed to offer continuing employment to substantially all the employees of the Servicing

---

[8]    The Sale Hearing was further continued to, and is currently scheduled for, October 15, 2007.

[9]    Capitalized terms not defined in this section shall have the meanings provided in the APA.  The description
of the terms of the APA herein is for descriptive purposes only.  To the extent this description and the terms of the
APA vary, the APA shall control.

Business as of the Final Closing Date. Additionally, the Buyer agreed to serve as the stalking

horse bidder for the Sale, conditioned upon approval of certain revised sale procedures (the

"Revised Sale Procedures") and certain auction protections, which were approved by the Court

by Order dated September 25, 2007, D.I. 937 (the "Revised Procedures Order"). Upon review of

the bids received and after consultation with the Administrative Agent and the Committee, the

Debtors determined that, aside from the offer set forth in the APA, there were no other bids for

substantially all of the Purchased Assets. Accordingly, the Auction was canceled, and parties in

interest were notified that the Debtors intended to seek Bankruptcy Court approval for the

transaction described in the APA.

      The APA contemplates that the Sale will be closed in two steps. At the Initial

Closing, anticipated to take place on or about October 31, 2007, the Buyer will pay the Purchase

Price, as provided in section 4.1(a) of the APA, by depositing (i) an amount equal to the Dispute

Amount in the Dispute Escrow; (ii) an amount equal to the necessary direct costs the Debtors

incurred in connection with the APA reasonably acceptable to the Administrative Agent; (iii) an

aggregate amount equal to the Initial Cure Amount for each Assumed Contract in the Cure

Escrow; and (iv) the Net Proceeds (as defined in section 4.1(a)(iv) of the APA) payable to the

Administrative Agent by depositing such Net Proceeds directly into an account specified by the

Administrative Agent in writing, which Net Proceeds will be paid and applied in accordance

with the Cash Collateral Order. Upon payment to the Administrative Agent, the liens and

security interests on the Purchased Assets will be released. Once the Buyer has completed its

licensing process, the parties will then consummate the Sale at the Final Closing.

      After the Initial Closing and through the Final Closing (the "Interim Period"), the

Debtors will operate the Servicing Business with their existing work force and in accordance

with applicable legal and contractual obligations, as provided in the APA. All profits and losses of the Servicing Business during the Interim Period will accrue for the account of the Buyer.

As a condition to the obligations of the Buyer under the APA, the Sale Approval Order must be entered by the Bankruptcy Court and become a final order (which is not subject to any stay of effectiveness) which, among other things: (i) orders that each Servicing Agreement can be assumed and assigned pursuant to § 365 of the Bankruptcy Code or sold pursuant to § 363 of the Bankruptcy Code, provided all other requirements of §§ 365 or 363, as applicable, have been satisfied; (ii) determines that the Buyer and its designees take the Purchased Assets free and clear of all Interests; and (iii) permanently enjoins any person from asserting an Interest (by way of direct claim, counterclaim, offset or otherwise) with respect to a Servicing Agreement.

The Buyer has not agreed to assume any liabilities of the Debtors, other than (a) those obligations arising after the Initial Closing under the Servicing Agreements and other contracts which the Buyer is acquiring, (b) liabilities for Losses incurred by the Servicing Business during the Interim Period, and (c) certain other liabilities specifically scheduled in the APA.

## IV.    THE OBJECTIONS

Several parties objected to the Sale Motion, the Cure Notice, the Modified Cure Notice, and/or the Supplemental Cure Notice prior to the October 2, 2007 objection deadline. Objections relating to the sale of the Debtors' rights under the Embedded Servicing Agreements, AARs, and Stand-Alone Servicing Agreements (collectively, the "Servicing Agreements") assert common grounds for objection that fall within one or more of the six categories discussed below.

The remaining Objections that are subject to this Omnibus Response, which do not relate to the Servicing Agreements, are identified on Exhibit G hereto, along with a brief

14

statement of the nature of each Objection, the Debtors' response thereto (if any), and the

Objection's current status. Hereinafter, the terms "Objection" and "Objecting Party" shall refer

only to those Objections and Objecting Parties challenging the sale of the Servicing Rights.

### A.    Objections Based on the *Cum Onere* Principle

The Objections identified on <u>Exhibit A</u> hereto (the "<u>Severability Objections</u>")

assert that the Debtors' proposed assumption and assignment of (i) the Embedded Servicing

Agreements without the remaining portions of the MLPSAs, (ii) an AAR without the underlying

MLPSA and/or other AARs derived from such MLPSA, or (iii) the RMBS or HELOC Servicing

Agreements without all Securitization-Related Agreements, violates the *cum onere* principle, i.e.,

that a debtor must assume the burdens along with the benefits of an executory contract.[10]

### B.    Objections Relating to Allegedly Incurable Defaults

The Objections identified on <u>Exhibit B</u> hereto (the "<u>Incurable Default</u>

<u>Objections</u>") assert prior defaults under the Servicing Agreements that are historical facts

allegedly incapable of cure. Accordingly, the Objecting Parties argue, the Debtors are unable to

comply with § 365(b)(1)(A) of the Bankruptcy Code and thus cannot assume the Servicing

Agreements or assign them pursuant to § 365(f)(2)(A).

### C.    Objections to the Proposed Cure Amount

The Objections identified on <u>Exhibit C</u> hereto (the "<u>Cure Objections</u>")[11] assert

defaults (or the possibility of defaults) for which the Proposed Cure Amount is an insufficient

---

[10]    Objections asserting that the Sale Motion and APA contemplate impermissible "carve outs" from the liabilities assumed by the Buyer are included in this category.

[11]    <u>Exhibit C</u> includes Objections that merely reserve the right to assert a Cure Objection at some later time.

cure and/or does not adequately compensate the Objecting Parties for their actual pecuniary losses resulting from such defaults as required by § 365(b)(1)(A) & (B) of the Bankruptcy Code.

### D.    Objections Asserting Prohibitions Against Assignment

The Objections identified on <u>Exhibit D</u> hereto (the "<u>Anti-Assignment Objections</u>") assert that the proposed assignment of the Servicing Agreements to the Buyer is prohibited by (i) § 365(c)(2) of the Bankruptcy Code (precluding assumption and assignment of any contract to extend "financial accommodations" to or for the benefit of the debtor), (ii) the Servicing Agreements themselves, and/or (iii) the Sale Procedures and/or Form APA.

### E.    Objections Regarding Adequate Assurance of Future Performance

The Objections identified on <u>Exhibit E</u> hereto (the "<u>Adequate Assurance Objections</u>") assert that the Debtors have not established (or cannot establish, as a matter of law) "adequate assurance of future performance" by the Buyer under the Servicing Agreements as required by § 365(b)(1)(C) and/or § 365(f)(2)(B) of the Bankruptcy Code.[12]

### F.    Objections Based on Alleged Termination of the Servicing Agreements

The Objections identified on <u>Exhibit F</u> hereto (the "<u>Termination Objections</u>") assert that the Servicing Agreements at issue were validly terminated and, accordingly, that the Debtors no longer have any Servicing Rights they can sell to the Buyer.

---

[12]    <u>Exhibit E</u> includes Objections that merely reserve the right to raise an Adequate Assurance Objection at some later time.

## ARGUMENT

**I.    The Servicing Agreements are not executory contracts; the Debtors can sell the Servicing Rights under § 363 of the Bankruptcy Code irrespective of the requirements of § 365**

The overwhelming majority of the Objections presuppose that the Servicing Agreements are executory contracts and attack the sale of the Debtors' Servicing Rights as failing to satisfy the requirements for assumption and assignment set forth in § 365of the Bankruptcy Code. The Court need not reach any of these arguments, however, because the Servicing Agreements are not executory contracts.[13]

**A.    The Servicing Rights are property of the Debtors' estates, which can be sold free and clear of various claims under § 363 of the Bankruptcy Code**

A debtor's rights under a contract constitute "property" interests that become property of the estate pursuant to § 541(a)(1) of the Bankruptcy Code, and which are saleable pursuant to § 363. Shaw Group, Inc., v. Bechtel Jacobs Co., LLC (In re The IT Group, Inc.), 350 B.R. 166, 171 (Bankr. D. Del. 2006) (citing In re Rickel Home Ctrs., Inc., 209 F.3d 291, 302 (3d Cir. 2000); Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 498 (3d Cir. 1998)). Section 365 of the Bankruptcy Code places certain burdens on a debtor as a prerequisite to a sale of rights under an *executory* contract, including the cure of prior defaults and the provision of adequate assurance of future performance under that contract. Shaw Group, 350 B.R. at 172. If a contract is *not* executory, however, a debtor need not cure any prior defaults as

---

[13]    The Debtors stated in their Modified and Supplemental Cure Notices that "the designation of any agreement as a Potential Executory Contract shall not constitute or be deemed to be a determination or admission by the Debtors that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code(all rights with respect thereto being expressly reserved)." (Id. at 5.) To remove all doubt, the Debtors also included the following language: "*BY LISTING A POTENTIAL EXECUTORY CONTRACT ON EXHIBIT B OR EXHIBIT C, THE DEBTORS DO NOT CONCEDE THAT ANY SUCH CONTRACT IS EXECUTORY*" (Modified Cure Notice at 2 (emphasis in original); see Supplemental Cure Notice at 2 (substantially identical language).) Accordingly, all parties were on notice that the Debtors could argue that the Servicing Agreements are not executory contracts subject to § 365 of the Bankruptcy Code.

17

a prerequisite to the sale of rights under such contract—claims arising from a prior breach of that

contract are simply general unsecured claims. In re Waste Systems Int'l, Inc., 280 B.R. 824, 827

(Bankr. D. Del. 2002). As other bankruptcy courts have noted

> [i]t would run contrary to the fundamental policies underlying the
> Bankruptcy Act to extend the statutory option . . . to reject or assume
> executory contracts to situations where the debtor has already received the
> contractual benefits and where the sole effect of assuming the contract
> would be to prefer one general creditor over others whose contracts have
> not been assumed. Assumption of such a contract would convert the
> breach of contract claim of the nonbankruptcy party into an expense of
> administration without providing any further benefit to the estate.

In re J.M. Fields, Inc., 22 B.R. 861, 864 (Bankr. S.D.N.Y. 1982) (citations omitted); accord In re

Precision Carwash Corp., 90 B.R. 34, 38-39 (Bankr. E.D.N.Y. 1988).

As discussed below, the Servicing Agreements are not executory contracts.

Accordingly, the Servicing Rights can be sold pursuant to § 363 of the Bankruptcy Code, and

any objections to the sale of the Servicing Rights which are premised upon § 365 should be

overruled.

### 1. The Debtors may sell their Servicing Rights free and clear of "claims" arising under the Servicing Agreements

Section 363(f) of the Bankruptcy Code permits the debtor to sell property of the

estate "free and clear of any interest in such property of an entity other than the estate"

(including liens, claims, and encumbrances) if:

> (1) applicable nonbankruptcy law permits sale of such property free
> and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be
> sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or

18

> (5)     such entity could be compelled, in a legal or equitable proceeding
> to accept a money satisfaction of such interest.

11 U.S.C. §§ 363(f). Section 105(a) of the Bankruptcy Code provides that the Court "may issue

any order, process or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a).

Because § 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction

of any one of its five requirements will suffice to permit the sale of assets "free and clear" of

liens and interests. In re Dundee Equity Corp., Case No. 89-B-10233, 1992 Bankr. LEXIS 436,

at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale

free of the interest concerned may occur if any one of the conditions of § 363(f) have been

met."); In re Bygaph. Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); see In re

Wolverine Radio Co., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same).

The alleged defaults under the Servicing Agreements, if proven, give rise to

nothing more than unsecured claims that can be liquidated and allowed against the Debtors.

Section 363(f)(5) permits the sale of the Servicing Rights free and clear of any claimed defaults

under the Servicing Agreements that can be reduced to a monetary claim.

2.    **The Debtors may sell their Servicing Rights
notwithstanding any *ipso facto* defaults under the
Servicing Agreements**

The Court's approval of the sale of the Servicing Rights should preempt any

provision in the Servicing Agreements that purports to terminate or modify the Debtors' rights

under the Servicing Agreements on the basis of the Debtors' financial condition.  Section 363(l)

of the Bankruptcy Code states, in pertinent part, that "the trustee may use, sell, or lease property

under subsection (b) or (c) of this section . . . notwithstanding any provision in a contract, a

lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor

19

. . . and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property." 11 U.S.C. §363(l).  Section 363(l) thus preempts state-law or contractual restrictions on the transfer of property of the estate that are based upon or conditioned on the insolvency or financial condition of the debtor.  Integrated Solutions v. Serv. Support Specialties, 124 F.3d 487, 493 (3d Cir. 1997).  Much like analogous provisions of the Bankruptcy Code, i.e., §§ 365(f)(1) and 541(c), § 363(l) preserves valuable property rights of a debtor's estate, notwithstanding so-called "*ipso facto*" clauses that purport to permit a non-debtor party to terminate the debtor's rights.  EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 640 (Bankr. D. Del. 2006) (citing In re James Cable Partners, L.P., 154 B.R. 813, 816 (M.D. Ga. 1993); In re Hutchins, 99 B.R. 56, 57 (Bankr. D. Colo. 1989)).

The Bankruptcy Code preempts *ipso facto* clauses "because they lead to the forfeiture of valuable assets and hamper the debtor's rehabilitation or liquidation.  Hence, they are construed broadly to effectuate the Bankruptcy Code's policy against forfeiture."  In re C.A.F. Bindery, 199 B.R. 828, 833 (Bankr. S.D.N.Y. 1996) (citing H. R. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978); DiCello v. United States (In re Railway Reorganization Estate, Inc.), 133 B.R. 578, 583 (Bankr. D. Del. 1991); In re Compass Van & Storage Corp., 65 B.R. 1007, 1013 (Bankr. E.D.N.Y. 1986); Chera v. 991 Boulevard Realty Corp. (In re National Shoes, Inc.), 20 B.R. 55, 58 (Bankr. S.D.N.Y. 1982)).

Certainly the Objections contesting the Debtors' sale of the Servicing Rights that are expressly based upon the Debtors' financial condition immediately prior to the Petition Date are inconsistent with the statutory language of § 363(l).  So too are the Objections based on AHM Servicing's alleged loss of Fannie Mae- and/or Freddie Mac-qualification.  As discussed further below, a Fannie Mae- and Freddie Mac-qualification requirement in a Servicing

Agreement merely serves as a proxy for financial wherewithal and has no independent

significance apart from establishing an industry baseline for the solvency of a mortgage loan

servicer. Indeed, Fannie Mae's and Freddie Mac's purported termination of the Debtors'

qualified servicer status prepetition was based upon the deterioration of the Debtors' financial

condition immediately prior to the Petition Date. Permitting the Objecting Parties to effect a

forfeiture of the Debtors' Servicing Rights based on Fannie Mae's or Freddie Mac's declaration

of an *ipso facto* default would eviscerate the protections of § 363(l) of the Bankruptcy Code.

Accordingly, the Court should approve the sale of the Servicing Rights pursuant

to § 363(b), notwithstanding any provisions of the Servicing Agreements that purport to

terminate the Debtors' rights on the basis of their financial condition and notwithstanding the

Debtors' alleged loss of Fannie Mae- and/or Freddie Mac-qualified servicer status.

### B.    The Servicing Agreements are not executory contracts

"[W]hether a contract is executory within the meaning of the Bankruptcy Code is

a question of federal law." In re Indian River Homes, Inc., 108 B.R. 46, 49 (D. Del. 1989)

(citing In re Munple, Ltd., 868 F.2d 1129, 1130 (9th Cir. 1989)). Courts, including the Third

Circuit, have widely held that the test to be applied to determine whether a contract is executory

is the "Countryman" definition, which provides that a contract is executory when the obligations

of "both the bankrupt and the other party to the contract are so far unperformed that the failure of

either to complete performance would constitute a material breach excusing the performance of

the other." See In re Golden Books Family Entm't, Inc., 269 B.R. 311, 314 (D. Del. 2001).

Conversely, a contract is not executory when one party has no obligations which, if

unperformed, would constitute a material breach. <u>Columbia Gas Sys.</u>, 50 F.3d at 239. [14]

   For purposes of § 365, whether any material obligations remain unperformed by

the parties to an agreement, therefore making that agreement an executory contract, is to be

evaluated as of the filing of the bankruptcy petition. <u>In re Gen'l Datacomm Indus., Inc.</u>, 407

F.3d 616, 623 (3d Cir. 2005); <u>see</u> <u>also</u> <u>In re Columbia Gas Sys., Inc.</u>, 50 F.3d 233, 239 (3d Cir.

1995).

   **1.**  **The Servicing Agreements impose obligations on AHM**
      **Servicing to perform all necessary tasks but impose no**
      **substantive obligations on the non-debtor parties**

   With some minor variations, the Servicing Agreements constitute agreements

between the Debtors (most typically AHM Servicing), on one hand, and a non-debtor party (e.g.,

a Third-Party Purchaser of loans from various sellers), on the other hand. The Servicing

Agreements set forth the terms by which AHM Servicing undertakes the servicing of the non-

debtor party's loans. Under the terms of the Servicing Agreements, AHM Servicing undertakes

numerous obligations in fulfillment of its duties to the non-debtor parties, including: collecting

P&I and T&I payments from mortgagors; affording the non-debtor parties access to documents;

providing the non-debtor parties with remittance reports; making any necessary T&I advances on

account of delinquent borrowers to preserve the non-debtor parties' rights with respect to the

---

[14]  Under applicable state law, a breach is material if it excuses the non-breaching party from performing its
obligations under the contract or is so substantial that it defeats the purpose of the contract. <u>Lipsky v.
Commonwealth United Corp.</u>, 551 F.2d 887, 895 (2d Cir. 1976) (New York law); <u>Fed'l Dep. Ins. Co. v. Air
Florida, Inc.</u>, 822 F.2d 833, 840 (9th Cir. 1987) (California law); <u>Skogberg v. Huisman</u>, Case No. C7-02-2059, 2003
Minn. App. LEXIS 1043, at *6-7 (Minn. Ct. App. Aug. 19, 2003) (Minnesota law). Each of those states hold that
the materiality of a breach is a question of fact. <u>In re Bradlees Stores, Inc.</u>, Case No. 01-CV-3934 (SAS), 2001 U.S.
Dist. LEXIS 14755, at *25 (S.D.N.Y. Sept. 20, 2001) (applying New York law under the Countryman test);
<u>Aceituno v. KBI Norcal, Inc.</u>, Case No. 2:06-cv-2273-GEB-DAD, 2007 U.S. Dist. LEXIS 43890, at *4 (E.D. Cal.
June 4, 2007) (applying California law under the Countryman test); <u>Cloverdale Foods v. Pioneer Snacks</u>, 580
N.W.2d 46, 49 (Minn. Ct. App. 1998).

collateral securing the mortgage loans; enforcing due-on-sale clauses upon demand; foreclosing on properties secured by defaulted mortgage loans; maintaining insurance policies such as hazard insurance and mortgage protection insurance; retaining compensation from payments of accrued interest on mortgage loans or otherwise; paying any subservicer; delivering statements of compliance; obtaining reports from certified public accountants; preparing and delivering any information reports required under applicable state or federal tax laws; and furnishing information to reporting agencies pursuant to the Fair Credit Reporting Act.

Even payment obligations under the Servicing Agreements do not fall on the non-debtor parties.  AHM Servicing is paid for servicing the mortgage loans by retaining a portion of the P&I it collects from the mortgagors.  The non-debtor parties to the Servicing Agreements never make payments to AHM Servicing; indeed, the non-debtor parties never even have possession of funds by which AHM Servicing is compensated.

Accordingly, the non-debtor parties literally cannot breach the agreement by refusing to pay AHM Servicing, as AHM Servicing is collecting its payment on its own.  Thus, the payment terms and obligations under the Servicing Agreements do not and cannot render such agreements executory; AHM Servicing's compensation is paid from the collections it receives and not from a payment obligation of the non-debtor parties whose loans are serviced.

At least three courts have held, precisely as the Debtors argue here, that agreements between a servicer of loans and an investor party were not executory contracts. Additionally, the Debtors are not aware of any cases holding that servicing agreements such as those at issue here are executory contracts.  In Hatoff v. Lemons & Associates, Inc. (In re Lemons & Associates, Inc.), 67 B.R. 198 (Bankr. D. Nev. 1986), the debtor originated loans on behalf of investors and also entered into agreements with investors which gave the debtor the

right to provide all collection and foreclosure services to the investors. Id. at 201. The court held that the loan servicing agreement between the debtor and the investor was not an executory contract under § 365 because all that remained for the investors to do was "await repayment," and thus the investor's obligations were complete. Id. at 211 (applying the Countryman test). Further, the court stated in dicta that "an obligation to convey title or to surrender a promissory note upon satisfaction of the underlying debt is insufficient to render an agreement executory." Id.

Similarly, in In re USA Commercial Mortgage Co., Case No. 2:07-CV-00072-RCJ-GWF, 2007 U.S. Dist. LEXIS 65264 (D. Nev. Aug. 29, 2007), the Nevada District Court affirmed another bankruptcy court ruling that a servicing agreement was not an executory contract and that the servicing rights thereunder could be transferred without assumption, assignment and cure of any defaults under the servicing agreement. The debtor, USACM, underwrote, originated, brokered, funded, and serviced commercial loans on behalf of various lenders. Id. at *5. USACM proposed a plan of reorganization, which provided for, among other things, the auction and sale of its rights to service loans pursuant to loan servicing agreements (referred to as the LSAs), free and clear of all liens, claims, encumbrances, rights of third parties and interests. Id. at *9-10. The debtor asserted that the LSAs were non-executory contracts, contending that it was not obligated to comply with the assumption, assignment, and cure requirements of § 365 of the Bankruptcy Code to transfer, which position was opposed by the lenders. Id. at *42-46. Over the lenders' objections, the bankruptcy court confirmed the plan and authorized the sale of USACM's loan servicing rights free and clear of claims against USACM

under the LSAs. Findings of Fact ¶ LL, <u>In re USA Commercial Mortgage Co.</u>, Case No. 06-10725 (LBR), D.I. 2377 (Bankr. D. Nev. Jan. 8, 2007).[15]

The district court dismissed the lenders' appeal of the confirmation order because the plan had been substantially consummated, thereby equitably mooting the appeal. <u>In re USA Commercial Mortgage Co.</u>, 2007 U.S. Dist. LEXIS 65264 at *33-34. However, the district court proceeded to analyze the substantive issues raised by the parties, and determined that even if not mooted, the plan would have been upheld. <u>Id.</u> at *35.

Regarding the debtor's sale of the LSAs, the district court ruled:

> At the time Debtors filed the petition for bankruptcy, Appellants could not evade the requirement to pay USACM servicing fees because, under the LSAs, USACM collected its fees through holding back a percentage of payments USACM collected from borrowers. USACM acquired its fees as the money passed through its hands from borrowers to lenders. Consequently, the Direct Lenders had no opportunity to deny USACM its fees, and thus they could not materially breach the LSAs by refusing to pay servicing fees. Likewise, the Direct Lenders could not breach the LSAs by refusing to pay foreclosure costs because in the event of such a refusal, USACM was contractually entitled to recover its costs by deducting costs from the foreclosure proceeds. Further, no evidence in the record suggests any outstanding demand for payment of foreclosure costs existed at the time the petition was filed.

<u>Id.</u> at *45. So too here, the compensation provisions of the Servicing Agreements leave to AHM Servicing the burden of collecting proceeds from the mortgage loans, making payments to the non-debtor parties, and retaining a portion of the proceeds for its efforts. The non-debtor parties have no obligation to AHM Servicing; the terms of the Servicing Agreements are quite intentionally structured so that the non-debtor parties (most of whom are lenders) must only sit back and await payments from AHM Servicing. The non-debtor parties owe no substantive, affirmative obligations to AHM Servicing; thus, the Servicing Agreements are not executory.

---

[15]     The Findings of Fact are attached hereto as <u>Exhibit H-1</u>.

25

2.    **The limited obligations of non-debtor parties under the Servicing Agreements are not material, and therefore do not render the Servicing Agreements executory**

Under the various Servicing Agreements, there are certain obligations of the non-debtor parties that remain as of the Petition Date; however, such obligations are truly ministerial in nature, or are not fundamental to the bargain reflected in the Servicing Agreements. In either case, none of the limited obligations of the non-debtor parties to AHM Servicing constitutes a material obligation that would render the Servicing Agreements executory.

a.    *Ministerial obligations under the Servicing Agreements are not material*

The Third Circuit stated in Columbia Gas that "ministerial acts are analogous to the execution of the release to be found in the settlement of any case," and do not have the requisite materiality to render a contract "executory" under § 365 of the Bankruptcy Code. 50 F.3d at 243. Any obligations imposed on non-debtor parties in the Servicing Agreements are indeed ministerial.

For example, various Servicing Agreements require that the non-debtor party: (i) provide AHM Servicing with notice of any transfer in ownership of any mortgage loan; (ii) release and transfer files and documents evidencing mortgage loans related to the loans being serviced; (iii) appoint parties to receive title to real estate owned properties; (iv) execute any power of attorney or other necessary documents to effectuate the purposes of the Servicing Agreement; (v) and provide procedures for compliance with the Securities and Exchange Commission rules and regulations. None of these acts or duties under the Servicing Agreements make the Servicing Agreements executory. Obligations to convey title documents under the terms of a contract do not render the contract executory. See In re Adolphsen, 38 B.R. 776, 778 (Bankr. D. Minn. 1983) (holding that "[t]he fact that [a party in possession of a document of

26

title] holds legal title and must at some point convey it to the debtors does not render the contract executory any more than the duty of the holder of promissory note to return the note when the debt is satisfied makes it executory"); accord Lemons & Assocs., 67 B.R. at 216. Similarly, obligations to execute a power of attorney or other documents to allow AHM Servicing to undertake its servicing obligations are also ministerial in nature and are not a material obligation under the Servicing Agreements. In re USA Commercial Mortgage Co., 2007 U.S. Dist. LEXIS 65264 at *45-46 (citing Columbia Gas, 50 F.3d at 243; Lemons & Assocs., 67 B.R. at 216).

> b.    *Ancillary obligations under the Servicing Agreements are not material*

The Servicing Agreements contain certain general obligations on the part of the non-debtor party, but even those provisions, when viewed in the context of the Servicing Agreements, do not constitute material provisions that would deem the Servicing Agreements executory.

For example, the Servicing Agreements include provisions requiring the parties to maintain confidentiality of customer information,[16] or the terms of the agreements themselves. See In re L.G. Philips Displays USA Inc., Case No. 06-10245 (BLS), 2006 Bankr. LEXIS 1092, at *14-15 (Bankr. D. Del. June 21, 2006) (holding that future performance of confidentiality provision would "not rise to a level of material performance" and thus did not render contract executory); see also Anchor Resolution Corp. v. State St. Bank & Trust Co. of Am. (In re Anchor Resolution Corp.), 221 B.R. 330, 337 (Bankr. D. Del. 1998) (Walsh, J.) (holding that a

---

[16] The confidentiality provisions are intended to protect the disclosure of information about the individual mortgagors, and any such disclosure would constitute a violation of consumer privacy laws. Thus, the confidentiality provisions are intended to benefit the non-debtor party by protecting it from liability that could arise from disclosure, which simply tracks the parties' legal obligations outside the terms of the Servicing Agreement in any event. Further, just because a provision provides for mutual obligation does not render the agreement executory. "The mere fact a passive restriction on future activity is mutual does not render the Agreement executory under the material breach test." Ready Prods., Inc. v. Jarvis (In re Jarvis), Case No. 04-10806-JMD, 2005 Bankr. LEXIS 536, at *13 (Bankr. D.N.H. Mar. 28, 2005).

confidentiality provision included in an agreement providing for the restructuring of notes was not a material obligation rendering the agreement executory); In re Spectrum Info. Technologies, 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996) (holding that a confidentiality provision in an employment separation agreement did not rise to a level of material future performance rendering the agreement executory); Certain Underwriters at Lloyd's v. McDermott Int'l, Inc.(In re The Babcock and Wilcox Co.), Case No. 01-912 c/w 01-1187, 2002 U.S. Dist. LEXIS 874, at *16-17 (E.D. La. Jan. 4, 2002) (finding that "[a]lthough [the parties to the contract] may have considered confidentiality important, the need for confidentiality was not the 'root' of the agreement").

   The confidentiality of the information under the Servicing Agreements is not at the heart of the agreements themselves, as it would be in the case of, for example, an intellectual property license, for which the confidentiality of the information being licensed was fundamental to the value of the agreement to the contracting parties.  The confidentiality obligations of the non-debtor parties are not material provisions of the Servicing Agreements and do not render the Servicing Agreements executory.  "To decide otherwise, and conclude that the parties' ongoing confidentiality commitments automatically give rise to an executory contract, would vitiate the Countryman Definition: any contract with routine confidentiality provisions would be forever executory."  L.G. Philips, 2006 Bankr. LEXIS 1092 at *14.

   Certain of the Servicing Agreements also provide for _de minimis_ obligations on the part of the non-debtor party.  For example, certain Servicing Agreements require the non-debtor to maintain the custodial account into which AHM Servicing deposits P&I payments collected from mortgagors or to appoint a replacement servicer upon a termination event.  Neither such "obligation," if breached, would deprive AHM Servicing of its rights under the

Servicing Agreements; accordingly, neither constitutes a material obligation that would render the Servicing Agreements executory. For example, if a non-debtor party failed to maintain a custodial account into which AHM Servicing was to deposit the non-debtor party's funds, such failure would certainly not deprive AHM Servicing of its right to continue to service the mortgage loans and retain its fee under the Servicing Agreement. The non-debtor parties' compliance with these terms inure to the non-debtor parties' benefit and are intended to protect the non-debtor parties' rights in the event of a default.

This Court has held that contract rights constitute property rights of a debtor, see Shaw Group, 350 B.R. at 171, and the Servicing Rights here represent significant value to the Debtors' estates. The non-debtor parties to the Servicing Agreements cannot make the requisite showing under the Countryman definition for the Servicing Agreements to be deemed executory contracts; thus, the Debtors are not required to meet the further requirements set forth in § 365 of the Bankruptcy Code before realizing the value of the Servicing Rights through the sale to the Buyer, and the Objections based on the Debtors' alleged obligation to do so should be denied.

II.    **TO THE EXTENT THE SERVICING AGREEMENTS ARE EXECUTORY CONTRACTS, THEIR ASSUMPTION AND ASSIGNMENT ON THE TERMS PROPOSED IN THE SALE MOTION AND THE APA IS CONSISTENT WITH THE REQUIREMENTS OF § 365 OF THE BANKRUPTCY CODE**

Even if the Servicing Agreements were executory (which, as discussed above, they are not), assumption and assignment of such agreements on the terms set forth in the Sale Motion and the APA would satisfy the requirements of § 365 of the Bankruptcy Code. The Objections premised upon § 365 are legion, but their resolution turns primarily upon a single issue: *whether the Objecting Parties will be deprived of the benefit of their bargain.* Clearly they will not.

29

In connection with the proposed assumption and assignment of the Servicing
Agreements, the Debtors will cure any and all material defaults under the Servicing Agreements
by compensating the Objecting Parties for any pecuniary losses resulting therefrom.  Mortgage
loans that have been serviced by the Debtors without incident during the pendency of these
chapter 11 cases will continue to be serviced, first by the Debtors (until the Final Closing) and
then by the Buyer, which will be found by this Court to have the financial wherewithal to
perform all material obligations under the Servicing Agreements.  *This is all that is required by*
*§ 365 of the Bankruptcy Code.*  See 11 U.S.C. § 365(b)(1) & (f)(2).  To the extent the Objections
seek to impose any additional conditions on the assumption and assignment of the Servicing
Agreements (e.g., the assumption of contracts and payment of claims relating to the Debtors'
defunct loan origination business, the cure of historical or immaterial defaults, and compliance
with express or *de facto* anti-assignment provisions), they should be overruled.

A.   **The Court has the discretion to refuse enforcement of
contractual terms that, if enforced, would prevent the Debtors
from realizing the intrinsic value of the Servicing Agreements
via assumption and assignment**

As a threshold matter, a number of the Objections premised upon § 365 direct the
Court to the Third Circuit's recent decision in In re Fleming Companies, Inc., No. 05-2365, 2007
Bankr. LEXIS 19927 (3d Cir. Aug. 22, 2007), which, they assert, confirms a "long-standing
prohibition" against the modification of the terms of an executory contract.  The Debtors agree
that Fleming is germane to many of the issues presented by the Objections.  But a fair reading of
the opinion actually confirms the bankruptcy court's power to modify an executory contract—
*including material terms thereof*—in appropriate circumstances, when necessary to accomplish
the purposes of § 365.

The debtor in Fleming, a wholesale supplier of supermarkets, sought to assume and assign a long-term supply agreement with a national supermarket chain ("Albertson's") to a cooperative of grocery wholesalers ("AWG"). The agreement was executed in connection with the debtor's acquisition of Albertson's Tulsa, Oklahoma warehouse (the "Tulsa Facility") as a going concern. By its terms, the agreement required the debtor to supply Albertson's Oklahoma stores "from the Tulsa Facility," which, in addition to being staffed largely with former Albertson's employees, utilized the electronic ordering system and ordering codes Albertson's had developed to gather data from which marketing and pricing decisions would be made. When the debtor was unable to perform under the agreement, Albertson's switched its source of supply for its Oklahoma stores to its own warehouse in Fort Worth, Texas. The debtor subsequently filed for chapter 11 relief and, at the direction of AWG, rejected the lease for the Tulsa Facility. AWG, which maintained its own warehouse facilities in the Midwest and operated retail stores that directly competed with Albertson's in Oklahoma, planned to supply Albertson's from its own warehouses at the prices and on the terms required by the supply agreement.

Albertson's objected to assumption and assignment of the supply agreement, arguing that the debtor and AWG could not establish "adequate assurance of future performance" unless Albertson's would be supplied from the Tulsa Facility. See 11 U.S.C. § 365(f)(2)(B). In response, the debtor and AWG argued that the contractual provision requiring shipment from the Tulsa Facility was not material and, even if it were, amounted to a *de facto* anti-assignment provision because compliance was no longer commercially practicable. The bankruptcy court sided with Albertson's, holding that "assumption and assignment *cannot* modify an agreement's express terms," Opinion at 6, In re Fleming Cos., Case No. 03-10945

31

(MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004) (emphasis added),[17] and concluding that AWG's undisputed inability to ship from the Tulsa Facility prevented it from providing adequate assurance of future performance. The district court affirmed. Order, <u>In re Fleming Cos.</u>, Civ. No. 04-371-SLR, D.I. 20 (D. Del. Mar. 30, 2005).[18]

Although the Third Circuit ultimately affirmed the bankruptcy and district courts, it disagreed with their legal analysis. For instance, in stark contrast to the bankruptcy court's narrow and absolutist view of its power under § 365 of the Bankruptcy Code, the Third Circuit began its analysis by *confirming* that "the bankruptcy court has *discretion* to excise or waive a bargained-for element of a contract" and "*can refuse enforcement* of terms of a contract in order to permit assignment" so long as doing so does not deprive the non-debtor party of the "full benefit of its bargain." <u>Fleming</u>, 2007 U.S. App. LEXIS 19927 at *11-12 (emphasis added). The threshold question in determining whether the exercise of such discretion is appropriate in a given case, the court concluded, is whether the contractual term at issue is "material and economically significant." <u>Id</u>. at *12-13 (citing <u>In re Joshua Slocum, Ltd.</u>, 922 F.2d 1081 (3d Cir. 1990)).

The "materially and economically significant" standard "was derived from a review of case law interpreting § 365 of the Bankruptcy Code which focused on balancing twin concerns: preventing substantial economic detriment to the nondebtor contracting party and permitting the bankruptcy estate's realization of the intrinsic value of its assets." <u>Id</u>. at *13. Accordingly, application of the standard requires a *two-part inquiry*. First, the court must focus on "the importance of the term to the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of

---

[17]    The Court's opinion is attached hereto as <u>Exhibit H-3</u>.

[18]    The District Court's order affirming the Court's ruling is attached hereto as <u>Exhibit H-4</u>.

that term gives a party the full benefit of his bargain (its economic significance)." Id. at *15.
Then, the court must balance the countervailing rights of the debtor, the proposed assignee, and
the debtor's creditors "to get the benefit of the bargain [the debtor] struck with [the non-debtor
party]." Id. at *17-18.

Applying this standard, the Third Circuit concluded that requiring delivery from
the Tulsa Facility was an integral part of the supply agreement and that noncompliance with this
condition would burden Albertson's in an "economically significant" way because Albertson's
had "bargained for the benefits of expedience, of a trained staff, a consistent supply of products,
and a proven electronic system of record-keeping which furthered Albertson's marketing a
pricing plans, all of which were only available from 'the Tulsa Facility.'" Id. at *18. The court
then considered the rights of the debtor, AWG, and creditors to realize the benefits of the supply
agreement, but concluded that, on balance, "the scale tip[ped] in favor of Albertson's." Id. at
*19. In reaching this conclusion, the court found it significant that AWG had brought about its
own inability to fulfill the terms of the supply agreement by ordering the debtor to reject the
lease for the Tulsa Facility. Id. at *19 ("AWG, by its own actions, cannot give adequate
assurance of performance."), *21 ("AWG rejected the Tulsa Facility lease, and now complains
that it is impossible to comply with an integral term of the contract. This term could have been
performed by some party. It is not now an anti-assignment provision simply because AWG
made the decision not to take on a necessary burden.").

As discussed more fully below, the Debtors believe that any provisions of the
Servicing Agreements that may be modified in connection with the proposed assumption and
assignment thereof are immaterial and/or economically insignificant. The Debtors leave the
Objecting Parties to their burden of proving otherwise at the Sale Hearing. In re Joshua Slocum,

<u>Ltd.</u>, 99 B.R. 250, 257 (Bankr. E.D. Pa. 1989) ("[T]he enforcement of a particular lease provision is dependent on the landlord's proving that the provision substantially serves the economic benefit of the landlord and/or his other tenants."), <u>aff'd in relevant part</u>, 922 F.2d 1081, 1091-92 (3d Cir. 1990).

Alternatively, should the Court determine that any provisions at issue are material and economically significant, the Debtors submit that, on balance, the Debtors' and their creditors' rights to realize the intrinsic value of the Servicing Agreements outweighs any detriment to the Objecting Parties that would result from assignment of the Servicing Agreements to the Buyer. <u>See</u> <u>Fleming</u>, 2007 U.S. App. LEXIS 19927 at *17-18.[19]  In this connection, there are at least two key differences between the <u>Fleming</u> case and this case.

First, in <u>Fleming</u>, permitting assignment of the Supply Contract to AWG would have required Albertson's to re-transition its supply source from its own warehouse facilities, which utilized its custom electronic ordering system, to AWG's facilities, which did not.  In addition, the Tulsa Facility was staffed with Albertson's former employees, who were familiar with Albertson's business, while AWG's warehouse facilities were staffed with its own employees, who were not.  Here, the transition of servicing from the Debtors to the Buyer will require nothing from the Objecting Parties and will in no way impact the continued remittance of P&I, first from the Debtors and then from the Buyer.  In addition, the Buyer will be staffed by the Debtors' former employees.  Accordingly, the Objecting Parties quite literally will receive the benefit they bargained for, i.e., the uninterrupted servicing of the mortgage loans by the Debtors' employees.

---

[19]     The Objecting Parties read <u>Fleming</u> as prohibiting the modification of material terms of a contract.  This reading is flawed, however, because if there were a *per se* rule against modification of material terms of a contract, the Third Circuit's analysis would have ended upon finding that shipment from the Tulsa Facility was "material and economically significant" to Albertson's.  The analysis did *not* end, however, and the court proceeded to balance the equities.

Second, in <u>Fleming</u>, AWG inflicted its own wound by directing Fleming to reject the Tulsa Facility lease. Here, the Buyer has done nothing to impair its ability to perform under the Servicing Agreements. Indeed, as discussed below, the Buyer is fully capable of performing under the Servicing Agreements and intends to do so. The Objecting Parties, however, insist on the performance of obligations (i.e., the payment of claims) essentially unrelated to the servicing of mortgage loans. Unlike Albertson's objection in <u>Fleming</u>, which was based on its commercially reasonable expectations of the bargain it struck with Fleming for the supply of its Oklahoma stores, the Objections here are a rather transparent attempt to improve the bargain the Objecting Parties' struck with AHM Servicing for the servicing of mortgage loans, by imposing requirements on the Buyer that would not be imposed upon a replacement servicer chosen by the Objecting Parties.

**B.** **The Servicing Agreements are severable from the Other Agreements and may be assumed and assigned independently consistent with the *cum onere* principle**

The Severability Objections, citing the familiar principle that a debtor must assume an executory contract *cum onere* (i.e., with the burdens as well as the benefits), <u>In re Italian Cook Oil Corp.</u>, 190 F.2d 994, 997 (3d Cir. 1951), assert that the proposed assumption of the Servicing Agreements is a "partial" assumption that amounts to impermissible "cherry picking" by the Debtors. To assume an Embedded Servicing Agreement, the Objecting Parties contend, the Debtors must assume the underlying MLPSA *en toto* . To assume an AAR, they contend, the Debtors must assume the underlying MLPSA and/or all other AARs derived from such MLPSA. And to assume an RMBS Servicing Agreement or HELOC Servicing Agreement, they argue, the Debtors must assume all Securitization-Related Agreements (such agreements, together with any non-servicing related provisions of the MLPSAs, AARs, and any other of the

35

Assumed Contracts (as defined in the APA), the "Other Agreements").  To assume the Other

Agreements, of course, the Objecting Parties assert that the Debtors would be required to cure

alleged defaults thereunder, see 11 U.S.C. § 365(b)(1)(A), including unpaid EPDs and PRPs that,

in the aggregate, are alleged to be in the tens of millions of dollars.  Accordingly, most of the

Objecting Parties raising Severability Objections also raise Cure Objections.

The Severability Objections overlook the necessary corollary to the *cum onere*

principle, i.e., "that 'in order to assume a particular executory contract . . . , the debtor is *only*

required to perform under that discrete contract . . . , not under other, substantially unrelated

agreements.'"  Shaw Group, Inc. v. Bechtel Jacobs Co. (In re IT Group, Inc.), 350 B.R. 166, 177

(Bankr. D. Del. 2006) (emphasis in original) (quoting United Air Lines, Inc. v. U.S. Bank Trust

Nat'l Ass'n (In re UAL Corp.), 346 B.R. 456, 467 (Bankr. N.D. Ill. 2006)).  "This principle

applies where distinct agreements are set out in the same document."  Id.  And it applies

especially where contracts set out in different documents are linked via provisions that triggering

a loss of rights under one contract if the other contract is breached.  See id. at 179 (noting that

cross-default provisions are "inherently suspect" for purposes of assumption under § 365 of the

Bankruptcy Code) (quoting Kopel v. Campanile (In re Kopel), 232 B.R. 57, 64 (E.D.N.Y.

1999)).  See also Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.), 304 F.3d

410, 444-45 (5th Cir. 2002) (same).

The Servicing Agreements are separate and distinct from the Other Agreements.

Accordingly, the Objecting Parties cannot be heard to complain about "cherry picking" by the

Debtors—the Bankruptcy Code expressly permits it, and federal bankruptcy policy favors it as a

means of maximizing the value of the estate for the benefit of all creditors.  See Shaw Group,

350 B.R. at 177-79; see also In re Rickel Home Ctrs., 209 F.3d 291, 298 (3d Cir. 2000) (§ 365

authorizes the trustee to "maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not"); Cinicola v. Scharffenberger, 248 F.3d 110, 119 (3d Cir. 2001) (same).

The real issue before the Court is whether the Bankruptcy Code and federal bankruptcy policy countenance the Objecting Parties' attempt to leverage their position in the Debtors' Servicing Business into payment in full, in cash of their claims relating to the Debtors' defunct loan origination business. The Debtors contend that they do not. The Debtors' bankruptcy estates should not be required to shoulder burdens under the Other Agreements as a prerequisite to realizing any value under the Servicing Agreements. Such a requirement would offend the letter and the spirit of the Bankruptcy Code, both by frustrating the Debtors' rejection power and by allowing some creditors, based on the happenstance of having multiple contracts with the Debtors, to receive dollar-for-dollar distributions on what would otherwise be general unsecured claims. See Shaw Group, 350 B.R. at 179. See also Kopel, 232 B.R. at 66 ("A creditor cannot use the protections afforded it by section 365(b) . . . in order to maximize its returns by treating unrelated unsecured debt as a *de facto* priority obligation.").

**1.    The Servicing Agreements and Other Agreements are not economically interdependent and are therefore severable under federal bankruptcy law**

It is well-established that a debtor's obligations under a number of allegedly integrated agreements must be *economically interdependent* in order to implicate the *cum onere* principle. See Shaw Group, 350 B.R. at 179-80 (collecting cases, holding that contracts are indivisible only where they are economically interdependent such that piecemeal assumption and assignment would thwart the non-debtor party's bargain). This is so whether the agreements are separately documented or contained in the same document. Id. at 180.

37

For example, in <u>In re Gardinier, Inc.</u>, 831 F.2d 974 (11th Cir. 1987), a seller contracted to sell real property to a buyer and to pay a broker a commission for his services. The contract stated that if the buyer failed to perform, the seller and the broker would divide the deposit, and if the seller failed to perform, he was responsible for the full commission to the broker. The seller filed for bankruptcy and sought to assume the contract. The bankruptcy court approved the seller's assumption of the contract and sale of the real property to the buyer, but blocked the commission, holding that the seller's agreement with the broker was a separate, fully executed agreement. Affirming the bankruptcy court, the Eleventh Circuit identified the following factors that supported the bankruptcy court's holding:

> First, *the nature and purpose of the agreements are different.* One agreement addresses the sale of property and the other contemplates an employment contract related to the sale of the property. Second, *the consideration for each agreement is separate and distinct.* [The buyer] agreed to pay [the seller] in excess of $ 5 million in consideration for the [property]. [The seller] separately agreed to pay [the broker] a commission as consideration for services rendered in making the sale of the property. There was no consideration flowing between [the broker] and [the buyer]. Finally, *the obligations of each party to the instrument are not interrelated.*

<u>Gardinier</u>, 831 F.2d at 976 (emphasis added, citations omitted).

In <u>Stewart Title v. Old Republic Nat. Title</u>, 83 F.3d 735 (5th Cir. 1996), the court concluded that a single lease instrument permitting a company (i) to lease an abstract plant and make use of records contained therein and (ii) upon lease termination, copy all property records relating to matters filed since 1960 was divisible into two separate agreements because, *inter alia*, (i) the reproduction rights survived breach and termination of the lease, (ii) the two agreements encompassed a different subject matter, and (iii) the parties' conduct (specifically, their method of payment), suggested implied consideration apportionment—i.e., the lease directed two types of payment for "use" (monthly rent) and reproduction (the ability to copy day-

to-day title additions). Id. at 739-40. Accordingly, rejection of the "use" lease did not affect the

debtor's reproduction rights, which were assets that could be sold separately by the estate. Id. at

741-42.

Courts have applied similar reasoning in cases involving multiple, allegedly

integrated contracts. For example, in In re Integrated Health Serv., Inc., Case No. 00-

389(MFW), 2000 Bankr. LEXIS 1310 (Bankr. D. Del. July 7, 2007), Judge Walrath concluded

that three leases executed by a health care provider were severable from a non-compete

agreement executed by the provider's executive that, among other things, prevented him from

leasing premises to other healthcare providers for 10 years post-execution. In reaching this

conclusion, Judge Walrath found relevant that (i) the consideration supporting each agreement

was apportionable (i.e., monthly lease payments versus annual executive salary), (ii) the

agreements covered different subject matter and had different objectives (i.e., a lease of real

property versus a personal contract to refrain from competitive conduct), and (iii) the agreements

at issue obligated different parties. Id. at *10-15; accord Bridgeport Jai Alai v. Autotote Sys. (In

re Bridgeport Jai Alai), 215 B.R. 651, 658 (Bankr. D. Conn. 1997) (finding significant that the

parties to each allegedly integrated agreement were different).

The foregoing authorities confirm that the Servicing Agreements and the Other

Agreements are severable under federal bankruptcy law. First, the nature and purpose of the

Servicing Agreements and Other Agreements are different—the former concern the servicing of

an existing, identified body or pool of mortgage loans, and the latter concern the initial sale

and/or packaging of such loans into securitization pools.

Second, the consideration underlying the servicing of the mortgage loans (i.e., the

servicing fees deducted from the borrowers' P&I payments) is separate and distinct from that

underlying the initial sale and/or packaging of the mortgage loans (i.e., the cash purchase price paid for the mortgage loans). This is nowhere more apparent than in the very real economic distinction between the sale of loans on a servicing-retained basis versus a servicing-released basis. In a servicing-released transaction, the seller realizes the value of the loan servicing rights as an element of the sale price for the loans; in a servicing-retained transaction, the seller realizes the value of the servicing rights as fee income from the actual servicing of the loans.[20] As such, the consideration flowing to the seller for any sale of mortgage loans is easily apportioned between the mortgage loans themselves and the associated servicing rights.

Finally, with very few exceptions, the Servicing Agreements and the Other Agreements obligate different parties, which reflects the real practical economic distinction between the Debtors' loan origination/sale business and the Debtors' servicing business. For instance, in a typical MLPSA with an Embedded Servicing Agreement, *AHM Corp./Acceptance* is the Seller (i.e., the actual owner of the mortgage loans who sells them to the Third-Party Purchaser subject to representations and warranties concerning EPDs and PRPs) and *AHM Servicing* is the Servicer. Similarly, in an AHM Securitization, the only contracts to which AHM Servicing is a party are the RMBS and HELOC Servicing Agreements.

In sum, the structure of the Servicing Agreements and the Other Agreements confirms the practical reality of the market place, where the origination and sale of mortgage loans is separate and distinct from the servicing of mortgage loans. Some entities specialize in

---

[20]     The distinction is captured succinctly by the advertising materials on the Freddie Mac website, which describe sales to Freddie Mac on a servicing-released basis as follows: "With the servicing-released execution, you sell your mortgage asset and servicing asset in one transaction, and receive an *all-in cash price that includes the servicing-released premium*." Freddie Mac: Cash, Servicing-Released Execution, http://www.freddiemac.com/sell/factsheets/cash_servicing.html (emphasis added) (last visited Oct. 9, 2007). Sales on a servicing-retained basis, on the other hand are described as follows: "This cash execution helps you increase your profitability for fixed-rate and balloon/reset mortgages, *while maintaining your servicing asset*." Freddie Mac: Cash, Servicing Retained Execution, http://www.freddiemac.com/sell/factsheets/cash_retained.html (emphasis added) (last visited Oct. 9, 2007).

one or the other. Until recently, AHM specialized in both. That the Objecting Parties contracted

with one AHM entity for the purchase or securitization of mortgage loans and another AHM

entity for the servicing of such loans does not render such contracts *economically interdependent*

so as to implicate the *cum onere* rule in bankruptcy.[21]

### 2. Applicable state law supports the conclusion that the Servicing Agreements are severable from the Other Agreements

The rights provided by § 365 of the Bankruptcy Code are sufficiently unique, and

the policies underlying them sufficiently compelling, to overcome rote deference to state contract

law on the issue of severability. See Butner v. United States, 440 U.S. 48, 55 (1979) ("Property

interests are created and defined by state law. *Unless some federal interest requires a different*

*result*, there is no reason why such interests should be analyzed differently simply because an

interested party is involved in a bankruptcy proceeding." (emphasis added)); Bridgeport Jai Alai

v. Autotote Sys. (In re Bridgeport Jai Alai), 215 B.R. 651, 656-58 (Bankr. D. Conn. 1997)

(applying Butner, holding that federal law would compel conclusion that contracts at issue were

severable even if Connecticut law did not, due to the "overriding federal interest" embodied in

§ 365 of the Bankruptcy Code). Accord Shaw Group, 350 B.R. 177-81 (applying federal case

law to determine whether cross-defaulted contracts were integrated or severable for purposes of

assumption and assignment under § 365).

---

[21]    By way of example, had the Objecting Parties purchased loans from AHM Corp. on a servicing-released basis and obtained servicing from a non-AHM servicer, that servicer would *not* assume AHM Corp.'s representations and warranties (i.e., liability for EPDs and PRPs) with respect to the serviced loans. Similarly, if the Objecting Parties had purchased loans on a servicing-retained basis from AHM Corp. and had terminated AHM Servicing's rights to service the mortgage loans, any successor servicer the Objecting Parties might select would *not* undertake to make the Objecting Parties whole for the EPDs and PRPs. In other words, outside of bankruptcy, EPDs and PRPs are sunk costs for which the Objecting Parties would only have claims against AHM Corp. Now that AHM Corp. is in bankruptcy, the Objecting Parties seek to alter this bargained-for allocation of risk by surcharging the Buyer (and indirectly, the bankruptcy estates) for EPDs and PRPs that no successor servicer *outside* of bankruptcy would be willing to pay.

The Third Circuit's recent Fleming decision confirms the importance of the policies underlying § 365 of the Bankruptcy Code. See 2007 U.S. App. LEXIS 19927 at *11-12 (confirming the bankruptcy court's power "to excise or waive a bargained-for element of a contract" in order to effectuate the policies underlying § 365). Accordingly, the federal law discussed above should control whether or not the Servicing Agreements and Other Agreements are severable. Cf. In re Waldron, 36 B.R. 633, 636 n.2 (Bankr. S.D. Fla. 1984) ("Where possible, the Code should be given federal meaning. This permits uniformity in a national system; it promotes exegesis in line with bankruptcy policies. . . . [C]haracterization of the contract under state law should not control under bankruptcy law. Moreover, interpretation of an executory contract under state law serves purposes which are unrelated to the purposes served under Sec. 365.").

Nevertheless, to the extent that state law is relevant, it supports the conclusion that the Servicing Agreements are severable from the Other Agreements. The Servicing Agreements and Other Agreements are governed by either New York or California law. While there is no precise state-law analogue to assumption and rejection of executory contracts, New York and California contract cases concerning severability in other contexts generally support the conclusion that the Servicing Agreements are severable from the Other Agreements.

In New York, the severability of a contract is a question of the parties' intent, "to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted." Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l (In re Balfour MacLaine Int'l), 85 F.3d 68, 81 (2d Cir. 1996) (quoting Christian v. Christian, 365 N.E.2d 849 (N.Y. 1977)); see In re Estate of Wilson, 405 N.E.2d 220, 223 (N.Y. 1980) (holding that "the intent of the parties as reflected in the language they employ and

42

the particular circumstantial milieu in which the agreement came into being" controls).[22]  As a

general rule, a contract is entire when "by its terms, nature, and purpose, it contemplates and

intends that each and all of its parts, and the consideration therefore, shall be common each to the

other and interdependent." First Savings & Loan Ass'n of Jersey City, N.J. v. Am. Home

Assurance Co., 29 N.Y.2d 297, 300, 327 N.Y.S.2d 609, 611 (1971); see Ming v. Corbin, 37 N.E.

105, 107 (N.Y. 1894) (holding that contract is severable "when the part to be performed by one

party consists of several distinct and separate items, and the price to be paid by the other is

apportioned to each item . . .").

Similarly, in California, the severability of a contract is a question of the parties'

intent, "to be ascertained from a consideration of the language employed and the subject-matter

of the contract." Los Angeles Gas & Elec. Co. v. Amalgamated Oil Co., 156 Cal. 776, 779 (Cal.

1909).  "[W]hen the price is expressly apportioned by the contract, or the apportionment may be

implied by law, to each item to be performed, the contract will generally be held to be

severable."  Id.; see Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th

1375 (Cal. Ct. App. 2004) (applying Amalgamated Oil analysis).  Accord Lowy v. United Pac.

Ins. Co., 429 P.2d 577, 580 (Cal. 1967); Simmons v. California Institute of Tech., 34 209 P.2d

---

[22]     By focusing on the parties' intent, state law permits (indeed, *invites*) parties to contract around bankruptcy
by artful drafting.  However, as observed by the Second Circuit:

> While the parties to a contract may intend that, between themselves, their relationship is
> to be governed by the label they affix, that label neither governs the rights of third parties
> nor affects the legal consequences of the parties' agreement.  This is especially so under
> the statutory scheme controlling bankruptcy proceedings, where Congress has defined the
> legal consequences of commercial relationships.   Moreover, it would be inherently
> inequitable to allow the parties' choice of label to affect the rights of third party creditors.

In re PCH Assocs., 804 F.2d 193, 198 (2d Cir. 1986); Cf. United Airlines, Inc. v. HSBC Bank U.S.A., N.A., 416
F.3d 609, 612 (7th Cir. 2005) ("It is unlikely that the [Bankruptcy] Code makes big economic effects turn on the
parties' choice of language rather than the substance of their transaction; why bother to distinguish transactions if
these distinctions can be obliterated at the drafters' will?") (Easterbrook, J.); In re Moreggia & Sons, Inc., 852 F.2d
1179, 1183-1184 (9th Cir. 1988) ("Simply meeting the state law definition of a lease will not necessarily mandate
the mindless application of section 365.  Rather, the substance of the agreement must properly fall within the scope
of the type of agreement anticipated by Congress in enacting section 365.").

581, 587-88 (Cal. 1949) ("Generally speaking, the test of whether a contract is divisible is that if the consideration is single, the contract is entire, but if the consideration is apportioned, the contract may be regarded as severable. And a contract may be severable as to some of its terms, or for certain purposes, but indivisible as to other terms, or for other purposes." (citations omitted)).

As discussed above, the Servicing Agreements and the Other Agreements (i) have different purposes and/or subject matter, (ii) are between different parties, (iii) entail different obligations, (iv) have separate and distinct consideration underlying such obligations, (v) are not economically interdependent, and/or (vi) expressly contemplate the servicing of loans by an entity other than AHM Servicing, which entity does not assume any EPD or PRP obligations at the time of the transfer. Accordingly, to the extent that state contract law is relevant to the question of severability for the purposes of assumption under § 365 of the Bankruptcy Code, the language of the contracts themselves and the circumstances of their execution indicate that the parties intended the Servicing Agreements to be severable from the Other Agreements.

### C. The Debtors will cure any "material and economically significant" defaults under the Servicing Agreements; other alleged defaults are irrelevant

The Debtors are investigating the alleged defaults raised in the Incurable Default Objections and the Cure Objections and reserve the right to challenge the existence, materiality, and/or economic significance of any such default at the Sale Hearing. What follows is a response to the legal issues raised in such Objections.

1.     **The Debtors are in fact Fannie Mae-qualified; any
       default relating to the alleged loss of such qualification
       has been cured**

The Debtors service certain mortgages on behalf of Fannie Mae.  On July 31,

2007, Fannie Mae sent the Debtors a written notice purporting to terminate their qualified

servicer status.  The Debtors dispute whether such termination was valid or effective prior to the

Petition Date.  In an effort to resolve this dispute, Fannie Mae and the Debtors negotiated a

settlement agreement (the "Stipulation"), which was approved by the Court on September 4,

2007, D.I. 611.

Among other things, the Stipulation permits the Debtors to continue servicing the

Fannie Mae mortgage portfolio on an interim basis in accordance with the Stipulation and the

Fannie Mae Guide for Mortgage Selling and Servicing Contracts (the "Fannie Mae Guide"),

available at http://www.allregs.com/enfma (last visited Oct. 9, 2007).  In exchange for such

interim servicing, the Debtors are authorized to collect the same fees as were payable in

connection with servicing of the Fannie Mae portfolio prior to the purported termination of their

approved servicer status.  The Stipulation also provides that, without prejudice to Fannie Mae's

rights in connection with its July 31, 2007, notice, the Debtors shall be deemed a qualified

Fannie Mae servicer on an interim basis during the term of the Stipulation.  The Stipulation

requires the Debtors to negotiate and close a sale of their rights to service Fannie Mae mortgages

on or before October 31, 2007.[23]

On August 17, 2007, DB Structured Products, Inc. ("DB Structured") moved for

relief from the automatic stay [D.I. 229] to terminate a Servicing Agreement with the Debtors on

the basis of an allegedly incurable and continuing default of a contractual provision requiring the

---

[23]    The Debtors and the Buyer are currently working with Fannie Mae to (i) extend the Debtors' interim
qualification past October 31, 2007, and (ii) obtain qualification for the Buyer.

Debtors to meet the qualifications of either a Fannie Mae or Freddie Mac servicer. At the hearing on such motion on September 17, 2007, DB Structured argued that the Stipulation did not provide the Debtors "actual" Fannie Mae-qualified servicer status within the meaning of the default provision in the Servicing Agreement. The Court disagreed, stating:

> [A]s we sit here today, the debtor is a qualified – or qualifies as a Fannie Mae servicer. So I don't think that the . . . movants have established that there's an ongoing continuing breach of the agreement that has not been cured. I think there was, in all likelihood, a breach, at least for some time, but that . . . has been cured by the settlement . . . .

(9/17/07 Hr'g Tr. 103:19-25.)[24]

To the extent that the Incurable Default Objections are based on the Debtors' purported loss of their Fannie Mae-qualified status, they should be overruled for the reasons stated on the record at the September 17, 2007, hearing.[25]

### 2. Section 365(b)(1)(A) does not require the Debtors to undo historical facts; any and all material and economically significant defaults under the Servicing Agreements are curable

The Incurable Default Objections invoke a variety of historical, nonmonetary defaults as talismans to ward off assumption of the Servicing Agreements, on the theory that the Debtors' inability to change the past renders "cure" impossible within the meaning of § 365(b)(1)(A) of the Bankruptcy Code. To cure any default, however, the Debtors need only (i) cease any continuing violation of the Servicing Agreements and (ii) restore the Objecting Party *economically* to the position it would have been in but for such default. With the possible exception of unenforceable *ipso facto* provisions (discussed below), the Debtors are currently in

---

[24]     Portions of the September 17 hearing transcript [D.I. 908] cited herein are attached hereto as Exhibit H-2.

[25]     The Debtors do not concede that they ceased to be Fannie Mae-qualified as a result of Fannie Mae's July 31, 2007, letter (or otherwise) and, to the extent necessary, reserve the right to challenge this at the Sale Hearing.

compliance with all provisions of the Servicing Agreements and there is no "continuing violation." The Objecting Parties will have an opportunity at the Sale Hearing to put on evidence of any losses resulting from the Debtors' alleged non-monetary defaults. To the extent the Incurable Default Objections assert that something more is required, they should be overruled.

At least one court in this circuit has recognized the absurdity of reading § 365(b)(1)(A) to require literal "cure" of a historical, nonmonetary default:

> Most non-monetary defaults (e.g., failure to maintain the premises in a certain condition, failure to seek approval; failure to provide reasonable consent) are "historical facts." Consequently, if [the] "historical fact" theory were applied to all non-monetary defaults, it would, in effect, eliminate the right to assume a lease for which non-monetary defaults exist. If Congress had intended to limit the right to assume to leases involving only monetary defaults, it could have so stated in § 365.

In re Vitanza, Case No. 98-19611, 1998 Bankr. LEXIS 1497, at *87 n.51 (Bankr. E.D. Pa. Nov. 13, 1998). Accord Madisonview Towers v. Yardley (In re Yardley), 77 B.R. 643, 645 (Bankr. M.D. Tenn. 1987) ("Congress contemplated that non-monetary defaults would be curable under § 365. Section 365(b)(1) begins with a general power to assume or reject an executory contract or unexpired lease. 'If there has been a default,' the trustee cannot assume the contract or lease without curing 'such default' or providing adequate assurance of a prompt cure. There are no words of limitation indicating that the nature of the prepetition default restricts the general power to assume or reject.").

The debtor in Vitanza sought to assume a commercial lease for premises on which he operated his restaurant prepetition. The lessor objected to the proposed assumption on the basis that the debtor's prior use of the sidewalk outside the premises for café seating violated a use provision in the lease and constituted a historical default not susceptible of cure. The lessor relied primarily on Worthington v. General Motors Corporation (In re Claremont Acquisition

47

Corp.), 113 F.3d 1029, 1033 (9th Cir. 1997), wherein the Ninth Circuit concluded that a debtor

auto dealership's failure to operate prepetition in default of a "going dark" provision in its GMC

franchise agreement "is a 'historical fact' and, by definition, cannot be cured." Id. at 1033

(citing In re Lee West Enters., 179 B.R. 204, 208 (Bankr. C.D. Cal. 1995).) The Vitanza court

agreed with the Ninth Circuit's view that the Bankruptcy Code relieves debtors of their

obligation to pay penalties but does not relieve them of their obligation to cure non-monetary

defaults.[26] 1998 Bankr. LEXIS 1497 at *75. It criticized the conclusion that a "historical fact" is

per se incurable, however, noting that the Ninth Circuit "did not provide any further explanation

or discussion of this point" and merely cited another case involving a franchise agreement. Id. at

*83. The court declined to extend the Claremont holding beyond franchise agreements:

> I find no relevant similarity between the cessation of business operations
> under a franchise agreement and Debtor's intermittent use of the sidewalk
> for a purpose not allowed under the Lease. . . . [T]here are statutory
> provisions which specifically permit franchisers to terminate a franchise
> which ceases to operate; no comparable statutory provision is at issue
> here. In addition, *[Lessor] has not presented any evidence that Debtor's
> use of the sidewalk affected its good will or caused it any economic or
> other harm.*

1998 Bankr. LEXIS 1497 at *75 (emphasis added).

     Assuming *arguendo* that the defaults raised by the Incurable Default Objections

are actual, material and economically significant so as to require cure under § 365(b)(1)(A), the

statute is more reasonably understood to permit the "cure" of such defaults by (i) ceasing any

ongoing violation and (ii) restoring the non-debtor party to the *status quo ante* by compensating

it for any pecuniary loss occasioned by the defaults. Bank of America, N.A. v. Garcia (In re

---

[26]    This was the narrow issue in Claremont. See Bank of America, N.A. v. Garcia (In re Garcia), 276 B.R.
627, 638 (Bankr. D. Ariz. 2002) ("[T]he key issue in Claremont was not whether the default was curable, but rather
whether the Code excused cure."). Congress recently codified *the* narrow holding of Claremont by amending
§ 365(b)(1)(B) of the Bankruptcy Code to clarify that the debtor is only excused from curing non-monetary defaults
resulting from application of a "penalty provision" in an executory contract. Congress did not codify Claremont's
other holding, i.e., that historical nonmonetary defaults are incapable of cure.

Garcia), 276 B.R. 627, 637-41 (Bankr. D. Ariz. 2002). See Vitanza, 1998 Bankr. LEXIS 1497 at

*90 n.52 ("As an alternative basis for permitting Debtor to assume the Lease, I accept Debtor's

representation that he will cease using the sidewalk for purposes of a cafe as a cure of his default

of . . . the Lease."); Central City South Assocs. v. Spirit Holding Company, Inc. (In re Spirit

Holding Company, Inc.), 166 B.R. 371, 379-80 (Bankr. E.D. Mo. 1994) (permitting debtor

which defaulted on lease by withholding consent to construction of outlets to cure default by

consenting to one of the outlets); Madisonview Towers, 77 B.R. at 645-46 (cure requirement of §

365(b)(1)(A) deemed satisfied where no party suggested that anything more could be done by the

debtor, who violated his lease by engaging in an altercation with a security guard, to cure his

default); In re Haute Cuisine, Inc., 58 B.R. 390, 392-393 (Bankr. M.D. Fla. 1986) (where debtor

proposed to re-open restaurant and obtain the necessary alcoholic beverage license within sixty

days, its assumption of lease was conditionally granted even though it defaulted under lease by

failing to have an open restaurant and allowing its alcoholic beverage license to lapse); In re Bon

Ton Restaurant and Pastry Shop, Inc., 53 B.R. 789, 801-02 (Bankr. N.D. Ill. 1985) (where debtor

defaulted on lease provisions requiring it to maintain the premises in good and proper condition,

debtor was permitted ninety day period to cure defaults by taking specific steps to eliminate fire

hazards that existed in the premises).

### 3. Section 365(b)(2) of the Bankruptcy Code excuses the cure of any *ipso facto* defaults

Section 365(b)(2) of the Bankruptcy Code provides that § 365(b)(1)'s cure

requirement "does not apply to a default that is a breach of a provision relating to (A) the

insolvency or financial condition of the debtor at any time before the closing of the case; [or] (B)

the commencement of a case under this title . . . ." 11 U.S.C. § 365(b)(2)(A) & (B).

49

The scope of section 365(b)(2) is broad. It applies not only to defaults triggered by a bankruptcy filing, but also to defaults triggered by events or conditions that are likely to occur or exist around the time that a case is commenced. For example, a default measured by the debtor's financial condition need not be cured, whether the default is related directly to the bankruptcy filing or merely occurred on the road to bankruptcy.

3 Collier on Bankruptcy ¶ 365.05[4]; see In re Rickel Home Ctrs., Inc., 209 F.3d 291, 298 (3d Cir. 2000) ("The Code . . . prevents enforcement of so-called *ipso facto* clauses that trigger a default upon a bankruptcy filing or upon 'events or conditions that are likely to occur or exist around the time that a case is commenced.'" (quoting Collier)). See also In re Joshua Slocum Ltd., 922 F.2d 1081, 1090 (3d Cir. 1991) ("Section 365(b)(2) on its face permits the court to ignore so-called ipso facto and forfeiture clauses.")[27] In light of the foregoing, to the extent the Incurable Default Objections and Cure Objections assert that the cure of *ipso facto* defaults is required, they should be overruled.

4.    **The Debtors need not cure defaults under the Other Agreements**

As discussed above, because the Servicing Agreements and the Other Agreements are severable, the Debtors may assume the Servicing Agreements without curing defaults under the Other Agreements. Accordingly, to the extent the Incurable Default Objections and the Cure Objections assert defaults relating to the Other Agreements as "cure" obligations with respect to the Servicing Agreements, they should be overruled.

---

[27]    Because a Fannie Mae-qualification requirement in a Servicing Agreement serves as a proxy for financial wherewithal (as discussed below), and because Fannie Mae's purported termination of the Debtors' qualified servicer status based on the Debtors' financial condition immediately prior to the Petition Date, any alleged default under the Servicing Agreement premised upon the Debtors' loss of Fannie Mae-qualified servicer status is properly characterized as an *ipso facto* default. Accordingly, even if the Court were inclined to reconsider its prior reasoning with respect to the Fannie Mae-qualification requirement, the loss of such qualification (whether prior to the Petition Date or upon expiration of the Stipulation) would not constitute an event of default. To the extent it is relevant, the same reasoning applies with equal force to a provision of a Servicing Agreement requiring Freddie Mac qualification.

D.    **The only condition for assignment of the Servicing Agreements is compliance with § 365(f)(2) of the Bankruptcy Code.**

The Anti-Assignment Objections identified on <u>Exhibit E</u> assert a variety of "necessary" conditions to assignment of the Servicing Agreements other than those specified in § 365(f)(2) of the Bankruptcy Code.

1.    **Servicing Agreements are not "financial accommodations" contracts and may be assumed and assigned without the Objecting Parties' consent**

Several Anti-Assignment Objections assert that the Servicing Agreements are "financial accommodations" contracts within the meaning of § 365(c)(2) of the Bankruptcy Code and, accordingly, cannot be assumed or assigned without the Objecting Parties' consent. This argument is without merit.

Section 365(c) of the Bankruptcy Code provides that the debtor may not assume or assign an executory contract if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor." 11 U.S.C. § 365(c)(2). Section 365(e)(2)(B) of the Bankruptcy Code provides that the general rule invalidating *ipso facto* defaults does not apply to an executory "financial accommodations" contract.

The term "financial accommodations" is not defined in the Bankruptcy Code. However, the legislative history of § 365(c)(2) makes clear that

> [t]he purpose of this subsection, at least in part, is to prevent the trustee from requiring new advances of money or other property. The section permits the trustee to use and pay for the property already advanced, but is not designed to permit the trustee to demand new loans or additional transfers of property under lease commitments.

<u>Harper v. Victor Motors (In re Victor Motors)</u>, Adv. No. 83P-0325, 1983 Bankr. LEXIS 6131, at *2-3 (Bankr. D. Utah May 27, 1983) (citation omitted).

51

The premise of the subsection is that, "where the loan or other transaction was based in the main or solely upon the financial strength of the debtor, there ought not be a requirement to extend new credit, whether in the form of new loans, lease financings or the purchase of discount notes" during the bankruptcy case. Id. at *5. "[C]haracterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time." Id. at 6. Accordingly, § 365(c)(2) has generally been held to apply to "agreements that have extensions of credit as their *primary purpose*." In re UAL Corp., 293 B.R. 183, 187 (Bankr. N.D. Ill. 2003) (emphasis added); see Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of Midcom Communs., Inc., 246 B.R. 296, 301 (E.D. Mich. 2000) (noting that, in the absence of the financial accommodations rule, revolving lines of credit would leave a creditor "exposed to demands by the debtor for additional advances of money" and "legally obligated to forward sums of money to a debtor whose creditworthiness has substantially changed").

Conversely, courts have not found a "financial accommodations" contract where extensions of credit to the debtor were *not* the primary purpose of the agreement. See, e.g., In re UAL Corp., 293 B.R. 183 (Bankr. N.D. Ill. 2003) (credit card processing agreements were not financial accommodations because, whatever the degree of credit risk relating to chargebacks, the principal purpose is to allow the debtor to make credit card sales of tickets); In re Neuhoff Farms, Inc., 258 B.R. 343 (Bankr. E.D.N.C. 2000) (supply contract with initial above-market payments to the debtor not a financial accommodation).

The primary purpose of the Servicing Agreements (as distinct from the Other Agreements) is obviously the servicing of existing mortgage loans, not the provision of credit to

52

the Debtors. Accordingly, the Servicing Agreements are not "financial accommodations"

contracts and may be assumed and assigned by the Debtors.

### 2. Express and *de facto* anti-assignment provisions are unenforceable under § 365(f)(1) of the Bankruptcy Code

Section 365(f)(1) of the Bankruptcy Code provides that assignment under

§ 365(f)(2) is permissible "notwithstanding a provision in an executory contract . . . , or in

applicable law, that prohibits, restricts, or conditions the assignment of such contract." 11

U.S.C. § 365(f)(1). The scope of this section is broad—it invalidates not only express anti-

assignment provisions, but also provisions of a contract that are so restrictive that they constitute

*de facto* anti-assignment provisions. In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831-32 (D.

Del. 1999), appeal dismissed, L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs.,

Inc.), 209 F.3d 291 (3d Cir.), cert denied, 531 U.S. 873 (2000); see In re ANC Rental Corp., 277

B.R. 226, 239-40 (Bankr. D. Del. 2002).

The vast majority of the contractual provisions cited in the Anti-Assignment

Objections are express prohibitions, restrictions, and/or conditions on assignment. The

remaining provisions are immaterial and/or economically insignificant and, if enforced, would

interfere with the Debtors' ability to realize the intrinsic value of the Servicing Agreements by

assigning them to the Buyer. Accordingly, the Anti-Assignment Objections should be overruled.

### 3. The Form APA did not require the Debtors to obtain the Objecting Parties' consent as a prerequisite to assignment of the Servicing Agreements

Certain of the Anti-Assignment Objections assert that, although the Bankruptcy

Code relieves the Debtors from any obligation to obtain the Objecting Parties' consent to

assignment of the Servicing Agreements, sections 2.4(a), 6.3(c)(ii), and 6(d) of the Form APA

require the Debtors to obtain such consent in order to assign the Servicing Agreements. Putting

aside for the moment the absurdity of the Debtors' drafting a Form APA with assignment

provisions *more* restrictive than those of the Bankruptcy Code, the provisions cited do not

reasonably admit of such an interpretation.

        Section 2.4(a) of the Form APA simply provides that, to the extent that any

contract included in the purchased assets cannot be assigned without the consent of a third party,

the Form APA shall not constitute an assignment or transfer of any contract unless such consent

is obtained prior to closing. Obviously, that provision does not require the Debtors to obtain

consent; it merely provides that the Form APA shall not constitute an assignment where a

consent is needed.[28]

        Section 6.3(c)(ii) of the Form APA states that Sellers shall use

> their commercially reasonable efforts to obtain, prior to the Closing, all
> *requisite* approvals, including . . . (ii) the Consent to the Closing and the
> transactions contemplated hereby of each other party to each Contract to
> which it is a party or to which the Purchased Assets or Assumed
> Liabilities are subject with a Seller or any Affiliate of a Seller . . . in each
> case if required by the terms of such loan, mortgage, lease, insurance
> policy or contract.

---

[28]    Perhaps more importantly, section 2.4 of the APA largely moots this issue. It provides, among other things, that where a consent cannot be obtained, the

> Seller and Purchaser will cooperate in a mutually agreeable arrangement under which
> Purchaser would obtain the benefits and assume the obligations thereunder in accordance
> with this Agreement, including, to the extent that such an arrangement would be
> permitted by Law and the related Contract, subcontracting, sub-licensing, or sub-leasing
> to Purchaser, or under which such Seller would enforce for the benefit of Purchaser, with
> Purchaser assuming such Seller's obligations, any and all rights of such Seller against a
> third party thereto.

(APA § 2.4.) This language reflects what the parties will do if a necessary consent cannot be obtained; it does not
confer additional consent rights.

(Form APA § 6.3(c)(ii) (emphasis added).)  At most, this provision requires the Debtors to use commercially reasonable efforts to obtain consents to assignment.  It does not confer a consent right on a third party under some third-party beneficiary theory.[29]

        Finally, section 6.3(d) of the Form APA provides, in pertinent part, that "Sellers shall use their commercially reasonable best efforts to obtain, prior to the Closing Date, all approvals and consents *necessary* under all Servicing Agreements *in order to consummate the transactions contemplated hereby*, including executing all such documents as required by the Servicing Agreements and reasonably required by any trustee . . . provided, that such agreements and documents do not materially increase the duties or obligations of the servicer under the related Servicing Agreements . . . ."  (Form APA § 6.3(d) (emphasis added).)  Consents "necessary . . . in order to consummate the transactions" obviously does not include any consents rendered unnecessary by operation of § 365(f)(1) of the Bankruptcy Code.

### E. The Adequate Assurance Objections are without merit; the Buyer need only comply with material and economically significant terms of the Servicing Agreements

        At the time the Adequate Assurance Objections were filed, the Buyer had not been identified.  Given that the Buyer has now been identified, most of the Adequate Assurance Objections are either moot or will be addressed by the evidence at the Sale Hearing.  Nevertheless, several Adequate Assurance Objections asserted that the Buyer's lack of Fannie

---

[29]    The analogue to this section in the APA appears in Section 6.4(c), which provides that, to the extent not covered in the Court's sale order, the Debtors "shall use their commercially reasonable efforts to obtain, prior to the Initial Closing, all requisite approvals, including the Consent to the transactions contemplated hereby of each other party to each Contract (other than a Servicing Agreement) to which it is a party or to which the Purchased Assets or Assumed Liabilities are subject with a Seller or any Affiliate of a Seller (including under any Software Contract or Contract relating to the Transferred Intellectual Property and IT Assets), if required by the terms of such Contract." This provision obviously moots the arguments posited under Section 6.3(c)(ii) of the Form APA.  First, it specifically carves out obtaining consents for Servicing Agreements.  Second, it obviously contemplates consents for licensing agreements and the like, not the Servicing Agreements.  Third, it is subservient to Section 2.4 of the APA, which requires that the parties use commercially reasonable efforts to obtain consents and, where they cannot, attempt to work around it.  This provision cannot be viewed as creating or confirming a consent right.

Mae-qualified servicer status would, as a matter of law, prevent the Debtors from establishing "adequate assurance of future performance" as required by § 365(f)(2) of the Bankruptcy Code. This is not the case.

The phrase "adequate assurance of future performance" is not defined in the Bankruptcy Code. The legislative history, however, indicates it was intended to be given a "practical, pragmatic construction." Cinicola v. Scharffenberger, 248 F.3d 110, 120 n. 10 (quoting In re Sapolin Paints, Inc., 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980)); see Fleming, 2007 U.S. App. LEXIS at *12.

> Section 2-609 of the Uniform Commercial Code [(the "U.C.C.")], from which the bankruptcy statute borrows its critical language, provides that "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future performance . . . ." The Commentaries to the [U.C.C.] note that "'adequate' assurance is to be "defined by commercial rather than legal standards.'" [U.C.C. § 2-609 cmt. 3 (1972).] What constitutes "adequate assurance" is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary and capricious.

Id. The commentary to the U.C.C. also indicates that adequate assurance "focuses on the financial condition of a contracting party and his ability to meet his financial obligations." In re U.L. Radio Corp., 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982) (citing U.C.C. § 2-609 cmt. 4).

Adequate assurance under § 365(f)(2) of the Bankruptcy Code does not require "literal fulfillment by the [assignee] of each and every term of the bargain." Id. at 543; see Fleming, 2007 U.S. App. LEXIS at *12 ("It is clear that adequate assurances need not be given for every term of an executory contract."). Indeed, given the broad policy of § 365 favoring assumption and assignment, a party seeking to compel strict performance with a particular term of an executory contract "must show that actual and substantial detriment would be incurred" as a result of nonperformance. In re U.L. Radio Corp., 19 B.R. at 544. Cf. Fleming, 2007 U.S.

App. LEXIS 19927 at *11-12 (holding that the bankruptcy court has the discretion to "excise" or "waive" immaterial or economically insignificant provisions of a contract in order to facilitate assignment).

As this Court noted in connection with the DB Structured stay relief motion, the Servicing Agreements use Fannie Mae qualification "as a proxy for determining whether or not the debtors are in fact servicing correctly." (9/17/07 Hr'g Tr. 72:8-10.) This conclusion is borne out by the Fannie Mae Guide itself, which requires a servicer, *inter alia*, (i) to have employees who are "well trained and qualified" to perform the functions required, (ii) to maintain facilities that are adequate to perform such functions, (iii) to maintain a fidelity bond and errors and omissions insurance, at its own expense, in an amount specified by Fannie Mae (Fannie Mae Guide Part II, A); and (iv) to meet current net worth requirements and maintain such net worth in the form of assets acceptable to Fannie Mae (Fannie Mae Guide Part II, C).[30]

At the Sale Hearing, evidence will be presented that (i) the Buyer meets the financial and operational qualifications[31] of a Fannie Mae servicer as set forth in the Guide; (ii) the Buyer is in the process of obtaining (and is likely to obtain) necessary licensure from the various states in which it will do business; (iii) the Buyer is in the process of obtaining (and is likely to obtain) qualification from Fannie Mae; and (iv) until the Buyer obtains all necessary

---

[30] To the extent they are relevant, the Freddie Mac qualification requirements are substantially identical. For example, Freddie Mac requires a seller-servicer: (i) has made and continues to make to Freddie Mac certain financial disclosures, (ii) meets minimum net worth requirements, (iii) maintains minimum levels of errors and omissions and fidelity insurance, (iv) maintains a quality control program that is acceptable to Freddie Mac, (v) was and is "able to demonstrate to Freddie Mac's satisfaction . . . sufficient capitalization, profitability, liquidity and funding sources to support its ongoing operations and its commitments to Freddie Mac," (vi) and has and is "complying with any additional requirements, as deemed appropriate by Freddie Mac in its sole discretion." Freddie Mac Single-Family Seller/Servicer Guide § 4.02, available at http:www.freddiemac.com/sell/guide (last visited Oct. 9, 2007).

[31] Indeed, the Buyer will have a quality workforce because it will hire the Debtors' former employees. See In re Enron Corp., Case No. 01 B 16034 (AJG), 2003 Bankr. LEXIS 2263, at *14-16 (Bankr. S.D.N.Y. Dec. 1, 2003) (finding adequate assurance where debtor's employees would continue to work for assignee post-assignment).

licenses and qualifications (i.e., in the interim period between approval of the sale and Final

Closing), the Debtors will continue servicing the mortgage loans in the ordinary course of their

business, as they have done at all times in these chapter 11 proceedings.  In light of the

foregoing, it is difficult to imagine what, if any, harm (economic or otherwise) the Objecting

Parties can demonstrate they will suffer as a result of the Buyer's lack of Fannie Mae

qualification as of the date of the Sale Hearing  And at any rate, even if the Objecting Parties

would be harmed in some way, such harm is not sufficient to overcome the Debtors' and their

estates' right to realize the intrinsic value of the Servicing Agreements via assumption and

assignment.

## III.    THE COURT NEED NOT DETERMINE AT THE SALE HEARING WHETHER ANY SERVICING AGREEMENTS WERE VALIDLY TERMINATED PREPETITION

The majority of the Termination Objections identified on <u>Exhibit F</u> assert that the

Servicing Agreements were validly terminated prior to the Petition Date and, accordingly, may

not be assumed or assigned by the Debtors.  The APA, however, establishes a Dispute Escrow

and specifically preserves both the Objecting Parties' right to assert the validity of any alleged

termination, and the Debtors' and/or the Buyer's rights to challenge the same, at a later date.

(APA § 4.4.)  Accordingly, the Court need not rule at this time on questions raised in the

Termination Objections asserting prepetition termination.

## IV.    THE PURPORTED POSTPETITION TERMINATION OF THE EMC EMBEDDED SERVICING AGREEMENT VIOLATED THE AUTOMATIC STAY AND WAS INVALID AS A MATTER OF LAW BECAUSE IT WAS PREMISED UPON AN UNENFORCEABLE *IPSO FACTO* DEFAULT PROVISION

EMC Mortgage Corp. ("<u>EMC</u>"), which is party to an MLPSA and an Embedded

Servicing Agreement with AHM Corp. and AHM Servicing, respectively, asserts that the filing

58

of these chapter 11 cases constituted an event of default under the MLPSA, on account of which

it validly terminated the Embedded Servicing Agreement, for cause, on August 14, 2007.  EMC

does not appear to dispute (nor could it) that (i) default provisions conditioned on the

commencement of a bankruptcy case are generally unenforceable in bankruptcy, see 11 U.S.C.

§§ 363(l) & 365(e)(1); (ii) the automatic stay prohibits the termination of a debtor's contract

rights post-petition without leave from the bankruptcy court to do so, 11 U.S.C. § 362(a)(3); In re

Valley Media, Inc., 279 B.R. 105, 137 (Bankr. D. Del. 2002); and (iii) actions taken in violation

of the automatic stay are void ab initio, Maritime Elec. Co. v. United Jersey Bank, 959 F.2d

1194, 1206 (3d Cir. 1991).  Rather, EMC argues that the Embedded Servicing Agreement is a

"securities contract" within the meaning of § 555 of the Bankruptcy Code and, as such, may be

terminated notwithstanding both the automatic stay and the ipso facto rule.[32]  This argument is

without merit, a point that is perhaps underscored by the fact that, with but one exception,[33]

other, similarly situated Objecting Parties have not raised it.

Section 555 of the Bankruptcy Code provides, in relevant part, that "[t]he exercise

of a contractual right of a stockbroker, financial institution, financial participant, or securities

clearing agency to cause the liquidation, termination or acceleration of a securities contract, as

defined in section 741 of this title, because of a condition of the kind specified in section

365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any

provision of this title or by order of a court . . . in any proceeding under this title . . . ."  11 U.S.C.

§ 555.

---

[32]   Alternatively, EMC argues that the Embedded Servicing Agreement is a "financial accommodations" contract within the meaning of §§ 365(e)(2)(B) and 365(c)(2), and, accordingly (i) is exempt from the ipso facto rule and (ii) may not be assumed or assigned.  This argument is unavailing for the reasons set forth above.

[33]   Residential Funding Co. LLC, which asserts prepetition termination of the MLPSA and Embedded Servicing Agreement at issue, raises § 555 as an alternative argument in its supplemental Objection, D.I. 1061.

59

The Third Circuit has held that the "safe harbor" provisions of the Bankruptcy Code must be construed precisely and with a close eye to the literal meaning of the statute. Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer S&L Ass'n. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 878 F.2d 742, 751 (3d Cir. 1989) (construing 11 U.S.C. § 559). The purpose of the safe harbor is limited to "enhanc[ing] enforcement of securities laws and rules assuring the integrity of securities markets." Kipperman v. Circle Trust (In re Grafton Partners, L.P.), 321 B.R. 527, 535 (B.A.P. 9th Cir. 2005). Courts therefore closely examine the nature of the transactions at issue to determine whether a contract before it is a securities contract. See In re Residential Resources Mortgage Inv. Corp., 98 B.R. 2, 23 (Bankr. D. Ariz. 1989); cf. Bevill, Bresler & Schulman, 878 F.2d at 745 (determining whether a contract was a purchase and sale agreement as opposed to a "repurchase agreement").

Many participants in the securities markets incorporate "securities contracts" *and* ancillary agreements into one operative master agreement. The 2005 Bankruptcy Code amendments recognized this practice and refined the definition of the term "securities contract" to include master agreements that provide for the transfer of certain securities among other related agreements between the parties. 11 U.S.C. § 741(7)(A)(viii).[34] The fact that a discrete agreement or transaction is embedded within a master agreement, however, does not enhance or diminish the rights of any party with respect to the components of that master agreement. The master agreement is only a "securities contract" to the extent that the individual agreements or

---

[34]    11 U.S.C. § 741(7)(A)(viii) states that the term "securities contract" includes:

> A master agreement that provides for an agreement or transaction referred to in clause (i), (ii), (iii), (iv), (v), (vi), or (vii), together with all supplements to any such master agreement, without regard to whether the master agreement provides for an agreement or transaction that is not a securities contract under this subparagraph, except that such master agreement shall be considered to be a securities contract under this paragraph only with respect to each agreement or transaction under such master agreement that is referred to in clause (i), (ii), (iii), (iv), (v), (vi), or (vii) . . . .

transactions embodied therein qualify *on their own* as securities contracts.  11 U.S.C. § 741(7)(A)(viii).

The master agreements between the Debtors and non-debtor parties contemplate separate and distinct transactions, namely: a Purchase and Sale Agreement (whereby the non-debtor purchases the mortgage loans from the originator) and a Servicing Agreement (whereby the servicer contracts to service the mortgage loan on behalf of the non-debtor).[35]  The Purchase and Sale Agreement may or may not constitute a "securities contract" within the meaning of § 555.[36]  Even if it does, however, the Servicing Agreement is not automatically entitled to the protections of § 555 of the Bankruptcy Code simply by virtue of being bundled with another contract that is entitled to such protections.  "Congress clearly intended the automatic stay to be quite broad.  Exemptions to the stay, on the other hand, should be read narrowly to secure the broad grant of relief to the debtor."  In re Stringer, 847 F.2d 549, 552 (9th Cir. 1988) (footnotes omitted).

Expanding the definitions of "securities contract" to include agreements not enumerated in § 741(7) of the Bankruptcy Code would impermissibly expand the scope of the precisely-worded, limited exception to the automatic stay provided by § 555, and would potentially strip the Debtors' estates of valuable, bargained-for rights related to the Servicing Agreement or other portions of the master agreement, where Congress's intent (as expressed in the statutory language) was clearly not to do so.  See 11 U.S.C. § 741(7)(A)(viii).  Such a result would openly invite parties to securities contracts to "bankruptcy-proof" their other transactions

---

[35]    Whether or not the Purchase and Sale Agreement portion of a master agreement constitutes a "securities contract" within the meaning of §§ 555 and 741(7) of the Bankruptcy Code is irrelevant for purposes of the Motion, since all the Debtors seek to transfer by the Motion are the Servicing Agreements.  The Debtors reserve their rights to argue that the Purchase and Sale Agreement portion of the various master agreements may not constitute "securities contracts," but do not do so here; nor must the Court rule on this issue now.

[36] The Debtors make no admission and reserve the right to challenge in this or any other proceeding whether a given contract constitutes a "securities contract" subject to §§ 555 or 741(7).

with the debtor by including them within a "master" agreement for the purchase and sale of securities. Such a result would also likely erode the ability of mortgage loan servicers, particularly those in bankruptcy, to access capital markets. Lenders would not be inclined to extend credit to debtor-servicers and accept a pledge of rights under Servicing Agreements as collateral, as such collateral could be eviscerated by another financial institution or financial participant under § 555 of the Bankruptcy Code without regard for the automatic stay or the *ipso facto* rule.

EMC will likely argue that a ruling from this Court recognizing the Embedded Servicing Agreement for what it is (i.e., *not* a "securities contract") would send shockwaves through the securities markets by calling into question the applicability of the § 555 safe harbor to *any* and *all* contracts purporting to be a "securities contract."

The Court should not countenance such scare tactics. Recognizing EMC's overreaching with respect to the Embedded Servicing Agreement will not vitiate the protections of § 555 for those contracts that legitimately fall within the statutory definition of a securities contract. For example, the Third Circuit has recognized, in the context of alleged purchase money security interests ("PMSIs") under the Uniform Commercial Code, that a security instrument purporting to create a PMSI in specific collateral securing both purchase-money and non-purchase money obligations can have a "dual status" such that the existence of non-purchase money obligations does not render the PMSI ineffective as to the actual purchase-money obligations. Pristas v. Landaus of Plymouth, Inc., 742 F.2d 797, 800 (3d Cir. 1984). The holding in Pristas is consistent with the definition of "securities contract" in § 741(7), in that the non-debtor party will not lose any rights it may have under § 555 respecting a legitimate "securities contract" that is embedded within a master agreement; but the "securities contract"

62

designation and associated rights will extend only so far as any agreements within the master agreement that legitimately qualify as "securities contracts" on their own. See, e.g., In re Brendlinger, 116 B.R. 42, 43-44 (Bankr. W.D. Pa. 1990) (applying Pristas and holding that secured creditor was entitled to relief from automatic stay for property secured by PMSI, but was not entitled to relief from stay for other items listed on a related security agreement pursuant to a refinancing of the original debt).

## CONCLUSION

The Debtors, the Objecting Parties, and the broader mortgage industry consider Servicing Rights to be *property* interests which are bought and sold separately from the underlying mortgage loans. The Objecting Parties did not purchase the Servicing Rights from the Debtors. They did not pay a servicing-released premium to the Debtors. Yet now, they seek to exercise control over the Servicing Rights as if they had paid for them. The Servicing Rights are property of the Debtors' bankruptcy estates that may be sold under § 363 of the Bankruptcy Code (i) free and clear of any claims that are unrelated to the servicing of the underlying mortgage loans and (ii) notwithstanding any provision of the Servicing Agreements that would effect a forfeiture based on the Debtors' financial condition.

The Objecting Parties try to avoid the foregoing conclusion by calling the Servicing Agreements "executory contracts." Invoking various provisions of § 365 of the Bankruptcy Code and blurring the practical and legal distinction between the origination and servicing of mortgage loans, on the one hand, and the servicing of mortgage loans, on the other, the Objecting Parties baldly assert that they will be deprived of the benefit of their bargain by the assumption and assignment of the Servicing Agreements to the Buyer. The evidence at the Sale Hearing will show that the Objecting Parties will not be harmed by the Debtors' gradual and

seamless transition of their servicing operations to a new, fully-capitalized entity staffed by the same experienced and skilled employees who have serviced the Objecting Parties' mortgage loans without incident prior to and during these chapter 11 cases. But the *servicing* of the loans is not the Objecting Parties' real concern—they want payment in full for claims arising from the *purchase* of the loans, and they seek to extract it from the Buyer (and indirectly, the Debtors' bankruptcy estates). Outside of bankruptcy, however, the Objecting Parties could have had no reasonable commercial expectation of payment from a replacement servicer of mortgage loans for claims against the seller of such loans. Thus, treating EPD and PRP claims against AHM Corp./Acceptance as cure obligations of AHM Servicing under the Servicing Agreements would actually *better* the Objecting Parties' bargain, at the expense of the Debtors' bankruptcy estates and their other creditors. Nothing in the Bankruptcy Code requires (or indeed, would countenance) such a result.

Some Objecting Parties try to avoid the foregoing conclusion by calling the Servicing Agreements "financial accommodations" or "securities contracts" entitled to special protection under the Bankruptcy Code. As discussed above, however, the Servicing Agreements are garden-variety contracts. The Objecting Parties are not entitled to any special treatment under the Bankruptcy Code, and should not be permitted to derail a sale of the Servicing Business that has the full support of the Administrative Agent and the Committee and which, if approved, could bring between $400-500 million into the Debtors' bankruptcy estates.

## RESERVATION OF RIGHTS

The Debtors reserve the right to amend, modify, or supplement this Omnibus Response based on additional information obtained from the Objecting Parties or otherwise, or to

respond to any objections that are not the subject of this Omnibus Response, at any time prior to the Sale Hearing.

WHEREFORE, the Debtors respectfully request that the Court enter an Order overruling the Objections, granting the Sale Motion, and granting the Debtors such other and further relief as is just and proper.

Dated:     Wilmington, Delaware
            October 10, 2007

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        James L. Patton, Jr. (No. 2202)
                        Robert S. Brady (No. 2847)
                        Pauline K. Morgan (No. 3650)
                        James P. Hughes, Jr. (No. 3102)
                        Sean T. Greecher (No. 4484)
                        Patrick A. Jackson (No. 4976)**
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Counsel for Debtors and Debtors in Possession

---

**     District bar admission pending October 15, 2007.

65

**EXHIBIT A**

**Severability Objections**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Financial Guaranty Insurance Company | 718 | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Financial Guaranty Insurance Company | 718 | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Financial Guaranty Insurance Company | 718 | HELOC Servicing Agreement, dated as of October 7, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| Citibank, N.A. | 723 | Servicing Agreement, dated as of September 29, 2004, among American Home Mortgage Servicing, Inc., as Master Servicer, American Home Mortgage Investment Trust 2004-3, as Issuer, and Citibank, N.A., as Indenture Trustee | Stand-Alone |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Citibank, N.A. | 723 | Servicing Agreement, dated as of July 28, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Citibank, N.A., as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Citibank, N.A. | 723 | Servicing Agreement, dated as of August 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Citibank, N.A., as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Citibank, N.A. | 723 | Assignment, Assumption and Recognition Agreement, made the 1st day of April, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Citibank, N.A., not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR2, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Citibank, N.A. | 723 | Assignment, Assumption and Recognition Agreement, made as of January 31, 2007, among EMC Mortgage Corporation, Citibank, N.A., not individually but solely as trustee for the holders of Structured Asset Mortgage Investments II Inc., Mortgage Pass-Through Certificates, Series 2007-AR1, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |

EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Citibank, N.A. | 723 | Assignment, Assumption and Recognition Agreement, made as of January 1, 2007, among HSBC Bank, National Association, HSI Asset Securitization Corporation, CitiMortgage Inc. as Master Servicer, Deutsche Bank National Trust Company not individually but solely as trustee on behalf of the holders of the HSI Asset Loan Obligation Trust, Series 2007-AR1, Asset-Backed Certificates, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Citibank, N.A. | 724 | Servicing Agreement, dated as of September 29, 2004, among American Home Mortgage Servicing, Inc., as Master Servicer, American Home Mortgage Investment Trust 2004-3, as Issuer, and Citibank, N.A., as Indenture Trustee | Stand-Alone |
| Citibank, N.A. | 724 | Servicing Agreement, dated as of July 28, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Citibank, N.A., as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Citibank, N.A. | 724 | Servicing Agreement, dated as of August 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Citibank, N.A., as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Citibank, N.A. | 724 | Assignment, Assumption and Recognition Agreement, made the 1st day of April, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Citibank, N.A., not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR2, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Citibank, N.A. | 724 | Assignment, Assumption and Recognition Agreement, made as of January 31, 2007, among EMC Mortgage Corporation, Citibank, N.A., not individually but solely as trustee for the holders of Structured Asset Mortgage Investments II Inc. Mortgage Pass-Through Certificates, Series 2007-AR1, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Citibank, N.A. | 724 | Assignment, Assumption and Recognition Agreement, made as of January 1, 2007, among HSBC Bank, National Association, HSI Asset Securitization Corporation, CitiMortgage Inc. as Master Servicer, Deutsche Bank National Trust Company not individually but solely as trustee on behalf of the holders of the HSI Asset Loan Obligation Trust, Series 2007-AR1, Asset-Backed Certificates, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| JP Morgan Chase Bank, N.A. | 730 | Assignment, Assumption and Recognition Agreement, dated as of June 1, 2006, entered into among J.P. Morgan Acceptance Corporation I, a Delaware corporation, U.S. Bank National Association, as trustee of J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Mortgage Acquisition Corp., American Home Mortgage Servicing, Inc., as the servicer and Wells Fargo Bank, N.A., as the Master Servicer | AAR |
| JPMorgan Chase Bank, N.A. | 730 | Mortgage Loan Sale Agreement dated April 1, 2006 | Stand-Alone |
| JPMorgan Chase Bank, N.A. | 730 | Flow Mortgage Interim Servicing Agreement dated April 1, 2006 | Stand-Alone |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| JPMorgan Chase Bank, N.A. | 730 | Mortgage Loan Sale and Servicing Agreement dated June 1, 2006 | Embedded |
| CitiMortgage, Inc. | 740 | Assignment, Assumption and Recognition Agreement, made as of January 1, 2007, among HSBC Bank, National Association, HSI Asset Securitization Corporation, CitiMortgage Inc. as Master Servicer, Deutsche Bank National Trust Company (the "Trustee") not individually but solely as trustee on behalf of the holders of the HSI Asset Loan Obligation Trust, Series 2007-AR1, Asset-Backed Certificates, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| CitiMortgage, Inc. | 740 | Loan Sale and Servicing Agreement | Embedded* |
| Deutsche Bank National Trust Company | 800 | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 800 | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 800 | HELOC Servicing Agreement, dated as of October 7, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of March 31, 2004, among Columbia National, Incorporated (currently known as American Home Mortgage Servicing, Inc.), as Master Servicer, American Home Mortgage Investment Trust 2004-1, as Issuer, and Wells Fargo Bank, National Association, as Indenture Trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of June 30, 2004, among Columbia National, Incorporated (currently known as American Home Mortgage Servicing, Inc.), as Master Servicer, American Home Mortgage Investment Trust 2004-2, as Issuer, and Wells Fargo Bank, National Association, as Indenture Trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of March 23, 2005, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of June 22, 2005, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of September 20, 2005, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2005-3, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of October 7, 2005, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as RMBS Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of October 7, 2005, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2005-4C, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of December 28, 2005, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2005-SD1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of March 29, 2006, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2006-1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of June 30, 2006, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of December 28, 2006, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2006-3, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of March 30, 2007, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2007-1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of April 20, 2007, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2007-2, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of March 13, 2007, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2007-SD1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of March 13, 2007, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |

## EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of October 31, 2005, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, DLJ Mortgage Capital, Inc., as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of December 28, 2005, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp. as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of May 25, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, Goldman Sachs Mortgage Company, as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of June 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of July 28, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Citibank, N.A., as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of August 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Citibank, N.A., as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of September 22, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of October 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of January 26, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of February 28, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of June 6, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of May 31, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Servicing Agreement, dated as of June 29, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | RMBS Servicing Agreement, dated as of May 15, 2007, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Assets Trust 2007-SD2, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made as of April 28, 2006, among EMC Mortgage Corporation, U.S. Bank National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2006-AC3, Asset-Backed Certificates, Series 2006-AC3, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made as of June 30, 2006, among EMC Mortgage Corporation, U.S. Bank National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2006-AC4, Asset-Backed Certificates, Series 2006-AC4, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made and entered into as of May 30, 2006, among DB Structured Products, Inc., having an address at 60 Wall Street, New York, New York 10005, Deutsche Alt-A Securities, Inc., having an address at 60 Wall Street, New York, New York 10005, and American Home Mortgage Servicing, Inc., having an address at 4600 Regent Boulevard, Suite 200, Irving, Texas 75063 and acknowledged and agreed to by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made and entered into as of June 30, 2006, among DB Structured Products, Inc., having an address at 60 Wall Street, New York, New York 10005, Deutsche Alt-A Securities, Inc., having an address at 60 Wall Street, New York, New York 10005, and American Home Mortgage Servicing, Inc., having an address at 4600 Regent Boulevard, Suite 200, Irving, Texas 75063 and acknowledged and agreed to by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made and entered into as of September 29, 2006, among DB Structured Products, Inc., having an address at 60 Wall Street, New York, New York 10005, Deutsche Alt-A Securities, Inc., having an address at 60 Wall Street, New York, New York 10005, and American Home Mortgage Servicing, Inc., having an address at 4600 Regent Boulevard, Suite 200, Irving, Texas 75063 and acknowledged and agreed to by Wells Fargo Bank, N.A., as master servicer | AAR |

EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made and entered into as of October 31, 2006, among DB Structured Products, Inc., having an address at 60 Wall Street, New York, New York 10005, Deutsche Alt-A Securities, Inc., having an address at 60 Wall Street, New York, New York 10005, and American Home Mortgage Servicing, Inc., having an address at 4600 Regent Boulevard, Suite 200, Irving, Texas 75063 and acknowledged and agreed to by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made and entered into as of December 15, 2006, among DB Structured Products, Inc., having an address at 60 Wall Street, New York, New York 10005, Deutsche Alt-A Securities, Inc., having an address at 60 Wall Street, New York, New York 10005, and American Home Mortgage Servicing, Inc., having an address at 4600 Regent Boulevard, Suite 200, Irving, Texas 75063 and acknowledged and agreed to by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made and entered into as of April 13, 2007, among DB Structured Products, Inc., having an address at 60 Wall Street, New York, New York 10005, Deutsche Alt-A Securities, Inc., having an address at 60 Wall Street, New York, New York 10005, and American Home Mortgage Servicing, Inc., having an address at 4600 Regent Boulevard, Suite 200, Irving, Texas 75063 and acknowledged and agreed to by Wells Fargo Bank, N.A., as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made on the 1st day of January, 2006, among American Home Mortgage Servicing, Inc., as seller, American Home Mortgage Corp. as servicer, U.S. Bank National Association, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR1, and GS Mortgage Securities Corp., as assignor and is acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made the 1st day of April, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Citibank, N.A., not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR2, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made the 1st day of August, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Deutsche Bank National Trust Company, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-OA1, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made the 1st day of April, 2007, is among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Deutsche Bank National Trust Company, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2007-OA1, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made the 29th day of June, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and Deutsche Bank National Trust Company, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-10, and as acknowledged by Wells Fargo Bank, National Association, as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made the 30th day of June, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and Deutsche Bank National Trust Company, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-11, and acknowledged by Wells Fargo Bank, National Association, as master servicer | AAR |

## EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Pooling and Servicing Agreement, dated as of June 1, 2006, among GS Mortgage Securities Corp., a Delaware corporation, IndyMac Bank, F.S.B., a federally chartered savings bank, as a servicer, American Home Mortgage Servicing, INC., a Maryland corporation, as a servicer, Ocwen Loan Servicing, LLC, a Delaware limited liability company, as a servicer, Wells Fargo Bank, N.A., a national banking association as master servicer and securities administrator, and Deutsche Bank National Trust Company, a national banking association, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, dated as of June 1, 2006, by and among American Home Mortgage Corp, American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc., Greenwich Capital Financial Products, Inc. and Wells Fargo Bank, N.A., as master servicer and securities administrator, and acknowledged by Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, dated as of August 1, 2006, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc., Greenwich Capital Financial Products, Inc. and Wells Fargo Bank, N.A., as master servicer and securities administrator, and acknowledged by Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement dated as of December 1, 2006, is by and among American Home Mortgage Corp, American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust Company, as trustee | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, dated as of March 1, 2007, is by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, dated as of June 1, 2007, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust company, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, dated as of July 1, 2007, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of June 1, 2006, entered into among J.P. Morgan Acceptance Corporation I, a Delaware corporation, U.S. Bank National Association, as trustee of J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Mortgage Acquisition Corp., American Home Mortgage Servicing, Inc., as the servicer and Wells Fargo Bank, N.A., as the Master Servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, dated as of December 27, 2006, by and among American Home Mortgage Servicing, Inc., Lares Asset Securitization, Inc., Maia Mortgage Finance Statutory Trust and Wells Fargo Bank, N.A., as master servicer and securities administrator, and acknowledged by HSBC Bank USA, National Association, as trustee | Stand-Alone |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of June 29, 2006, among UBS Real Estate Securities Inc., Mortgage Asset Securitization Transactions, Inc., American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of December 29, 2005, among UBS Real Estate Securities Inc., Mortgage Asset Securitization Transactions, Inc., American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of November 15, 2006, among UBS Real Estate Securities Inc., Mortgage Asset Securitization Transactions, Inc., American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of January 16, 2007, among UBS Real Estate Securities Inc., as Assignor, Mortgage Asset Securitization Transactions, Inc., as Assignee, American Home Mortgage Securitization Transactions, Inc., as Assignee, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc., as Servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of May 15, 2007, among UBS Real Estate Securities Inc., Mortgage Asset Securitization Transactions, Inc., American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of March 1, 2006, among Morgan Stanley Mortgage Capital I Inc., a Delaware corporation, Morgan Stanley Mortgage Capital Inc. American Home Mortgage Corp., as seller, American Home Mortgage Servicing, Inc., as servicer, and acknowledged by LaSalle Bank National Association, as trustee of Morgan Stanley Mortgage Loan Trust 2006-5AR, and Wells Fargo Bank, National Association, as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of April 1, 2006, among Morgan Stanley Capital I Inc., a Delaware corporation, Morgan Stanley Mortgage Capital Inc., American Home Mortgage Corp., as seller, American Home Mortgage Servicing, Inc., as servicer, and acknowledged by LaSalle Bank National Association, as trustee of Morgan Stanley Mortgage Loan Trust 2006-6AR, and Wells Fargo Bank, National Association, as master servicer | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, dated as of May 1, 2006, is entered into among Morgan Stanley Capital I Inc., a Delaware corporation, Morgan Stanley Mortgage Capital Inc., American Home Mortgage Corp., as seller, American Home Mortgage Servicing, Inc., as servicer, and acknowledged by LaSalle Bank National Association, as trustee of Morgan Stanley Mortgage Loan Trust 2006-8AR, and Wells Fargo Bank, National Association, as master servicer") | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made as of May 31, 2006, among EMC Mortgage Corporation, JPMorgan Chase Bank, National Association, not individually but solely as trustee for the holders of Structured Asset Mortgage Investments II Inc., Mortgage Pass-Through Certificates, Series 2006-AR5, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Assignment, Assumption and Recognition Agreement, made as of January 31, 2007, among EMC Mortgage Corporation, Citibank, N.A., not individually but solely as trustee for the holders of Structured Asset Mortgage Investments II Inc., Mortgage Pass-Through Certificates, Series 2007-AR1, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Wells Fargo Bank, N.A. | 824 | Reconstituted Servicing Agreement, entered into as of the 1st day of June, 2006, by and among Thornburg Mortgage Home Loans, Inc., a Delaware corporation, American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp., LaSalle Bank National Association, as Trustee under the Pooling and Servicing Agreement defined below, on behalf of the and acknowledged by Wells Fargo Bank, N.A., as master servicer | Stand-Alone |
| The Bank of New York | 826 | Servicing Agreement, dated as of December 21, 2004, among GMAC Mortgage Corporation, as HELOC Master Servicer, American Home Mortgage Corporation, American Home Mortgage Investment Trust 2004-4, as Issuer, American Home Mortgage Acceptance, Inc., as Seller, and The Bank of New York, as Indenture Trustee | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| The Bank of New York | 826 | HELOC Subservicing Agreement, dated as of December 21, 2004, between GMAC Mortgage Corporation, as HELOC Master Servicer, and American Home Mortgage Servicing, Inc., as HELOC Subservicer | Stand-Alone |
| The Bank of New York | 826 | Servicing Agreement, dated as of December 21, 2004, among American Home Mortgage Servicing, Inc., as RMBS Master Servicer, American Home Mortgage Investment Trust 2004-4, as Issuer, and The Bank of New York, as Indenture Trustee | Stand-Alone |
| The Bank of New York | 826 | Assignment, Assumption and Recognition Agreement is made this 28th day of April, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, American Home Mortgage Corp., GS Mortgage Securities Corp., a Delaware corporation, and U.S. Bank National Association, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-6, and as acknowledged by JPMorgan Chase Bank, National Association, as master servicer | AAR |
| The Bank of New York | 826 | Assignment, Assumption and Recognition Agreement, made the 26th day of April, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and U.S. Bank National Association, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-9, and as acknowledged by JPMorgan Chase Bank, National Association, as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| The Bank of New York | 826 | Assignment, Assumption and Recognition Agreement, made as of May 31, 2006, among EMC Mortgage Corporation, JPMorgan Chase Bank, National Association, not individually but solely as trustee for the holders of Structured Asset Mortgage Investments II Inc., Mortgage Pass-Through Certificates, Series 2006-AR5, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Deutsche Bank National Trust Company | 832 | RMBS Servicing Agreement, dated as of March 23, 2005, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | RMBS Servicing Agreement, dated as of June 22, 2005, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of September 20, 2005, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2005-3, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of December 28, 2005, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2005-SD1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of March 29, 2006, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2006-1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | RMBS Servicing Agreement, dated as of June 30, 2006, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | HELOC Servicing Agreement, dated as of June 30, 2006, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of December 28, 2006, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2006-3, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of March 30, 2007, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2007-1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of April 20, 2007, among Wells Fargo Bank, N.A., as Master Servicer, American Home Mortgage Investment Trust 2007-2, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | RMBS Servicing Agreement, dated as of March 13, 2007, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2007-SD1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-SD1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | RMBS Servicing Agreement, dated as of March 13, 2007, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |

EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of October 31, 2005, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, DLJ Mortgage Capital, Inc., as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of December 28, 2005, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp. as Seller, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of May 25, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, Goldman Sachs Mortgage Company, as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of June 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of September 22, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of October 30, 2006, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of January 26, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of February 28, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of June 6, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of May 31, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | Servicing Agreement, dated as of June 29, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | RMBS Servicing Agreement, dated as of May 15, 2007, among Wells Fargo Bank, N.A., as RMBS Master Servicer, American Home Mortgage Assets Trust 2007-SD2, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as RMBS Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | HELOC Servicing Agreement, dated as of May 15, 2007, among American Home Mortgage Assets Trust 2007-SD2, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Reconstituted Servicing Agreement, dated as of June 1, 2006, by and among American Home Mortgage Corp, American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc., Greenwich Capital Financial Products, Inc. and Wells Fargo Bank, N.A., as master servicer and securities administrator, and acknowledged by Deutsche Bank National Trust Company, as trustee | Stand-Alone |

EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | Reconstituted Servicing Agreement, dated as of August 1, 2006, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc., Greenwich Capital Financial Products, Inc. and Wells Fargo Bank, N.A., as master servicer and securities administrator, and acknowledged by Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Reconstituted Servicing Agreement dated as of December 1, 2006, is by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Reconstituted Servicing Agreement, dated as of March 1, 2007, is by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust Company, as trustee | Stand-Alone |
| Deutsche Bank National Trust Company | 832 | Reconstituted Servicing Agreement, dated as of June 1, 2007, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc., Greenwich Capital Acceptance, Inc. and Greenwich Capital Financial Products, Inc. and is acknowledged by Wells Fargo Bank, N.A., as master servicer and securities administrator and Deutsche Bank National Trust company, as trustee | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | Assignment, Assumption And Recognition Agreement, made the 29th day of June, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and Deutsche Bank National Trust Company, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-10, and as acknowledged by Wells Fargo Bank, National Association, as master servicer | AAR |
| Deutsche Bank National Trust Company | 832 | Assignment, Assumption and Recognition Agreement, made the 30th day of June, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and Deutsche Bank National Trust Company, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-11, and acknowledged by Wells Fargo Bank, National Association, as master servicer | AAR |
| Deutsche Bank National Trust Company | 832 | Pooling and Servicing Agreement, dated as of June 1, 2006, among GS Mortgage Securities Corp., a Delaware corporation, IndyMac Bank, F.S.B., a federally chartered savings bank, as a servicer, American Home Mortgage Servicing, INC., a Maryland corporation, as a servicer, Ocwen Loan Servicing, LLC, a Delaware limited liability company, as a servicer, Wells Fargo Bank, N.A., a national banking association as master servicer and securities administrator, and Deutsche Bank National Trust Company, a national banking association, as trustee | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Deutsche Bank National Trust Company | 832 | Assignment, Assumption and Recognition Agreement, made the 1st day of August, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Deutsche Bank National Trust Company, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-OA1, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Deutsche Bank National Trust Company | 832 | Assignment, Assumption and Recognition Agreement, made as of January 1, 2007, among HSBC Bank, National Association, HSI Asset Securitization Corporation, CitiMortgage Inc. as Master Servicer, Deutsche Bank National Trust Company not individually but solely as trustee on behalf of the holders of the HSI Asset Loan Obligation Trust, Series 2007-AR1, Asset-Backed Certificates, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| Deutsche Bank National Trust Company | 832 | Assignment, Assumption and Recognition Agreement, as of July 31, 2007, among HSBC Bank, National Association, HSI Asset Securitization Corporation, Wells Fargo Bank, N.A., as master servicer, Deutsche Bank National Trust Company not individually but solely as trustee on behalf of the HSI Asset Loan Obligation Trust 2007-AR2, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, dated as of June 1, 2006, entered into among J.P. Morgan Acceptance Corporation I, a Delaware corporation, U.S. Bank National Association, as trustee of J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Mortgage Acquisition Corp., American Home Mortgage Servicing, Inc., as the servicer and Wells Fargo Bank, N.A., as the Master Servicer | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, made on the 1st day of January, 2006, among American Home Mortgage Servicing, Inc., as seller, American Home Mortgage Corp. as servicer, U.S. Bank National Association, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR1, and GS Mortgage Securities Corp., as assignor and is acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement is made this 28th day of April, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, American Home Mortgage Corp, GS Mortgage Securities Corp., a Delaware corporation, and U.S. Bank National Association, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-6, and as acknowledged by JPMorgan Chase Bank, National Association, as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, made the 26th day of April, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and U.S. Bank National Association, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-9, and as acknowledged by JPMorgan Chase Bank, National Association, as master servicer | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, made as of April 28, 2006, among EMC Mortgage Corporation, U.S. Bank National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2006-AC3, Asset-Backed Certificates, Series 2006-AC3, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, made as of June 30, 2006, among EMC Mortgage Corporation, U.S. Bank National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2006-AC4, Asset-Backed Certificates, Series 2006-AC4, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, made as of January 30, 2007, among EMC Mortgage Corporation, U.S. Bank, National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2007-AC1, Asset-Backed Certificates, Series 2007-AC1, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |

EXHIBIT A - Severability Objections, cont.

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, dated as of November 15, 2006, among UBS Real Estate Securities Inc., Mortgage Asset Securitization Transactions, Inc., American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, dated as of January 16, 2007, among UBS Real Estate Securities Inc. as Assignor, Mortgage Asset Securitization Transactions, Inc., as Assignee, American Home Mortgage Corp., and American Home Mortgage Servicing, Inc., as Servicer | AAR |
| U.S. Bank, N.A. | 836 | Assignment, Assumption and Recognition Agreement, dated as of May 15, 2007, among UBS Real Estate Securities Inc., Mortgage Asset Securitization Transactions, Inc., American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| U.S. Bank, N.A. | 836 | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| U.S. Bank, N.A. | 836 | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| U.S. Bank, N.A. | 836 | HELOC Servicing Agreement, dated as of October 7, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| CIFG Assurance North America, Inc. | 838 | HELOC Servicing Agreement, dated as of June 30, 2006, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| HIS Asset Securitization Corporation and HSBC Bank USA, N.A. | 840 | Assignment, Assumption and Recognition Agreement, made as of January 1, 2007, among HSBC Bank, National Association, HSI Asset Securitization Corporation, CitiMortgage Inc. as Master Servicer, Deutsche Bank National Trust Company not individually but solely as trustee on behalf of the holders of the HSI Asset Loan Obligation Trust, Series 2007-AR1, Asset-Backed Certificates, American Home Mortgage Corp. and American Home Mortgage Servicing, Inc. | AAR |
| HIS Asset Securitization Corporation and HSBC Bank USA, N.A. | 840 | Master Mortgage Loan Purchase and Servicing Agreement, dated as of June 21, 2006, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc. and HSBC Bank USA, National Association | Embedded |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| HIS Asset Securitization Corporation and HSBC Bank USA, N.A. | 840 | Loan Sale and Servicing Agreement | Embedded* |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Seconded Amended and Restated Mortgage Loan Sale Agreement dated as of May 1, 2006 | Embedded |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement is made this 28th day of April, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, American Home Mortgage Corp., GS Mortgage Securities Corp., a Delaware corporation, and U.S. Bank National Association, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-6, and as acknowledged by JPMorgan Chase Bank, National Association, as master servicer | AAR |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made the 26th day of April, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and U.S. Bank National Association, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-9, and as acknowledged by JPMorgan Chase Bank, National Association, as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made the 29th day of June, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and Deutsche Bank National Trust Company, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-10, and as acknowledged by Wells Fargo Bank, National Association, as master servicer | AAR |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made the 30th day of June, 2006, among American Home Mortgage Servicing, Inc., a Maryland corporation, GS Mortgage Securities Corp., a Delaware corporation, and Deutsche Bank National Trust Company, not in its individual capacity, but solely as trustee on behalf of GSAA Home Equity Trust 2006-11, and acknowledged by Wells Fargo Bank, National Association, as master servicer | AAR |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Pooling and Servicing Agreement, dated as of June 1, 2006, among GS Mortgage Securities Corp., a Delaware corporation, IndyMac Bank, F.S.B., a federally chartered savings bank, as a servicer, American Home Mortgage Servicing, INC., a Maryland corporation, as a servicer, Ocwen Loan Servicing, LLC, a Delaware limited liability company, as a servicer, Wells Fargo Bank, N.A., a national banking association as master servicer and securities administrator, and Deutsche Bank National Trust Company, a national banking association, as trustee | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made on the 1st day of January, 2006, among American Home Mortgage Servicing, Inc., as seller, American Home Mortgage Corp. as servicer, U.S. Bank National Association, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR1, and GS Mortgage Securities Corp., as assignor and is acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made the 1st day of April, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Citibank, N.A., not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-AR2, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made the 1st day of August, 2006, among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Deutsche Bank National Trust Company, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2006-OA1, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 845 | Assignment, Assumption and Recognition Agreement, made the 1st day of April, 2007, is among American Home Mortgage Servicing, Inc., as servicer, American Home Mortgage Corp. as seller, Deutsche Bank National Trust Company, not in its individual capacity but solely as trustee on behalf of GSR Mortgage Loan Trust 2007-OA1, and GS Mortgage Securities Corp., as assignor and acknowledged by Wells Fargo Bank, N.A., as master servicer | AAR |
| Wells Fargo Funding, Inc. | 851 | Master Mortgage Loan Purchase and Interim Servicing Agreement, dated as of January 25, 2007, by and among American Home Mortgage Corp., American Home Mortgage Servicing, Inc. and Wells Fargo Funding, Inc. | Embedded |
| GMAC Mortgage LLC | 857 | Servicing Agreement, dated as of December 21, 2004, among GMAC Mortgage Corporation, as HELOC Master Servicer, American Home Mortgage Investment Trust 2004-4, as Issuer, American Home Mortgage Acceptance, Inc., as Seller, and The Bank of New York, as Indenture Trustee | Stand-Alone |
| GMAC Mortgage LLC | 857 | HELOC Subservicing Agreement, dated as of December 21, 2004, between GMAC Mortgage Corporation, as HELOC Master Servicer, and American Home Mortgage Servicing, Inc., as HELOC Subservicer | Stand-Alone |
| GMAC Mortgage LLC | 857 | HELOC Servicing Agreement, dated as of March 23, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |

**EXHIBIT A – Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| GMAC Mortgage LLC | 857 | HELOC Servicing Agreement, dated as of June 22, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc. as Seller, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| GMAC Mortgage LLC | 857 | HELOC Servicing Agreement, dated as of October 7, 2005, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2005-4A, as Issuer, U.S. Bank National Association, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Seller, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| GMAC Mortgage LLC | 857 | HELOC Servicing Agreement, dated as of June 30, 2006, among GMAC Mortgage Corporation, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2006-2, as Issuing Entity, Deutsche Bank Trust Company Americas, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Acceptance, Inc., as HELOC Servicer | Stand-Alone |
| GMAC Mortgage LLC | 857 | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-SD1, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |

**EXHIBIT A - Severability Objections, cont.**

| Objecting Party | Docket No. | Name of Servicing Agreement at Issue | Embedded, AAR or Stand-Alone |
|---|---|---|---|
| GMAC Mortgage LLC | 857 | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Assurance Guaranty Corp. | 1065 | HELOC Servicing Agreement, dated as of March 13, 2007, among GMAC Mortgage, LLC, as HELOC Back-Up Servicer, American Home Mortgage Investment Trust 2007-A, as Issuing Entity, Deutsche Bank National Trust Company, as Indenture Trustee, American Home Mortgage Acceptance, Inc., as Sponsor, and American Home Mortgage Servicing, Inc., as HELOC Servicer | Stand-Alone |
| Assurance Guaranty Corp. | 1065 | Servicing Agreement, dated as of June 6, 2007, among Wells Fargo Bank, N.A., as Master Servicer, Deutsche Bank National Trust Company, as Trustee, American Home Mortgage Corp., as Sponsor, and American Home Mortgage Servicing, Inc, as Servicer | Stand-Alone |
| Goldman Sachs Mortgage Company and GS Mortgage Securities Corp. | 1118 | Mortgage Loan Sale and Servicing Agreement, dated as of December 1, 2005, between American Home Mortgage Corp, as Seller, American Home Mortgage Servicing, Inc., as Servicer, and Goldman Sachs Mortgage Company, as Purchaser | Embedded |

**EXHIBIT B**

**Incurable Default Objections**

| Objecting Party | Docket No(s). |
|---|---|
| DB Structured Products, Inc. | 675 & 1108 |
| Citibank, N.A. | 723, 724 & 1047 |
| Connecticut Housing Finance Authority | 813 |
| GMAC Mortgage LLC | 857 & 1071 |

**EXHIBIT C**

**Cure Objections**

| Objecting Party | Docket No(s). |
|---|---|
| Countrywide Bank, FSB | 614 & 1056 |
| DB Structured Products, Inc. | 675 & 1108 |
| Fannie Mae | 716, 717 & 1043 |
| Financial Guaranty Insurance Company | 718 & 1036 |
| Citibank, N.A. | 723, 724 & 1047 |
| EMC Mortgage Corp. | 850 & 1057 |
| Connecticut Housing Finance Authority | 813 |
| Wells Fargo, Bank N.A. | 824 & 1053 |
| The Bank of New York | 826 |
| UBS Real Estate Securities Inc. | 828 & 1029 |
| Deutsche Bank National Trust Company | 800 & 832 |
| U.S. Bank, N.A. | 836, 1067 & 1117 |
| CIFG Assurance North America, Inc. | 838 |
| HSI Asset Securitization Corp. and HSBC Bank, USA, N.A. | 840 & 1113 |
| Goldman Sach Mortgage Company and GS Mortgage Securities Corp. | 845 & 1118 |
| Morgan Stanley Mortgage Capital Holdings LLC | 849 |
| Wells Fargo Funding, Inc. | 851 & 1052 |
| GMAC Mortgage LLC | 857 & 1071 |
| Assurance Guaranty Corp. | 1065 |

## EXHIBIT D

### Anti-Assignment Objections

| Objecting Party | Docket No(s). |
|---|---|
| Financial Guaranty Insurance Company | 718 & 1036 |
| JPMorgan Chase Bank, N.A. | 730 & 1048 |
| CitiMortgage, Inc. | 740, 855 & 1056 |
| Connecticut Housing Finance Authority | 813 |
| Deutsche Bank National Trust Company | 800 & 832 |
| U.S. Bank, N.A. | 836, 1067 & 1117 |
| GMAC Mortgage LLC | 857 & 1071 |
| Residential Funding Company, LLC | 859 & 1061 |

## EXHIBIT E

### Adequate Assurance Objections

| Objecting Party | Docket No(s). |
|---|---|
| DB Structured Products, Inc. | 675 & 1108 |
| Financial Guaranty Insurance Company | 718 & 1036 |
| Citibank, N.A. | 723, 724 & 1047 |
| JP Morgan Chase Bank, N.A. | 730 & 1048 |
| CitiMortgage, Inc. | 740, 855 & 1056 |
| Wells Fargo Bank, N.A. | 824 & 1053 |
| The Bank of New York | 826 |
| Duke University Federal Credit Union | 831 |
| Deutsche Bank National Trust Company | 800 & 832 |
| U.S. Bank, N.A. | 836, 1067 & 1117 |
| CIFG Assurance North America, Inc. | 838 |
| Goldman Sach Mortgage Company and GS Mortgage Securities Corp. | 845 & 1118 |
| Morgan Stanley Mortgage Capital Holdings LLC | 849 |
| Wells Fargo Funding, Inc. | 851 & 1052 |
| GMAC Mortgage LLC | 857 & 1071 |
| Assurance Guaranty Corp. | 1065 |

## EXHIBIT F

### Termination Objections

| Objecting Party | Docket No(s). | Date of Alleged Termination |
|---|---|---|
| Countrywide Bank, FSB | 614 & 1056 | September 2, 2007 |
| DB Structured Products, Inc. | 675 & 1108 | August 1, 2007 |
| Financial Guaranty Insurance Company | 718 & 1036 | August 2, 2007·········· |
| EMC Mortgage Corp. | 850 & 1057 | August 14, 2007ᴵᴵᴵᴵᴵᴵᴵ |
| Deutsche Bank National Trust Company | 800 & 832 | August 2, 2007 |
| Wells Fargo Bank, N.A. | 824 & 1053 | August 2, 2007* |
| U.S. Bank, N.A. | 836, 1067 & 1117 | August 2, 2007* |
| GMAC Mortgage LLC | 857 & 1071 | August 2, 2007* |
| Residential Funding Company, LLC | 859 & 1061 | August 31, 2007 |

---

·········· Limited Objection that the HELOC Servicing Agreements dated March 23, 2005, June 22, 2005 and October 7, 2005, were terminated by GMAC Mortgage LLC at the direction of Financial Guaranty Insurance Co.

ᴵᴵᴵᴵᴵᴵᴵ Termination alleged with respect to the Purchase, Warranties and Servicing Agreement dated as of March 1, 2006 and the related Term Sheets dated March 30, 2006 and June 29, 2007.

**EXHIBIT G**

**Non-Servicing Related Objections**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| Tuscaloosa County, Alabama | 615 | Taxing Authority | Tuscaloosa County asserts a security interest in the assets of the Sale in connection with 2007 ad valorem taxes, in an amount of $1,430.67. | This objection has been resolved. Pursuant to paragraph 3 of the proposed Sale Order, such interests "attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Sellers may possess with respect thereto." |
| De Lage Landen Financial Services, Inc. | 660 841 1041 | Equipment Lessor | DLL objects to the description of the equipment as insufficient to determine which equipment leases are subject to the Sale. The Debtors do not own, and cannot convey title to, any potential buyer. DLL reserves its right to object to any attempted | The Debtors have provided DLL with a list of equipment serial numbers that are subject to lease assignment in the Sale. The Debtors are working on a global resolution with DLL that |

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| FNC, Inc. | 720 | Software Vendor | Sale of its leased equipment. | they believe will resolve this Objection. |
| | | | DLL proposes various cure amounts depending on the equipment leases to be assigned. | |
| | | | FNC objects to an assignment of its non-exclusive software license without FNC's express written consent. | The Debtors are working with FNC to reach a resolution of this matter. To the extent that a resolution is not reached, the Debtors will not seek to assume and assign or otherwise transfer any agreement with FNC in connection with the Sale of the Servicing Business. |
| | | | FNC will withhold consent unless provided adequate assurance (i) that the acquirer/assignee is financially capable of completing the terms of the Agreement and (ii) that FNC finds the adequate assurance to be satisfactory. | |
| | | | To assume and assign, the Debtors must release FNC from any and all avoidance actions that they may have or claim to have against FNC. | To the extent that FNC contends that the Debtors must reject the FNC agreement within ten (10) days, the Debtors submit that FNC must file a motion to compel assumption or assignment of the agreement. |
| | | | FNC proposes a cure amount in | |

b

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| Iron Mountain Information Management, Inc. | 815 | Document Storage Vendor | excess of $496,579.35.<br><br>If the agreement is not assumed, FNC asserts that the Debtors should be required to reject the agreement within ten (10) days.<br><br>The Modified Notice fails to identify which of the contracts that the Debtors seek to assume and assign. Iron Mountain attached 9 of 14 contracts.<br><br>Iron Mountain asserts a cure payment of $93,081.48, inclusive of attorneys' fees. | Schedule 2.1(b)(i) of the APA identifies only one contract in which the Debtors intend to assume and assign, namely the Customer Agreement, dated as of November 1, 2001, by and between Iron Mountain and Columbia National, Inc. (the "IM Agreement").<br><br>Iron Mountain and the Debtors have agreed to a cure amount of $1,122.86. |
| Security Connections, Inc. | 823<br>1046 | Processing Vendor | SCI supports the proposed Sale to the stalking horse.<br><br>SCI proposes a cure amount of $228,819.55, plus a one-month prepayment of $130,000. | The Debtors are working with SCI to reach a resolution of this objection. |

c

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| Experian Information Solutions, Inc. | 825 | Marketing & Monitoring Vendor | EIS proposes a cure amount of $43,430.83. | The Purchaser and the Debtors have determined that the agreement subject to this objection will not be assumed and assigned or otherwise transferred in connection with the Sale of the Servicing Business. Accordingly, this objection is moot. |
| | | | In the event that the Agreement is assumed and assigned to the Purchaser, and the appropriate cure amount is paid, the SCI states that the objection will be moot. | |
| Qwest Communications Corp. | 829 1066 | Communications Vendor | Qwest asserts that the Debtors erroneously listed only one Amendment to the larger Qwest Total Advantage™ Agreement – Option Z. Qwest asserts that the entire agreement, including twelve amendments, should be assigned. Qwest proposes a cure amount of approximately $672,000.00. | Any and all agreements in which Qwest was a party were not included in Schedules 2.1(b)(i) and 2.1(b)(ii) of the APA. Therefore, the Debtors do not seek to assume and assign or otherwise transfer such agreements in connection with the Sale of their Servicing Business. |

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| ZC Real Estate Tax Solutions | 830 1115 | Tax Services Vendor | Qwest asserts that the proposed order approving the Sale fails to provide for payment obligations that accrue, but are not yet payable, prior to the Initial Closing. | Accordingly, this objection is moot. |
| | | | Qwest further asserts that the Debtors may not be entitled to relief under section 363(k) of the Bankruptcy Code. | |
| | | | ZC proposes a cure amount consisting of (a) $1,125,804.15 on account of prepetition invoices; (b) no less than $42,015.69 for outstanding postpetition services; (c) any additional amounts accruing up to the closing of the Sale, but not otherwise paid by the Debtors in the ordinary course; and (d) attorneys' fees of approximately $46,332.54. | The Debtors confirm that $1,125,804.15 is due for prepetition services. All postpetition obligations have been paid or will be paid at the time of closing in the ordinary course of their business. The Debtors are working with counsel for ZC with respect to these amounts and applicable attorneys' fees. |
| | | | The description of ZC's tax servicing agreement included in the Debtors' Modified Notice | |

e

Exhibit G - Non-Servicing Related Objections, cont.

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| Travis County, Texas | 911 | Taxing Authority | should be "to perform certain services for the management and administration of the Debtors' real estate tax management and payment obligations for present and future real estate loans owned, serviced, or sub-serviced by Debtors."<br><br>ZC wants the Court to require that the Debtors assume and assign the Tax Servicing Agreement in its entirety and require that any assignee be bound by all the terms, provisions and obligations under such agreement.<br><br>Travis County, for and on behalf of various taxing authorities, hold a statutory lien against the Debtors' personal property. Travis County *et al.* claims an interest in the proceeds of the Sale of the personal property. | Pursuant to paragraph 3 of the proposed Sale Order, such interests "attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Sellers may possess with respect |

f

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| Banc of America Leasing & Capital, LLC | 995 | Equipment Lessor | Banc of America Leasing objects to the description of the equipment as insufficient to determine which equipment leases are subject to the Sale. | The Debtors have provided Banc of America Leasing with a list of equipment serial numbers that are subject to lease assignment in the Sale. |
| | 1051 | | Respondent objects to "zero" cure amount, but does not propose an alternative amount. | The Debtors are working with Banc of America Leasing to determine an appropriate cure amount. |
| United States Trustee | 1060 | Office of the United States Trustee | The United States Trustee asserts that the Sale Order should acknowledge that, to the extent that the Debtors propose to sell any interests in either consumer credit transactions that are subject to TILA or interests in consumer credit contracts, the Sale will not be free and clear of such claims and defenses that are related to the consumer credit transaction subject to TILA or the consumer credit contract in accordance with section 363(o) of the Bankruptcy | The Debtors submit that the proposed language is redundant of section 363(o) of the Bankruptcy Code; however, the Debtors will attempt to work with the United States Trustee to resolve this objection. |

thereto."

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| | | | Code. | |
| MERS | 1062 | Vendor | MERS asserts that, pursuant to the MERS terms and conditions, the Debtors are required to pay certain fees relating to the transfer or de-registration of mortgage loans sold pursuant to the Sale. | The Debtors submit that no loans are being sold pursuant to the Sale of the Debtors' Servicing Business. |
| | | | MERS asserts that the Sale Order should provide that the Debtors are obligated to pay the fees out of the proceeds of the Sale immediately after such proceeds are received. | The Debtors intend to honor any and all fees incurred in connection with the terms and conditions of the MERS membership agreements. |
| | | | If AH Acquisition is not a MERS member, the Sale Order should also provide that the Sale cannot close until such time as (i) the proposed purchaser becomes a MERS member or (ii) all of the affected mortgage loans are de-registered from the MERS System and MERS is removed as the mortgagee of record. | |

h

**Exhibit G - Non-Servicing Related Objections, cont.**

| Objecting Party | Docket No(s). | Relationship | Nature of Objection | Status/Proposed Resolution |
|---|---|---|---|---|
| DRI Management Systems, Inc. | Informal | Software Vendor | DRI proposes a cure amount of $106,050.00 for the annual maintenance fee ($99,750) and for system training program in the amount of $5,712.28. | All amounts owing to DRI have been paid, except for an invoice relating to the system training program in the amount of $5,712.28. |
| SoftLanding Systems, Inc. | Informal | Software Vendor | SoftLanding objects to its identification as "SoftLanding Software." <br><br> SoftLanding further objects to the assumption and/or assignment of its software license from Debtors to a prospective assignee in the absence of a mutually agreed-upon new license agreement or agreed-upon transfer payment. | The Purchaser and the Debtors have determined that the agreement subject to this objection will not be assumed and assigned or otherwise transferred in connection with the Sale of the Servicing Business. <br><br> Accordingly, this objection is moot. |

**<u>EXHIBIT H-1</u>**

**Findings of Fact, <u>In re USA Commercial Mortgage Co.</u>**

Case No. 06-10725 (LBR), D.I. 2377 (Bankr. D. Nev. Jan. 8, 2007)



Entered on Docket
January 08, 2007

_____
Hon. Linda B. Riegle
United States Bankruptcy Judge

Annette W. Jarvis, Utah Bar No. 1649
RAY QUINNEY & NEBEKER P.C.
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: ajarvis@rqn.com
and

Lenard E. Schwartzer, NV Bar No. 0399
Schwartzer & McPherson Law Firm
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada  89146-5308
Telephone: (702) 228-7590
Facsimile:  (702) 892-0122
E-Mail:  bkfilings@s-mlaw.com
Attorneys for Debtors and Debtors-in-Possession

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br>USA COMMERCIAL MORTGAGE COMPANY,<br><br>Debtor. | Case No. BK-S-06-10725 LBR<br>Case No. BK-S-06-10726 LBR<br>Case No. BK-S-06-10727 LBR<br>Case No. BK-S-06-10728 LBR<br>Case No. BK-S-06-10729 LBR |
| In re:<br>USA CAPITAL REALTY ADVISORS, LLC,<br><br>Debtor. | Chapter 11 |
| In re:<br>USA CAPITAL DIVERSIFIED TRUST DEED FUND, LLC,<br><br>Debtor. | Jointly Administered Under<br>Case No. BK-S-06-10725 LBR |
| In re:<br>USA CAPITAL FIRST TRUST DEED FUND, LLC,<br><br>Debtor. | [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, AS MODIFIED HEREIN" |
| In re:<br>USA SECURITIES, LLC,<br><br>Debtor. | |
| Affects:<br>☒ All Debtors<br>☐ USA Commercial Mortgage Company<br>☐ USA Securities, LLC<br>☐ USA Capital Realty Advisors, LLC<br>☐ USA Capital Diversified Trust Deed Fund, LLC<br>☐ USA First Trust Deed Fund, LLC | __Confirmation Hearing__<br>Date:  December 19, 2006<br>Time: 10:00 a.m. |

1

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Commencing on December 19, 2006 at 10:00 a.m., the Court held a hearing (the

2  "Confirmation Hearing") on the confirmation of the "Debtors' Third Amended Joint Chapter 11

3  Plan of Reorganization") (as modified by the Confirmation Order (as defined below), the

4  "Plan"[1]) proposed by USA Commercial Mortgage Company ("USACM"), USA Securities,

5  LLC ("USA Securities"), USA Capital Realty Advisors, LLC ("USA Realty"), USA Capital

6  Diversified Trust Deed Fund, LLC ("DTDF") and USA Capital First Trust Deed Fund, LLC

7  ("FTDF"), debtors and debtors in possession in the above-captioned chapter 11 cases (the

8  "Debtors"). Appearances were made as indicated on the record at the Confirmation Hearing.

9    The Court considered the pleadings and documents filed by the Debtors and other

10  interested parties in connection with confirmation of the Plan, including the following:

11    (a)    the Plan and all accompanying exhibits, including, without limitation, the

12  Plan Documents Supplement, the Revised Schedule of Executory Contracts and Unexpired

13  Leases, the forms of Disbursing Agent Agreements for USACM and FTDF filed by the Debtors

14  and the Direct Lender Supplement;

15    (b)    the "Debtors' First Amended Disclosure Statement to Debtors' Third

16  Amended Joint Plan of Reorganization" (the "Disclosure Statement") previously approved by the

17  Court;

18    (c)    the "Memorandum of Points and Authorities in Support of Confirmation of

19  the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" (the "Confirmation

20  Memorandum");

21    (d)    the Declaration of Thomas J. Allison filed in support of confirmation of the

22  Plan (the "Allison Declaration");

23    (e)    the Affidavit of Balloting Agent Regarding Solicitation and Tabulation of

24  Votes in Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization,

25  regarding compliance with the "Solicitation Procedures" approved in the Disclosure Statement

26  Order ("BMC Declaration");

27

28

---

[1]    All terms not otherwise defined in these Findings of Fact and Conclusions of Law (the "Findings")
shall have the meanings assigned to them in the Plan.

2

1           (f)     the Declaration of David Blatt of Compass Partners LLC in Support of

2    Confirmation of Debtors' Third Amended Joint Plan of Reorganization ("Compass Declaration");

3           (g)     the "Affidavit of Balloting Agent Regarding Solicitation and Tabulation of

4    Votes in Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization"

5    and the Ballot Tabulation Report attached as Exhibit A thereto [Docket No. 2165] and

6    "Supplemental Affidavit of Balloting Agent Regarding Solicitation and Tabulation of Votes in

7    Connection with the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization" and the

8    Revised Ballot Tabulation Report attached as Exhibit B thereto [Docket No. 2243], which detail

9    the tabulation of Ballots cast for or against the Plan;

10           (h)     the "Partial Opposition to Debtors' Third Amended Joint Plan of

11    Reorganization," filed by Erna D. Grundman and Joanne M. Grundman;

12           (i)     the "Partial Opposition to Debtors' Third Amended Joint Plan of

13    Reorganization," filed by Joanne M. Grundman;

14           (j)     the "Objection of The Pension Benefit Guaranty Corporation to Debtors'

15    Third Amended Joint Plan of Reorganization," filed by the Pension Benefit Guaranty Corporation

16    ("PBGC");

17           (k)     the "Objection to Confirmation of Debtors' Third Amended Joint

18    Chapter 11 Plan of Reorganization," filed by Edward Burgess;

19           (l)     "Liberty Bank's Limited Objection to Confirmation of Debtors' Third

20    Amended Joint Chapter 11 Plan of Reorganization," filed by Liberty Bank;

21           (m)     "Standard Property Company, LLC's Limited Objection to the Debtors'

22    Third Amended Joint Plan of Reorganization," filed by Standard Property, LLC;

23           (n)     "Joinder in Standard Property Company, LLC's Limited Objection to the

24    Debtors' Third Amended Joint Plan of Reorganization on Behalf of Copper Sage Commerce

25    Center LLC, " filed by Copper Sage Commercial Center;

26           (o)     "Joinder in Standard Property Company, LLC's Limited Objection to the

27    Debtors' Third Amended Joint Plan of Reorganization on Behalf of Binford Medical Developers,"

28    filed by Binford Medical Developers;

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

3

1    (p)    "Memorandum of Points and Authorities in Opposition to Confirmation of

2    Debtor's Plan," filed by Debt Acquisition Company of America V and the Declaration of Howard

3    Justus [Docket No. 2032] filed in support thereof;

4    (q)    "Limited Objection to Plan," filed by Gregory Walch and Shauna Walch,

5    etc.;

6    (r)    the "Objection of USA Investment Partners, LLC, Joseph Milanowski and

7    Thomas Hantges to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of

8    Reorganization," filed by Joseph Milanowski and Thomas Hantges (the "H&M Objection") and

9    the Declaration of Victoria Loob filed in support thereof (the "Loob Declaration");

10    (s)    the "Objection to Confirmation of Debtors' Third Amended Joint

11    Chapter 11 Plan of Reorganization as it Applies to Debtor USA Commercial Mortgage Company,"

12    filed by The Lenders Protection Group (the "LPG Objection");

13    (t)    the Declaration of Donna Cangelosi filed in support of the LPG Objection

14    (the "Cangelosi Declaration");

15    (u)    Multiple joinders to objections to confirmation of the Plan filed by

16    Objecting JV Creditors [Docket nos. 2040, 2099, 2179, 2180, 2182, 2184, and 2191];

17    (v)    "Limited Objection to Pecos Professional Park Limited Partnership and

18    Haspinov, LLC, to Debtors' Proposed Plan of Reorganization," filed by USA Commercial Real

19    Estate Group;

20    (w)    "Joinder in Limited Opposition to Plan," filed by Direct Lenders Alexander

21    and others as shown in the Second Amended Statement of Robert C. LePome, Esq. and Nancy

22    Allf, Esq. Pursuant to Rule 2019;

23    (x)    "Errata to Limited Objection to Plan," filed by Gregory J. Walch and

24    Shauna M. Walch, Trustees of the Gregory J. and Shauna M. Walch Family Trust;

25    (y)    the "Opposition and Joinder of Sierra Liquidity Fund, L.L.C. in Oppositions

26    [sic] to Confirmation of Debtors' Third Amended Joint Plan of Reorganization" ( the "Sierra

27    Liquidity Objection" and, collectively with the objections to the Plan listed in (h)-(x) above, the

28    "Objections");

4

1    (z)    the "Debtors' Combined Motion In Limine And Memorandum In Support

2 Regarding The Objection Of USA Investment Partners, LLC, Joseph Milanowski And Thomas

3 Hantges To The Confirmation Of The Debtors' Third Amended Joint Chapter 11 Plan Of

4 Reorganization," filed by the Debtors; and

5    (aa)    all other pleadings, affidavits and documents filed in connection with this

6 matter.

7    The Court has heard the statements, arguments, representations and offers of proof

8 of counsel regarding confirmation of the Plan at the Confirmation Hearing, and has considered the

9 record of these Chapter 11 Cases and all testimony and evidence admitted at or before the

10 Confirmation Hearing.

11    These findings of fact and conclusions of law are in support of the "Order

12 Confirming the 'Debtors' Third Amended Joint Chapter 11 Plan Of Reorganization,' As Modified

13 Herein" (the "Confirmation Order"), entered concurrently herewith.

14    Based on the foregoing, the Court makes the following findings of fact and

15 conclusions of law, as supplemented by the findings of fact and conclusions of law stated orally

16 and reported in open court on the record at the Confirmation Hearing (which are incorporated

17 herein) pursuant to Bankruptcy Rule 7052:[2]

18

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

19    A.    This matter is a core proceeding over which the Court has jurisdiction

20 pursuant to 28 U.S.C. §§ 157(b) and 1334(a).  Venue of this proceeding is proper under 28 U.S.C.

21 §§ 1408 and 1409.

22    B.    The Debtors provided notice of the Confirmation Hearing and of the time

23 fixed for balloting and filing objections to confirmation of the Plan to all entities entitled to

24 receive such notice, including all known holders of Claims and Equity Interests of the Debtors.

25 The notice by the Debtors of such matters fully and adequately described the relief requested at the

26

27    [2]    This document constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy

28    Rules 7052 and 9014.  Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, when appropriate.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1   Confirmation Hearing and was reasonable, appropriate, and complied in all regards with due

2   process and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules (including

3   Bankruptcy Rules 2002, 3017, 3018, and 3019), and the Local Bankruptcy Rules and orders of the

4   Court, including this Court's "Order Approving: (A) Debtors' Disclosure Statement; (B) Proposed

5   Notice of Confirmation Hearing; (C) Proposed Solicitation and Notice Procedures; and (D)

6   Proposed Form of Ballots" (the "Disclosure Statement Order").

7          C.     Pursuant to the Disclosure Statement Order, all objections to confirmation

8   of the Plan, including all evidence in support thereof, were required to be filed by December 11,

9   2006 and, therefore, the Cangelosi Declaration filed on December 18, 2006 and the Sierra

10   Liquidity Objection filed on December 15, 2006 were not timely filed and were stricken from the

11   record and/or overruled.

12          D.     The only evidence submitted in support of the H&M Objection was the

13   Loob Declaration. On December 18, 2006, the Debtors undertook an examination of Ms. Loob

14   pursuant to Bankruptcy Rule 2004 where Ms. Loob asserted her rights under the Fifth Amendment

15   of the United States Constitution in connection with questions concerning the H&M Objection and

16   her declaration in support thereof. Additionally, USA Investment Partners ("USAIP") and Joseph

17   Milanowski each failed to appear at Court-ordered examinations to be conducted pursuant to Rule

18   2004 of the Federal Rules of Bankruptcy Procedure. Upon consideration of Ms. Loob's assertion

19   of her Fifth Amendment rights, the failure of USAIP and Mr. Milanowski to appear at their

20   respective Rule 2004 examinations, and the Motion in Limine, the H&M Objection and Loob

21   Declaration were stricken from the record.

22          E.     None of the Objections, including the LPG Objection, raised any objection

23   with respect to the classification of the Classes of Claims and/or Equity Interests as set forth in the

24   Plan or use of a Class to meet cramdown requirements. Further, Class A-5 consists of holders of

25   "claims" within the meaning of Bankruptcy Code section § 101(5).

26          F.     The Debtors conducted the solicitation of acceptances or rejections of the

27   Plan, and the related distribution and tabulation of ballots with respect thereto, in good faith and in

28   compliance with the Disclosure Statement Order, all applicable provisions of the Bankruptcy

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Rules (including Bankruptcy Rules 3017 and 3018), all applicable provisions of the Bankruptcy

2    Code (including sections 1125 and 1126), and all other applicable laws, rules, and regulations.

3    Among other things, the Debtors transmitted the Plan, the Disclosure Statement, and the

4    applicable ballot to all known holders of Claims and Equity Interests of the Debtors that are

5    impaired under, and therefore entitled to vote on, the Plan.

6       G. The Plan satisfies all of the requirements of Bankruptcy Code

7    section 1129(a) as follows:

8       1. 11 U.S.C. § 1129(a)(1): the Plan complies with all of the applicable

9    provisions of the Bankruptcy Code, including Bankruptcy Code sections 1122 and 1123.

10       The classification structure is proper and in accordance with Section 1122 of the

11    Bankruptcy Code. Each Class under the Plan differs in legal character or nature. All Claims and

12    Equity Interests within each Class are substantially similar to the other Claims or Equity Interests

13    in that Class because they are similar in legal character to the other Claims against or Equity

14    Interests in Debtors in such class.

15       Article II Section C of the Plan designates Classes of Claims and Equity Interests

16    for each of the Debtors, other than those specified in Sections 507(a)(2), (a)(3) and (a)(8) of the

17    Bankruptcy Code, and states the treatment of each Class under the Plan in accordance with

18    Sections 1123(a)(1), (2) and (3). The Plan also provides for the same treatment of each Claim and

19    Equity Interest within a particular Class in accordance with Section 1123(a)(4).

20       Article IV of the Plan provides adequate means for its implementation in a manner

21    that is consistent with Section 1123(a)(5) and (b).

22       2. 11 U.S.C. § 1129(a)(2): the Debtors have complied with all of the

23    applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 1125.

24       3. 11 U.S.C. § 1129(a)(3): the Debtors have proposed the Plan in good faith

25    and not by any means forbidden by law. Moreover, the Plan itself, and the negotiated process

26    leading to its formulation, along with all four Committees, provide independent evidence of the

27    good faith of the Debtors.

28       4. 11 U.S.C. § 1129(a)(4): Article II Section B.1 and Article VII Section A of

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    the Plan, provides for the appropriate review and determination of the fees and expenses incurred

2    through the Effective Date.

3         5.    11 U.S.C. § 1129(a)(5): the Plan, the Disclosure Statement, the exhibits to

4    the Plan, the Confirmation Memorandum, the Plan Documents Supplement, the Direct Lender

5    Supplement, and the disclosures at the Confirmation Hearing disclose the identity, qualifications,

6    method of election, and/or compensation of the DTDF Administrator, the DTDF Post-Effective

7    Date Committee, USACM Trustee, the USACM Trust Committee, the Disbursing Agents for

8    FTDF, USA Realty and USA Securities, respectively.  The appointment of such persons is

9    consistent with the interests of creditors and shareholders and with public policy.

10         6.    11 U.S.C. §§1129(a)(6):  the requirements of Bankruptcy Code

11    section 1129(a)(6) are not applicable to the Plan.

12         7.    11 U.S.C. § 1129(a)(7): each holder of a Claim or Equity Interest in a Class

13    that is impaired under the Plan will receive or retain under the Plan property of a value, as of the

14    Effective Date, that is not less than such holder would so receive or retain if the Debtors were

15    liquidated under chapter 7 of the Bankruptcy Code on such date.

16         8.    11 U.S.C. § 1129(a)(8), (10): In the Chapter 11 Cases of FTDF, DTDF,

17    USA Realty, and USA Securities, Classes, B-1 through B-4, C-1 through C-4, D-1 through D-3

18    and E-1 through E-3 are unimpaired, and Classes B-5, C-5, D-4 and E-4, though impaired, have

19    accepted the Plan.  The Plan, with respect to the Chapter 11 Cases of FTDF, DTDF, USA Realty,

20    and USA Securities, thus satisfies the requirement of Bankruptcy Code section 1129(a)(8).

21         In the Chapter 11 case of USACM, Classes A-1 through A-3 are unimpaired,

22    and classes A-4 through A-8 are impaired under the Plan.  Classes A-6 through A-8 will receive

23    no distribution under the Plan and are deemed to reject the Plan. Impaired Class A-5 has voted to

24    accept the Plan, and based on the Revised Ballot Tabulation Report, impaired Class A-4 also has

25    voted to accept the Plan. Accordingly, Section 1129 (a)(8) has been satisfied with respect to

26    USACM's Chapter 11 Case. Based on the acceptance of the Plan by Class A-5, Section

27    1129(a)(10) has been met with regard to USACM's Chapter 11 Case even if Class A-4 had not

28    accepted the Plan as a result of the Del Bunch Rule 3018 contested matter.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Section 1129(a)(10) does not apply to FTDF or DTDF because there is no impaired

2    class of Claims in their respective Chapter 11 Cases

3    In USA Realty's case, Classes D-4, the only voting impaired Class of Claims, has

4    voted to accept the Plan. Section 1129(a)(10) is met in USA Realty's Chapter 11 Case.

5    In USA Securities' case, Class E-4, the only voting impaired Class of Claims, has

6    voted to accept the Plan. Section 1129(a)(10) is met with regard to USA Securities' Chapter 11

7    Case.

8    9.    11 U.S.C. § 1129(a)(9): the treatment of Allowed Administrative Expense

9    Claims, Allowed Priority Unsecured Claims, Allowed Priority Tax Claims and Allowed Secured

10   Tax Claims as set forth in Article II, Sections B. and C. of the Plan satisfies the requirements of

11   Bankruptcy Code section 1129(a)(9) in that holders of such Administrative Expense Claims,

12   Priority Unsecured Claims, Priority Tax Claims and Secured Tax Claims will be paid in full on the

13   Effective Date, or as soon as such expenses or claims become Allowed under the terms of the

14   Plan, except where the holder of such Claim agrees to a different treatment.

15   10.    11 U.S.C. § 1129(a)(11): the Plan satisfies the requirements of Bankruptcy

16   Code section 1129(a)(11) as the evidence submitted by the Debtors shows that each of the Debtors

17   has sufficient funds on the Effective Date to make all of the distributions required to be made

18   under the Plan and that the Plan, including all of the documents incorporated therein, has adequate

19   provisions for the creation and management of the USACM Trust, the retention of assets by and

20   the management of Post-Effective Date DTDF, for making distributions to holders of Allowed

21   Claims or Equity Interests classified in Classes A-4 (Allowed General Unsecured Claims against

22   USACM), B-4 (Allowed General Unsecured Claims against FTDF), B-5 (Equity Interests in

23   FTDF), C-4 (Allowed General Unsecured Claims against DTDF), C-5 (Equity Interests in DTDF),

24   D-4 (Allowed General Unsecured Claims against USA Realty) and E-4 (Allowed General

25   Unsecured Claims against USA Securities), which are the only Classes that will receive a

26   distribution under the Plan, and to implement the provisions of the settlement with the holders of

27   Class A-5 (Direct Lender Compromise Claims).

28   11.    11 U.S.C. § 1129(a)(12): the Plan's provision for the payment of statutory

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

9

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1 | fees to the Office of the United States Trustee, satisfies the requirements of Bankruptcy Code

2 | section 1129(a)(12).

3 |      12.    11 U.S.C. § 1129(a)(13): the Plan satisfies the requirements of Bankruptcy

4 | Code section 1129(a)(13) because the Debtors are not subject to any retiree benefits as defined in

5 | Bankruptcy Code section 1144.

6 |      13.    11 U.S.C. § 1129(a)(14): the requirements of Bankruptcy Code

7 | section 1129(a)(14), which mandate the payment of domestic obligations, are inapplicable to these

8 | business Debtors.

9 |      14.    11 U.S.C. § 1129(a)(15): the requirements of Bankruptcy Code

10 | section 1129(a)(15), which only applies to cases where the debtor is an individual, are inapplicable

11 | to these business Debtors.

12 |      15.    11 U.S.C. § 1129(a)(16): the requirements of Bankruptcy Code

13 | section 1129(a)(16), which only applies to "the transfer of property by a corporation or trust that is

14 | not a moneyed, business, or commercial corporation or trust", are inapplicable because each of the

15 | Debtors is a moneyed business or commercial corporation.

16 |      16.    11 U.S.C. § 1129(b)(1) and (2): With respect to Classes A-6, A-7, A-8, D-5

17 | and E-5, which have not accepted the Plan, and Class A-4, to the extent such Class has not

18 | accepted the Plan, the Plan satisfies the requirements of Bankruptcy Code sections 1129(b)(1) and

19 | 1129(b)(2) because the Plan does not discriminate unfairly against, and provides fair and equitable

20 | treatment with respect to, the Allowed Claims in Classes A-4, A-6 and A-7 and Allowed Equity

21 | Interests in Classes A-8, D-5 and E-5 in that the Plan provides for no distribution to any junior

22 | Class in a Debtor's Estate and does not discriminate unfairly among such Classes.

23 |      H.    The Plan satisfies the requirements of Bankruptcy Code section 1129(b) as

24 | follows:

25 |      1.    All of the applicable requirements of Bankruptcy Code section 1129(a)

26 | other than paragraph (8) are met with respect to the Plan.

27 |      2.    The Plan does not discriminate unfairly with respect to Classes A-4 (to the

28 | extent such Class has not accepted the Plan), A-6, A-7, A-8, D-5 and E-5.

1      3.    The Plan is "fair and equitable" as to Classes A-4 (to the extent such Class

2   has not accepted the Plan) and A-6 because holders of junior Claims or Equity Interests will not

3   receive or retain under the Plan on account of such junior Claim or Equity Interest any property.

4      4.    The only Classes of Claims and Equity Interests that are junior to Class A-4

5   Claims are Claims in Classes A-6 through A-8. Holders of Class A-6 Claims will not receive or

6   retain any property unless holders of Allowed Class A-4 Claims are paid in full, plus interest.

7   Holders of Class A-7 Claims will not receive or retain under the Plan on account of their Claim

8   any property unless holders of Class A-4 and Class A-6 Claims are paid in full, plus interest.

9   Furthermore, holders of Equity Interests in USACM, classified in Class A-8, will receive no

10  distribution and retain no property under the Plan.

11     5.    The only Classes of Claims and Equity Interests that are junior to Class A-6

12  Claims are Claims in Classes A-7 through A-8. Holders of Class A-7 Claims will not receive or

13  retain under the Plan on account of their Claim any property unless holders of Class A-6 Claims

14  are paid in full, plus interest. Furthermore, holders of Equity Interests in USACM, classified in

15  Class A-8, will receive no distribution and retain no property under the Plan

16     6.    The Plan is "fair and equitable" as to Class A-7 because holders of junior

17  Claims or Equity Interests will not receive or retain under the Plan on account of such junior

18  Claim or Equity Interest any property. The only Class that is junior to Class A-7 Claims is Class

19  A-8, which is comprised as Equity Interests in USACM. Holders of Equity Interests in USACM

20  will receive no distribution or retain any property under the Plan.

21     7.    The Plan is "fair and equitable" within the meaning of section

22  1129(b)(2)(C)(ii) as to Class A-8, which is comprised of Equity Interests in USACM, Class D-5,

23  which is comprised of Equity Interests in USA Realty, and Class E-5, which is comprised of

24  Equity Interests in USA Securities because no holder of any interest that is junior to the Equity

25  Interests treated in these Classes will receive or retain any property under the Plan.

26     I.    Article V of the Plan governing the assumption and rejection of executory

27  contracts and unexpired leases satisfies the requirements of sections 365 and 1123(b)(2) of the

28  Bankruptcy Code. As provided in the Debtors' Revised Schedule of Executory Contracts And

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

11

1  Unexpired Leases In Connection With Debtors' Third Amended Joint Chapter 11 Plan Of

2  Reorganization, filed on December 18, 2006 (docket no. 2162), the Debtors have elected to reject

3  all executory contracts and unexpired leases.

4         J.     The principal purpose of the Plan is not the avoidance of taxes or the

5  avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

6         K.     All modifications to the Plan filed or announced prior to the conclusion

7  of the Confirmation Hearing constitute technical changes and/or changes that have either been

8  consented to by affected constituents or which do not adversely affect or change the treatment

9  of any other Claims or Equity Interests.  Accordingly, pursuant to Bankruptcy Rule 3019, these

10  modifications do not require additional disclosure under Bankruptcy Code section 1125 or

11  1127(a), or resolicitation of votes under Bankruptcy Code section 1126, nor do they require that

12  holders of Claims or Equity Interests be afforded an opportunity to change previously cast

13  acceptances or rejections of the Plan.  The Plan as so modified meets the requirements of

14  Bankruptcy Code sections 1122 and 1123.  Such modifications shall be deemed accepted by

15  each holder of a Claim or Equity Interest who has previously voted to accept the Plan.

16         L.     The form of documents in the Plan Documents Supplement, including

17  the USACM Liquidating Trust Agreement, the DTDF Amended Operating Agreement, the

18  Direct Lender Supplement, and the Disbursing Agent Agreements for USACM and FTDF

19  substantially in the form filed by the Debtors are appropriate.

20         M.     The appointment of Michael Tucker of FTI Consulting to serve as the

21  DTDF Administrator and to perform the duties specified under the Plan and the DTDF

22  Amended Operating Agreement is appropriate and consistent with the best interests of DTDF's

23  creditors, Equity Interest holders, and the interests of public policy.

24         N.     The appointment of Geoffrey L. Berman of Development Specialists,

25  Inc. to serve as the USACM Trustee and to perform the duties specified under the Plan and the

26  USACM Trust Agreement is appropriate and consistent with the best interests of USACM's

27  creditors and the interests of public policy.

28         O.     The parties identified to the Court to serve as members of the USACM

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    Trust Committee and the DTDF Post-Effective Date Committee are appropriate to serve in such

2    roles.

3           P.      All of the conditions precedent to Confirmation of the Plan described in

4    Article VI Section A of the Plan have been satisfied.

5           Q.      The agreements, transactions and transfers authorized by the Confirmation

6    Order, including, without limitation, the USACM Trust Agreement and the DTDF Amended

7    Operating Agreement, are fair, equitable and reasonable, are entered into in good faith, are in the

8    best interests of the USACM and DTDF, their respective creditors and Estates (and with respect to

9    DTDF, its Equity Interest holders), and help provide adequate means for implementing the Plan.

10          R.      Pursuant to Bankruptcy Code section 1125(e), Persons, including the

11   Debtors, the Committees, and their respective attorneys, agents, directors, officers and

12   representatives, have acted in good faith with respect to the solicitation of votes on the Plan and

13   thus are entitled to all the protections of Bankruptcy Code section 1125(e).

14          S.      The injunctions, releases and limitations on liability contained in the Plan

15   are fair and equitable, are given for valuable consideration, were properly noticed to holders of

16   Claims and Equity Interests and other interested parties in accordance with the requirements of

17   due process and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and are

18   in the best interests of the Debtors and their Estates.

19          T.      Each term and provision of the Plan is valid and enforceable pursuant to its

20   terms.

21          U.      The Plan satisfies the requirements for confirmation set forth in

22   section 1129 of the Bankruptcy Code.

23          V.      The Court's retention of jurisdiction as set forth in Article VIII Section D of

24   the Plan is appropriate and comports with the parameters contained in 28 U.S.C. § 157.

25          W.      The provisions of the Plan, these Findings and the Confirmation Order

26   shall bind the Debtors, their respective Estates, the Asset Purchaser, the USACM Trustee, the

27   DTDF Administrator, and all holders of Claims against, and Equity Interests in the Debtors,

28   whether or not the Claims or Equity Interests of such entities are Allowed under the Plan or

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

13

1 | impaired under the Plan, whether or not such entities have voted to accept or reject the Plan,

2 | and whether or not such entities have filed or are deemed to have filed proofs of Claim or

3 | Equity Interests in these Chapter 11 Cases.

4 |         X.     The transfer of the Acquired Assets (including, without limitation, both

5 | real and personal property) to the Asset Purchaser is a transfer in accordance with Bankruptcy

6 | Code section 1146(c) and, therefore the making, delivery, filing or recording of any mortgages,

7 | deeds of trust, leasehold mortgages, leases (whether recorded or unrecorded), and/or the various

8 | instruments and documents of transfer as specified in or contemplated by the Asset Purchase

9 | Agreement or the Plan (collectively, "Instruments of Transfer"), and/or the exhibits thereto are

10 | hereby exempt from taxation under any law imposing a recording tax, stamp tax, sales tax,

11 | transfer tax, use tax or any similar tax or any so-called "bulk-sale". The appropriate federal,

12 | state or local government filing and recording officers are hereby directed to accept for filing or

13 | recording all Instruments of Transfer or other documents of transfer to be filed and recorded in

14 | accordance with the Plan or the Asset Sale Transaction, without payment of any such tax or

15 | government assessment, and without the presentation of any affidavits, instruments, or returns

16 | otherwise required for recording, other than the Confirmation Order. The Court retains

17 | jurisdiction to enforce the foregoing direction, by contempt proceedings or otherwise.

18 |         Y.     All DTDF Litigation Claims and FTDF Transferred Assets accruing to

19 | DTDF or FTDF, or their Estates, shall remain assets of the Post-Effective Date DTDF, whether

20 | or not litigation relating thereto is pending on the Effective Date and whether or not any such

21 | right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or

22 | any schedule, exhibit or other document filed in connection therewith.

23 |         Z.     All USACM Litigation Claims and the FTDF Litigation Claims (transferred

24 | to USACM pursuant to section E.2.j of Art. IV of the Plan) accruing to USACM or FTDF,

25 | respectively, or their respective Estates shall remain assets of and vest in the USACM Trust,

26 | whether or not litigation relating thereto is pending on the Effective Date and whether or not any

27 | such right or cause of action has been listed or referred to in the Plan, the Disclosure Statement or

28 | any schedule, exhibit or other document filed in connection therewith.

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1         AA.   As set forth in Article IV, Section E.1. of the Plan, the compromise between

2   USACM and the Direct Lenders is fair and reasonable and is in the best interests of the USACM

3   Estate and the Direct Lenders, respectively.

4         BB.   As set forth in Article IV, Section E.2. of the Plan, the compromise between

5   USACM and FTDF is fair and reasonable and is in the best interests of the USACM Estate and

6   FTDF Estate, respectively.

7         CC.   As set forth in Article IV, Section E.3. of the Plan, the compromise between

8   FTDF and DTDF is fair and reasonable and is in the best interests of the FTDF Estate and DTDF

9   Estate, respectively.

10        DD.   As set forth in Article IV, Section E.4. of the Plan, the compromise between

11   FTDF and USA Realty is fair and reasonable and is in the best interests of the FTDF Estate and

12   USA Realty Estate, respectively.

13        EE.   As set forth in Article IV, Section E.5. of the Plan, the compromise

14   between DTDF and USA Realty is fair and reasonable and is in the best interests of the DTDF

15   Estate and USA Realty Estate, respectively.

16        FF.   The Asset Purchase Agreement and the transactions contemplated by the

17   Asset Purchase Agreement were negotiated and have been and are undertaken by USACM and

18   FTDF (FTDF together with USACM, the "Sellers") and Asset Purchaser at arm's length,

19   without collusion or fraud, and in good faith within the meaning of section 363(m) of the

20   Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization

21   provided herein to consummate the Asset Sale Transaction shall not affect the validity of the

22   transfer of the Acquired Assets to the Asset Purchaser unless such authorization is duly stayed

23   pending such appeal.

24        GG.   The Auction conducted in accordance with the Bid Procedures Order on

25   December 7, 2006, at which Asset Purchaser was declared the highest and best bidder, was

26   conducted in good faith within the meaning of section 363(m) of the Bankruptcy Code. The

27   Asset Purchaser is a purchaser in good faith of the Acquired Assets. As a result of the

28   foregoing, the Sellers and Asset Purchaser entitled to the protections of section 363(m) of the

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 • Fax: (702) 892-0122

1  Bankruptcy Code.

2       HH.    The Asset Purchase Agreement was negotiated, proposed and entered

3  into by the Debtors and the Asset Purchaser without collusion, in good faith, and from arm's-

4  length bargaining positions.

5       II.    There were no brokers involved in the Asset Sale Transaction, and no

6  brokers' commissions are due with respect to the Asset Sale Transaction.

7       JJ.    The Asset Purchaser is not an "insider" of any of the Debtors, as that

8  term is defined in section 101 of the Bankruptcy Code.

9       KK.    The transfer of the Acquired Assets to the Asset Purchaser will be a

10  legal, valid, and effective transfer of the Acquired Assets, and will vest the Asset Purchaser

11  with all right, title, and interest of the Sellers to the Acquired Assets free and clear of all liens,

12  claims, interests, obligations and encumbrances whatsoever, including, but not limited to, (A)

13  all monetary and non-monetary defaults and rights that purport to give to any party a right or

14  option to effect any forfeiture, modification, right of first refusal, or termination of the Sellers'

15  or the Asset Purchaser's interest in, or rights in or under, the Acquired Assets, or any similar

16  rights, based in any way on any action taken (or failed to be taken) by any of the Debtors or any

17  other matter or occurrence relating to the period prior to the Closing (other than any right that

18  existed and was matured and exercisable, as of the Petition Date, to effect a substitution of

19  USACM as loan servicer under Section 3 of any Loan Servicing Agreement, as well as any

20  defenses of the loan servicer thereto (a "Surviving Section 3 Right")); (B) taxes arising under or

21  out of, in connection with, or in any way relating to the existence, ownership, management or

22  servicing of the Acquired Assets prior to the Closing; and (C) (i) all mortgages, deeds of trust,

23  security interests, conditional sale or other title retention agreements, pledges, liens, judgments,

24  demands, encumbrances, rights of first refusal or charges of any kind or nature, if any,

25  including, but not limited to, any restriction on the use, voting, transfer, receipt of income or

26  other exercise of any attributes of ownership and (ii) all debts arising in any way in connection

27  with any agreements, acts, or failures to act, of any of the Sellers or any of the Sellers'

28  predecessors or affiliates; all claims (as that term is defined in the Bankruptcy Code),

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

16

1  obligations, liabilities, rights of recoupment or setoff, demands, guaranties, options, rights,

2  restrictions, interest and matters of any kind and nature in any way relating to the existence,

3  ownership, management or servicing of the Acquired Assets prior to Closing, whether known

4  or unknown, contingent or otherwise, whether arising prior to or subsequent to the

5  commencement of these cases pursuant to chapter 11 of the Bankruptcy Code, and whether

6  imposed by agreement, understanding, law, equity or otherwise, including but not limited to

7  claims otherwise arising under doctrines of successor liability (collectively, "Interests");

8  provided, however, that, in connection with any attempted post-Closing exercise of a Surviving

9  Section 3 Right: (a) the Direct Lenders must provide Compass at least thirty (30) days prior

10  written notice of the intended exercise of such right in accordance with section 8 of the Loan

11  Servicing Agreement, (b) Compass shall have the right to challenge the exercise of such

12  Surviving Section 3 Right by filing a motion with this Court prior to the expiration of such

13  thirty (30) day period to determine whether such Surviving Section 3 Right has been properly

14  and validly exercised (the "Compass Motion") and the Court shall retain jurisdiction to

15  adjudicate any such disputes, (c) in the event Compass timely files such Compass Motion, the

16  effectiveness of the attempted exercise of such Surviving Section 3 Right shall be stayed

17  pending this Court's entry of an order in respect of the Compass Motion, and (d) the post-

18  Closing survival of such Surviving Section 3 Right shall not impair in any respect any rights or

19  interests of Compass under the Loan Servicing Agreements, including, without limitation, its

20  rights under Section 2(c)(iii) of the Loan Servicing Agreement.  In the event of a proper

21  exercise of remedies under Section 3 of the Loan Servicing Agreement, (i) neither the Direct

22  Lenders nor any replacement servicer selected by such Direct Lender shall have the right or

23  ability to compromise, subordinate, or impair, in any respect, any claims purchased by Compass

24  from the Estates for default interest, accrued servicing fees, late charges, success fees, or other

25  amounts under the Loan Servicing Agreement, and (ii) the Confirmation Order shall be binding

26  upon such replacement servicer regardless of whether such replacement servicer actually

27  received such copy of the Confirmation Order.

28       LL.    The Loan Servicing Agreements are not executory contracts under

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1  Bankruptcy Code section 365 and can be transferred to the Asset Purchaser under Bankruptcy

2  Code sections 1123 and 363(b) without being assumed and assigned to the Asset Purchaser

3  under Bankruptcy Code section 365.

4        MM.   The Asset Purchaser would not have entered into the Asset Purchase

5  Agreement and would not consummate the transactions contemplated thereby, thus adversely

6  affecting the Sellers, their Estates, their creditors, and, with respect to FTDF, its Equity Interest

7  holders, if the sale of the Acquired Assets to the Asset Purchaser was not free and clear of all

8  Interests of any kind or nature whatsoever, or if the Asset Purchaser would, or in the future

9  could, be liable for any of the Interests, including, without limitation, any liabilities not

10  expressly assumed by the Asset Purchaser.

11        NN.   The consideration provided by Asset Purchaser pursuant to the Asset

12  Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired

13  Assets, (iii) will provide a greater recovery to the Sellers' Estates than would be provided by

14  any other available alternative, and (iv) constitutes reasonably equivalent value and fair

15  consideration under the Bankruptcy Code and under the laws of the United States, any State

16  (including Nevada), territory, possession, or the District of Columbia.

17        OO.   Unless otherwise provided by law, the reversal or modification of the

18  Confirmation Order and these Findings on appeal shall not affect the validity of the Plan, or any

19  agreement or action authorized by the Confirmation Order or under the Plan with respect to any

20  entity acting in good faith, whether or not that entity knows of the appeal, unless the

21  Confirmation Order is stayed pending appeal.

22        PP.   Based on the foregoing findings and conclusions, the Debtors are entitled to

23  entry by this Court of the Confirmation Order.

24  Submitted by:                          Approved / Disapproved by:

25  RAY QUINNEY & NEBEKER P.C.      OFFICE OF THE U.S. TRUSTEE
    and SCHWARTZER & MCPHERSON LAW FIRM

26  By:  /s/ Jeanette E. McPherson         By: _____

27  LENARD E. SCHWARTZER, ESQ.        August B. Landis
    JEANETTE E. MCPHERSON, ESQ.

28  ANNETTE W. JARVIS, ESQ.
    STEVEN STRONG, ESQ.
    *Counsel for Debtors*

SCHWARTZER & MCPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, AS MODIFIED HEREIN"**

**Approved**/Disapproved by:
LEWIS AND ROCA, LLP

By:  /s/ Rob Charles
    SUSAN M. FREEMAN, ESQ.
    ROB CHARLES, ESQ.
    *Counsel for the Official Committee of*
    *Unsecured Creditors of USA Commercial*
    *Mortgage Company*

**Approved**/Disapproved by:
GORDON & SILVER, LTD.

By:  /s/ Gregory Garman
    GERALD M. GORDON, ESQ.
    GREGORY E. GARMAN, ESQ.
    *Counsel for the Official Committee of*
    *Holders of Executory Contract Rights of*
    *USA Commercial Mortgage Company*

**Approved**/Disapproved by:
ORRICK, HERRINGTON & SUTCLIFFE LLP
and BECKLEY SINGLETON, CHTD.

By:  /s/ Marc A. Levinson
    MARC A. LEVINSON, ESQ.
    JEFFERY HERMANN ESQ.
    BOB L. OLSON, ESQ.
    ANNE M. LORADITCH, ESQ.
    *Counsel for the Official Committee of*
    *Equity Security Holders of USA Capital*
    *Diversified Trust Deed Fund, LLC*

**Approved**/Disapproved by:
STUTMAN TREISTER & GLATT, P.C. and
SHEA & CARLYON, LTD.

By:  /s/ Christine Pajak
    FRANK A. MEROLA, ESQ.
    EVE KARASIK, ESQ.
    CHRISTINE PAJAK, ESQ.
    CANDACE C. CARLYON, ESQ.
    *Counsel for the Official Committee of*
    *Equity Security Holders of USA Capital*
    *First Trust Deed Fund LLC*

Approved/**Disapproved** by:

By:  /s/ Kevin Darby for
    ALAN SMITH, ESQ.
    *Counsel for Lenders Protection Group*

Approved/Disapproved by:

By:
    DEAN KIRBY, ESQ.
    *Counsel for Debt Acquisition*
    *Company of America*

Approved/Disapproved by:

By:
    ERIC FIELD, ESQ.
    *Counsel for Pension Benefit Guarantee*
    *Corporation*

Approved/Disapproved by:

By:
    NANCY ALLF, ESQ.
    ROBERT LEPOME, ESQ.
    *Counsel for The Alexander Group*

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590  Fax: (702) 892-0122

1   [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE "ORDER
2   CONFIRMING THE "DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF
    REORGANIZATION, AS MODIFIED HEREIN"

3

4   Approved/Disapproved by:                      Approved/**Disapproved** by:

5
    By: _____              By: /s/ Janet Chubb_____
6      MICHAEL SCHMAHL, ESQ.                      JANET CHUBB, ESQ.
       *Counsel for Dr. Gary Kantor, Mrs. Kantor*    *Counsel for Jones Vargas Direct Lenders*
7      *and Kantor Nephrology 401K plan*

8   **Approved**/Disapproved by:                 Approved/Disapproved by:

9

10  By: /s/ George Davis_____        By: _____
       GEORGE DAVIS ESQ.                           DAVID COHEN, ESQ.
11     *Counsel for Compass Partners*              *Counsel for Sierra Liquidity Fund*

12

13  Approved/Disapproved by:                     Approved/Disapproved by:

14

15  By: _____              By: _____
       GREGORY J. WALCH ESQ.                       JEFFREY SYLVESTER, ESQ.
16     *Counsel for Gregory J. Walch and Shauna*   *Counsel for USA Commercial Real Estate*
    *M. Walch, Trustees of the Gregory J. and*    *Group*
17  *Shauna M. Walch Family Trust*

18

19  Approved/Disapproved by:                     Approved/Disapproved by:

20

21  By: _____              By: _____
       RUSSELL WALKER, ESQ.                        SUSAN SCANN, ESQ.
22     *Counsel for USA Investment Partners, LLC,*  *Counsel for Copper Sage Commercial*
    *Joseph Milanowski and Thomas Hantges*        *Center and Binford Medical Developers, LLC*

23

24  **Approved**/Disapproved by:                 Approved/Disapproved by:

25  By: /s/ Andrew Brumby_____        By: _____
       ANDREW BRUMBY, ESQ.                         WADE GOCHNOUR, ESQ.
26     R. VAUGHN GOURLEY, ESQ.                     ARYN M. FITZWATER, ESQ.
       *Counsel for Standard Property Development*  *Counsel for Liberty Bank*

27

28  / / /

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

1    In accordance with LR 9021, counsel submitting this document certifies as follows (check one):

2    ___ The court has waived the requirement of approval under LR 9021.

3    ___ No parties appeared or filed written objections, and there is no trustee appointed in the case.

4    _X_ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any
unrepresented parties who appeared at the hearing, and any trustee appointed in this case, and each has
approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the
5    party has approved, disapproved, or failed to respond to the document]:

6    **Failed to respond:**

7    WADE GOCHNOUR, ESQ.
SUSAN SCANN, ESQ.
8    RUSSELL WALKER, ESQ.
GREGORY J. WALCH ESQ.
9    JEFFREY SYLVESTER, ESQ.
DAVID COHEN, ESQ.
10    MICHAEL SCHMAHL, ESQ.
ROBERT LEPOME, ESQ.
11    ERIC FIELD, ESQ.
DEAN KIRBY, ESQ.
12    August B. Landis, Esq.

13

14

15                                    # # #

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHWARTZER & McPHERSON LAW FIRM
2850 South Jones Boulevard, Suite 1
Las Vegas, Nevada 89146-5308
Tel: (702) 228-7590 · Fax: (702) 892-0122

**<u>EXHIBIT H-2</u>**

**Excerpts, Transcript of September 17, 2007 Hearing [D.I. 908]**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                        .    Chapter 11
                              .
AMERICAN HOME MORTGAGE        .    Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware    .    (Jointly Administered)
corporation, et al.,          .
                              .    Sept. 17, 2007 (12:08 p.m.)
        Debtors.              .    (Wilmington)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          MR. WILAMOWSKY: Your Honor, I think that the

2    references in the representations and warranties,

3    particularly given the absence of a defined term on page 58,

4    is somewhat informative, and it informs the reading of the

5    provision on page 58.  Your Honor can agree with that or not,

6    but in either event, if we just look at 58, even on a

7    standalone basis, the use of the word "ceases" I think is in

8    fact a helpful term in this section that's not even contained

9    in the other section on the rest of the warranties because

10   the fact that Fannie Mae has said, Okay, on this interim

11   basis for this particular set of loans that you yourself,

12   American Home, owned as of a particular date, we're going to

13   call you approved, but we're not going to accept, and by the

14   expressed terms of our settlement with you, we're not going

15   to accept and you will not even try to sell us any loans that

16   you originate on a going-forward basis.

17          THE COURT: Well, that's a different – Now, let's,

18   okay.  So let's assume that Romanette 6 means servicer ceases

19   to meet the qualifications, Fannie Mae or Freddie Mac

20   servicer, and what that really means is in good standing,

21   eligibility requirements, et cetera, et cetera, as set forth

22   in the reps and warranty section.

23          MR. WILAMOWSKY: Okay.

24          THE COURT: Okay, let's assume that, but you're

25   making a different argument, I think, which is a more refined

1    argument which is that because they are a Freddie Mae

2    approved servicer for X, Y, and Z portfolio that Freddie Mae

3    owns, that doesn't mean that they're an approved servicer for

4    A, B, C portfolios including your portfolio.  And where is

5    there anything in this document that indicates that they have

6    to be an approved servicer on your portfolio?  Because the

7    way I read this document, and it makes a lot of sense, is

8    that you're using Freddie Mae and Freddie Mac as a proxy for

9    determining whether or not the debtors are in fact servicing

10   correctly, and it's also a market condition that everyone

11   uses in order to, as a proxy for or a substitute for having

12   to go and actually doing a detailed investigation about

13   what's going into debtor, we assume that agencies like

14   Freddie Mae and Freddie Mac are doing that for us.  The

15   market assumes that, it makes a lot of sense, you know, the

16   cost of doing business goes down, but I don't see anything in

17   this document that says it has to be an approved Freddie Mac,

18   Freddie Mae servicer on your portfolio.

19            MR. WILAMOWSKY: It's not even the case that it is

20   approved on the debtors' going-forward portfolio.  It's a

21   specific that's not even in all the debtors' loans.  If, Your

22   Honor, there was one loan and with respect to that one loan,

23   Fannie Mae said that, Okay, we're going to call that, you

24   know, you're Fannie Mae approved as to the servicing of that

25   particular loan.  I don't think even the debtors would be up

1    tracking the sale, because we don't know how many more times

2    the sale may be moved.  We don't know if the lenders are

3    going to agree to extend beyond October 31st, and we're being

4    asked to track the sale, that's exactly what we're trying to

5    avoid, Your Honor.  That's all.

6         THE COURT: Okay.  Thank you.  All right.  I'm going

7    to deny the motion without prejudice.  The movant has gone

8    forward on two bases indicating that they have cause for

9    relief from the automatic stay, as I understand it.  One,

10   that they're unable to sell the loans in this portfolio as a

11   result of the fact that the debtor is not a Fannie Mae

12   approved servicer, and there was testimony to this effect by

13   the movant's witness.  However, there was also testimony by

14   the debtors' witness that even if - assuming arguendo whether

15   or not - we'll get to the point about whether or not they're

16   a Fannie Mae approved servicer or not in a minute, but even

17   sort of aside from whether or not the default has been cured,

18   even if the debtors were an approved Fannie Mae servicer, at

19   this time that these loans, first of all, were never subject

20   to securitization in the vast majority of the case over 1,659

21   loans to six, which gives you about .4 percent in connection

22   with the Alt-A loans and by value just a hair over one

23   percent.  The vast bulk of this portfolio was never

24   securitizable or subject to securitization, to use an actual

25   English word, and second, that regardless of that, even if

1    you look at it from a wholesale loan prospective, the current

2    market is such that these loans are simply not saleable, and

3    I find the debtors' witness to be more persuasive on these

4    points than I find the movant's witness, and as a result, the

5    Court finds that at least as the facts present themselves

6    right now, the aspect of whether or not the debtor is a

7    Fannie Mae approved servicer is having no affect on whether

8    or not the movant is able to sell or securitize these loans

9    so there's no cause for relief from the automatic stay in

10   that connection.  The second point is that there's an ongoing

11   continuing breach of the agreement that is not being cured

12   because Fannie Mae is in fact - excuse me, the debtors are in

13   fact not a Fannie Mae approved or Fannie Mae qualified

14   servicer.  And again, I reject that argument based on the

15   facts in front of me.  First, with regard to the fact that

16   the settlement agreement is between the parent company and

17   Fannie Mae as opposed to the servicing company and Fannie

18   Mae.  We dealt with this in argument but just to incorporate

19   my comments from there, the Fannie Mae agreement that's being

20   settled, i.e., the agreement under which the servicer is a

21   qualified Fannie Mae servicer is an agreement between the

22   parent company and Fannie Mae, is what the evidence is in

23   front of me today, so it's not at all surprising that the

24   settlement agreement is between the actual parties to the

25   contract.  And this has been the situation for the life of

1    the loan.  So, three years down the road, I'm not going to

2    hear - I think it rings hollow to complain that they haven't

3    cured a default when there was no default ever to cure and

4    that the servicer was never party to the contract.  So I

5    think the fact that it's an agreement between the parent

6    company and Fannie Mae as opposed to the servicer and Fannie

7    Mae is neither here nor there, so then the issue becomes

8    whether that agreement is sufficient to make the debtors a -

9    and let me get the language right.  "Whether the servicer has

10   ceased to meet the qualifications of either a Fannie Mae or a

11   Freddie Mac seller/servicer", which is on page 58 of the

12   underlying agreement.  If you look back at the settlement

13   agreement between the debtors and Freddie Mae, I think that's

14   taken care of quite plainly by paragraph (1) of the

15   settlement agreement that provides that the company shall be

16   deemed an approved Fannie Mae servicer on an interim basis

17   during the term of this agreement.  So it is subject to some

18   future termination, which is one of the many reasons that the

19   motion is being denied without prejudice, but as we sit here

20   today, the debtor is a qualified - or qualifies as a Fannie

21   Mae servicer.  So I don't think that the debtors - or excuse

22   me, the movants have established that there's an ongoing

23   continuing breach of the agreement that has not been cured.  I

24   think there was, in all likelihood, a breach, at least for

25   some time, but that that has been cured by the settlement and

1    although it is subject to arising again in the event that the

2    interim agreement expires or the settlement agreement

3    expires, we're not here today at this point.  In addition, I

4    don't really believe I heard any evidence from the movant as

5    to how they're not being amicably protected, and I think for

6    many of the reasons that I previously found in connection

7    with the Credit Suisse matter that the movant is in fact

8    adequately protected, at least in the interim, with the

9    ongoing sales process, with the institution of cash

10   collateral and DIP financing motions that have been put in

11   place by the debtors, and the cash management system that's

12   in place, and the ongoing servicing of these loans. There's

13   been no evidence whatsoever that the servicer isn't doing

14   what it's actually contractually required to do, which is

15   service the agreement as opposed to what DB wants it to do,

16   which is somehow make sure that there's a market for DB to

17   sell these loans.  That is, obviously, the point of the

18   entire exercise, but I don't think it's fair to the debtors,

19   frankly, to put more on their plate than they're actually

20   contractually required to do, certainly in the context of

21   adequate protection.  They're servicing the loans.  There's

22   no indication that they're not servicing the loans.  So, for

23   those reasons I am denying the motion without prejudice.

24   Obviously, to the extent that the facts change, that Fannie

25   Mae terminates the debtor as a qualified servicer, to the

1    extent that the market actually improves and there becomes a

2    market to either sell or securitize these assets and the

3    debtors' bankruptcy is in some way impairing DB's rights to

4    do that, I think that would change the facts that are in

5    front of the Court, and I may be inclined to grant stay

6    relief or at least require adequate protection, but those

7    facts aren't in front of me for today's purposes.  And I ask,

8    could the debtor submit a form of order, please.

9           MR. DORSEY: Yes, Your Honor, thank you.

10          THE COURT: All right.

11          MR. BOWDEN: Your Honor, again for the record, Bill

12   Bowden for DB Structured Products.  Two things, Your Honor.

13   First, if I may ask Mr. Dorsey to send me a copy of the

14   proposed order he submits to Your Honor I'd be gratefully -

15          THE COURT: Yeah, circulate it amongst counsel and

16   then before you submit it under certification.

17          MR. DORSEY: We'll submit it with a certificate of

18   no objection, Your Honor.

19          MR. BOWDEN: Thank you, Your Honor, and thank you,

20   Mr. Dorsey.  And second, Your Honor, could we be excused for

21   the balance of the hearing.

22          THE COURT: Yes.

23          MR. BOWDEN: Thank you.

24          MR. WILAMOWSKY: Thank you, Your Honor.

25          THE COURT: Just give us a few seconds to allow - we

**<u>EXHIBIT H-3</u>**

**Opinion, <u>In re Fleming Cos.</u>**

Case No. 03-10945 (MFW), D.I. 6916 (Bankr. D. Del. Feb. 27, 2004)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FLEMING COMPANIES, INC., et al. | ) | Case No. 03-10945 (MFW) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |

**OPINION**[1]

Before the Court is the Debtors' Motion to assume and assign two Facility Standby Agreements ("the FSAs") it has with Albertson's, Inc., to Associated Wholesale Grocers, Inc. ("AWG"). Albertson's opposes the Motion. For the reasons set forth below, we deny the Motion with respect to the Tulsa FSA and grant the Motion with respect to the Lincoln FSA.

I.    FACTUAL BACKGROUND

On April 1, 2003, Fleming Companies, Inc., and several of its affiliates ("the Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. At that time, the Debtors were in the wholesale grocery distribution business, the retail

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

1

grocery business and the convenience store distribution business. Shortly after filing the petition, the Debtors consummated a sale of their retail grocery business.

Prior to and subsequent to the filing of their petitions, the Debtors had severe financial difficulties and, as a result, were unable to fully perform their wholesale grocery distribution supply agreements with their customers. Consequently, numerous customers, including Albertson's, filed motions seeking relief from the stay to terminate those agreements. A hearing was held on the Albertson's Motion on August 13, 2003, at which time we denied the motion conditioned on the Debtors deciding to assume or reject the FSAs within thirty days.

In the interim, the Debtors marketed their wholesale grocery distribution business. On July 11, 2003, the Debtors filed a Motion for authority to sell that business to C&S Wholesale Grocers, Inc., and C&S Acquisition LLC (collectively "C&S"). After bidding procedures were approved and an auction conducted, C&S was approved as the purchaser of the Debtors' wholesale grocery distribution business assets. Pursuant to the sale, C&S was permitted to designate another purchaser for certain assets. C&S designated AWG as the purchaser of the Albertson's FSAs. On September 3, 2003, the Debtors filed a motion to assume and assign the FSAs to AWG. Albertson's opposed that motion and a

2

hearing was held on December 4, 2003.  The parties have filed
post-trial briefs.


II.  JURISDICTION

     This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and
28 U.S.C. § 157(b)(2)(A), (G), (M), (N), and (O).


III. DISCUSSION

     The decision to assume or reject an executory contract is a
matter within the sound business judgment of the debtor.  See,
e.g., In re Taylor, 913 F.2d 102 (3d Cir. 1990).  Once the debtor
has established a sound business reason to assume the contract,
however, the debtor must comply with the requirements of section
365.  Section 365 provides, in relevant part:

> (a) [T]he trustee, subject to the court's approval, may
> assume or reject any executory contract or unexpired
> lease of the debtor.
> (b)(1) If there has been a default in an executory
> contract or unexpired lease of the debtor, the trustee
> may not assume such contract or lease unless, at the
> time of assumption of such contract or lease, the
> trustee-
>> (A) cures, or provides adequate assurance that the
>> trustee will promptly cure, such default;
>> (B) compensates, or provides adequate assurance
>> that the trustee will promptly compensate, a party
>> other than the debtor to such contract or lease,
>> for any actual pecuniary loss to such party
>> resulting from such default; and

3

> (C) provides adequate assurance of future
> performance under such contract or lease.
>                                              . . .
> (f)(2) The trustee may assign an executory contract or
> unexpired lease of the debtor only if –
>       (A) the trustee assumes such contract or lease in
>       accordance with the provisions of this section;
>       and
>       (B) adequate assurance of future performance by
>       the assignee of such contract or lease is
>       provided, whether or not there has been a default
>       in such contract or lease.

11 U.S.C. § 365. Here, the Debtors and AWG seek a determination

that the Debtors' assumption and assignment of the FSAs complies

with the requirements of section 365. Albertson's contends that

the FSAs cannot be assumed and assigned because the Debtors and

AWG cannot comply with the requirements of section 365.

Before an executory contract may be assigned, the debtor

must first assume the contract and provide adequate assurance of

future performance. <u>See</u> 11 U.S.C. §§ 365 (b)(1)(A) & (f)(2)(A).

Adequate assurance provides the non-debtor party with needed

protection because assignment relieves the debtor and the

bankruptcy estate from liability for breaches that occur after

the assignment. Determining whether an assignee has provided

adequate assurance is a fact-based inquiry that focuses on the

specific facts of the proposed assignment. <u>See</u> <u>Cinicola v.</u>

<u>Scharffenberger</u>, 248 F.3d 110 (3d Cir. 2001).

4

A.  <u>Tulsa FSA</u>

Albertson's asserts that the Debtors cannot assume and assign the Tulsa FSA because that would result in a modification of material provisions of the FSA.  Section 365 requires that when a debtor assumes and assigns a contract the express terms of that contract cannot be modified.  <u>Cinicola</u>, 248 F.3d at 119-20.

> An assignment does not modify the terms of the underlying contract.  It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed.  An assignment is intended to change only who performs an obligation, not the obligation to be performed.

<u>Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 60 (3d Cir. 2001) (citations omitted).

Albertson's contends that AWG cannot satisfy the express terms of the Tulsa FSA because AWG cannot supply Albertson's Oklahoma stores from the Tulsa Facility.  In fact, Albertson's asserts that AWG's decision to direct the Debtor to reject the Tulsa Facility lease makes it impossible for AWG to fulfill the express requirements of the Tulsa FSA.  Thus, allowing assumption and assignment would impermissibly modify the terms of the Tulsa FSA.

AWG asserts that Albertson's position is without merit because fulfilling the Tulsa FSA from another warehouse will not

5

have an adverse effect on Albertson's nor impact AWG's ability to perform the Tulsa FSA.  AWG contends that the "important feature of the bargain" is "the timely delivery of virtually all of its food and related products," which will not be affected by the closing of the Tulsa Facility.  Albertson's disagrees with AWG's assertions.  AWG proposes to supply Albertson's Oklahoma stores from its Oklahoma City warehouse.  Albertson's argues that this warehouse is further away from the Debtor's Tulsa Facility and, since the FSA provides that Albertson's pays the freight costs from the warehouse to its stores, this will increase Albertson's costs.  AWG argues, however, that utilizing its Oklahoma City warehouse will not increase Albertson's freight costs.  Since Albertson's has approximately the same number of stores in Oklahoma City and Tulsa, AWG contends that any increase in the freight costs associated with supplying Albertson's Tulsa stores will be offset by a reduction in the freight costs associated with supplying Albertson's Oklahoma City stores.

We disagree with AWG's assertion that this should be the focus of our analysis.  Section 365 provides that a debtor's assumption and assignment cannot modify an agreement's express terms; it does not require the other party to the contract to agree to changes, even if the overall impact lowers its costs.

6

Nor should the court consider only the "important feature of a bargain" or determine whether the parties will be adversely impacted by an assignment. See 11 U.S.C. § 365. The contract must be assigned and enforced according to its terms. Cinicola, 248 F.3d at 119-20.

We must look to Oklahoma law to interpret the Tulsa FSA.[2] Oklahoma law provides that a contract must be considered as a whole so as to give effect to all of its provisions. Mercury Inv. Co. v. F.W. Woolworth Co., 706 P.2d 523, 529 (Okl. 1985) (citing 15 O.S. 1981 §157). Although the court must interpret a contract so as to give effect to the intent of the parties at the time the contract was formed, parol evidence cannot be used unless fraud or mistake is involved in pre-contract negotiations. Mercury, 706 P.2d at 529. Therefore, where a contract is complete and unambiguous, its express language is the only legitimate evidence of the parties' intent. Id.

After reviewing the Tulsa FSA, we conclude that fulfillment from the Tulsa Facility is an essential element of the agreement. In fact, the Tulsa FSA references this requirement on five separate occasions. Since AWG cannot fulfill these provisions, this Motion cannot be granted.

---

[2] Both FSAs provide that they are to be governed by and construed in accordance with the laws of Oklahoma.

7

AWG contends that section 2-614 of the Oklahoma Commercial Code excuses the requirement that it fulfill the Tulsa FSA from the Tulsa Facility. 12A Okla. Stat. Ann. § 2-614(1). Specifically, AWG asserts that section 2-614 provides that where a commercially reasonable substitute is available, failure to ship from a particular location cannot constitute a material breach of an agreement. (Post Hearing Brief of AWG in Support of Debtors' Motion to Assume and Assign at 10.) However, AWG refers to only part of section 2-614, ignoring a crucial detail. Section 2-614 provides that "[w]here _without fault of either party_ the agreed berthing, loading, or unloading facilities fail . . . but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted." 12A Okla. Stat. Ann. § 2-614(1) (emphasis added). Here, the Tulsa Facility did not become unavailable without fault of either party. Pursuant to the sale, AWG (through C&S) could choose which contracts the Debtors would assume and assign to it. AWG could have directed the Debtors to assume and assign the Tulsa Facility to it. Instead, AWG chose not to acquire the rights to the Tulsa Facility and directed the Debtors to reject that lease. Thus, even if there is a "reasonable substitute," we conclude that AWG is not "without fault." Section 2-614 does not excuse AWG from

8

fulfilling the Tulsa FSA from the Tulsa Facility.  Since AWG is
not able to perform the Tulsa FSA according to its terms, we
conclude that the Motion to assume and assign the Tulsa FSA must
be denied.

    B.   <u>Lincoln FSA</u>

AWG presented significant evidence to establish adequate
assurance of its ability to satisfy the Lincoln FSA.  First, AWG
established that it has the size, expertise and experience in the
wholesale grocery distribution business.  AWG is the fourth
largest grocery wholesaler in the United States, serving over
1,300 individual supermarkets.  Through the course of this
bankruptcy case, AWG has already begun serving approximately 490
stores previously serviced by the Debtors, including a 16 store
Nebraska chain with annual sales over $175 million.  Second, AWG
has the capacity to service Albertson's eleven Nebraska stores.
Mr. Rand of AWG testified about AWG's capacity levels and its
ability to maintain the contractual service levels required by
the Lincoln FSA from its Kansas City warehouse.

In its brief, Albertson's contends that AWG cannot assume
and assign the FSAs because AWG cannot provide adequate assurance
of its ability to purchase, stock and ship Albertson's private
label merchandise.  AWG argues (and Albertson's concedes),

9

however, that the Lincoln FSA does not require the Debtors to purchase, stock and ship its private label goods. Therefore, that does not preclude the assumption and assignment of the Lincoln FSA to AWG. Nonetheless, AWG presented evidence that it was able to supply Albertson's with its private label goods.

Albertson's contends, however, that AWG cannot provide adequate assurance because it does not intend to fulfill the Lincoln FSA. To support this position, Albertson's asserts that AWG has not really assumed any of the other facility standby agreements that it purchased from the Debtors, but has instead required that each grocer execute new supply agreements on different terms.

Although AWG has apparently renegotiated every contract it was assigned, this does not establish its inability to satisfy the requirements of the Lincoln FSA in this case. As discussed in depth above, section 365 requires the assignee to assume all contractual obligations. By assuming the Lincoln FSA, AWG is bound by its terms. AWG will not be able to supply Albertson's under different terms unless Albertson's itself agrees to a new wholesale grocery distribution agreement. Despite Albertson's contention, we find that AWG has established that it is ready, willing and able to satisfy the Lincoln FSA as written and has

10

established its ability to fulfill all of its obligations.
Accordingly, we conclude that AWG has provided adequate assurance
of future performance of the Lincoln FSA.

     C.   <u>Ability to Cure</u>

     Albertson's also contends that the Debtors cannot assume and
assign the FSAs because they are unable to cure the material,
non-monetary defaults under the agreements.  While the parties
have agreed that the Court should not reach a determination on
the actual cure amount at this time, we must determine whether
the Debtors' default under the Lincoln FSA is curable to conclude
that the contract may be assumed and assigned.

     Albertson's asserts that the Debtors' prior failure to
fulfill their contractual obligations caused Albertson's to
suffer considerable harm that cannot be compensated.  Section 365
provides that a debtor cannot assume an executory contract on
which there has been a default unless it cures or provides
adequate assurance that it will promptly cure such default.  11
U.S.C. §365(b)(1)(A).  Despite disagreement regarding when the
Debtors originally breached the FSAs, and the extent of that
breach, the parties do not dispute that the Debtors did breach
the FSAs.

11

Albertson's contends that the Debtors' failure to satisfy the service levels and product dating requirements caused Albertson's to suffer irreparable harm including: an erosion of customer support, a drop in employee morale, a disruption in the Albertson's Ft. Worth Facility and corporate headquarters, and lower sales and profits. While Albertson's originally filed a proof of claim to estimate the damages, it now contends that the damages cannot be quantified with certainty because these were incurable non-monetary damages. AWG disagrees with Albertson's assertion that the Debtors' breach is incurable. Specifically, AWG contends that the asserted damages are curable by the payment of money damages.

We agree with AWG that Albertson's alleged damages are curable. Our conclusion is supported by the fact that Albertson's originally filed a proof of claim estimating in damages suffered as a result of the Debtors' breach at approximately $4 million. Although Albertson's no longer asserts that claim, because it could not quantify the damages with "exacting certainty," it continues to assert that the Debtors' defaults have caused it serious economic harm. We find that there is nothing unique about Albertson's damages that render them incurable. They are normal damages arising from the breach

12

of a supply agreement.  Our conclusion is bolstered by

Albertson's conduct following the Debtors' breach.  When

Albertson's began self-supplying its stores, thereby incurring

the asserted damages, Albertson's deducted the costs associated

with its self-supplying from monies it owed to the Debtors.  This

confirms its ability to calculate the damages caused by the

Debtors' breach.  Accordingly, we conclude that the alleged

damages can be quantified and cured by prompt payment.


IV.  CONCLUSION

    For the foregoing reasons we grant in part and deny in part

the Debtors' Motion to Assume and Assign the FSAs.

    An appropriate Order is attached.


                      BY THE COURT:


                      Mary F. Walrath
                      United States Bankruptcy Judge

Dated: February 27, 2004

13

**<u>EXHIBIT H-4</u>**

**Order, <u>In re Fleming Cos.</u>,**

Civ. No. 04-371-SLR, D.I. 20 (D. Del. Mar. 30, 2005)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| FLEMING COMPANIES, INC., et al., | ) | |
| | ) | Case No. 03-10945-MFW |
| Debtors. | ) | |
| ——————————————— | ) | |
| | ) | |
| AWG ACQUISITION, LLC, et al., | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | Civ. No. 04-371-SLR |
| | ) | |
| FLEMING COMPANIES, INC. and | ) | |
| ALBERTSON'S INC., | ) | |
| | ) | |
| Appellees. | ) | |

O R D E R

At Wilmington this 30th day of March, 2005, having reviewed the appeal filed by AWG Acquisition, LLC, and the papers filed in connection therewith;

IT IS ORDERED that said appeal is denied and the decision of the bankruptcy court dated February 27, 2004 is affirmed, for the reasons that follow.

1. **Standard of review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. See Am. Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999). With mixed

questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 642 (3d Cir. 1991) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 101-02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. In re Hechinger, 298 F.3d 219, 224 (3d Cir. 2002); In re Telegroup, 281 F.3d 133, 136 (3d Cir. 2002).

2.    **Question presented.**  Did the bankruptcy court err when it denied the debtors' motion to assume and assign the Tulsa Facility Standby Agreement ("Tulsa FSA")?

3.    **Background facts.**  In July 2003, debtors at bar sold their wholesale grocery distribution business assets to C&S Wholesale Grocers, Inc. and C&S Acquisition LLC (collectively, "C&S"). Pursuant to the sale, C&S was permitted to designate another purchaser for certain assets. C&S designated AWG as the purchaser of the Tulsa FSA. In September 2003, the debtors filed a motion to assume and assign the Tulsa FSA to AWG. Albertson's Inc., a customer of debtors and a party to the Tulsa FSA,

2

objected.

4.    By the Tulsa FSA, debtors committed to "supply to Albertson's a certain amount of food, grocery, and related products". Debtors committed to do so through "certain resources, including capital, employees, inventory, equipment, and facilities".[1]    (D.I. 14, ex. 1, ¶ (iv))  Specifically, debtors committed to supply "food, grocery, meat, perishables and other related products, supplies and merchandise . . . as provided in the Special Fleming FlexPro/FlexStar Marketing Plan described below to Albertson's in quantities sufficient to allow Albertson's to purchase the Estimated Purchase Level described in Section 3 of this Agreement **from the Tulsa Facility**."  (D.I. 14, ex. 1, ¶ 1)(emphasis added)  Moreover, the products sold to Albertson's pursuant to the Tulsa FSA were to be "priced, and other terms of sale [were to] be established, in accordance with the Special Fleming FlexPro/FlexStar Marketing Plan for Albertson's Stores Supplied **by the Tulsa Facility**".  (D.I. 14, ex. 1, ¶ 2)(emphasis added)  The term of the Tulsa FSA was to continue "until the later of (i) five (5) years following the Effective Date; or (ii) the date upon which Albertson's has purchased one billion one hundred fifty five million dollars ($1,155,000,000) of Products **from the Tulsa Facility**".  (D.I. 14,

---

[1]By a concurrent transaction, debtors acquired Albertson's Tulsa, Oklahoma warehouse, designated as "the Tulsa Facility". (D.I. 14, ex. 1, ¶ (iii))

3

ex. 1, ¶ 4)  The "Special Fleming FlexPro/FlexStar Marketing Plan for Albertson's Stores Supplied by Tulsa" ("the Plan") was attached to the Tulsa FSA as Exhibit B.  Attachment A to the Plan set forth the charges associated with the Plan.  The "Fixed Charge" included property rent and property tax payable by debtors for the Tulsa Facility.  (D.I. 14, ex. 1)

5.  **Analysis.**  As correctly noted by the bankruptcy court, once a debtor has established a sound business reason to assume an executory contract, the debtor must comply with the requirements of 11 U.S.C. § 365.  Among those requirements is that the debtor provide adequate assurance of future performance.  See 11 U.S.C. §§ 365(b)(1)(A) and (f)(2)(A).  Determining whether a debtor has provided adequate assurance is a fact-based inquiry that focuses on the specific facts of the proposed assignment.  See Cinicola v. Scharffenberger, 248 F.3d 110 (3d Cir. 2001).

6.  The bankruptcy court, therefore, started with the premise that a contract must be assigned and enforced according to its terms.  See Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001).  The court determined, through its fact-based inquiry, that use of the Tulsa Facility was an essential provision of the Tulsa FSA.  The court then reasoned that AWG, which had directed the debtors to reject the Tulsa Facility lease, could not fulfill the express requirements of the Tulsa FSA.  The court concluded that

4

permitting permit AWG to supply Albertson's through its own

channels of supply would impermissibly modify the terms of the

Tulsa FSA.

    7.  I see no error in this reasoning.[2]


                                   _____

                               United States District Judge

---

[2]I note, as did the bankruptcy court, that Oklahoma law (the law governing the Tulsa FSA) is consistent with this reasoning, as it provides:

    (1)  Where without fault of either party the agreed berthing, loading, or unloading facilities fail or an agreed type of carrier becomes unavailable or the agreed manner of delivery otherwise becomes commercially impracticable but a commercially reasonable substitute is available, such substitute performance must be tendered and accepted.

12A Okla.St.Ann. § 2-614(1). The annotation to this statute explains that "Oklahoma has previously been very strict in holding that the parties are bound by the terms of the agreement." Therefore, "[t]here must . . . be a true commercial impracticability to excuse the agreed to performance and justify a substituted performance." Here, the agreed to facility is not available only because debtors, a party to the Tulsa FSA, made the Tulsa Facility unavailable by rejecting the lease. I agree with the bankruptcy court that these circumstances do not justify the substituted performance requested by debtors.

5

# **APPENDIX B**

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))**

**C**
Dawson Home Fashions, Inc. v. SRCO Inc.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
DAWSON HOME FASHIONS, INC., Plaintiff,
v.
SRCO INC. and Frederick W. Regnery, Defend- ants.
**No. 94 CIV. 6333 (MBM).**

Nov. 15, 1995.

Bradley I. Ruskin, Proskauer Rose Goetz &
Mendelsohn, New York City, Robert B. Smith,
White & Case, New York City, for Plaintiff.
Kaare Phillips, Grais & Phillips, New York City,
for Defendants.

OPINION AND ORDER

MUKASEY, District Judge.
**\*1** Plaintiff Dawson Home Fashions, Inc. sues its
contract partner SRCO Inc. and SRCO's President,
Frederick W. Regnery, on six theories: (1) breach
of warranty, (2) fraudulent inducement to contract,
(3) fraud, (4) misrepresentation, (5) breach of con-
tract and (6) declaratory judgment for return of es-
crow money. Defendants have filed three counter-
claims: (1) breach of contract, (2) payment of the
escrow money, and (3) patent infringement.
Plaintiff now moves for summary judgment uphold-
ing its breach of warranty claim, and dismissing all
three of defendants' counterclaims. For the reasons
stated below, plaintiff's motion for summary judg-
ment is granted as to all except defendants' patent
infringement claim.

I.

A. *Contract History*

Plaintiff Dawson manufactures and distributes bath

fashion products. It is the successor in interest to
Hygiene Industries Division of Associated
Products, Inc. ("Hygiene"), and has assumed all of
Hygiene's rights and liabilities. (Hogan Aff. ¶ 1)
Defendant SRCO is in the same industry; it manu-
factures fabric-covered shower hooks or rings[FN1]
on which to hang shower curtains. (*Id.*)

On December 31, 1991 SRCO appointed plaintiff,
then known as Hygiene, its "exclusive distributor
and reseller of the Products," defined in Recital A
as "fabric covered shower curtain rings." (Hogan
Aff., Ex. 1 (the "Contract") ¶ 1, Recital A) SRCO
limited the representation in Paragraph 15 of the
Contract. Entitled "Other Products," that paragraph
states:

SRCO has disclosed to Hygiene other products in-
vented by SRCO, including a complete shower cur-
tain and valance, with shower rings sewn in (the
"Other Product").... Hygiene acknowledges and
agrees that this Agreement does not include or
grant any rights to Hygiene in connection with the
Other Product.

Thus, the contract gave plaintiff the exclusive right
to sell only "the Products" -- fabric-covered shower
curtain rings.

In addition to giving plaintiff an exclusive distribut-
orship, SRCO warranted the patent protection of its
products. Paragraph 7(a) of the Contract states:

SRCO represents and warrants to Hygiene that it
has applied to the United States Patent and Trade-
mark Office ("PTO") for Letters Patent with respect
to the Product and that such application has been
allowed by the examiners of the PTO. If such Let-
ters Patent are not issued by June 30, 1992, Hy-
giene may, on thirty (30) days' written notice there-
after to SRCO, terminate this Agreement. Notwith-
standing such termination, Hygiene shall be oblig-
ated to perform its obligation hereunder through the
termination hereof.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))**

Paragraph 15 states that
SRCO has applied to the PTO for Letters Patent on this Other Product. Hygiene acknowledges and agrees that this Agreement does not include or grant any rights to Hygiene in connection with the Other Product.

The parties agree that in the great majority of cases, a Notice of Allowability from the PTO signals that a patent will be awarded.

**\*2** In return for this exclusive arrangement, plaintiff assumed several responsibilities, including to purchase 500,000 units (of 12 rings each) from SRCO quarter annually (Contract ¶ 3), to maintain at least 50,000 yards of fabric at SRCO's factory at all times (*id.* at ¶ 4), to deliver to SRCO an irrevocable letter of credit for $1,020,000 at the inception of the contract, and thereafter to deliver a new letter of credit in the same amount at least 30 days before the end of each quarter annual period (*id.*), and to deposit $60,000 security in an escrow account, from which defendant could withdraw if plaintiff failed to purchase the requisite units. Now Dawson sues for breach of warranty and has discontinued performance of its duties.

B. *Patent History*

The patent warranties in the contract refer to SRCO's long history of patent prosecution. In September 1990 SRCO filed its first patent application with the PTO for an "Improved Shower Curtain Ensemble." The application contained six claims. The first three sought a patent for a "shower ensemble" which included fabric covered hooks and a curtain of matching fabric. The remaining three sought a patent for a combination of hooks, curtain and rail on which the hooks would hang. (Smith Decl., Ex. B 19-21) None of the original claims concerned a fabric-covered hook or ring unaccompanied by other shower accessories.

Six months later, in March 1991, in response to a PTO Action of December 5, 1990, SRCO amended

Claim 1, withdrew Claims 4 through 6, and added Claims 7 through 12 to the application. The new claims (7-12) all sought patents for different variations of the fabric-covered shower hooks alone. Claim 7 described only a fabric-covered hook. Claim 8 also described a hook, but included reference to a rail and a fabric curtain. Claims 9 through 12 described variations of the hook in Claim 8, all of which were dependent upon Claim 8. Claim 9 described a C-shaped hook, Claim 10 described a waterproof fabric-covered hook, Claim 11 described a gathered-fabric hook and Claim 12 described a fabric-covered plastic or metal hook. (*Id.* at 39-40)

On June 19, 1991 the PTO allowed SRCO's Claims 1 through 3 and rejected Claims 7 through 12. The PTO explained that Claim 7, for the fabric-covered hook alone, was anticipated by an existing patent on a hook with a fabric covering, and therefore barred from patent protection under 35 U.S.C. § 102(b) (1988), which disallows patents for inventions that were

patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

The PTO rejected SRCO's contention that its hook was distinguishable because it facilitated sliding on a shower curtain rail. The PTO characterized that feature as "merely functional" and concluded that it "does not provide merit to applicant's claimed invention."(*Id.* at 46)

**\*3** The PTO rejected claims 8 through 12 for failure to comply with the claim specificity requirements of 35 U.S.C. § 112 (1988).[FN2] The PTO explained that "Claim 8 is vague in that it is not clear whether or not applicant is claiming the combination of the hook and the curtain."(*Id.*) Consequently, Claim 8 and its dependent claims, 9 through 12, could not be allowed. The PTO then counseled SRCO to revise Claim 8 to cover a combination hook, curtain and rail. (*Id.* at 46-47)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))**

In response, on August 30, 1991 SRCO again amended its application. It changed Claim 7 to cover a hook with a "tubular-shaped fabric covering" and changed Claim 8 to address, without a doubt, the hook alone. (*Id.* at 50-51) The PTO again rejected Claims 7 through 12. (*Id.* at 71) In a telephone interview on October 1, 1991 PTO examiner Korie Chan advised SRCO's patent counsel that inclusion of "the combination language" might make Claims 7 through 12 allowable. (*Id.* at 72) Accordingly, on October 9, 1991, SRCO amended its application one more time. It withdrew Claim 7, enhanced Claim 8 to describe fabric-covered hooks and a curtain "in combination," and modified dependent Claims 9 through 12 to reflect the changes in Claim 8. (*Id.* at 74-78) Finally, on October 21, 1991 the PTO issued a Notice of Allowability for Claims 1 through 3 and renumbered Claims 4 through 8. (*Id.* at 81) Claims 1 through 3 were the original claims for the shower ensemble. *See* pp. 3-4, *supra.*Claims 4 through 8 previously had been numbered 8 through 12. In their final form, they too concerned "*[i]n combination, a plurality of shower curtain hooks disposed on* a curtain rail *suspending therefrom* an operational shower curtain made of a curtain fabric .... " (*Id.* at 74) (emphasis in original)

Consistent with standard PTO procedure, on April 7, 1992, the PTO issued United States Patent No. 5,101,877 to SRCO for its "Shower Curtain Ensemble" (the "'877 Patent"). The scope of the '877 patent mirrors that of the October 21, 1991 notice. The patent Abstract describes defendants' products as:

A shower curtain ensemble ... with a curtain member that has a plurality of apertures along the top thereof for engagement by a plurality of plastic hooks that have been covered with a tubular fabric that matches the curtain member and creates the pleasing effect of being completely fabric in appearance. Also, a process for covering the hooks with fabric by initially creating a tube of fabric and slipping it over the hooks is disclosed.

(Smith Decl., Ex. A)

Upon issuance of this patent, Dawson ceased to perform under the contract and, in September 1992, sued defendants on six theories, including breach of patent warranty.

II.

Subject matter jurisdiction in this case is based upon diversity of citizenship. 28 U.S.C. § 1332(a) (1988). Plaintiff is a Delaware corporation with its principal place of business in New York (Compl. ¶ 4), defendant SRCO is an Illinois corporation with its principal place of business in that state (*Id.* at ¶ 5), defendant Frederick Regnery, also is a citizen of Illinois (*Id.* at ¶ 6), and Dawson seeks more than $50,000 in damages. New York law governs this case, both because the Contract so provides (Contract ¶ 12), and because New York has some contacts with the Contract, thereby complying with constitutional principles. *See Allsate Ins. Co. v. Hague,* 449 U.S. 302, 313 (1981).

III.

**\*4** Summary judgment may be granted if, after drawing all inferences in favor of the nonmovant, the court finds "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed. R. Civ. P. 56(c). When undertaking this analysis in contract disputes, the court seeks to ascertain the intent of the parties. To do so, the court first decides whether that intent, manifest in the language of the contract, is ambiguous. *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir. 1990); *Sutton v. East River Savings Bank,* 55 N.Y.2d. 550, 554, 450 N.Y.S.2d 460, 462 (1982). If the court concludes that the language is ambiguous, the court must deny summary judgment and reserve decision for the trier of fact. *Care Travel Co. v. Pan American World Airways,* 944 F.2d 983, 988 (2d Cir. 1991).

If, however, the court determines that the language is not ambiguous, the court, not the trier of fact, in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))

terprets the language and resolves the dispute as a matter of law. *Sutton,* 55 N.Y.2d at 454, 450 N.Y.S.2d at 463. In this effort, the court is guided by the cardinal rule of interpretation -- to give effect to the "plain and ordinary" meaning of language. *Zolotar v. New York Life Ins. Co.,* 172 A.D.2d 27, 30, 576 N.Y.S.2d 850, 852 (1st Dept. 1991). More specifically, courts in this Circuit have explained that contract language is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."*Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993).

In this case, both the Paragraph 7(a) warranty, *see* p. 2, *supra,* and the scope of the patent claim are in dispute. Dawson contends that both are unambiguous. It argues that the warranty clause guarantees the existence of a patent on fabric-covered shower rings alone, that the notice of allowability issued by the PTO covered only the ring-curtain combination, and that SRCO therefore breached its warranty. Not surprisingly, SRCO reads the disputed language differently. It maintains that although the Product plaintiff agree to buy was fabric-covered shower curtain rings or hooks alone, SRCO warranted that it had patent protection for a shower curtain *and* fabric-covered ring ensemble. To support this position, SRCO notes that the warranty in Paragraph 7(a) is for a patent "with respect to" the Product, whereas in Paragraph 15, in which the parties refer to another product, the rights to which were not conveyed under the agreement, SRCO recites that it has a patent "on" that other product. This difference, SRCO maintains, indicates the broader coverage of the language in 7(a). In the alternative, SRCO argues that the clause is ambiguous and that its meaning cannot be determined on summary judgment.

The disputed phrases in the Contract and the patent claim are unambiguous, and their plain meaning establishes breach by the defendant. To any reader,

the combination of Recital A, which defines "the Product" as the hooks alone, and defendant's warranty that it had received a notice of allowability for a patent "with respect to the Product," means that SRCO had received the notice of allowability for the fabric-covered shower hooks alone. Nowhere does the definition of "the Product," mention a curtain, rail, combination or ensemble. In fact, the Contract in Paragraph 15 refers to an ensemble only to exclude it from the scope of Dawson's exclusive right to distribute. Even SRCO's President recognizes that "the agreement itself was for the sale of rings alone."(Regnery Aff. ¶ 10)

**\*5** Defendant's strained reading of the contract language is legalism gone berserk. Defendant argues that the phrase "with respect to the Product"

does not say, and therefore should not be held to mean, that the PTO had allowed a patent on fabric-covered shower curtain rings alone or in which the rights were independently claimed. The language in the warranty is either ambiguous ... or it means only that a patent had been allowed in which fabric-covered shower rings formed a part. (Def. Mem. at 7)

This interpretation of the clause, however, gives an unnatural meaning to words and offends fundamental principles of interpretation.

"With respect to," or even the synonyms that SRCO suggests -- "with reference to," "in relation to" and "concerning" -- directly link the preceding and subsequent terms in the sentence. "With respect to" does not connote a relationship of part to whole, as the terms "including" or "among other things" do. Here, the phrase "with respect to" connects the notice of allowance with the fabric-covered rings alone in a way that is indistinguishable from the way the word "on" functions elsewhere in the contract.

The PTO's notice of allowability on defendant's patent claims is equally unambiguous. One barely

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 5
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))

needs to look beyond the patent's title -- "Shower Curtain Ensemble" -- to conclude that the notice covers the combination of matching curtain and hooks, not hooks alone. Moreover, even a brief peek behind the figurative curtain of the patent itself, to the patent prosecution history, makes clear that the notice did not include the hooks alone. Indeed, the PTO explicitly rejected the claim for fabric-covered hooks alone, because the hooks alone did not advance prior art.

Despite both the clear language of the patent claim and the history recited above, defendant maintains that the patent for the ensemble protects the rings alone as well. Defendant first argues that Dawson is protected because another company's production of the fabric-covered hooks would violate the '877 Patent. To infringe a patent, however, a party must copy more than just one decidedly non-inventive element of a protected item. Under the doctrine of literal infringement, a plaintiff may recover for infringement only from the manufacturer of a device that duplicates *every* element and limitation of the protected product. *Jurgens v. McKasy,* 927 F.2d 1552, 1560 (Fed. Cir.), *cert. denied,* 502 U.S. 902 (1991); *Fairfax Dental (Ireland) Ltd. v. Sterling Optical Corp.,* 808 F. Supp. 326, 334 (S.D.N.Y. 1992), *aff'd without opinion,* 11 F.3d 1074 (2d Cir. 1993). Because even copied fabric-covered shower hooks alone would not violate every element of the '877 Patent on the ensemble, Dawson would not be protected by the patent against sale of an item that copied the only thing Dawson was purportedly licensed by defendant to sell -- fabric-covered shower curtain hooks.

An infringement claim would fail even under the more lenient doctrine of equivalents. Infringement occurs under that doctrine when the accused device is "substantially" similar to the patented device in function, means, and result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608 (1950); *Fairfax Dental,* 808 F. Supp. at 334. The similarity must reflect the use by the defendant of the inventive features of the patented product, not

those limited to the prior art. Coverage either anticipated by or made obvious by the prior art is not available under the doctrine of equivalents. *Conroy v. Reebok Int'l., Ltd.,* 14 F.3d 1570, 1576-77 (Fed. Cir. 1994).

*6 A court would be hard pressed to find that fabric-covered rings alone are "substantially similar" to the curtain-ring combination in function, means and result. The former offers solely a place to hang a covering, the latter provides full enclosure of the shower stall. Moreover, the patent prosecution history makes clear that the covered rings are not the inventive, patentable aspect of the ensemble. The PTO explicitly denied SRCO a patent on the rings because they were anticipated by the prior art. The doctrine of equivalents, therefore, also would not protect Dawson.

Defendant next argues that a manufacturer of fabric-covered rings alone would be liable for contributory infringement of SRCO's patent under 35 U.S.C. § 271(c). That statute states that

[w]hoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constitution a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Defendant again misunderstands the law. A defendant is liable for contributory infringement when, although it has not directly infringed the patent itself, it facilitates patent infringement by another. *Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 199-213 (1980). Contributory infringement depends upon, and cannot exist in the absence of, direct infringement. *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 526 (1972). As discussed above, no action for direct infringement could be maintained against a producer of fabric-covered rings alone. Therefore, an action for contributory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))**

infringement could not be maintained either.

The parties also disagree about what plaintiff must prove to recover for breach of an express warranty. Dawson argues that proof of breach alone is enough. SRCO contends that New York law requires plaintiff also to prove injury from the breach. SRCO bases this contention on its reading of Comment 13 to Uniform Commercial Code §2-314, which states that

[i]n an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained.

As Dawson correctly points out, though, that comment applies to the breach of implied warranties. New York law governing express warranties is otherwise. To recover for breach of an express warranty, the plaintiff need only establish breach. *CBS Inc. v. Ziff-Davis Publishing Co.,* 75 N.Y.2d 496, 503-04, 554 N.Y.S.2d 449, 453 (1990). This distinction "reflects the prevailing perception of an action for breach of express warranty as one that is no longer grounded in tort, but essentially in contract."*Id.* Because the warranty here is express, and because plaintiff has proved defendant's breach by proving that defendant did not have protection for the only item it licensed to plaintiff -- fabric-covered shower curtain rings, plaintiff has met its burden. Dawson's motion for summary judgment on its claim for breach of warranty therefore is gran- ted.

IV.

*7 Plaintiff next seeks summary judgment on defendant's counterclaim for breach of contract. Defendant contends that plaintiff materially breached the contract by: (1) failing to purchase the minimum amount of product after April 30, 1992, (2) failing to supply SRCO's factory with the requisite amount of fabric, and (3) failing to deliver to SRCO

the second quarterly letter of credit by March 31, 1992. (Hogan Aff., Ex. 2 ¶¶ 92, 95, 99) Plaintiff argues that defendant's breach of warranty, which occurred at the moment the contract was signed, relieves plaintiff of its duty to perform.

A material breach of contract by one party discharges the other party from performance under the contract. *See, e.g., Jafari v. Wally Findlay Galleries,* 741 F. Supp. 64, 68 (S.D.N.Y. 1990). The question in this case is whether the breach was material. The Second Restatement of Contracts advises that the general inquiry is whether the "injured party will be deprived of the benefit which he reasonably expected."Restatement (Second) of Contracts § 241(a) (1979). Put differently, would the innocent party have agreed to the contract if the breached clause had been absent? *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir. 1976).

The breach of warranty in the instant case frustrates the primary purpose of the contract and therefore relieves plaintiff of its duty to perform. Dawson bargained for an exclusive right to distribute SRCO's patent-pending fabric-covered shower curtain rings. Plaintiff's right to terminate the contract if the patent was not awarded is but one bit of evidence that demonstrates the value of the clause. Contrary to defendants' contention, any delay by plaintiff in terminating the contract does not demonstrate the non-materiality of the clause. Delay can result from any number of causes, and does not bear on the materiality inquiry.

Patent protection would have made plaintiff the exclusive seller of SRCO's curtain rings and therefore the exclusive seller of fabric-covered rings generally. If other companies could manufacture and sell the same product, the value of Dawson's right would plummet. Dawson did not bargain simply to become the exclusive distributor of SRCO's fabric-covered shower curtain rings and to compete with other manufacturers of the same rings. Plaintiff's motion for summary judgment on defendant's counterclaim for breach of contract therefore is granted.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.))**

V.

Plaintiff next seeks return of the $60,000 it deposited in escrow at the outset of the agreement. (Contract ¶ 4) The Contract allowed SRCO to draw on the escrow account if plaintiff failed to purchase the minimum amount of product in any contract year, and the account secured SRCO against Dawson's breach of its minimum purchase obligation. (*Id.*) When defendant's breach discharged that obligation, however, the guarantee was no longer necessary. The escrow agent therefore, is directed to return the money to plaintiff.

VI.

Finally, plaintiff seeks summary judgment dismissing defendant's counterclaim of patent infringement. Because infringement is a fact-intensive inquiry, courts have approached such summary judgment motions with special caution. *See, e.g., SRI Intern v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1116 (Fed. Cir. 1985).

**\*8** Defendant submits two pieces of evidence to support its claim of infringement. First, Frederick Regnery states in his affidavit that SRCO learned "from an employee of JC Penney, that Dawson was the supplier" of matching shower curtains and rings that violate the '877 Patent. (Regnery Aff. ¶ 13) To buttress its claim, SRCO includes pages from the JC Penney catalog advertising shower curtains and rings under the brand name "Dynasty," which defendant contends is the JC Penney brand name for Dawson bath products.(*Id.,* Ex. C) Second, Regnery contends that Dawson has put together a "sample package" of curtains and matching covered rings for presentation to retailers. (Regnery Aff. ¶ 15) Defendant also maintains that it has not had sufficient opportunity to conduct discovery, in part due to its own logistical problems.(*Id.* at ¶ 16)

In response, Dawson's president Timothy A. Hogan, Jr. firmly denies any infringing sales. (Hogan Aff. ¶ 10) He also maintains that Dawson

sent the sample package to SRCO only, in response to SRCO's request during settlement discussions. (*Id.* ¶¶ 11, 12)

Although defendant's evidence is slim, it does raise a material issue of fact making summary judgment inappropriate at this point. The existence of the "sample package" and the allegations of sales to JC Penney suggest that infringement may have occurred. Moreover, defendant is entitled to a reasonable time for additional discovery to review its own documents as well as those of plaintiff.

3

For the reasons stated above, plaintiff's motion for summary judgment is granted upholding its claim for breach of warranty and dismissing defendants' counterclaims for breach of contract and return of the escrow, but is denied as to defendants' counterclaim for patent infringement.

SO ORDERED.

> FN1. Because both parties agree that the terms "hooks" and "rings" may be used interchangeably, and because both have done so in their papers, this opinion does so too.

> FN2. The first paragraph of that section requires a patent application to "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."35 U.S.C. § 112 (1988).

S.D.N.Y.,1995.
Dawson Home Fashions, Inc. v. SRCO Inc.
Not Reported in F.Supp., 1995 WL 679253 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- B.R. ----                                                                    Page 1
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))

In re Buffets Holdings, Inc.
Bkrtcy.D.Del.,2008.
Only the Westlaw citation is currently available.
United States Bankruptcy Court,D. Delaware.
In re BUFFETS HOLDINGS, INC., et al., Debtors.
No. 08-10141(MFW).

May 16, 2008.

**Background:** Chapter 11 debtors that had entered into sales-and-lease-back transactions with respect to specific properties where they operated restaurants moved for permission to assume their master leases with lessor as to certain locations and to reject them as to others, and lessor objected that each master lease was a single, indivisible agreement, which debtors had to assume or reject in their entirety.

**Holdings:** The Bankruptcy Court, Mary F. Walrath, J., held that:
(1) master leases into which restaurant operators entered as part of sales-and-lease-back transactions were, by their plain terms, indivisible agreements under Illinois law, which restaurant operators, after commencement of their Chapter 11 cases, had to assume or reject in their entirety; and
(2) even assuming that master leases were ambiguous, evidence of circumstances surrounding negotiation of master leases, as well as evidence that restaurant operators thereafter sought lessor's consent to substitute one restaurant for another under master lease, showed that parties intended each master lease to be one, indivisible agreement.

Motions denied.

**[1] Bankruptcy 51 ☞0**

51 Bankruptcy
If debtor decides to assume unexpired lease, it must generally assume all the terms of lease and may not pick and choose only the favorable terms to be assumed; debtor may not blow hot and cold but, if it accepts the benefits of contract, must accept them cum onere. 11 U.S.C.A. § 365.

**[2] Bankruptcy 51 ☞0**

51 Bankruptcy
Debtor's right to assume and assign lease is enforceable notwithstanding any provision in lease that prohibits, restricts or conditions assignment; courts will not enforce provisions designed solely to impair debtor's ability to assume or reject its unexpired leases. 11 U.S.C.A. § 365(f)(1).

**[3] Bankruptcy 51 ☞0**

51 Bankruptcy
Requirement that any lease or contract which is assumed or rejected in bankruptcy must be assumed or rejected in its entirety, with both its benefits and its obligations, does not mean that every lease or contract denominated as "contract" or "lease" must be treated as a single, indivisible whole; rather, if single document contains separate, severable agreements, then debtor may reject one agreement and not another. 11 U.S.C.A. § 365.

**[4] Bankruptcy 51 ☞0**

51 Bankruptcy
Determination of whether a specific contract or lease is a single indivisible agreement, or is several agreements that may be assumed or rejected separately, is question of state law. 11 U.S.C.A. § 365.

**[5] Contracts 95 ☞0**

95 Contracts
Under Illinois law, it is intent of parties entering into contract that determines its severability; issue is whether parties intended a single contract even though it may be expressed in separate agreements, or whether they intended separate contracts even though they are bundled together in one agreement.

**[6] Contracts 95 ☞0**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

95 Contracts
Illinois courts use "four corners" approach to contract interpretation, under which courts will confine their review to four corners of document itself to ascertain parties' intentions, as long as document is unambiguous.

**[7] Contracts 95 ☞0**

95 Contracts
Under Illinois law, contract that is susceptible to only one reasonable interpretation is "unambiguous," and court must determine its meaning as matter of law.

**[8] Bankruptcy 51 ☞0**

51 Bankruptcy

**Landlord and Tenant 233 ☞0**

233 Landlord and Tenant
Master leases into which restaurant operators entered as part of sales-and-lease-back transactions were, by their plain terms, indivisible agreements under Illinois law, which restaurant operators, after commencement of their Chapter 11 cases, had to assume or reject in their entirety, and under which they had no right to pick and choose specific properties covered by master lease that they would continue to lease and those which they would not, though each master lease provided for allocation of rent among properties covered by that lease, where obligation to pay rent was joint and several, and restaurant operators were liable for total rent specified in master lease even if one or more of properties covered by that master lease was condemned or destroyed, and where master lease specifically defined circumstances under which lessor would be entitled to sever one of the leased restaurants from master lease and substitute another property. 11 U.S.C.A. § 365.

**[9] Contracts 95 ☞0**

95 Contracts
Under Illinois law, ability to apportion considera-

tion to different parts of contract is but one factor for court to consider when deciding whether parties intended for their contract to be one, indivisible agreement or separate, severable agreements; fact that consideration may be apportioned is not conclusive.

**[10] Contracts 95 ☞0**

95 Contracts
Under Illinois law, determination of whether contract is severable depends on intention of parties and is fact-intensive.

**[11] Landlord and Tenant 233 ☞0**

233 Landlord and Tenant
Under Illinois law, mere fact that restaurant operators's master leases with company with which it had entered into sales-and-lease-back transactions allowed company, in certain circumstances, to sever one of the leased restaurants from master lease and substitute another property did not mean that parties intended each master lease to severable for all purposes; in fact, it was evidence to the con- trary.

**[12] Bankruptcy 51 ☞0**

51 Bankruptcy
Cross-default provisions in debtor's lease are not per se invalid, as provisions designed to impair debtor's ability to assume or reject lease. 11 U.S.C.A. § 365(f)(1).

**[13] Bankruptcy 51 ☞0**

51 Bankruptcy
There is no federal policy which requires severance of lease condition solely because it makes debtor-tenant's reorganization more feasible; rather, determination of whether specific contract or lease is indivisible agreement or is several agreements in one, which should properly be severable, depends on application of state law. 11 U.S.C.A. § 365.

**[14] Bankruptcy 51 ☞0**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

51 Bankruptcy

**Landlord and Tenant 233 ⬤➝0**

233 Landlord and Tenant
Even assuming that master leases into which restaurant operators entered as part of sales-and-lease-back transactions were ambiguous, and did not by their plain terms indicate whether parties intended for these master leases to be indivisible or severable, evidence of circumstances surrounding negotiation of master leases, which showed that lessor insisted on master lease concept and refused to proceed with sales-and-lease-back transactions for each individual restaurant that was to be sold and leased back, as well as evidence that restaurant operators thereafter sought lessor's consent to substitute one restaurant for another under master lease, showed that parties intended each master lease to be one, indivisible, agreement, such that restaurant operators, upon commencement of their Chapter 11 cases, had to assume or reject each master lease in its entirety, and could not pick and choose specific properties covered by master lease that they would continue to lease and those which they would not. 11 U.S.C.A. § 365.

Erin Edwards, Joel A. Waite, John T. Dorsey, Joseph M. Barry, M. Blake Cleary, Nathan D. Grow, Patrick A. Jackson, Pauline K. Morgan, Ryan M. Bartley, Sean T. Greecher, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, for Debtors.

**OPINION**[FN1]

MARY F. WALRATH, Bankruptcy Judge.
**\*1** Before the Court is the Motion of the Debtors FN2 for approval of the assumption and assignment of an unexpired lease of non-residential real property located in Warrington, Pennsylvania, (the "Assumption Motion") and the Debtors' First and Third Motions for authority to reject certain non-residential real property leases, including property located in Moline, Illinois, and Muskegon, Michigan (the "Rejection Motions"). The Motions

are opposed by FP1 LLC and FP2 LLC (collectively "FP"), which assert that the leases are not separate but are integrated into master leases which must be assumed or rejected in toto. For the reasons stated below, the Court will deny the Motions.

I. *BACKGROUND*

The Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code on January 22, 2008. The Debtors comprise the nation's largest steak-buffet restaurant chain and the second largest restaurant company in the family-dining segment of the restaurant industry. As of the filing of their bankruptcy cases, the Debtors had more than 600 company-operated restaurants and 16 franchise locations in over 40 states.

Prior to their bankruptcy filings, in 2002 and 2003 the Debtors sought to recapitalize, replace their expensive secured debt, and issue a dividend to shareholders. (Duncan Tr. 17:17-18:12, 19:12-19 .) FN3This was accomplished in three stages. In stage one, the Debtors entered into a sale/leaseback transaction in which they sold certain restaurants and the ground on which they stood and then leased them back. This resulted in cash to pay part of the secured debt and took the restaurants and the debt off their balance sheet. In stage two, the Debtors entered into a sale/leaseback transaction with respect to twenty-nine restaurants where they owned the building but not the land on which it stood. In that transaction, which is the subject of this dispute, the Debtors assigned their ground leases and sold the buildings constructed thereon to FP.FN4 The Debtors then subleased from FP the grounds and buildings pursuant to four Master Leases. The Debtors received a sum of cash (approximately $35 million) and removed the restaurants and debt from their balance sheet. The conclusion of the first two stages permitted the Debtors in the third stage to refinance their secured debt at more reasonable rates and to issue a dividend to shareholders.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On the petition date, the Debtors filed their First Motion for authority to reject certain non-residential real property leases, including a lease with FP1 in Moline, Illinois. On February 22, 2008, the Debtors filed their Third Motion to reject certain other non-residential real property leases, including a lease with FP2 in Muskegon, Michigan. On March 25, 2008, the Debtors filed the Assumption Motion with respect to the Warrington lease they have with FP2. The Debtors have ceased operations at each of the three locations and want to reject or assign the leases in order to cut costs. (Tr. 100:15-101:6.) FP filed objections to the three Motions, and a joint evidentiary hearing on the issue of whether the individual leases were severable from the Master Leases and could be assumed or rejected separately was held on April 14, 2008.[FN5]The parties have briefed the issues and the matter is ripe for decision.

## II. JURISDICTION

*2 This Court has jurisdiction over these matters which are core proceedings pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A), (M) & (O).

## III. DISCUSSION

### A. Review of Case law

Upon the filing of a bankruptcy petition, a debtor has the right to assume or reject an unexpired non-residential real property lease in accordance with section 365 of the Bankruptcy Code. 11 U.S.C. § 365(a).*See also N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (noting that "the authority to reject an executory contract is vital to the basic purpose to a chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."); *In re Convenience USA, Inc.,* No. 01-81478, 2002 WL 230772, at *7 (Bankr.M.D.N.C. Feb.12, 2002) (concluding that section 365 allows a debtor to "pick and choose among the debtor's executory contracts and unexpired leases and to assume those which are beneficial to the estate and to reject those that are not beneficial.")

[1] If the debtor decides to assume a lease, however, it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed. "The [debtor] may not blow hot and cold. If he accepts the contract he accepts it cum onere. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other."*In re Italian Cook Oil Corp.,* 190 F.2d 994, 997 (3d Cir.1951).*See also In re Fleming Cos., Inc.,* 499 F.3d 300, 308 (3d Cir.2007) (holding that debtor could not assume and assign store lease because an essential term of it required service from a warehouse whose lease had already been rejected); *In re ANC Rental Corp., Inc.,* 277 B.R. 226, 238-39 (Bankr.D.Del.2002) (holding that debtor may not assume only part of a contract but must assume the entire agreement).

[2]Section 365(f)(1) states that a debtor's right to assume and assign a lease is enforceable notwithstanding any provision in a lease which prohibits, restricts, or conditions the assignment of that lease. Consequently, the courts will not enforce provisions designed solely to impair the debtor's ability to assume or reject leases. 11 U.S.C. § 365(f).*See also Fleming Cos.,* 499 F.3d at 307 (noting that the Bankruptcy Code invalidates contract provisions that are so restrictive as to be de facto anti-assignment clauses); *In re Rickel Home Ctrs., Inc.,* 209 F.3d 291, 299 (3d Cir.2000) (stating that section 365(f)(1) ensures the "free assignability [of executory contracts or unexpired leases] as a means to maximize the value of the debtor's estate.... [T]o that end, [it] allows the [debtor] to assign notwithstanding a provision in the contract or lease, or applicable law, prohibiting, restricting, or conditioning assignment."); *The Shaw Group, Inc. v. Bechtel Jacobs Co., LLC (In re The IT Group, Inc.),* 350 B.R. 166, 179 (Bankr.D.Del.2006) (noting that "[c]ross-default provisions are 'inherently suspect' because they interfere with the debtor's rejection

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----

--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)

**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

power by saddling the estate (albeit indirectly) with the burdens of unwanted executory contracts."); *Convenience USA,* 2002 WL 230772, at *7 (concluding that "cross-default provisions are unenforceable in bankruptcy where they would restrict the debtor's ability to fully utilize the provisions of § 365.... Thus, where a debtor is a party to a number of unexpired leases, cross-default clauses that would serve to prevent the debtor from assuming some of the leases without assuming the others at the same time are unenforceable under § 365(f).").

**\*3** [3] The fact that there is one document reflecting the parties' agreements does not mean that it is one contract. "The 'all or nothing' requirement [of assumption or rejection under section 365] does not mean ... that every document denominated a 'contract' or a 'lease' must be treated as a single, indivisible whole.... If a single contract contains separate, severable agreements, however, the debtor may reject one agreement and not another." 2 William L. Norton, Jr. & William L. Norton, III, *Norton Bankr.L. & Prac.* § 39:11 (2d ed.1999).

[4] The determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one is a question of state law. *See, e.g., In re T & H Diner, Inc.,* 108 B.R. 448, 453 (D.N.J.1989) ( "The question of divisibility is a matter of state law. In New Jersey the determination of whether a transaction constitutes one or several contracts is primarily based upon the intentions of the parties.") (citations omitted); *In re Adelphia Bus. Solutions, Inc.,* 322 B.R. 51, 55 (Bankr.S.D.N.Y.2005) (holding that state law governs the interpretation of leases); *In re Wolflin Oil, LLC,* 318 B.R. 392, 397 (Bankr.N.D.Tex.2004) ( "Where a lease or contract 'contains several different agreements, and the lease or contract can be severed *under applicable non-bankruptcy law,* section 365 allows assumption or rejection of the severable portions of the lease or contract.'") (emphasis added) (*quoting In re FFP Operating Partners, LP,* No. 03-90171, 2004 WL 3007079, at *1 (Bankr.N.D.Tex. Aug.12, 2004)); *In re Plum*

*Run Serv. Corp.,* 159 B.R. 496, 499 (Bankr.S.D.Ohio 1993) (applying Ohio law to issue of whether contract was divisible).

[5] Under Illinois law,[FN6] the test for severability depends on the intent of the parties. *See, e.g., Super Stop Petroleum, Inc. v. Clark Retail Enters. (In re Clark Retail Enters.),* 308 B.R. 869, 888 (Bankr.N.D.Ill.2004) (Illinois law requires a determination of "the intention of the parties as established by a reasonable interpretation of the terms and provisions of the contractual document itself, by the circumstances of the transaction at issue, and by the subject matter to which the contract has reference."). The issue is whether the parties intended a single contract even though it may be expressed in separate agreements or whether they intended separate contracts even though they are "bundled" together in one agreement.

[6][7] Illinois courts use the "four corners" approach to contract interpretation, under which the courts will confine their review to the four corners of the document itself if it is not ambiguous to ascertain the parties' intentions in executing it. *See, e.g., Neuma, Inc. v. AMP, Inc.,* 259 F.3d 864, 873 (7th Cir.2001) (finding that if a contract is unambiguous, a court "will not look beyond its 'four corners' in interpreting its meaning."); *Clark Retail,* 308 B.R. at 884 ("Illinois courts use the 'four corners' approach to contract interpretation, confining their attention to only that which appears within the four corners of the relevant documents."). A contract that is susceptible to only one reasonable interpretation is unambiguous, and a court must determine its meaning as a matter of law. *See, e.g., Bourke v. Dun & Bradstreet Corp.,* 159 F.3d 1032, 1036 (7th Cir.1998).

B. *Application to the Facts*

1. *Express Terms of the Contract*

**\*4** [8] The Debtors and Committee assert that the terms of the Master Leases clearly evidence that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

Page 6

individual leases incorporated within them were independent and separate agreements. The two Master Leases [FN7] at issue cover ten and eleven property leases, respectively. (Exs. D-1 & D-2.) The properties in the first Master Lease are in scattered locations in four states. (Ex. D-1.) The properties in the second Master Lease are in eight states. (Ex. D-2 .) Both Master Leases have two tenants (OCB Restaurant Co. and HomeTown Buffet, Inc.). (Exs. D-1 & D-2.) Each underlying lease in the Master Leases covers a separate restaurant that operates independently of the other restaurants in the Debtors' chain and are required, under the Master Leases, to provide their financial reports separately to FP. (Tr. 96:20-97:12; Exs. D-1 & D-2 at ¶ 29 .) Although the total rent due under the Master Leases was wired by the tenants to FP in a lump sum, Exhibit B to the Master Leases reflects the allocation of the rent among the underlying restaurants. (Tr. 97:13-22; Exs. D-1 & D-2 at ¶ 6(a) & Ex. B.)

The Debtors argue that the fact that the rent is apportionable is a critical factor mandating a finding that the Master Leases are severable. *See, e.g., Altra Corp. v. Chemtoy Corp. (In re Chemtoy Corp.),* 19 B.R. 475, 481 (Bankr.N.D.Ill.1982) (stating that an agreement is severable "where one party's performance consists of several distinct and separate items and the price to be paid by the other party is apportioned to each of the items to be performed."); *Kel-Keef Enters., Inc. v. Quality Components Corp.,* 316 Ill.App.3d 998, 250 Ill.Dec. 308, 738 N.E.2d 524, 539 (Ill.App.Ct.2000) ("In determining the intention of the parties, useful factors include whether performance by one party consists of distinct and separate items and whether the price is apportioned for each item of performance."); *Keeshin v. Levin,* 31 Ill.App.3d 790, 334 N.E.2d 898, 905 (Ill.App.Ct.1975) (stating that "[i]f a part to be performed by one party consists of several distinct and separate items ... and the prices to be paid by the other is apportioned to each item to be performed, or if left to be implied by law, such a contract will generally be held to be severable; and the same rule holds where the price to be paid is clearly and dis-

tinctly apportioned to different parts of what is to be performed, although the latter is in its nature single and entire.") (quoting *Amsler v. Bruner,* 173 Ill.App. 337, 345 (Ill.App.Ct.1912)).

[9] The Court disagrees with the conclusion of the Debtors and the Committee. The ability to apportion the consideration to different parts of the contract is one factor to be considered in determining the intent of the parties but it is not conclusive. There are many cases where, although the payment is apportioned among many items, the Illinois courts have still found an integrated, non-severable contract. *See, e.g., City of Chicago v. Sexton,* 115 Ill. 230, 2 N.E. 263, 264 (Ill.1885) (holding that contract to furnish the ironworks for a multi-story building was not divisible even though the consideration was "made up by stating the estimated cost of each story separately, and the roof, and then adding the whole together."); *Meredith v. Knapp,* 62 Ill.App.2d 422, 211 N.E.2d 151, 153 (Ill.App.Ct.1965) (holding that double indemnity coverage in insurance policy was not separate contract even though a separate premium was charged for it).

*5 The Seventh Circuit has noted that the intention of the parties is critical and "[e]ven if the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it 'as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.' " *In re United Air Lines, Inc.,* 453 F.3d 463, 468, 470 (7th Cir.2006) (applying Colorado law and concluding that agreement to lease airport space and to repay bond issue for building on that space were not independent agreements, though separate payments were made for each, because "the parties' bond arrangement ... is not and could not have been a lone-standing bargain. In other words, the parties would not have entered the bond-related portion in the complete absence of the leasing portion.").*See also Plum Run,* 159 B.R. at 499 (applying Ohio law and finding contract indivisible because "the parties intended to consider the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

[contract] as a single, interdependent contract, not as eleven divisible contracts.").

[10] Even the cases cited by the Debtors acknowledge that the determination of whether a contract is severable depends on the intention of the parties and is fact-intensive. *See, e.g., Chemtoy Corp.,* 19 B.R. at 481 ("[W]hether a contract is severable depends on the intent of the parties. This intent is ascertained by the terms and the subject matter of the contract."); *Kel-Keef Enters.,* 250 Ill.Dec. 308, 738 N.E.2d at 539 (stating that "[w]hether a contract is severable depends on the intention of the parties" and that apportionment of the price is only one useful factor); *Keeshin,* 334 N.E.2d at 904 ("Whether a given contract is or is not severable cannot be determined by any precise rule; each case must depend in large part upon the specific terms of the contract involved.").

The Debtors and Committee argue nonetheless that several other provisions of the Master Leases demonstrate that the individual leases should be separated from each other. For example, they note that FP has the ability to divide and consolidate individual leases and create new Master Leases. (Exs. D-1 & D-2 at ¶¶ 25(b), 31 & 36(a).) FP also has the right to sell the underlying property relating to any of the individual leases (subject to the tenants' right of first refusal), which will result in the severance of that lease from the Master Lease. (Exs. D-1 & D-2 at ¶ 36(a).) If an individual property is condemned, the Debtors can substitute another property for it. (Exs. D-1 & D-2 at ¶ 7(b).) Any of the individual leases can be assigned or substituted for another by the Debtors, with FP's consent. (Exs. D-1 & D-2 at ¶¶ 17(a) & 31.) The Debtors and Committee argue that these provisions demonstrate that the Master Leases could be severed.[FN8]

FP argues that all of the cited provisions are exercisable only by FP or require FP's consent. Therefore, FP argues that rather than proving the agreement is divisible, the provisions evidence that it is not.

*6 [11] The Court agrees with FP. The fact that the Master Leases could in certain circumstances be severed by their terms does not mean that the parties intended them to be separate agreements for all purposes. In fact, it demonstrates the opposite: that the parties intended each Master Lease to be an integrated agreement except for certain specifically identified circumstances. Further support for this conclusion is found in other provisions of the Master Leases. For example, the Master Leases expressly provide that the individual leases shall not be merged with each other, even if the landlords are the same and the tenants are the same. (Exs. D-1 & D-2 at ¶ 24.)

The Debtors and Committee argue further, however, that the conduct of the parties proves the severability of the Master Leases. Pre-petition, the parties had been negotiating to substitute a lease the Debtors had in Cicero, Illinois, for the Moline, Illinois, lease which was not performing well. (Tr. 99:5-21.) FP had agreed to the substitution, but it was not completed by the time of the bankruptcy filing. (Tr. 100:3-7.) FP responds that the fact that the Debtors sought its permission for the substitution demonstrates that they did not have the power to sever the Master Lease under Illinois law.

The Court agrees with FP on this point. The fact that FP was willing to accept a substitution does not mean that the Master Lease was intended to be divisible. If the Master Leases were severable, it is unlikely that the Debtors would have gone to the trouble of negotiating the substitution with FP or would have agreed to add another lease (that was free of the restrictions in the Master Lease) for the Moline lease. The Debtors apparently recognized that the leases were not severable under Illinois law. Therefore, the Court concludes that the parties' prior conduct supports the conclusion that the Master Leases are not severable.

FP argues that many other provisions of the Master Leases evidence that they are intended as one agreement. For example, the obligation to pay rent is joint and several; that is, each Tenant is liable for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

the entire rent. (Exs. D-1 & D-2 at ¶ 25(a).) FP argues that this proves that the Master Lease is one integrated agreement because the notion that one party is responsible for the payment of rent on a building it is not occupying is consistent only with the idea that this is one integrated contract.

FP also notes that all rent remains due, even if the Debtors are unable to use one or more of the properties because of condemnation, destruction, or termination of the ground lease. (Exs. D-1 & D-2 at ¶¶ 6(e), 7(b) & 33(a).) At the expiration of their terms, the Master Leases may only be extended if all the ground leases are extended. (Exs. D-1 & D-2 at ¶ 5(a).) Finally, on default of one of the individual leases, FP has the right to declare the entire Master Lease in default or to treat only the individual lease in default. (Exs. D-1 & D-2 at ¶ 19(b).)

*7 The Debtors and Committee disagree, arguing instead that these provisions are simply cross-default provisions that courts typically find are not enforceable under section 365(f).*See, e.g., Convenience USA,* 2002 WL 230772, at *7 (concluding that provision of master lease that would have terminated the entire lease if six of the twenty-one locations were rejected was unenforceable); *In re Sambo's Rests., Inc.,* 24 B.R. 755, 758 (Bankr.C.D.Cal.1982) (finding that cross-default provisions linking multiple restaurant leases were unenforceable). The Committee also argues that the fact that FP can exercise its default rights against only one property proves the divisibility of the contract.

The Court disagrees with this last argument of the Committee. It is typical in contracts to give a party flexibility in exercising its remedies on default, allowing it to exercise some remedies without waiving any other remedies it may have under law. The Court views the default provision here as similar and not indicative of the severability of the Master Leases. In fact, if the Master Leases were intended to be severable, it is more likely that they would have limited FP to exercising its remedies on default to the defaulting property only rather than per-

mitting it to exercise remedies against all the properties.

[12] Further, contrary to the suggestion of the Debtors and the Committee, cross-default provisions are not per se invalid under section 365. Rather, as this Court noted in *The Shaw Group:*

> The "critical feature" of decisions which do not invalidate cross-default provisions is "that the agreements linked by a cross-default clause were *economically interdependent:* the consideration for one agreement supported the other."*United Air Lines,* 346 B.R. at 470 (emphasis added), *citing Lifemark Hosps., Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),* 304 F.3d 410, 445 (5th Cir.2002) (upholding cross-default provision in one agreement where nonenforcement "would collapse the [other] agreement" and "thwart [non-debtor party's] bargain in agreeing to enter into the [other] agreement"); *Kopel,* 232 B.R. at 67 (enforcing cross-default clause in lease and collateral note where they were "contemporaneously executed as necessary elements of the same transaction, such that there would have been no transaction without each of the other agreements").

350 B.R. at 179-80.

The Court concludes that in this case the individual leases incorporated into each Master Lease are economically interdependent. Although the underlying leases between the Debtors and the ground lessors were originally independent agreements, when the Master Leases were executed they became consolidated. Unlike the original landlords, FP had no real interest in each specific lease; its interest was in the total package. This conclusion is supported by the terms of the Master Lease: the total rent is due jointly and severally by all the tenants regardless of what happens to any of the individual leases. (Exs. D-1 & D-2 at ¶¶ 6(e), 7(b), 25(a) & 33(a).) To allow the Debtors to reject one of the leases without continuing to pay the total rent would be to destroy the essence of FP's bargain.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

Page 9

**\*8** The Debtors contend though that the provisions of the Master Leases at issue are merely skillful drafting to avoid the consequences of the effects of the Bankruptcy Code. They contend that enforcement of those provisions would make it difficult for them to eliminate under-performing restaurants. They argue that this could have a devastating effect on their efforts to reorganize.

[13] The Court notes, however, that there is "no federal policy which requires severance of a lease condition solely because it makes a debtor's reorganization more feasible."*Bistrain v. East Hampton Sand & Gravel Co., Inc. (In re East Hampton Sand & Gravel Co., Inc.),* 25 B.R. 193, 199 (Bankr.E.D.N.Y.1982). Rather, the determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one, which should properly be severable, depends on the application of state law. *See, e.g., T & H Diner,* 108 B.R. at 453 ("The question of divisibility is a matter of state law."); *Wolflin Oil,* 318 B.R. at 397 ("Where a lease or contract ... can be severed *under applicable non-bankruptcy law,*section 365 allows assumption or rejection of the severable portions of the lease or contract.' ") (emphasis added).

The Debtors and Committee argue, however, that in similar circumstances courts have held that a single, master lease for separate retail stores or restaurants is severable. *See, e.g., FFP Operating Partners,* 2004 WL 3007079, at \*4-5 (finding lease covering twenty convenience stores in ten cities to be severable where each property was operated separately, the lump sum rent could be apportioned among the properties, and two properties had been severed from the lease previously without affecting the other properties); *Clark Retail,* 308 B.R. at 888 (finding a single purchase agreement for eighty-one gas stations was severable into distinct agreements for each property when the agreement priced the properties separately; each property had its own due diligence information; the agreement contemplated separate warranties, inspections, and closing for each property; and environmental conditions and remediation obligations varied among the properties); *In re Cafeteria Operators, L.P.,* 299 B.R. 384, 390-92 (Bankr.N.D.Tex.2003) (finding master lease of forty-three restaurants to be divisible when rent was apportioned among the properties, the leases had differing terms, and each property operated independently); *Convenience USA,* 2002 WL 230772, at \*2-4 (finding that master lease executed in connection with sale-leaseback of twenty-seven convenience stores in eighteen cities was severable where rent was allocated among the properties, the landlord had the option to transfer properties out of the lease, condemnation of one property would not terminate the leases, and the properties operated separately).

The Court finds the cases cited by the Debtors distinguishable. None of them involved the situation presented here where the Debtors, after entering into the leases, bundled them for purposes of monetizing them. In many of the cases cited by the Debtors and the Committee, the party objecting to severance of the agreement was the original landlord or sub-landlord. *Cf. Adelphia,* 322 B.R. at 53;*FFP Operating Partners,* 2004 WL 3007079, at \* 1;*Cafeteria Operators,* 299 B.R. at 387-88. In those cases, it was reasonable to conclude that the landlord did, in fact, view each of the leases as a separate contract and that the bundling of the leases together in a master lease or the use of cross-default or similar provisions did not change that view.

**\*9** The *Wolflin Oil* and *Plitt Amusement* cases are also distinguishable, because in those cases the leases were executed in connection with the sale of a business. 318 B.R. at 395;*In re Plitt Amusement Co. of Washington, Inc.,* 233 B.R. 837, 839 (Bankr.C.D.Cal.1999). The Courts concluded that the leases were severable from the asset purchase agreements because they were in separate documents, with separate payment obligations, and were to continue long after payment for the business was complete. 318 B.R. at 399, 233 B.R. at 844. The *Clark Retail* case is similarly distinguishable because it involved a bankruptcy auction of eighty-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

Page 10

one properties and the bid procedures expressly permitted bids on individual properties although it required use of a standard asset purchase agreement form. 308 B.R. at 881.

The Debtors argue, however, that the Master Lease structure was motivated purely by financial considerations that served no business purpose apart from providing FP with credit enhancements (such as cross-default provisions). They contend that such credit enhancements do not integrate otherwise divisible, separate agreements.

The fact that the Master Lease structure was used for financial reasons is a red herring. Presumably, all business transactions are done for financial reasons. In the absence of the sale/leaseback, the Debtors would have been free to assume or reject any of the individual leases. The difference in this case is that the Debtors entered into the sale/leaseback agreement whereby the leases were bundled in exchange for one obligation. FP agreed to pay the Debtors a substantial sum of money in exchange, inter alia, for the right to bundle the leases into four Master Leases and restrict the exercise of rights by the individual tenants. The Court concludes that the intent to treat the Master Leases as integrated indivisible agreements is clear from the face of those agreements.

### 2. Prior Dealings

[14] Even if the Master Leases were ambiguous, however, the course of dealings of the parties demonstrates that the deal was meant to be indivisible. During the negotiations, the Debtors expressed their preference for individual leases, but FP insisted on the Master Lease concept. (Tr. 87:3-14, 102:23-103:5, 104:15-16, 105:25-106:7; Duncan Tr. 35:20-39:3, 44:18-50:9; Exs. FP-2 & FP-3.) FP's view prevailed and the deal was done that way. (Tr. 87:20-24; Exs. D-1 & D-2.) The Debtors agreed to the Master Lease structure because they were more interested in the favorable terms offered by FP (total proceeds and rental terms) and in getting treatment of the transaction as an operating lease.[FN9] (Tr. 87:20-24, 109:7-12.)

The Court concludes that it is clear from the negotiations that the use of a Master Lease, with the concomitant joint and several obligation of all tenants to pay the total rent, was a critical element of the parties' agreement. *See, e.g., Fleming Cos.,* 499 F.3d at 308 (holding that debtor could not assume and assign store lease because an essential term of it required service from a warehouse whose lease had already been rejected); *ANC Rental Corp.,* 277 B.R. at 238-39 (holding that debtor may not assume only part of a contract but must assume the entire agreement).

**\*10** The testimony demonstrates that FP would never have done the deal as individual leases. (Tr. 131:15-132:2; Shrewsberry Tr. 17:18-21, 56:17-58:3, 84:14-85:13.) FP contends that this fact alone establishes the interdependence of the leases. *Bonner v. Westbound Records, Inc.,* 76 Ill.App.3d 736, 31 Ill.Dec. 926, 394 N.E.2d 1303, 1314 (Ill.App.Ct.1979) ("A contract is not severable where the parties assented to all promises as a single whole."). *See also Trapkus v. Edstrom's, Inc.,* 140 Ill.App.3d 720, 95 Ill.Dec. 119, 489 N.E.2d 340, 346-47 (Ill.App.Ct.1986) (holding that profit-sharing portion of employment agreement was interdependent with stock buy-sell arrangement because "it is impossible to affirm that the plaintiff would have assented to any part [of the contract] unless he assented to all.").

The Debtors argue that FP's testimony that it would not have entered into the transaction without the bundling of the leases into Master Leases is self-serving and cannot be used to defeat the provisions of the Bankruptcy Code. *See, e.g., The Shaw Group,* 350 B.R. at 180 (" '[s]elf-serving testimony that [the non-debtor lessor] would not have entered into the leases ... without the cross-default provisions [was] unconvincing' and insufficient to 'override the policy of the Code of allowing debtors to selectively assume or reject ... divisible agreements.'") (*quoting Wolflin,* 318 B.R. at 399).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

Here, however, the Court finds the testimony convincing. Unlike the situation in *The Shaw Group* or in the cases cited by the Debtors which involve multiple leases, in this case there was no reason for FP to enter into the sale/leaseback transaction unless it could include the leases together in Master Leases. *Cf. Convenience USA*, 2002 WL 230772, at *1 (sale/leaseback done by seller as part of sale of business). In this case, FP was not the original lessor; it had no reason to do business with the Debtors on any of the leases. Instead, it was being asked by the Debtors to "monetize" their leases. In exchange for doing that at the price that it did, FP insisted on the leases being bundled.[FN10]

The Debtors and Committee argue that insistence on the Master Lease concept, however, does not mean that the deal is an integrated one. They contend that the leases were combined into Master Leases only to permit FP to later securitize them, not because they represented one agreement. (Tr. 129:25-130:4; Ex. FP-13.) They argue, further, that the structure of the deal should no longer be considered because the purpose for that structure (to securitize the leases) was never achieved. (Shrewsberry Tr. 46:6-24.)

The Court disagrees. From the testimony presented, the Court concludes that the leases were consolidated for a different reason: to permit the Debtors to "monetize" those leases and assure that FP would be repaid. (Tr. 82:7-16, 83:18-85:1.) While FP might have wanted to securitize the Master Leases later, that was not a condition to the agreement. (Exs. D-1 & D-2.) The securitization (or resale of the Master Leases) was a secondary goal of FP's; the primary goal was to assure that it would recover its investment. (Tr. 129:25-131:7.) The Debtors' purpose in doing the transaction with FP was achieved. The Debtors received significant consideration (in the amount of funds received, a favorable cap rate, and operating lease treatment) precisely because FP was able to get Master Leases where each tenant was responsible for the total rent. (Tr. 88:23-25, 130:16-131:14; Duncan Tr. 31:3-24,

35:11-13.)

**\*11** Finally, the Debtors and Committee argue that the mere fact that the agreement is in one document at the insistence of FP does not mean that it is an integrated agreement. They contend that it is not enough to put disparate things together and then say that they are one agreement. *See generally*, 2 William L. Norton, Jr. & William L. Norton, III, *Norton Bankr.L. & Prac.* § 39:11 (2d ed. 1999) ("If a single contract contains separate, severable agreements, however, the debtor may reject one agreement and not another.").

The Court concludes, however, that the purpose of the Master Lease was not simply to consolidate several agreements that FP already had with the Debtors. Instead, the purpose of the agreement was to assure FP that it would be repaid for the money given to the Debtors. From FP's perspective this was akin to a financing and it sought to reduce its risk and assure that the "debt" was fully amortized by consolidating its collateral into Master Leases. (Tr. 129:25-131:7; Shrewsberry Tr. 16:5-11, 38:12-39:25.) Accordingly, FP's analysis of the economics of doing the deal was based on a determination of the average [FN11] of the terms of the leases and the total rent paid by the Debtors collectively.[FN12]Thus, this case is dramatically different from the situation where the lessor has an independent reason to enter into each lease and then just seeks to reduce its risk by including cross-default provisions in each lease.[FN13]

Consequently, the Court concludes that the negotiations of the Master Leases confirm that it was the intent of the parties to have an integrated agreement in each Master Lease and that they are not severable into the individual leases. As a result, the Court concludes that the Debtors may not assume and assign or reject an individual lease but must assume or reject each of the Master Leases as a whole.


IV. *CONCLUSION*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)

**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

For the foregoing reasons, the Court will deny the Debtors' Motions to reject and to assume and assign the individual leases.

An appropriate order is attached.

### ORDER

**AND NOW** this 16th day of **MAY, 2008,** upon consideration of (1) the Debtors' Motions to reject the unexpired leases of property located in Moline, Illinois, and Muskegon, Michigan, (2) the Debtors' Motion to assume and assign the unexpired lease of property located in Warrington, Pennsylvania, (3) the responses thereto filed by FP1 LLC and FP2 LLC, and (4) the evidence and argument presented at the hearing held on April 14, 2008, and for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that the Debtors' Motions are **DENIED** to the extent they deal with the unexpired leases of the non-residential property located in Moline, Illinois, Muskegon, Michigan, and Warrington, Pennsylvania.

cc: Mark Collins, Esquire [FN1]

FN1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

FN2. The Debtors are Buffets Holdings, Inc.; Buffets, Inc.; Buffets Leasing Company, LLC; Buffets Franchise Holdings, LLC; Fire Mountain Restaurants, LLC; Fire Mountain Leasing Company, LLC; Fire Mountain Management Group, LLC; HomeTown Buffet, Inc.; HomeTown Leasing Company, LLC; OCB Restaurant Company, LLC; OCB Leasing Company, LLC; OCB Purchasing Company; Ryan's Res-

taurant Group, Inc.; Big R Procurement Company, LLC; Ryan's Restaurant Leasing Company, LLC; Ryan's Restaurant Management Group, LLC; Tahoe Joe's, Inc.; Tahoe Joe's Leasing Company, LLC.

FN3. References to the record of the April 14, 2008, hearing are to: "Tr. [page:line]". References to the deposition designations of the parties are to: "[deponent's name] Tr. [page: line]".

FN4. Originally the sale/leaseback was negotiated and executed by American Commercial Capital ("ACC") which thereafter assigned all its interests to FP.

FN5. The parties have agreed to defer presenting evidence and having the Court decide the other issues inherent in the Debtors' Assumption Motion until after the severability issue is resolved.

FN6. In this case, the parties agreed that Illinois law would apply to the interpretation of the Master Leases. (Exs. D-1 & D-2 at ¶ 39(m).)

FN7. The parties executed two additional Master Leases, which are not at issue here, covering an additional eight properties. (Andrews Tr. 75:14-76:3.)

FN8. In addition, the Debtors and Committee note that FP did not even care which individual lease was in which Master Lease. (Tr. 89:15-17.)

FN9. In fact, some of the Debtors' rights to substitute one lease for another contained in earlier iterations of the deal were eliminated by the Debtors' accountant in order to meet the test for operating lease treatment. (Tr. 111:13-25.)

FN10. The Debtors' representatives who negotiated the deal also confirmed that FP

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- B.R. ----
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)
**(Cite as: --- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.))**

insisted upon the Master Lease structure and would not agree to individual leases despite the Debtors' efforts. (Tr. 87:11-24, 102:23-103:5, 109:4-24; Duncan Tr. 37:24-39:7, 44:15-45:4, 46:1-10, 49:10-50:9.)

FN11. The term of each Master Lease is close to an average of the terms of the individual leases. Therefore, the obligation to pay rent under the Master Leases may extend beyond the end of an individual lease. (Tr. 89:22-90:5; Andrews Tr. 34:21-35:10; Shrewsberry Tr. 76:7-77:20.)

FN12. In fact, the allocation of the rent among the properties was not negotiated by the parties but was determined by the Debtors' accountants in order to assure treatment as an operating lease. (Tr. 92:17-24.) FP was interested only in assuring that the total rent was paid, not how it was allocated. (Shrewsberry Tr. 16:5-11, 18:22-20:11.)

FN13. The Debtors' CEO, Michael Andrews, admitted that FP's interests were different from the interests of the underlying ground lessors. FP was only interested in getting the rent paid, while the ground lessors were also interested in having a restaurant operated by a national chain to enhance traffic and sales at their strip centers. (Tr. 113:3-115:21.)

FN1. Counsel shall serve a copy of this Order and the accompanying Opinion on all interested parties and file a Certificate of Service with the Court.

Bkrtcy.D.Del.,2008.
In re Buffets Holdings, Inc.
--- B.R. ----, 2008 WL 2080555 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 2964835 (S.D.Tex.)
**(Cite as: 2007 WL 2964835 (S.D.Tex.))**

In re Burr Wolff, LP
S.D.Tex.,2007.
Only the Westlaw citation is currently available.
     United States District Court,S.D. Texas,Houston
                              Division.
               In re BURR WOLFF, LP, Debtor.
            Marlin Leasing Corp., Appellant,
                                 v.
          Joseph M. Hill, Trustee, Appellee.
              **Bankruptcy No. 06-37073-H3.**
                **Civil Action No. H-07-1497.**

                        Oct. 10, 2007.

Burr Wolff, LP, Houston, TX, pro se.
Thomas H. Grace, Locke Liddell et al., Houston,
TX, for Debtor.

             ***MEMORANDUM OPINION AND ORDER***

SIM LAKE, United States District Judge.
*1 Appellant Marlin Leasing Corp. appeals the
March 28, 2007, order of the bankruptcy court
denying Marlin's Motion for Relief From Automat-
ic Stay and declaring that the proceeds of an insur-
ance policy issued to Burr Wolff by HCC Specialty
Insurance Company were property of the bank-
ruptcy estate under 11 U.S.C. § 541(a)(1), (6).[FN1]
The court will vacate the bankruptcy court's order
because the status of the liability insurance pro-
ceeds is not a ripe issue.

          FN1. Marlin Leasing Corp.'s Record on
          Appeal [hereinafter "MROA"], Docket
          Entry No. 8, Document 10.

           **I. *Factual and Procedural Background***

Before becoming insolvent, the debtor, Burr Wolff,
LP ("Burr Wolff"), contracted with other compan-
ies to perform professional services related to the
payment of property taxes.[FN2]Burr Wolff entered
into contracts with many clients including appel-
lant, Marlin Leasing Corp. ("Marlin").[FN3]

          FN2. Brief of Appellant, Marlin Leasing
          Corp., Docket Entry No. 6, p. 1.

          FN3.*Id.*

In connection with its business, Burr Wolff pur-
chased an Errors and Omissions liability insurance
policy ("E & O policy") from HCC Specialty Insur-
ance Company ("HCC").[FN4] Under the E & O
policy HCC agreed to pay claims "on behalf of"
Burr Wolff that HCC incurred while performing its
professional services.[FN5]The policy provided up to
$5,000,000 in coverage for any amounts that Burr
Wolff became "legally obligated to pay" and that
exceeded         the        policy's        $100,000
deductible.[FN6]HCC's obligation to pay claims
made against the policy was contingent upon the
claim being reduced to "a monetary judgment,
award or settlement" against Burr Wolff.[FN7]

          FN4.*Id.* at 2; Brief of Appellee Joseph M.
          Hill, Trustee, Docket Entry No. 10, p. 3.

          FN5. MROA, Docket Entry No. 8, Docu-
          ment 7, p. 73.

          FN6.*Id.* at 52, 56, 73.

          FN7.*Id.* at 74.

At the end of 2005 Burr Wolff failed to pay its cli-
ents' taxes as it had agreed. Burr Wolff estimated
that this failure rendered it contractually liable for
over $6,000,000 at that time. Consequently, Burr
Wolff filed a claim with HCC on the E & O policy
in February of 2006 to cover the potential claims of
its clients.[FN8]HCC denied Burr Wolff's claim and
refused to pay any proceeds under the E & O policy
because HCC contended that Burr Wolff's claim
against potential losses was excluded from cover-
age.[FN9]On October 25, 2006, Burr Wolff filed an
action in state court against HCC for a declaratory
judgment to determine coverage under the E & O
policy and for actual damages.[FN10]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN8. Brief of Appellee Joseph M. Hill, Trustee, Docket Entry No. 10, pp. 2, 4-5.

FN9. See Petitioner's Original Petition in MROA, Docket Entry No. 8, Document 6, pp. 45-46, which restates HCC's three reasons for denying coverage.

FN10.*Id.*

On December 11, 2006, Burr Wolff filed a petition under Chapter 7 of the Bankruptcy Code.[FN11]Subsequently, on February 15, 2007, Marlin filed a proof of claim against Burr Wolff's estate in the amount of $402,069.[FN12]

FN11. Brief of Appellant, Marlin Leasing Corp., Docket Entry No. 6, p. 5; Brief of Appellee Joseph M. Hill, Trustee, Docket Entry No. 10, p. 5.

FN12. Brief of Appellant, Marlin Leasing Corp., Docket Entry No. 6, p. 5; Brief of Appellee Joseph M. Hill, Trustee, Docket Entry No. 10, p. 5.

With Burr Wolff's declaratory judgment action still pending in state court, Marlin filed a Motion for Relief from Automatic Stay and Brief in Support contending that the proceeds of Burr Wolff's E & O policy were not property of the estate.[FN13]The bankruptcy court denied Marlin's motion and held that the E & O policy proceeds were property of the estate.[FN14]Marlin timely filed this appeal.

FN13. MROA, Docket Entry No. 8, Document 5.

FN14.*Id.,* Document 9, p. 141 and Document 10.

On appeal, Marlin challenges both the bankruptcy court's determination that the proceeds of the E & O policy are property of Burr Wolff's bankruptcy estate and the bankruptcy court's denial of Marlin's motion for relief from stay based on that determination.[FN15]

FN15. Brief of Appellant, Marlin Leasing Corp., Docket Entry No. 6, p. xii.

## II. *Standard of Review*

**\*2** When a district court reviews a bankruptcy court's decision, it applies the same standards of review applied by federal courts of appeals. *Webb v. Reserve Life Ins. Co. (In re Webb),* 954 F.2d 1102, 1103-04 (5th Cir.1992). Accordingly, this court reviews the bankruptcy court's conclusions of law *de novo. See Osborne v. Homeside Lending, Inc. (In re Osborne),* 379 F.3d 277, 282 (5th Cir.2004). The bankruptcy court's denial of Marlin's motion for relief of stay is reviewed for an abuse of discretion. *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238, 245 (5th Cir.2006). Ripeness is a "question of law that implicates this court's subject matter jurisdiction, which [is] review[ed] *de novo,"* and may be raised *sua sponte. Urban Developers LLC v. Cit y of Jackson, Miss.,* 468 F.3d 281, 292 (5th Cir.2006) (citations omitted).

## III. *Analysis*

Under 11 U.S.C. § 362(a), the filing of a bankruptcy petition automatically stays any effort by a creditor to collect from "the debtor or against property of the estate[.]" The automatic stay may be lifted for "cause" upon a party's motion. 11 U.S.C. § 362(d). Because the Bankruptcy Code does not define "cause" "reviewing courts must determine whether cause exist[s] on a case-by-case basis."*Reitnauer v. Texas Exotic Feline Found. (In re Reitnauer),* 152 F.3d 341, 343 n. 4 (5th Cir.1998) (citations omitted). Marlin argues that the bankruptcy court had cause to grant Marlin's motion for relief from stay because the property Marlin sought to collect against (the proceeds of the E & O policy) was not property of the bankruptcy estate.FN16Marlin argues that the bankruptcy court erred both when it concluded the E & O policy proceeds were property of the estate and when it denied Marlin's motion for relief from the stay

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2964835 (S.D.Tex.)
**(Cite as: 2007 WL 2964835 (S.D.Tex.))**

Page 3

based on that conclusion.

> FN16. Brief of Appellant, Marlin Leasing Corp., Docket Entry No. 6, pp. 19-20; Reply Brief of Appellant, Marlin Leasing Corp., Docket Entry No. 11, p. 10.

**A. Whether the E & O Proceeds are Property of the Estate is Not Ripe for Determination.**

Section 541(a) of the Bankruptcy Code defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case."*Houston v. Edgeworth (In re Edgeworth),* 993 F.2d 51, 55 (5th Cir.1993) (citing 11 U.S.C. § 541(a)). This definition "is intended to be broadly construed[.]"*Id.*(citation omitted). Accordingly, nearly all courts construe "property of the estate" broadly enough to include liability insurance policies. *Homsy v. Floyd (In re Vitek),* 51 F.3d 530, 533 & n. 8 (5th Cir.1995). However, the Fifth Circuit distinguishes "titular ownership of a *policy* from total ownership of the *proceeds* of that policy [.]"*In re Vitek,* 51 F.3d at 533 (emphasis in original). Thus, although a liability insurance policy may be property of the estate, the *proceeds* of that policy are not property of the estate "when the debtor has no legally cognizable claim to the insurance proceeds[.]"*In re Edgeworth,* 993 F.2d at 56;*accord Baker Hughes Oilfield Operations. Inc. v. Official Unsecured Creditor's Committee (In re Equinox Oil Co., Inc.),* 300 F.3d 614, 618 (5th Cir.2003). A debtor has a cognizable claim to liability insurance proceeds if the debtor has a right to receive and keep the insurance proceeds or if the proceeds fail to fully satisfy all claims. *See In re Edgeworth,* 993 F.2d at 55-56.

**\*3** Before this court can reach the merits of this issue, it must be sure "that the claim in question is ripe, even if neither party raised the issue."*Urban Developers LLC,* 468 F.3d at 292. The ripeness doctrine is rooted in Article III of the Constitution, which limits the jurisdiction of federal courts to actual "cases" and "controversies." *United Transp. Union v. Foster,* 205 F.3d 851, 857 (5th Cir.2000)

(citing U.S. Const. art. III, § 2). It "prevents federal courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes."*National Advertising Co. v. City of Miami,* 402 F.3d 1335, 1339 (11th Cir.2005). To determine whether an issue is ripe, the court must examine "[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration."*Id.* (internal quotations and citations omitted).

*1. The Issues are not Fit for Judicial Decision.*
Whether the E & O policy proceeds are property of the estate is not an issue that is presently fit for review because the facts that underlie that determination are not known. Generally, an issue is not fit for decision "if further factual development is required" or " 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.' "*Monk v. Houston,* 340 F.3d 279, 282 & n. 2 (5th Cir.2003) (internal citations omitted). The issue of whether the proceeds of the E & O policy are property of the estate is not fit for judicial decision by the bankruptcy court because whether there will even be insurance proceeds for the estate to claim is contingent upon the outcome of litigation pending in state court; and because it is uncertain whether the claims against Burr Wolff's E & O policy will exceed the coverage limit.

Before the fate of the E & O policy proceeds can be properly-decided, it must first be clear that there will be proceeds. In every decision the court has found on this issue the existence of insurance proceeds was either undisputed or apparent. *See, e.g .,* *Baker Hughes Oilfield Operations, Inc. v. Official Unsecured Creditor's Committee (In re Equinox Oil Co., Inc.),* 300 F.3d 614, 617 (5th Cir.2003); *In re Vitek,* 51 F.3d at 532;*In re Edgeworth,* 993 F.2d at 54;*Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition, Inc.),* 832 F.2d 1391, 1394 (5th Cir.1987); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 837 F.2d 89, 90 (2d Cir.1988); *Tringali v. Hathaway Machinery Co., Inc.,* 796 F.2d 553 (1st

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2964835 (S.D.Tex.)
**(Cite as: 2007 WL 2964835 (S.D.Tex.))**

Cir.1986); *see also Landry v. Exxon Pipeline Co.,* 260 B.R. 769, 784, 785-86 (Bankr.M.D.La.2001) (noting that the debtor's insurer never denied the debtor coverage but instead "seem[ed] consigned to defend[ ]" the debtor); *In re Sfuzzi,* 191 B.R. 664, 668 (Bankr.N.D.Tex.1996) (granting insurers permission to disburse liability insurance proceeds to tort claimants).

**\*4** In this case, however, there are no proceeds. HCC, the insurer, has denied Burr Wolff coverage under the E & O policy.[FN17]Although Burr Wolff has filed an action for declaratory judgment to obtain a defense and coverage,[FN18] that action is still pending.[FN19]Thus, whether there will ever be any insurance proceeds is entirely contingent upon the outcome of a separate case in a separate court. *Cf. PPG Ind., Inc. v. Hartford Fire Ins. Co.,* 531 F.2d 58, 62 (2d Cir.1976) (noting that where an insurer denied its insured coverage, the insurance proceeds did not exist until a judgment was obtained against the insurer).

> FN17. MROA, Docket Entry No. 8, Document 6, pp. 45-46.
>
> FN18. Brief of Appellee Joseph M. Hill, Trustee, Docket Entry No. 10, pp. 4-5.
>
> FN19. Brief of Appellant, Marlin Leasing Corp., Docket Entry No. 6, p. 11.

In declaring that the E & O policy proceeds were property of the estate, the bankruptcy court necessarily found, or at least assumed, that the E & O policy proceeds already existed. This was error because any ruling by the bankruptcy court that the proceeds are property of the estate will be rendered moot if the state court decides against Burr Wolff in its declaratory judgment action. Consequently, the issue of whether the proceeds of the E & O policy are property of the estate is unfit for judicial resolution. *Cf. Huron County Bd. of Comm'rs v. Saunders,* 149 Ohio App.3d 67, 775 N.E.2d 892, 897-98 (Ohio Ct.App.2002) (vacating on ripeness grounds a trial court's allocation of motor vehicle

liability insurance proceeds because no one had recovered any insurance proceeds at the time of the court's decision).

Second, even if there were no dispute about whether there was coverage under the E & O policy, the bankruptcy court still could not properly decide that the proceeds were property of the estate because it is not clear whether Burr Wolff has a cognizable interest in the E & O proceeds under *In re Edgeworth.*As the *Edgeworth* court observed, the proceeds of a liability insurance policy may be property of the estate if the claims against the policy exceed the policy's limit. 993 F.2d at 56 & n. 21. In several cases whether claims against a liability insurance policy exhausted the policy's proceeds proved dispositive of the status of liability insurance proceeds as property of the estate. *See, e.g., In re Edgeworth,* 993 F.2d at 955-56;*Tringali,* 796 F.2d at 560-61;*In re Sfuzzi,* 191 B.R. at 668. However, in these cases the facts surrounding the amount of the claims against the liability insurance policy were sufficiently clear to render the case fit for resolution.

For instance, in *Tringali,* it was clear that a tort plaintiff's claims against the debtor's liability insurance policy would exceed the policy's coverage limit because the tort plaintiff had already obtained a judgment against the debtor that exceeded the limit. 796 F.2d at 556. Thus, the court concluded the proceeds were property of the estate. *Id.* at 560.In *In re Sfuzzi* the court was able to conclude that liability insurance proceeds were not property of the estate because the debtor settled the claims against it within the policy's limits. 191 B.R. at 668. Even without a judgment or settlement agreement, it may become clear that a liability insurance policy will not fully satisfy all claims when the number of claims against the policy makes it obvious that coverage will be insufficient. *See, e.g., A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 996 (4th Cir.1986) (debtor was subject to 5,000 products liability lawsuits).

**\*5** At the time of the bankruptcy court's order,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2964835 (S.D.Tex.)
**(Cite as: 2007 WL 2964835 (S.D.Tex.))**

Page 5

however, whether the claims of Burr Wolff's former clients will exceed the E & O policy's limit was not known. None of Burr Wolff's former clients had obtained a judgment against Burr Wolff. There were no settlement agreements between Burr Wolff and its former clients. All that was known was that Burr Wolff estimated its own liability as exceeding $6,000,000.[FN20] But whether that number will translate into an excess of $5,000,000 in claims covered under the E & O policy (assuming there is coverage) is entirely speculative at this point. Some of Burr Wolff's former clients may not file claims, which could reduce the total amount of claims against the policy below the limit. Moreover, Burr Wolff's former clients could later agree to settle all of their claims against Burr Wolff within the policy's limits. Given the uncertainty surrounding the extent of the claims against Burr Wolff's E & O policy and the existence of coverage under the policy, whether the E & O proceeds are property of the estate is an issue that was not fit for judicial decision at the time of the bankruptcy court's order.

> FN20. Brief of Appellee Joseph M. Hill, Trustee, Docket Entry No. 10, p. 2.

### 2. *Hardship to the Parties*

While the lack of fitness of the issues in this case is alone a sufficient basis for the court's conclusion that the issue whether the policy proceeds are property of the estate is not ripe, *see United Trasp. Union,* 205 F.3d 857-58, the court also concludes that any hardship imposed by its conclusion that the issue is not ripe would be slight. The automatic stay provided by § 362 remains in place and "will adequately protect the interests of all parties involved" by preventing Burr Wolff's former clients from "suing or recovering from the debtor's insurer."*In re Edgeworth,* 993 F.2d at 56 n. 21. Consequently, neither the Trustee nor Marlin will be exposed to hardship. Moreover, once the issue ripens into an actual case or controversy, Marlin will be free to request from the bankruptcy court whatever relief the facts and the law allow. *Cf. In re Sfuzzi,* 191 B.R. at 665, 668.

### B. Marlin's Motion for Relief of Stay

Marlin limited its appeal of the bankruptcy court's denial of its motion to the argument that the proceeds were not property of the estate. Because the court has concluded that the issue of whether the E & O policy proceeds are property of the estate is not ripe, the court has necessarily rejected Marlin's argument that the policy proceeds are not property of the estate.

### IV. *Conclusions and Order*

For the reasons explained above, the court concludes that the bankruptcy court erred when it concluded that the proceeds of the E & O policy were property of the estate because that issue was not ripe. Accordingly, the March 28, 2007, order of the bankruptcy court is **VACATED.**

S.D.Tex.,2007.
In re Burr Wolff, LP
Slip Copy, 2007 WL 2964835 (S.D.Tex.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.