```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE


IN RE:                      ) Chapter 11
AMERICAN HOME MORTGAGE      ) Case No. 07-11047(CSS)
HOLDINGS, INC., a Delaware) Jointly Administered
corporation, et al.,        )
                            )
              Debtors.      )
- - - - - - - - - - - - - - - - - -
DB STRUCTURED PRODUCTS,     ) C.A. No. 07-00773(JJF)
INC.,                       )
                            )
              Appellant,    )
                            )
v.                          )
                            )
AMERICAN HOME MORTGAGE,     )
HOLDINGS, INC., a Delaware)
corporation, et al.,        )
                            )
              Appellees.    )

                   Thursday, October 16, 2008
                        11:34 a.m.
                      Courtroom 4B



                     844 King Street
                   Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge


APPEARANCES:

         ASHBY & GEDDES
         BY:  AMANDA M. WINFREE, ESQ.

                   -and-

         BINGHAM McCUTCHEN, LLP
         BY:  STEVEN WILAMOWSKY, ESQ.

                   Counsel for the Appellant
```

1    APPEARANCES CONTINUED:

2

3              YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
               BY:   PATRICK A. JACKSON, ESQ.
4              BY:   ROBERT S. BRADY, ESQ.

5                              Counsel for the Appellee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                   THE CLERK:  All rise.

 2                   THE COURT:  Be seated, please, and

 3     good morning.

 4                   All right.  Ready to proceed?

 5                   You want to announce your

 6     appearances?

 7                   MS. WINFREE:  Good morning, Your

 8     Honor.  I'm Amanda Winfree from Ashby & Geddes on

 9     behalf of the appellant.

10                   With me in the courtroom today is

11     Steve Wilamowsky of the firm of Bingham

12     McCutchen.

13                   THE COURT:  Okay.  Thank you.

14                   MR. WILAMOWSKY:  Good morning, Your

15     Honor.

16                   THE COURT:  Good morning.

17                   MR. JACKSON:  Good morning, Your

18     Honor.  Patrick Jackson from Young, Conaway,

19     Stargatt & Taylor on behalf of the appellee,

20     American Home Mortgage and their affiliated

21     Debtors and Debtor-in-possession.

22                   And with me is Mr. Bob Brady from

23     our office.

24                   THE COURT:  Good morning.  All
```

```
 1    right.

 2                   Are you ready to begin?

 3                   MR. WILAMOWSKY:  Yes, Your Honor.

 4                   THE COURT:  I have kind of focused

 5    on the 361 question -- 363 question with regard

 6    to the bankruptcy judge's conclusions, and also

 7    subsumed into that -- you know, subsumed into

 8    that the question of the applicability of the

 9    integrated case.  So if you want to focus there,

10    it might be more helpful in the limited time we

11    have.

12                   MR. WILAMOWSKY:  Absolutely, Your

13    Honor.  I'd like to focus wherever I can be

14    helpful.

15                   So I can skip right to that

16    discussion.  That would be fine.

17                   Your Honor, with respect to 363, I

18    assume that Your Honor is referring to the

19    bankruptcy judge's conclusion or the issue as to

20    what the Bankruptcy Court concludes as to

21    whether, in fact, this is an agreement that

22    arises or an agreement that is subject, if it's

23    going to be transferred subject to the provisions

24    that permit transfer under 363 rather than under
```

```
 1    365 of the Bankruptcy Code.
 2              THE COURT:  And the redundancy that
 3    you argued of 365 -- well, tell me what your
 4    position is, because that's what I want to get
 5    clear.
 6              MR. WILAMOWSKY:  Okay.  Your Honor,
 7    we were very clear, I think from the outset, and
 8    especially once we filed the briefs, we think
 9    that whether the analysis is -- whether this is
10    an agreement under 363 or whether it's an
11    agreement under 365, we think that there is --
12    frankly, we think we win either way.
13              But once the Debtor took the
14    position that this was an agreement under 363, we
15    essentially said, Fine.  Have it your way.  We
16    basically said that in the brief.  We said, We're
17    not going to challenge that position, because we
18    think we win either way.
19              So if the Debtor wants to take the
20    position that this is an agreement under 363,
21    that's a position that we're perfectly willing to
22    adopt.
23              The Debtor has argued, and we have
24    not challenged it -- the Debtor has argued, Look,
```

1   this is an agreement where there is no

2   performance required on the side of our client,

3   the appellant.  DB is not required to do

4   anything.

5           The loans are there.  DB Structure

6   Products.  They serviced and we're required to

7   receive a fee.

8           There's no recourse to Structure

9   Products for anything.  So the Debtors' position,

10  and seemingly the position that the Bankruptcy

11  Courts adopted as well in the absence of any

12  opposition from us, was this is an agreement

13  that, if it's going to be transferred, has to be

14  transferred under Section 363 of the Bankruptcy

15  Code.

16          Your Honor, 363, there is only one

17  restriction that can be found anywhere in Section

18  363 -- or one exception.  Let's put it that way.

19          There's only one exception in

20  Section 363 that can be found anywhere that would

21  say that, notwithstanding whatever the Debtors'

22  right would be under state law, the supremacy

23  clause in the Bankruptcy Court working --

24  Bankruptcy Code working to create a different

 1    result than would prevail under state law.

 2                    And that the only such section in

 3    that regard is Section 363L of the Bankruptcy

 4    Code.  363L of the Bankruptcy Code deals with

 5    what we conclusory refer to in the bankruptcy bar

 6    as ipso facto clauses.

 7                    It's -- colloquially, it's if you

 8    have an agreement that says that it will

 9    terminate or the rights of the parties are

10    somehow -- are modified in any way, or at least

11    in any material way as a result of the financial

12    condition of the Debtor, or the insolvency of the

13    Debtor, then that provision can be overrode.

14                    That condition -- that provision can

15    be overridden, and the agreement could be sold,

16    transferred, whatever, notwithstanding that

17    provision that may be contained in the agreement.

18                    In all other respects, Section 363

19    is simply an enabling statute.  It permits the

20    trustee, the bankruptcy trustee, or in the case

21    of a Chapter 11 case, the Debtor-in-possession to

22    transfer whatever right it has with whatever

23    burdens are attended.  And those cannot -- those

24    cannot be modified in any way.

1            Your Honor, we think that it's clear

2    that this is what Integrated dealt with.  And we

3    think, in fact, that it's directly on point.

4            Integrated was a case where a

5    trustee, under state law, under applicable state

6    law would not have been able to sell the assets

7    that he was trying to sell due to state law

8    restrictions on the sale of tort claims.  And the

9    trustee tried to say, Well, that's a restriction

10   on my ability to sell under Section 363.

11           The goal is I should be able to sell

12   these assets to maximize the benefit for the

13   estate.  And Your Honor, Integrated said that --

14   the Third Circuit said in the Integrated case,

15   No, Section 363 is an enabling statute.

16           Moreover, the Third Circuit said

17   Congress knows how to create exceptions when it

18   wants to.  Look what it did, it created Section

19   363L.

20           So by saying that, the Third Circuit

21   actually recognized -- acknowledged the existence

22   of 363L.  And at the same time, said 363L is not

23   a catchall.

24           Congress knew how to create an

```
 1    exception when it wanted to do it and created

 2    Section 363L.  That completely undercuts any

 3    argument, in our view, that the Debtors would

 4    want to make to somehow broaden the scope of 363L

 5    beyond what the words would allow.

 6              So as to call anything that hinders

 7    the Debtors' ability to get the most dollars that

 8    any buyer would potentially pay for any

 9    particular bundle of rights within an agreement,

10    anything that hinders that would be considered an

11    ipso facto under 363L.

12              We think that Integrated case is

13    very clear that you can't read 363L that way.

14    And the Integrated Court has essentially said

15    that.

16              Moreover, if you look at the

17    background on 363L and on the Integrated case, as

18    we note in our briefs, there's a long history

19    that predates the Bankruptcy Code with respect to

20    this issue.  And that is -- and what the

21    Bankruptcy Code effectively did was to codify the

22    Supreme Court case of Chicago Board of Trade v.

23    Johnson.

24              In that case, the trustee, or
```

1    whoever it was in bankruptcy, wanted to sell a

2    seat that the Debtor held on the Chicago Board of

3    Trade on the Chicago Exchange.  And it was

4    believed to have substantial value, could have

5    brought in value through the estate.

6              However, there was one problem under

7    the governing agreements --

8              THE COURT:  Well, that's a 1924

9    case.  I understand it's a Supreme Court case.  I

10   understand that there was some debt payment

11   attached to the transfer.

12             MR. WILAMOWSKY:  Correct.

13             THE COURT:  You want me, in

14   reviewing this in a de novo fashion, to basically

15   say that the bankruptcy judge's conclusions about

16   363 and the application -- well, what the Debtor

17   says is, Listen, you're going to get a stream of

18   money, so what are you complaining about?  Unlike

19   when you have anti-assignment provisions,

20   typically like in a lease context.

21             MR. WILAMOWSKY:  Right.  Well, we're

22   not --

23             THE COURT:  I'm just trying to

24   understand your argument.  They're getting a

1    stream of money.  They're selling the stream of

2    service and payments.  They're selling the stream

3    of money.

4              MR. WILAMOWSKY:  Right.

5              THE COURT:  And where's your harm by

6    the way that bankruptcy judge treated the

7    agreement?

8              MR. WILAMOWSKY:  The harm is very

9    pronounced.  In fact, in current market, Your

10   Honor, the harm is that it is exceedingly

11   difficult to sell loan portfolios in last year's

12   market when this first came up, you know, when we

13   were dealing with this case.  But much, much

14   harder in this market to sell the loan portfolio.

15             And when you're trying to sell the

16   loan portfolio on a basis where you can't give

17   the party the full bundle of the rights, you

18   can't give the party the whole loans, and they're

19   still --

20             THE COURT:  Tell me how that works a

21   little more, because that's maybe the part I

22   don't get, how that works.

23             MR. WILAMOWSKY:  There is a -- there

24   the master loan, MLPSA, what we call it, was

1   entered into by other parties.  There are

2   provisions in dealing with servicing, with sale

3   of a loan, with breach of warranties, with all

4   the various things.  There's a waterfall

5   provision that tells the servicer how to apply

6   fees.

7           All of that governs the treatment of

8   these loans.  What the agreement, however, also

9   provides is that there are requirements that both

10  the seller and the servicer have obligated

11  themself to, both contracting Debtors.  Not only

12  to service the loans properly, but also to

13  maintain certain approvals to maintain certain

14  qualifications with Fannie Mae, with Freddy Mack

15  to buy back loans that were originated, that went

16  in default in the first three months.

17          All of those are encapsulated within

18  the agreement and are part of the waterfall

19  provision that is contained in the agreement

20  that, pursuant to which when the servicer gets in

21  money, here's what I have to do with it.  And all

22  that is wrapped into this agreement.

23          And what the Court has done, what

24  the Bankruptcy Court has done by effectively

1    rendering them into two parts, based solely on

2    where -- you know, where it would be beneficial

3    to the Debtors and where the liability will get

4    left behind in the estate, and where the buyer

5    will be able to get a benefit is create a

6    situation where you've got a servicer.

7              But the servicer is somehow

8    providing or applying payments in a quasi

9    contractual way, because there's nothing in the

10   agreement.  The contract has effectively been

11   reformed or something.  There's no real -- the

12   application of the servicing doesn't -- of the

13   fees that come in, not being done pursuant to any

14   writing, any agreement that anyone can point to,

15   because the waterfall provisions are being

16   violated.

17             The indemnity provision -- it's not

18   clear where -- you know, which ones "relate to

19   service" and which ones relate to sale.  It's

20   never been analyzed.  And it's never been broken

21   apart that way.

22             Presumably that would be a litigable

23   condition some day.  You know, you're going into

24   a very, very difficult market and you're saying,

```
 1    Here's this agreement, but I can't really sell
 2    you all the loans.  I'm selling you the loans
 3    that arise under this agreement, but it's not
 4    exactly this agreement.  There's other things
 5    that are being -- you know, that have been
 6    written out of this agreement by the Bankruptcy
 7    Court.  I can't tell you exactly what those are.
 8              That's not what we negotiated for,
 9    Your Honor.  We negotiated for a single agreement
10    where the seller and the servicer would be both
11    on the hook.
12              They both agreed to be on the hook
13    where there would be a specific stream of
14    payments that would be applied in a particular
15    way.  And one of those things was that if there
16    is any payments due for early payment defaults,
17    breaches of warranties, that those would be held
18    back, and the debt -- the servicer would not be
19    able to receive its servicing fee until those
20    were satisfied.
21              And that's been completely written
22    out of this agreement.  We have not gotten the
23    benefit of our bargain.
24              As we said, we have argued Fleming
```

```
 1    is not applicable here, because it's a 363 based

 2    on the Bankruptcy Court's decision that it's a

 3    363-type agreement.

 4              But to the extent that Fleming would

 5    be relevant and it's a 365 agreement, you think

 6    of it in those terms.  There's a two-prong

 7    inquiry that the Debtors concede exists under

 8    Fleming.

 9              One of them is materiality.  The

10    other one is economic significance.

11              The Debtors treat that almost as if

12    it's all in one.  It's not all in one, because

13    it's really -- if one looks at Fleming, it

14    really -- the difference between the two is that

15    one goes to what was material at the time it was

16    negotiated.  The other goes to what's

17    economically significant now.

18              Both of those tests have to be

19    passed.  In other words, it has to be -- in order

20    for the Court to ignore the provision, it's got

21    to both be a provision that wasn't material at

22    the time it was entered and not of economic

23    significance now such that the party gets the

24    benefit of the bargain.
```

```
 1                    But you can't -- what you can't do

 2        is you can't come back and say, We think the

 3        Court did and said, Well, you know, the agreement

 4        said you negotiated for Freddie Mac

 5        qualifications.  We agree that Freddie Mac

 6        qualifications was something you negotiated for

 7        at the time, but as a factual matter, we have

 8        testimony to show that even if the Debtors are

 9        not Freddie Mac qualified, they've been doing a

10        great job servicing.  And Freddie Mac has

11        effectively negotiated that for the purpose of

12        trying to keep an eye on the servicing and making

13        sure that certain standards were maintained.

14                    You've got those standards now.  So

15        in retrospect, you didn't need the Freddy Mack.

16                    That's the kind of Monday morning

17        quarterbacking that we respectfully submit

18        Fleming absolutely does not permit.  In any

19        event, we say Fleming -- it relates to a 365

20        analysis.  So it doesn't really apply here.

21                    The other point I would make, Your

22        Honor, is that under the section that the Debtors

23        focus their brief on, the question of the

24        contract visibility under New York law, and
```

1    accuse the appellants of focusing the Court on

2    the 363 issue to the -- to the detriment of, what

3    it calls, a central issue is the issue of

4    visibility.

5              It's very important to note,

6    however, that you don't get into the question of

7    the visibility under New York law unless you can

8    conclude that the 365 applies.

9              If you cannot conclude that Section

10   365 applies, there is no "cross default rule".

11   And, therefore, even if you can somehow find a

12   basis for dividing the contract under New York

13   law, it doesn't help you, because you've still

14   got -- on the servicing side, you've still got

15   the waterfall provisions that hold back certain

16   payments based on breaches of warranties.

17             You've still got the indemnification

18   provisions.  So if you don't have 365, and it's a

19   cross default rule to rely on, then if -- even if

20   you can divide the contracts under New York law,

21   but if it's a 363-type agreement, it's a futile

22   exercise, because you're still in a situation

23   where the Debtors are in -- where the servicing

24   piece that you've just -- that you've just broken

```
1    it out into is one that the buyer would have no

2    interest in.

3                So it is essential and it is a --

4    the central point as to the point that the

5    Debtors standing up here today cannot argue in

6    front of Your Honor that this is an executory

7    contract, because they spent the last number of

8    months before the Bankruptcy Court last year

9    arguing that this is not an executory contract.

10               So for that reason, we don't think

11   that the Debtors have any basis to defend this

12   appeal.

13               And then, finally, Your Honor, I

14   would note --

15               THE COURT:  So your harm -- to get

16   back to the question --

17               MR. WILAMOWSKY:  Right.

18               THE COURT: -- is the marketplace?

19               MR. WILAMOWSKY:  The harm is --

20   well, the market.  Obviously, the market is --

21   yes, the market is causing the harm.

22               The fundamental harm is that we're

23   not getting the benefit of our bargain.  I mean,

24   that's the harm.
```

```
 1              We're still sitting on these
 2   agreements.  We can't sell them.
 3              We're still holding them.  Structure
 4   Products -- and the testimony was uncontroverted
 5   on this point -- it was not in the business of
 6   holding loans.
 7              Structure Products would in this --
 8   whenever everybody was having a party with the
 9   securitizations, these would -- you know,
10   Structure Products would structure these and
11   would sell them.  It is a market now where you
12   can't really sell.
13              THE COURT:  And affected by this
14   decision and the sale order, what is the volume?
15              MR. WILAMOWSKY:  Oh, in terms of --
16   in terms of what the purchaser would be willing
17   to pay for?  The purchaser is willing to pay, I
18   believe, one -- about one and a half million
19   dollars probably at this point.  Because probably
20   worked down -- it's about one and a half million
21   dollars from what the purchaser has agreed to pay
22   in a transaction of this size of, what was it,
23   about $400 million, something like that?
24              So it was -- you know, we don't
```

 1   think that affects the legal analysis.  But for

 2   whatever your -- for whatever it's worth, it's a

 3   small percentage of the total transaction, which

 4   has already closed, has already consummated.  The

 5   sale has already occurred.

 6          And apparently the Debtors have

 7   negotiated an extension with the buyer pursuant

 8   to which the buyer, if the Debtors can get them a

 9   final order by a date certain, the buyer will be

10   obligated to purchase these agreements.

11          But Your Honor, in our view, the key

12   is 363 does not allow the Debtor to try to divide

13   the contract this way.  If it wants to assign the

14   agreement, it's got to sign it with the burden.

15   Everybody -- everyone agrees that the agreement

16   with the burden is not something the buyer is

17   interested in, and therefore, is fundamentally

18   not of value.

19          The Debtors say we want to get the

20   intrinsic value out of the agreement.  There is

21   no intrinsic value, because on a net basis,

22   there's just no balance value.

23          It's illusory to say this has got

24   intrinsic value, because I'm looking at a

1   particular right that I have under the agreement

2   without looking at all the various obligations.

3            Your Honor, to the extent that I

4   have a few more minutes, I'd rather save them for

5   brief reply.

6            THE COURT:  All right.  Thank you.

7            MR. JACKSON:  Hi, Your Honor.

8   Again, Patrick Jackson, Young, Conaway,

9   Stargatt & Taylor.

10           I can pick up on the Integrated

11  issue, but I'd actually like to walk through some

12  aspects of the MLPSA of the underlying agreement

13  here, because I'd have to disagree with some of

14  what counsel has said and how counsel has

15  described the way that the agreement works.

16           Your Honor asked what's the harm?

17  And we actually see that as the central issue

18  here.

19           The record doesn't show that there

20  is any harm resulting to Structure Products as a

21  result of the sale.  Now, the harm that they've

22  articulated -- that they articulated at the trial

23  was that their EPD and their premium recapture

24  claims would not be paid.

1          This was something that their

2    witness acknowledged on cross-examination, and we

3    note this in our papers.  That in the absence of

4    a bankruptcy, had Structure Products been

5    permitted to terminate its servicing rights, any

6    successor servicer that they would have selected

7    would not have picked up the EPD and premium

8    recapture obligations.

9          So whether they're selling under

10   bankruptcy or whether we're allowing them to

11   allow their rights outside of bankruptcy, there's

12   no difference as far as they're concerned.  They

13   have a claim against the bankruptcy estate for

14   the EPD and premium recapture obligations.

15          And that's the same under either

16   scenario.  So the harm -- that's the harm that

17   they explored at the trial.

18          Now, the harm that you've just heard

19   from counsel --

20          THE COURT:  And that will be

21   available to them?

22          MR. JACKSON:  A claim we -- actually

23   the plan of liquidation in its current form

24   actually has a protocol for dealing with EPD-type

1    claims.  And then premium recapture claims are

2    just assertable as a claim as any other unsecured

3    claim against the estate.

4              And that's important to note that

5    the Bankruptcy Court was not extinguishing the

6    right to payment.  It was just directing the

7    right to payment to rest against the Debtors.

8              I understand, for practical

9    purposes, because claims against a liquidating

10   estate is not -- you know, not worth what the

11   dollar for dollar that they would want.  That's

12   understandable.

13             But I just wanted to emphasize that

14   there was no indication on the record below, and

15   actually they admitted otherwise, that there's no

16   way that they're going to get these paid in full,

17   whether they're in bankruptcy or not.

18             So that can't be the element of the

19   harm that was caused to them by the result of the

20   sale.

21             Now, what you heard from counsel was

22   that the harm is that it's difficult to sell a

23   loan portfolio when you can't sell the whole

24   loan.  When you have to sell the loan, but the

1      servicing rights reside elsewhere.

2                      And you know, hearing that, I'm

3      really glad that we -- that we counter designated

4      for the record on appeal the record of the

5      proceedings before the Bankruptcy Court very

6      early on in the case where Structure Products

7      moved for relief from the automatic stay to

8      permit them to terminate the servicing rights.

9                      Now, at the time of that, they moved

10     under a theory that the MLPSA was an executory

11     contract.  They sought relief from the automatic

12     stay to terminate the contract on the basis,

13     among other bases, that because there was the --

14     at the time, there was the Fannie Mae -- lack of

15     Fannie Mae qualifications.

16                     They asserted that this was an

17     incurable default that would preclude assumption

18     and assignment of the MLPSA in any sale.

19                     And they also provided that the lack

20     of Fannie Mae qualifications, Fannie Mae at the

21     time, not Freddie Mac, would render it impossible

22     for the Debtors to provide adequate assurance of

23     future performance.

24                     Now, cure and adequate assurance are

1   both uniquely 365 concepts under the Bankruptcy

2   Code.  So I'd note from a very early position,

3   they were asserting as a basis for getting the

4   loans back that it would be impossible for the

5   Debtors to satisfy a 365 standard.  And we

6   pointed this out in our papers.

7            Now, at this hearing, the Bankruptcy

8   Court on the hearing on the stay relief motion,

9   the Bankruptcy Court, once the Debtors had

10  provided evidence that the Fannie Mae situation

11  had, in fact, been resolved and that Fannie Mae

12  qualifications had been temporarily restored, the

13  Court asked of Structure Products, what's the

14  harm then to denying the stay relief motion and

15  letting the Debtors see if they can sell this

16  thing?

17           And at the time, the argument was,

18  Well, we can't sell these loans because the

19  servicing is tied up.  Now, on the record of the

20  stay relief hearing, the Debtors -- you'll see

21  there was testimony of Mr. Principato from

22  Structure Products who also testified at the sale

23  hearing.  He said, "I can't sell these loans and

24  I can't sell them because of the Fannie Mae

1    issue."

2            The Debtors put on evidence,

3    testimony of Simon Sakamoto, an employee of the

4    Debtors, who testified that the nature of the

5    Structure Products' loan portfolio were

6    international taxpayer identification number

7    loans.  These are loans to undocumented

8    immigrants.

9            And that ITIN loans, as they're

10    known, are not agency eligible.  They may not be

11    purchased by Fannie or Freddie, which makes sense

12    in light of their federal government charters.

13    And, furthermore, to the Debtors' witness'

14    knowledge, it was not possible to securitize ITIN

15    loans in a private-label securitization

16    transaction, because one of the predicates to a

17    private label is securitization.

18            You have to get a bond rating

19    agency, such as Moody's or S & P to rate the pool

20    of loans before you can dump it into the

21    securitization.  And the Debtors had actually

22    tried, and Mr. Sakamoto testified that the

23    Debtors had, in years past, attempted to get

24    Moody's to rate ITIN loans.  And the results

```
 1    hadn't been fruitful.

 2              So the testimony of the Debtors'

 3    witness was, Well, if you can't sell these loans

 4    or securitize these loans, it's not because of

 5    the lack of Fannie qualifications.  It's because

 6    the nature of the loans.

 7              They're ITIN loans.  These are not

 8    susceptible of securitization.

 9              And there was no evidence presented

10    to rebut this.  And Judge Sontchi denied the stay

11    relief motion without prejudice for their ability

12    to bring it back at a later time.

13              But I think it's really instructive

14    here to see that, you know, we're going over the

15    same ground that we've tread before.  And as far

16    as the sale hearing goes, there's no evidence on

17    the record of the sale hearing indicating that

18    there is any impairment of their ability to

19    alienate this mortgage loan pool.

20              Now, to get to the MLPSA on this

21    point, the actual contract, I note that the MLPSA

22    itself contemplates that Structure Products would

23    sell the loans on a whole-loan basis.  I don't

24    have the agreement in front of me right now, but
```

1    it was -- this is Record Item 37.  And it's Pages

2    40 to 41, Section 1269.

3                MLPSA talks about the various ways

4    in which the parties acknowledge that the loans

5    that are being serviced pursuant to this

6    agreement may be placed into a securitization.

7    They may be sold on a whole-loan basis, which

8    would terminate the servicing binary of the whole

9    loan transaction.

10               And Section 15 of the MLPSA, which

11   is Page 59 of the agreement, which by nature

12   actually is a termination provision.  And it

13   expressly permits -- as is done in these

14   transactions, it expressly permits Structure

15   Products to terminate the Debtors' servicing

16   right with or without cause.

17               The only catch is that if Structure

18   Products terminates its servicing right without

19   cause, they have to pay this servicer their

20   market value of the servicing right.  So

21   ordinarily how this would work is if Structure

22   Products lines up a whole-loan trade and it

23   wouldn't move the loans along with the servicing

24   right, that's fine.  They will just take some of

1   those sale proceeds.  They'll pay the service --

2   the value of the servicing strip, and everything

3   will be fine.

4                Nothing under the MLPSA precludes

5   them from selling and terminating without cause

6   and paying the fair market value of the servicing

7   right.  And nothing in the sale order -- and I

8   mean, I'm willing to represent on the record

9   here, nothing in the sale order precludes

10  operation of this termination provision.

11               This is not one of the things that

12  the Bankruptcy Court excised from the contract.

13  And this is something that they've been able

14  to -- they still are able to exercise this right

15  vis-a-vis the purchaser.

16               So the idea that they're suffering

17  from harm as a result of the inability to

18  alienate the loans, it's just not supported on

19  the record, either the factual record or the

20  actual agreement itself.

21               Now, to go to -- pardon me, Your

22  Honor.

23               I guess I can go to the Integrated

24  Holdings, Your Honor.  Now, we -- in our papers,

1    we raised what we consider a threshold issue of

2    before the Court -- before this Court can reach

3    the issue of whether the Bankruptcy Court's

4    misapplication of the Integrated precedent or

5    misapplication of 363L to invalidate the

6    anti-assignment provision, before the Court can

7    get there, the Court has to conclude that the

8    appellant can even raise this issue.

9              I think it's interesting to note

10   that in counsel's argument, he said that the

11   Debtors today are precluded from arguing that the

12   MLPSA is executory and subject to 365, because

13   we've spent the last year arguing that it wasn't.

14   And I mean, that's -- to flip that around, that's

15   precisely the point that we've made in our

16   answering brief is that the appellant is

17   estopped, is judicially estopped from now saying

18   oh, it's non-executory, because it's

19   non-executory.

20             The only way the Bankruptcy Court

21   could have authorized the sale is under 363.  And

22   because there was a 363 error of law, you should,

23   therefore, reverse the sale order.

24             Now, we pointed out in our papers

1    that in light of the fact that the Court did not

2    decide whether the agreement was executory or

3    not, because presumably the Court thought this

4    was a live issue between the parties at the time,

5    that it took the decision under advisement.

6    Because the Court didn't decide that.

7              In order to conclude that an error

8    under 363, whether as a result of the Integrated

9    precedent or not, is grounds to reverse the sale

10   order, the Court would either have to find that

11   the MLPSA is not non-executory or remand for the

12   Bankruptcy Court to figure that out.

13             And in the same way as counsel

14   suggests that the Debtors would be precluded from

15   arguing that it's executory at this point, they

16   are precluded -- we -- our position is they're

17   precluded from arguing that it's not executory.

18             I mean, we had -- as I mentioned

19   just a moment ago, we had an evidentiary hearing

20   very early in the case on stay relief.  The

21   theory advanced at the stay relief hearing was it

22   would be futile to allow the Debtors to continue

23   to exercise these servicing rights, because

24   there's no way that they could sell them because

```
 1    they cannot meet the standards of 365.

 2                This position was advanced and we go

 3    through this history, the history of the

 4    development of the appellant's position below

 5    pretty exhaustively in our answering brief.

 6                This position was advanced and

 7    readvanced and readvanced.  There were further

 8    defects in the proposed sale of the servicing

 9    agreement based on the various requirements of

10    365.

11                Cure of prior defaults required

12    under 365, not under 363.  Adequate assurance of

13    future performance, again required under 365, not

14    under 363.

15                And it was really only when the

16    Debtors came out with their brief and in support

17    of the sale, which I note was drafted in response

18    to in excess of 30 objections, and addressed a

19    pool of servicing agreements that covered 180

20    agreements or so.

21                It was only in response to the

22    Debtors who then advanced a differential theory

23    under both -- that theory under both that DB

24    began to think, Oh, let's address the 363 issue
```

1    as well.

2                     And I understand that they needed to

3    do that.  But the way that they did it was not to

4    say, you know what, Debtors, you're right.  We've

5    been wrong all along.  We agree with you.  363

6    applies.  Now, let's talk about Integrated.

7                     They didn't say that in their

8    initial -- in their reply brief.  They said,

9    Well, we don't think that's a very good idea that

10   this is -- that this is governed by 363.  We're

11   going to still advance some of our 365 arguments.

12   But to the extent, you know, we lose on this

13   issue, here's some 363 arguments.

14                    Integrated wasn't even mentioned in

15   that brief.  Integrated didn't even come up in

16   oral argument.  That's fine.

17                    I understand that adequately

18   preserves the Integrated decision for appeal.

19   But it's interesting to note that it didn't

20   really become the crown jewel of the appellant's

21   legal position until after the sale order was

22   entered, and presumably after some additional

23   research was done.

24                    And then they said, ah-ha, this is

```
 1   what we should have been arguing all along.  So
 2   now let's say --
 3              THE COURT:  That's kind of like the
 4   pattern in bankruptcy.  You have all the
 5   presentations.  Judge Sontchi's analysis of the
 6   separability of the agreements and permitting the
 7   sale.
 8              I don't have that familiarity with
 9   his record.  Did he ever address this issue?
10              MR. JACKSON:  The Integrated
11   decision?
12              THE COURT:  Yeah.
13              MR. JACKSON:  Not at the sale
14   hearing.  And actually where this all comes from
15   is if you read his decision specifically on the
16   DB agreement, which was reserved for the very end
17   of his bench ruling, his very long bench ruling,
18   and he addressed the DB structure, the UBS and
19   Morgan Stanley agreements together, presumably
20   because each of them had disagreed with the
21   Debtors' non-executory theory.
22              He actually did all of his analysis.
23   And as they correctly point out in their papers,
24   all of his analysis centered around the Shaw
```

1    Group case, the cross default rule.  I think

2    there's mention of Fleming.

3              These were all 365 precedents.  Now,

4    we, you know, don't believe they're necessarily

5    limited to the 365 context, but if you read his

6    decision, it actually reads as if he's responding

7    to all of the 365-based arguments that all of

8    those objecting parties had raised in their

9    papers up until that point.

10              And it was only in one sentence of

11   his ruling where he says, Therefore, I can

12   conclude that the indemnity waterfall and

13   termination provisions of the MLPSA's constitute

14   the ipso facto assignments, which are

15   unenforceable under 365F and 363L.  And

16   alternatively, 363L.

17              He didn't understand the holding,

18   though.  Now, it had come up in oral argument

19   earlier that counsel had raised the Integrated

20   decision.  And we had responded that to the

21   extent the termination provision and the cross

22   indemnity provision, to the extent that all of

23   these things -- the purpose of these provisions

24   was to allow Structure Products to hedge against

1    the financial ruin of the Debtors, that these

2    could be constituted ipso -- these could

3    constitute ipso facto provisions subject to 363L.

4              And actually in this connection,

5    Your Honor, I just wanted to highlight,

6    Mr. Principato from Structure Products testified

7    that the purpose of these, the indemnity default

8    waterfall provision, this was based on -- his

9    testimony was -- that the failure of the seller

10   or the servicer to make an EPD or recapture claim

11   would be an indicator that the Debtors' business

12   enterprise was in financial distress.

13             So it would make sense that they

14   would want the ability to terminate servicing.

15   And that's really what we were basing that

16   argument on below.

17             The judge didn't really address it

18   in his opinion.  He just said in his ultimate

19   ruling, alternatively 363L invalidates these

20   provisions.  But all of his analysis was based --

21   tied very closely to the Shaw Group opinion,

22   which was actually decided under 363 and 365.

23             The recapture claim, which I can

24   talk about for a moment, if you'd like, but it

1    was focused very closely on the 365 half.  So, if

2    anything, it looks as if what the judge was doing

3    was being responsive to what the objectors had

4    been asserting, that there were these elements of

5    365 that could not be satisfied, and therefore,

6    he precluded the sale.

7              And then, you know, kind of as a

8    last thought, he threw in a knot to the Debtors'

9    alternative theory.  And he figured I've made

10   everybody happy, so I don't need to decide the

11   underlying issue if I think the result would be

12   the same both ways.  So I won't.

13             Now, after this, I think that's when

14   the appellants really reconsidered the strategy

15   and said, ah-ha, you know, there's not a whole

16   lot of case law on 363L, and you know, it's

17   counterintuitive.  And we can make a lot out of

18   this, so let's -- you know, I think it's a bit

19   revisionous to say, Let's say that we've conceded

20   the point that it's not executory.  Let's switch

21   horses, and let's go that route on appeal.

22             I think that's what they've done.

23   And I -- the reason that I think that's

24   problematic is, like I said, in order to conclude

1    that the sale order would be reversed as an error

2    under 363, the Court would have to find that it's

3    non-executory.  But in order to do that, this

4    Court would either have to find it or would have

5    to remand it to Bankruptcy Court to find it.

6              And that would put you in a really

7    awkward position, because it would put them in

8    the position of arguing exactly the opposite of

9    what they had been advancing all the way up until

10   the last day of the sale hearing.  And even then,

11   it wasn't as if they had fully adopted the

12   position, because they were still advancing their

13   alternative theories.

14             And I think that's -- I really think

15   that's an inappropriate place to use the doctrine

16   of judicial estoppel just to say, Look, you know,

17   you asked the Bankruptcy Court for a 365 ruling.

18   You got it.

19             It was perfectly ripe for appeal.  I

20   will acknowledge that.

21             I mean, it was a matter of first

22   impression, whether a servicing agreement could

23   be severed from an MLPSA.  It's not something

24   that there's conclusive, you know, guidance from

1   the Third Circuit on.  It's something the

2   Bankruptcy Court himself noted was a close call.

3                    Why would you not appeal the 365

4   ruling that you asked for?

5                    THE COURT:  A lot of the Second

6   Circuit law on whether service agreements are

7   discernable, there's Judge Chanci's subject

8   appeal in the Calion decision -- I think in this

9   circuit, it's unresolved.  And as an appellate

10  court, which is how we sit now in the Third

11  Circuit, will sit -- there's some predicate

12  questions that probably would require remand

13  where, I think in some of the bankruptcies being

14  dealt with in the Second Circuit -- I don't know.

15                   But --

16                   MR. JACKSON:  Right.

17                   THE COURT:  What's the status of the

18  estate today?

19                   MR. JACKSON:  In terms of

20  progression towards a plan and such?

21                   THE COURT:  Yeah.

22                   MR. JACKSON:  The estate, the

23  Debtors have filed a plan back in mid-August.

24  They've amended the plan a couple of times.

 1           And most recently there was a motion

 2  to appoint an Official Committee of Borrowers,

 3  which the Bankruptcy Court granted.  We had

 4  originally been on track for confirmation hearing

 5  in about mid-November, but in light of the

 6  Court's decision to appoint a Committee of

 7  Borrowers to consult in connection with

 8  negotiation of the plan, it's likely that

 9  confirmation will be deferred until December or

10  January.  But there's a plan on file.  Disclosure

11  statement on file.

12           It's a liquidating plan.  None of

13  the Debtors are going to be reorganizing.  It's a

14  very slim recovery base.  On our estimate now,

15  anywhere from .1 cent to six cents, depending on

16  which estate the claim is against.

17           So that's the general status of the

18  case.

19           THE COURT:  And if there is reversal

20  of this decision with regard to sale of the

21  servicing arm, there's some diminishing scale

22  value going on?

23           MR. JACKSON:  It would be -- it

24  would not threaten the sale as a whole.  It would

1    just be this piece, this particular subgroup of

2    loans and the servicing right related thereto.

3              So, as counsel indicated, it would

4    be -- it would represent approximately $1.5

5    million of additional value that would come into

6    the estate if a final order were entered.  And if

7    the sale order were reversed, then the purchaser

8    would be able to exercise rights under the Asset

9    Purchase Agreement, not to -- you know, to walk

10   away and actually would be precluded, as a matter

11   of law, of trying to buy them at that point.

12             And the servicing right, and the

13   MLPSA's, and the whole kit and caboodle, if you

14   will, would revest in the Debtors.  And then we

15   would be -- I'm not sure where we would be.

16             The Debtors would be holding --

17   would still hold the servicing right and

18   presumably could seek to sell them as part of

19   the -- along with the entire MLPSA.  That

20   wouldn't be likely based on the magnitude of the

21   claims that they're asserting.

22             So I would think as, for practical

23   purposes, it would just be -- you know, the

24   Debtors' estate would be out about $1.5 billion

```
 1    dollars that would have, otherwise, gone to
 2    satisfy their pre-prepetition secured creditors.
 3               Now, you know, there's -- certainly
 4    there's no mootness argument to make in a live
 5    issue.  It's not as if this appeal is going to
 6    alter the state of the case is what I'm getting
 7    at.
 8               But I think I agree with you that a
 9    remand would be appropriate on the issue of
10    executory versus non-executory.  And I guess the
11    point I'm making is that --
12               THE COURT:  Well, if you thought you
13    had to get to that and you find another ground to
14    affirm --
15               MR. JACKSON:  Right.  Right.  And
16    actually speaking of --
17               THE COURT:  And maybe, you know, if
18    it got to the Third Circuit, they may not see the
19    need to remand.  They may feel that under their
20    appellate authority --
21               MR. JACKSON:  Correct.  As Your
22    Honor could do as well, based on -- I mean, I
23    think the record is plenty on a matter of points
24    if some of the nuances of the arguments that have
```

```
1    been raised on appeal weren't necessarily dealt

2    with below and the court's ruling -- the Court's

3    kind of limited ruling.

4             But I know I've gone on for some

5    time, Your Honor.  I can address the Integrated

6    decision if you'd like me to.  But other than

7    that, I don't want to take up too much time.

8             THE COURT:  No.  I think we're good.

9             Let's have a rebuttal.  And I think

10   we have a better understanding.

11            MR. WILAMOWSKY:  Terrific.

12            THE COURT:  Thank you.

13            MR. WILAMOWSKY:  Thank you, Your

14   Honor.  I'll try to keep it under five minutes.

15            First of all, I think that

16   Mr. Jackson did an excellent job in terms of

17   really articulating, better than I could have

18   thought of without him, my client's harm.

19   Because what he said, which was -- I like the way

20   he said it, is our client is in a position -- my

21   client is in a position to terminate the

22   servicing agreement if it wants, pursuant to the

23   -- without cause, pursuant to those provisions of

24   the agreement that allow you to terminate without
```

1   cause and make certain payments in order to

2   effect that termination without cause.

3              So really a good way of describing

4   the harm here is that there is cause.  So, what's

5   the Debtors' harm?  That we have -- they've got

6   grounds to terminate the servicing agreement for

7   cause.  And the Debtors are trying to force us

8   into it for no cause provisions, which has a

9   significant cost attended to that.

10             So, I mean, you could describe it --

11  the reason I described it as the market cost the

12  way I did is because, yes, it's true that the

13  real cost is the $18 million that we are

14  asserting in DB's claim that we wouldn't get.

15  That's particularly the cost as sort of a Chicago

16  Board of Trade Creditors case.

17             Well, what is the harm to the other

18  creditors if the seat goes to somebody else?

19  What do they care if the seat goes to somebody

20  else?

21             Well, they care because they've got

22  a contractual right to money that they're now

23  going to get a penny on the dollar, whatever I'm

24  going to get on the case, too.  A Penny on the

1    dollar.  They have got a right to be paid if the

2    seat is going to be taken.

3              It's not the right that's the harm,

4    per se.  It's the ignoring of the rights that are

5    associated with that agreement.

6              So, yes, we can terminate without

7    cause, but there is cause.  And, therefore, you

8    know, that's a harm that we shouldn't have to

9    sustain.

10             As a practical matter -- like I

11   said, as a practical matter, it's the market

12   cost.  And the reason I said it that way is

13   because, as a practical matter, we're not going

14   to get $18 million if Your Honor reverses Judge

15   Sontchi's ruling, because they're going to

16   probably go ahead and reject -- it's almost

17   certain that they're going to reject the

18   agreement if they're faced with the choice of

19   assuming it in toto or rejecting it in toto.

20             Therefore, if they reject, we'll

21   have effectively -- what we'll have is our loan

22   back.  So the practical and immediate harm is the

23   fact that we don't have our loans back.  And if

24   Your Honor reverses, we would get our loans back.

1            But, theoretically, it's the $18

2   million claim that we're not getting paid in the

3   same way as the Chicago Board of Trade Creditors

4   were not getting paid in that case.

5            I would also note just to correct a

6   few matters of the record is that on the ITIN,

7   what Mr. Jackson refers to as the ITIN loans

8   to -- again, that is to us Monday morning

9   quarterbacking, because ITIN loans were not the

10  only loans that were presumed were going to be

11  purchased under this agreement.

12           And, in fact, were not.  They were

13  most of the loans, but there was a minority of

14  the loans that were not these ITIN loans.

15           And the record reflects that in the

16  proceedings below.  But Mr. Jackson is saying,

17  well, since most of the ones that ended up

18  getting purchased were ITIN loans any way and may

19  have had a hard time being part of

20  securitization, you really didn't need Freddie

21  Mac too much.

22           We think that Fleming precluded

23  that, because Fleming looks at materiality.  The

24  benefit of the bargain and the -- what did the

1    parties bargain for in the first instance, not in

2    hindsight.  It was a material term in the first

3    instance.

4                Also, with respect to materiality,

5    it's the same point under New York law.  And in

6    the Debtors' brief, the Debtor said, Well,

7    Freddie Mac was not material because they were

8    doing a good job servicing.  Well, New York law

9    defines materiality as a material time term as

10   the time that the party bargained for it such

11   that they wouldn't have entered into that

12   agreement without that term in the agreement.

13               Again, an ex ante standard, not a

14   post facto standard that the Debtors are trying

15   to impose.

16               And, again -- then, finally, Your

17   Honor, with respect to the estoppel arguments, I

18   mean, we've addressed it amply, I think, in our

19   reply briefs.  I am not going to take up too much

20   more time except to point out, obviously, first,

21   the first rule of judicial estoppel is, well, we

22   lost.  So even if we were coming in and we had

23   raised the lift stay, and even if we had come and

24   made a lift stay motion, and if we had won on the

1    basis of 365, which by the way, we could have won

2    on either basis, because the Debtor has -- the

3    Debtors allege in the papers, et cetera,

4    commensurate 363 or 365.

5              So if there was an incurable

6    default, that could have been caused by lifting a

7    stay, whether it's 365 or 363.  But let's even

8    assume the Debtors are right.  Let's assume that

9    we are right that 365 would have been our basis

10   for getting stay relief.

11             We didn't get stay relief, so we got

12   no benefit from taking a position.  And now we're

13   trying to take a contraposition.  We lost.

14             Well, parties frequently take

15   positions, lose.  The Court finds something else.

16   And then within the Court's finding, the parties

17   have to work with -- the party has to work within

18   that framework of what the Court has found, as a

19   matter of fact, to try to address the arguments

20   in that framework.

21             So there is no judicial estoppel

22   where we lost.  And if Your Honor has any

23   questions, I'd be happy to answer them.

24             But, otherwise, I would commend Your

```
 1    Honor's attention to our -- particularly to our

 2    reply brief.  And thank you for the honor of

 3    appearing before you today.

 4              THE COURT:  Thank you.

 5              I am going to ask you each a

 6    question, same question and then you just give me

 7    your answer.

 8              In my view, and I've read the papers

 9    and I think I have a little more clarification on

10    some things that I didn't fully understand from

11    the papers.

12              I think there's two options for me.

13              The first option is to remand the

14    case for a specific period of time to Judge

15    Sontchi to allow him to address what may be some

16    issues that he didn't get a chance to address

17    fully.  But I think he has a record to address,

18    and then bring the case back here and make a

19    decision on essentially what would be his

20    enhanced rulings, which would give me a better

21    foundation, and would then move the case to the

22    Court of Appeals on that enhanced set of rulings

23    and review by me.

24              The second option is to affirm, and
```

```
 1    I think bankruptcy lawyers who have been before

 2    me before have heard this, affirm, but without --

 3    in other words, I think this is a close case, but

 4    I could affirm the case without further

 5    cluttering the record by adding my two cents

 6    where I might refine some issues that have been

 7    raised.

 8              But, in essence, it would be an

 9    affirmance and just send it on to the Court of

10    Appeals where they have plenary review of a full

11    record and not cause you to spend anymore time in

12    the District Court.

13              Because, you know, in the Third

14    Circuit, they will take it up fully in their

15    perspective of what the case is.  And they'll

16    even say in opinions, you know, in the first

17    instance, we look to the Bankruptcy Court

18    decisions.  I even put that in my decisions of

19    appeal that go there.

20              So let me ask the appellant:  Do you

21    want to spend some time back with Judge Sontchi

22    or do you want to lose here and move on without

23    me cluttering up what I think is a pretty cogent

24    position you've established in front of me, that
```

1    you could then establish in front of the Third

2    Circuit and I won't mess it up for you?

3              MR. WILAMOWSKY:  I appreciate very

4    much -- I appreciate your forthrightness about

5    your view in terms -- and I actually read Your

6    Honor's opinion in --  is it IT Group -- where

7    Your Honor has the footnote about Your Honor's

8    view of the appellate position of this Court

9    relative to the Third Circuit.

10             Not having -- that having been said,

11   given the choice that Your Honor's presented, I

12   think that we would go for -- we would recommend

13   the remand.  And the reason we would -- I would

14   do that is, first of all, I really would like to

15   pin down -- frankly, I don't want to say

16   disrespectfully, but I'd like to pin down Judge

17   Sontchi on the question of whether the ruling on

18   the alternative presupposes that there are -- you

19   can come to the same conclusion either way.

20             We don't think that works here.  So

21   you've got to rule one way or the other, we

22   think.  Is it a 363 or 365?

23             We'd like Judge Sontchi to decide

24   that, or maybe he'll come to the same conclusion

52

```
1    that I don't have to decide it, because you get
2    to the same result either way.  But at least it
3    will give him a chance to articulate.
4               Second of all, we think that Judge
5    Sontchi will be very respectful, as he has in the
6    past, of decisions at the Bankruptcy Court level,
7    so that there is a uniformity of jurisprudence at
8    the Bankruptcy Court in Delaware.
9               And we think that Judge Walrath,
10   Chief Judge Walrath, the chief bankruptcy judge
11   in In Re:  Buffets Holdings, which is a very
12   recent decision.  It was issued in May and is
13   very relevant, we thought, in terms of
14   expectation of the parties separability.  And we
15   thought it was an extremely useful case.
16              And I think I'd like to have Judge
17   Sontchi have the benefit of reviewing his
18   colleague's case in determining what to do with
19   this -- with this matter.  So that would be our
20   position, Your Honor.
21              THE COURT:  All right.  Thank you.
22              Mr. Jackson.
23              MR. JACKSON:  I'm inclined to agree,
24   Your Honor, on a remand.  I think it would be
```

1    beneficial for all involved to allow Judge

2    Sontchi to explain the basis for his ruling.

3              My only concern, however, is that in

4    light of our judicial estoppel argument, I'd want

5    to be sure that Judge Sontchi is able to address

6    it.  We have a really odd situation right now in

7    that if we are right, that it is problematic now,

8    that the result is known of the result of the

9    ruling below.

10              For the appellants to choose now

11   which horse they're going to take up to the Third

12   Circuit, whether it's 365 or 363, I wouldn't want

13   us to lose the ability to argue that.

14              And then I guess -- I don't know.  I

15   haven't looked into it -- whether that is a

16   matter that Judge Sontchi would be able to

17   address on remand in deciding whether, for

18   example, they had waived an issue on appeal.  I

19   don't know that the Bankruptcy Court can decide

20   that.

21              THE COURT:  Well, I think he could

22   say if, you know -- the jurisprudence of

23   procedure is that he could say that I don't think

24   that was before me properly, --

54

```
 1                    MR. JACKSON:  Right.
 2                    THE COURT:  -- and I'm going to
 3       stand on my ruling.  And you could certainly
 4       argue that and he could adopt that.  I believe
 5       that that wouldn't prevent the Third Circuit.
 6                    MR. JACKSON:  From considering the
 7       option?
 8                    THE COURT:  Right.
 9                    MR. JACKSON:  Okay.  That makes
10       sense.
11                    THE COURT:  So that's why I'm
12       offering both sides here the opportunity to go
13       back in front of him.  In fairness, it's a very
14       complex case --
15                    MR. JACKSON:  Agreed, Your Honor.
16                    THE COURT:  -- with some complex
17       issues.  And to go back before him, so he can
18       feel comfortable that he gave his best judgment,
19       which I'm not sure he got a chance to do.
20                    And I don't think you're really
21       affected in judicial estoppel argument, because I
22       think, you know, my reading of their cases are
23       when they have the view that they ought to, I
24       mean, they'll make findings.
```

```
 1                    MR. JACKSON:  Right.

 2                    THE COURT:  So I don't know if

 3      you're really harmed in that regard.  But -- but

 4      I would certainly leave it to Judge Sontchi to

 5      have the option to say -- the option to say, I

 6      did my work, and thank you for the opportunity.

 7      And back to you, Farnan.

 8                    MR. JACKSON:  Yeah.  Okay.

 9                    With that clarification, I just

10      wanted to make sure that we didn't lose an

11      opportunity on an argument that we had advanced

12      on which actually is not really fully briefed.

13                    I point out this, you know, for

14      example, the requirement that there be reliance

15      or that the party below win, that's an open issue

16      under the case law and we haven't briefed that,

17      for example.

18                    THE COURT:  I think it's a close

19      case for a lot of reasons, procedurally and

20      substantively, and I think I'm in between Judge

21      Sontchi and the Third Circuit.  And I think that

22      I could reach out and give my views, but I don't

23      think they're of much value, because I think it's

24      really here and there.
```

```
1              So I'm willing to pass the case or

2     I'm willing to send it back, and then give you

3     both a chance and Judge Sontchi a fair chance to

4     address it.

5              So I think you're a remand person,

6     too.

7              MR. JACKSON:  Yeah.  I think I'm a

8     remand person.  Just raising further for the

9     record --

10             THE COURT:  And I think it saves you

11    time and money --

12             MR. JACKSON:  Right.

13             THE COURT:  -- which is -- you know,

14    we used to do -- you're all so young.  You

15    probably weren't around in those days.  Only

16    Mr. Brady was.

17             Only kidding.

18             MR. WILAMOWSKY:  I was around.  I

19    was before Your Honor in the Planet Hollywood

20    case.

21             THE COURT:  I'm trying to be

22    respectful.  And, you know, we were more

23    intimately involved, and I did learn a lot about

24    bankruptcy and about the procedures.
```

```
 1              And, you know, it's just my judgment
 2    in this case, I've been as candid as I think I'm
 3    allowed to be of where your best shot is.  And I
 4    think efficiency is always important in
 5    bankruptcy, both of clients' funds, lawyers'
 6    time, and also trying to get as best an answer.
 7              Because I think, like even if the
 8    patents -- there's never sometimes a right
 9    answer, but you know, there is a better answer.
10              MR. JACKSON:  All right.  So just to
11    clarify, Your Honor, what you're proposing is an
12    order remanding for clarification for the basis
13    of the decision, and then it will come back to
14    you?
15              THE COURT:  Here's how I would do
16    it.  I would today enter an order saying this
17    matter -- after oral argument, this matter is
18    remanded back to the Bankruptcy Court for
19    consideration on the issues raised on appeal.
20              MR. WILAMOWSKY:  Raised on appeal.
21              THE COURT:  And I think that gives
22    you both a real broad opportunity to go back in
23    front of Judge Sontchi.  I think there will be
24    some further briefing.
```

1           For instance, on a couple of issues

2     that I picked up on your papers that both sides

3     would probably want to brief, he'll get a chance

4     to answer.  And I think, you know, he's going to

5     be interested in the issues, because I think

6     they're significant.

7           And then, you know, maybe he'll have

8     the last word or maybe it will come back through.

9     If it comes back through, it will still be my

10    appeal, but at that point you've got a very good

11    likelihood of me passing you through, unless I

12    think he's just, which I don't think will happen

13    unless, you know, he just missed something

14    altogether that somebody can clearly point out.

15          And then I think you've been

16    efficient for your clients, both the estate and

17    your client, and then you're in the Third

18    Circuit.

19          MR. JACKSON:  Okay.  Understood,

20    Your Honor.

21          THE COURT:  Is that --

22          MR. WILAMOWSKY:  That's fine.

23          THE COURT:  Is there anything I

24    could add to all that?

```
 1                    MR. WILAMOWSKY:  No, that's fine,
 2     Your Honor.  I mean, I'm obviously not getting a
 3     reversal today, so that sounds like a fair --
 4     short of that, that's -- you know, that's fair.
 5     That's certainly fair.
 6                    THE COURT:  Okay.  So --
 7                    MR. JACKSON:  And just one other
 8     clarification, so we don't have to ask you about
 9     it later is I presume if Judge Sontchi
10     reconsiders the issue, then if it comes back --
11     if and when it comes back to Your Honor, the
12     bankruptcy -- I assume the Bankruptcy Court would
13     decide what manner and level of briefing there
14     would be before it came back up to you, because
15     this isn't a today issue that we would have to
16     hammer this out.
17                    THE COURT:  Right.  It's an issue
18     for the Bankruptcy Court.  And that will be in
19     the transcript so that's clear.
20                    MR. WILAMOWSKY:  We'll order the
21     transcript.
22                    THE COURT:  Exactly.  So I agree
23     with you.  I'm going to enter a very straight
24     forward one-page order that basically says it's
```

```
 1    being sent back for remand on consideration

 2    issues raised on appeal.

 3               And, yeah, and then if there is an

 4    appeal taken from any reconsideration or action

 5    Judge Sontchi takes on the appeal, it should be

 6    docketed in this Court as a case to be assigned

 7    to me.

 8               Since I'm -- and then you should get

 9    in touch with chambers right away, so we can move

10    you.  I'll take a quick look and then you don't

11    have to go through mediation or anything.

12               We'll move you quickly.

13               MR. WILAMOWSKY:  Okay.

14               THE COURT:  So that's all clear.

15               Okay.  All right.

16               Thank you very much.  You were very

17    helpful.

18               MR. WILAMOWSKY:  Thank you, Your

19    Honor.

20               MR. JACKSON:  Thank you, Your Honor.

21               THE CLERK:  All rise.

22               (Court was recessed at 12:35 p.m.)

23

24
```

```
1    State of Delaware    )
                          )
2    New Castle County    )

3

4

5                    CERTIFICATE OF REPORTER

6

7            I, Heather M. Triozzi, Registered

8    Professional Reporter, Certified Shorthand

9    Reporter, and Notary Public, do hereby certify

10   that the foregoing record, Pages 1 to 61

11   inclusive, is a true and accurate transcript of

12   my stenographic notes taken on October 16, 2008,

13   in the above-captioned matter.

14

15           IN WITNESS WHEREOF, I have hereunto

16   set my hand and seal this 22nd day of October,

17   2008, at Wilmington.

18

19

20           _____

21                    Heather M. Triozzi, RPR, CSR
                      Cert. No. 184-PS
22

23

24
```